UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

FILED

2004 JAN 23  P 3: 48

US DISTRICT COURT
BRIDGEPORT

|  |  |  |
|---|---|---|
| FERRON SHORTER JR.<br>    Plaintiff, | : | |
| | : | |
| | : | CIVIL NO.: 303 CV 0149(WIG) |
| v. | : | |
| | : | |
| HARTFORD FINANCIAL SERVICES GROUP,<br>INC. and MARYANNE RHODES<br>    Defendants. | : | |
| | : | JANUARY 23, 2004 |
| | : | |

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT
### OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56 of this District, Hartford Financial Services Group, Inc. ("The Hartford") respectfully files the following Memorandum of Law in support of its Motion for Summary Judgment. The Hartford moves this Court for the entry of summary judgment as to Counts One through Ten and Count Thirteen of Plaintiff's Amended Complaint dated April 28, 2003 ("Complaint").[1]  Plaintiff's thirteen count Complaint alleges various statutory and common law claims arising out of the termination of his employment with The Hartford on January 23, 2002.

Counts One through Ten allege the following causes of action against The Hartford: 1) sexual harassment in violation of Title VII; 2) race and sex discrimination in violation of Title VII; 3) violation of 42 U.S.C. § 1981; 4) retaliation in violation of Title VII; 5) retaliation under 42 U.S.C. § 1981; 6) race and sex discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"); 7) retaliation in violation of CFEPA; 8) intentional

---

[1]  Counts Eleven and Twelve allege claims against Defendant Maryanne Rhodes.

1

infliction of emotional distress; 9) negligent infliction of emotional distress and 10) breach of implied covenant of good faith and fair dealing. Count Thirteen alleges a common law claim for invasion of privacy.

I.    FACTUAL BACKGROUND[2]

   A.    Plaintiff's Employment At The Hartford

        Plaintiff commenced employment with The Hartford in 1989 as a data entry clerk. (Deposition of Ferron Shorter, Vol. I, p. 109; hereinafter referenced as "Pl. Dep. Vol. I, p. __.")[3] At the time of Plaintiff's discharge on January 23, 2002, he was employed as a Developer. (Pl. Dep. Vol. I, p. 110.) Plaintiff worked in The Hartford's actuarial specialty department. (Pl. Dep. Vol. I, p. 115.)

   B.    Plaintiff's Relationship With Maryanne Rhodes

        Plaintiff first met Maryanne Rhodes in the fall of 2000. In February 2001, Plaintiff and Ms. Rhodes developed a personal friendship and, in June 2001, they commenced a romantic relationship. (Pl. Dep. Vol. I, pp. 108, 116.) At the time, Ms. Rhodes was employed with The Hartford as an accountant in The Hartford's Internal Audit Department. (Cmplt., ¶ 18.) Ms. Rhodes and Plaintiff did not work together. (Pl. Dep. Vol. I, p. 106.)

        From about November 11, 2001 to December 16, 2001, Plaintiff and Ms. Rhodes lived in Ms. Rhodes' apartment together. After about one month, Plaintiff moved out of Ms. Rhodes' apartment. (Pl. Dep. Vol. I, pp. 119, 124-26.) After he moved out of her apartment,

---

[2]  Relevant pages from deposition transcripts and other numbered exhibits referenced herein are appended to the Affidavit of Margaret J. Strange ("Strange Aff.") dated January 22, 2004, filed simultaneously herewith. Unpublished decisions cited herein are also attached to the Strange Affidavit.

[3]  A copy of relevant portions of the transcript of Plaintiff's deposition testimony (Volumes I and II) is attached to the Strange Affidavit as Exhibit 1.

Plaintiff and Ms. Rhodes continued to have a tumultuous, on-again, off-again relationship.  In April 2002, Ms. Rhodes informed Plaintiff that she was pregnant with his child.  (Pl. Dep. Vol. I, pp. 221-22; Cmplt., ¶¶ 128-29; 134-35.)  Plaintiff and Ms. Rhodes did not contact each other after July 2002, when Plaintiff obtained a restraining order against Ms. Rhodes.  (Pl. Dep. Vol. I, p. 222.)

      C.    The Hartford's Electronic Communications Policy

During Plaintiff's employment, The Hartford maintained an Electronic Communications Policy ("ECP").[4]  (Deposition of Jennifer Ames, pp. 39, 47-48; hereinafter "Ames Dep., p. __."; Pl. Dep. Vol. II, pp. 54-56.)[5]  The ECP was available to employees online and was e-mailed to employees.  (Ames Dep., pp. 39-40.)  The ECP stated, in pertinent part,

> It is The Hartford's policy to procure and maintain electronic communication systems for purposes of supporting the business objectives of the company.  Personal use that interferes in any way with company business is strictly prohibited. . . . The electronic communications systems to which this policy applies, include, but are not limited to . . . voice mail.  (ECP, Strange Aff., Ex. 2.)

The ECP also described several examples of prohibited conduct including, "access[ing] others' proprietary information . . . even if you are given a password by an authorized person."  (ECP, Strange Aff., Ex. 2.)  The ECP further stated, "Violations of this policy by a company employee, including the first offense, are considered serious and may lead to disciplinary action, up to and including termination of employment."  (ECP, Strange Aff., Ex. 2.)

---

[4] A copy of the ECP is attached to the Strange Affidavit as Exhibit 2.

[5] A copy of relevant portions of the transcript of Jennifer Ames' deposition testimony is attached to the Strange Affidavit as Exhibit 3.

D.    Plaintiff's Termination Of Employment

1.    Maryanne Rhodes' Complaint

At approximately 1:15 pm on the afternoon of Monday, January 21, 2002, Ms. Rhodes contacted Lisa Anderson of The Hartford's Office of Equal Opportunity Development ("EOD"). (Affidavit of Lisa Anderson, ¶ 3; hereinafter "Anderson Aff., ¶ __.") Ms. Anderson was employed with The Hartford as a Human Resources Consultant. Her job duties included responding to charges of discrimination and harassment in the workplace. (Anderson Aff., ¶ 1; Deposition of Lisa Anderson, pp. 6-7; hereinafter referenced as "Anderson Dep., p. __.")[6]

Ms. Rhodes told Ms. Anderson that she and Plaintiff had shared a consensual relationship for about six months and that for approximately two months, they lived together at her apartment.[7]  Ms. Rhodes told Ms. Anderson that at some point during her relationship with Plaintiff, "I had shared my password . . . to allow him to listen to my messages because he was jealous and would accuse me of things." (Rhodes Stmnt., Strange Aff., Ex. 5.)

Ms. Rhodes also told Ms. Anderson that on the previous Friday, January 18, 2002, she flew to Florida to visit a friend.  Ms. Rhodes told Plaintiff that she was going away for the weekend, but lied about where she was going because she did not want Plaintiff to know. (Rhodes Stmnt., Strange Aff., Ex. 5.)  While Ms. Rhodes was in Florida, Plaintiff accessed her voice mail account and changed her password so that she was could not obtain her voice mail

---

[6]  A copy of relevant portions of the transcript of Lisa Anderson's deposition testimony is attached to the Strange Affidavit as Exhibit 4.

[7]  Following her conversation with Ms. Rhodes, Ms. Anderson prepared a written statement summarizing their discussion which Ms. Rhodes signed. (Anderson Aff., ¶ 4; Anderson Dep., pp. 9-10.)  A copy of Ms. Rhodes' written statement is attached to the Strange Affidavit as Exhibit 5.

messages.  As a result, Ms. Rhodes had to contact her supervisor to notify him that she did not

have access to voice mail.  As set forth in Ms. Rhodes' statement,

> I arrived at the airport after 1:00 on Friday afternoon. [Ferron] called me
> on my cell phone and was asking questions about who I was going with,
> and where I was going.  I arrived in Florida around 6:00 pm and tried to
> check voice mail at work but it didn't work.  I called Ferron on his cell
> phone and asked him what he did with my voice mail.  He said, "I'm just
> messing with you."  I hung up and called my boss, Brian Vadney, to tell
> him that my voice mail was messed up and that he should leave message
> for me at the hotel and not voice mail or on my cell phone.  I couldn't
> access my cell phone voice mail either.  Both phones use the same
> password . . . .  Ferron called me on Saturday morning.  I told him that it
> was important that I be able to hear work messages over the weekend.  He
> said, don't worry, there's nothing from your boss.  I told him that I was
> going to Security at work.  He told me something like, that if I did that and
> he lost his job, then he'd have nothing to lose and he would come after
> me.  He called again Sunday and told me that he had been to Security to
> report me.  He then played a message that my friend Liz had left for me on
> my personal cell phone. (Rhodes Stmnt., Strange Aff., Ex. 5.)

Ms. Rhodes also told Ms. Anderson that her relationship with Plaintiff ended in

December 2001 when he moved out of her apartment.  (Rhodes Stmnt., Strange Aff., Ex. 5.)

During their relationship, "Ferron could be very jealous.  He had had a bad temper and would

scream at me.  He has squeezed my arm and it bruised, and he kicked me.  When he moved in,

he told me that he had a gun and he showed it to me."  She told Ms. Anderson that Plaintiff had

threatened her brother and that, on one occasion, her sister-in-law called the police because she

heard Plaintiff screaming at Ms. Rhodes over the phone.  (Rhodes Stmnt., Strange Aff., Ex. 5)

Since her relationship with Plaintiff ended, Ms. Rhodes stated that Plaintiff had

harassed her, that she was frightened of him and that she did not know how to handle the

situation.  (Rhodes Stmnt., Strange Aff., Ex. 5; Anderson Dep., pp. 18-19.)  After hearing Ms.

Rhodes' complaint, Ms. Anderson felt "[i]t was, in my estimation, one of the most outrageous

things I had ever heard, and it was a serious matter. It was a serious violation of company policy." (Anderson Dep., p. 11.)

        2.     <u>The Hartford's Investigation</u>

After her meeting with Ms. Rhodes, Ms. Anderson began to investigate Ms. Rhodes' complaint. First, she attempted to corroborate as much of Ms. Rhodes' statement as possible. (Anderson Aff., ¶ 5.) Ms. Anderson contacted Ms. Rhodes' supervisor, Brian Vadney, who confirmed that Ms. Rhodes had contacted him Friday evening to ask him to leave any messages for her at her hotel since she could not access her voice mail. (Anderson Aff., ¶ 6; Anderson Dep., p. 18.) Ms. Anderson also obtained Ms. Rhodes' flight records to Florida, Ms. Rhodes' voice mail records indicating the number of times her voice mail was accessed and when her password was changed, and building security records which showed that Plaintiff had been at work for a few hours on Saturday morning and that he returned to work for approximately eight minutes that afternoon. (Anderson Aff., ¶ 7; Anderson Dep., p. 17.)

Ms. Anderson also obtained a message which Plaintiff left on the answering machine of a friend of Ms. Rhodes named Scott. The message from Scott's answering machine recorded an obscenity-laced tirade by Plaintiff berating, threatening and screaming at Ms. Rhodes. (Anderson Aff., ¶ 8.) Ms. Rhodes provided this as further corroboration of her complaint against Plaintiff.

Ms. Rhodes' voice mail records indicated that her voice mail was accessed more than 40 times between 3:00 pm on Friday, January 18, 2002 and 1:30 am on Monday, January 21, 2002. The records also indicated that her password was changed at 5:01 pm and 5:18 pm on January 18, 2002 and that her password was changed an additional two times during the weekend. The records also showed that several messages were deleted from Ms. Rhodes' voice

mail. (Anderson Aff., ¶ 9.)  After Plaintiff changed Ms. Rhodes' password on January 18, 2002,

he was the only person who had access to her voicemail account.  (Pl. Dep. Vol. I, 45-46.)

On Tuesday, January 22, 2002, Ms. Anderson notified Jennifer Ames, a human

resources generalist for Plaintiff's department, of Ms. Rhodes' complaint.  (Anderson Aff., ¶ 10;

Ames Dep. pp. 5-6.)  The two agreed that Ms. Rhodes' complaint about Plaintiff's conduct was a

serious matter.  They also agreed that if Plaintiff admitted to accessing Ms. Rhodes' voice mail

and changing her password, it would constitute a serious violation of the ECP.  (Anderson Aff., ¶

10.)

On Wednesday, January 23, 2002, Ms. Anderson contacted Jack Jacewicz,

Director of the Department of Special Investigations ("DSI"), to discuss conducting an

investigation into the matter.  She brought with her Ms. Rhodes' written statement and the

documentation she obtained corroborating Ms. Rhodes' complaint.  (Anderson Aff., ¶ 11;

Anderson Dep., pp. 14-17.)  · Mr. Jacewicz assigned the matter to an Investigator, Richard

Wardell, to investigate.  (Deposition of Richard Wardell, pp. 7-8; hereinafter "Wardell Dep., p.

___.")[8]

> 3.    Plaintiff's Admission That He Violated The Electronic Communications
>        Policy

As part of his investigation, Mr. Wardell interviewed Ms. Rhodes and reviewed

her statement. (Wardell Dep., p. 18.)  In addition to confirming the information in her statement,

Ms. Rhodes told Mr. Wardell that she feared for her personal safety.  (Wardell Dep., p. 19.)

---

[8]  A copy of relevant portions of the transcript of Richard Wardell's deposition testimony is attached to the Strange
Affidavit as Exhibit 6.

Mr. Wardell also interviewed Plaintiff and obtained a written statement from him.[9] Plaintiff admitted to Mr. Wardell that he accessed Ms. Rhodes' voice mail ten to fifteen times over the weekend and that he changed her password twice. (Pl. Stmnt, Strange Aff., Ex. 7.) Plaintiff claimed that he did this to attempt to catch Ms. Rhodes in a lie. As set forth in Plaintiff's statement, on January 18, 2002,

> I checked her voice mail at work . . . . I found out from a message from a Rich that was on her Hartford's voice mail that she was in Florida. . . . I knew she lied again, so I changed her Hartford voice mail code before I spoke to her again. I just went into the administrative function of the voice mail system and changed it . . . . I changed this code because I didn't want her to delete it before I played it back to her. (Pl. Stmnt, Strange Aff., Ex. 7.)

Plaintiff also admitted that he accessed Ms. Rhodes' voice mail on Saturday from his work station. Plaintiff denied threatening Ms. Rhodes and stated that she had nothing to fear because he had no criminal convictions. (Pl. Stmnt, Strange Aff., Ex. 7.)

As part of his investigation, Mr. Wardell requested a criminal background check on Plaintiff and obtained Plaintiff's email messages from his computer. (Wardell Dep., pp. 30-31.) Mr. Wardell obtained a criminal conviction report which indicated that Plaintiff had two criminal convictions – one in 1990 for breach of the peace and one in 1996 for threatening.[10] Mr. Wardell also obtained an email message Plaintiff sent Ms. Rhodes on the morning of January 18, 2002. In his email, Plaintiff referred to himself as a "real jealous type of dude" and stated, "Remember this nigga won't forget about you right away!"[11]

---

[9] A copy of Plaintiff's written statement is attached to the Strange Affidavit as Exhibit 7.

[10] A copy of the criminal conviction report Mr. Wardell obtained is attached to the Strange Affidavit as Exhibit 8.

[11] A copy of Plaintiff's email of January 18, 2002 to Maryanne Rhodes is attached to the Strange Affidavit as Exhibit 9.

4.    Plaintiff's Termination Of Employment

Following Plaintiff's admission that he accessed Ms. Rhodes voice mail and changed her password, Ms. Anderson met with Ms. Ames and they concluded that Plaintiff's conduct warranted his termination. (Anderson Aff., ¶ 12; Anderson Dep., pp. 20-22, 67, 75-76; Ames Dep. pp. 40-41, 50-52.)  Plaintiff was terminated for violating The Hartford's ECP by accessing Ms. Rhodes' voice mail and changing her password so that she could not access her voice mail account.  Also of concern to Ms. Ames was Plaintiff's statement that he did not have any criminal convictions and the email he sent to Ms. Rhodes on the morning of January 18, 2002. (Ames Dep., p. 52.)

In making the determination to discharge Plaintiff, Ms. Anderson and Ms. Ames relied on the documentation obtained during The Hartford's investigation and on Plaintiff's admission that he violated company policy.  (Anderson Dep., p. 76; Ames Dep. pp. 42-43.)  As Ms. Ames stated, "We concluded that Mr. Shorter would be terminated for the violation. . . . Accessing voicemail, changing voicemail password, preventing Ms. Rhodes from accessing work-related materials and work systems."  (Ames Dep. pp. 51-52.)[12]  Ms. Ames considered Plaintiff's conduct to constitute "a serious violation of the electronic communications policy."  (Ames Dep., p. 43.)  Ms. Anderson and Ms. Ames made their decision with input from Mr. Wardell.  (Ames Dep., p. 40.)

---

[12]    Ms. Anderson testified, "The conduct that he admitted that led to his termination was not accessing the voicemail, but changing the password so that Maryanne could not access her work-related messages and then just having his way with that account . . . ."  (Anderson Dep., p. 76.)  Based on the information obtained during The Hartford's investigation, including, but not limited to, Ms. Rhodes' statement, Plaintiff's email to Ms. Rhodes on January 18, 2002 and the message Plaintiff left for Ms. Rhodes' friend Scott, Ms. Anderson was also concerned about a potential threat of violence in the workplace.  (Anderson Dep., pp. 35-36, 68-69.)

After meeting with Ms. Anderson, Ms. Ames met with Plaintiff and notified him that his employment was terminated. (Ames Dep., p. 9.) She told him that "he was terminated for violating The Hartford's electronic communications policy." (Ames Dep., pp. 10-11.) During their meeting, Ms. Ames told Plaintiff that he was not allowed to go back to his desk. Ms. Ames obtained Plaintiff's personal items for him and Plaintiff was escorted out of the building by a security officer. (Ames Dep., p. 12.)

E.    Discipline Of Maryanne Rhodes

As a result of The Hartford's investigation, Ms. Rhodes was also disciplined for violating the ECP by giving her voicemail password to Plaintiff. Ms. Anderson recommended to Ms. Rhodes human resources generalist, Sharon Courey, that Ms. Rhodes receive a written warning.[13] (Anderson Dep., pp. 63-65.) While Ms. Rhodes violated The Hartford's ECP, her violation in disclosing her password was not as serious as Plaintiff's conduct in accessing her voice mail account and changing the password so that she could not access her voice mail messages. Ms. Anderson determined that Ms. Rhodes' conduct did not warrant her termination. (Anderson Dep., pp 65-66, 69.)

II.    ANALYSIS

A.    Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that a party is entitled to summary judgment if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported

---

[13] A copy of Ms. Rhodes' written warning is attached to the Strange Affidavit as Exhibit 10.

motion for summary judgment; its requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (citations omitted; emphasis in original). For purposes of Rule 56, a fact is "material" if it "might affect the outcome of the suit under the governing law." Id. at 248. An issue of fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50. Once "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

B. The Hartford Is Entitled To Judgment As A Matter Of Law On Count One Alleging Hostile Work Environment Sexual Harassment Because Plaintiff Cannot Show That He Was Harassed Due To His Sex

In Count One, Plaintiff alleges that he experienced a sexually hostile work environment in violation of Title VII. (Cmplt., ¶¶ 33, 50-52.) In support of his claim, Plaintiff testified that Ms. Rhodes harassed him by repeatedly coming to his desk, staring at him, and forcing him to go for walks with her. He also testified that Ms. Rhodes called him excessively at work and left him long voice mail messages. (Pl. Dep. Vol. I, pp. 125-28, 138-139; 186-90; Pl. Dep. Vol. II, pp. 29-30.) Ms. Rhodes' alleged harassment of Plaintiff commenced after the

11

termination of their relationship in December 2001 and continued until the week of January 14, 2002 to January 18, 2002. (Pl. Dep. Vol. I, p. 128; Cmplt., ¶¶ 33, 50.)

The Hartford is entitled to judgment on Plaintiff's claim of sexual harassment because: 1) the undisputed evidence shows that Ms. Rhodes' alleged conduct was not motivated by Plaintiff's sex; 2) none of Ms. Rhodes' alleged conduct was sex-based; and 3) Ms. Rhodes' alleged conduct does not, as a matter of law, rise to the level of severe and pervasive necessary to establish liability under Title VII.

     1.    <u>Plaintiff Cannot Prevail On His Claim Of Sexual Harassment Because Ms. Rhodes' Alleged Conduct Was Motivated By Her Relationship With Plaintiff, Not His Sex</u>

Plaintiff's claim of sexual harassment fails because the undisputed evidence establishes that Ms. Rhodes' alleged conduct was motivated, not by Plaintiff's sex, but by her desire to resume their romantic relationship. In January 2002, Plaintiff testified that Ms. Rhodes told him that she came to his desk to visit him and talk to him because she loved him. (Pl. Dep. Vol. I, p. 151.) Plaintiff also testified that he believed that Ms. Rhodes called him and visited his desk because "she still was trying to get me to see her side to work out the relationship. . . . [S]he wanted to make attempts to resume the relationship." (Pl. Dep. Vol. II, p. 21.) In fact, every time Ms. Rhodes called Plaintiff or came to his desk after he moved out of her apartment in December, 2001, she talked about resuming their relationship. (Pl. Dep. Vol. II, pp. 21-22.)

Plaintiff's evidence does not, as a matter of law, support liability for sexual harassment under Title VII. To prevail on a claim of sexual harassment, Plaintiff cannot rely on conduct arising out of his failed romantic relationship with Ms. Rhodes. To the contrary, Plaintiff's testimony that Ms. Rhodes' alleged harassment was motivated by the termination of their romantic relationship, not by his sex, is fatal to his claim in Count One. <u>See</u> <u>Succar v.</u>

Dade County School Bd., 229 F.3d 1343, 1345 (11th Cir. 2000)(alleged harassment was not actionable where it was motivated, not by plaintiff's gender, but by ill will following termination of his sexual relationship with alleged harasser; under such circumstances, plaintiff's gender "was merely coincidental"); DeCintio v. Westchester County Med. Ctr., 807 F.2d 304, 306-07 (2d Cir. 1986) (Title VII proscribes conduct "based on a person's sex, not on his or her sexual affiliations."); Grandquest v. Mobile Pulley & Machine Works, Inc., 163 F. Supp. 2d 1338, 1348 (S.D. Ala. 2001)(alleged harassment based on uninvited conversations with plaintiff and visits to her desk following failed romantic relationship not actionable under Title VII because conduct was not motivated by her sex); Perez v. MCI World Com Communications, 154 F. Supp. 2d 932, 942 (N.D. Tex. 2001)("the mere fact that two co-workers had an 'affair gone wrong' does in itself turn sex-neutral harassment into harassment based on sex."). Thus, in the absence of evidence that Ms. Rhodes' conduct was motivated by Plaintiff's sex rather than by their failed relationship, The Hartford is entitled to judgment as a matter of law as to Count One.

    2.    Plaintiff Cannot Prevail On His Claim Of Sexual Harassment Because There Is No Evidence Of Harassing Conduct Related To His Sex

The Hartford is also entitled to judgment as to Count One because there is no evidence that Ms. Rhodes' alleged harassing conduct was related to Plaintiff's sex. To prevail on a claim of sexual harassment, it is axiomatic that a plaintiff "must produce evidence that []he was discriminated against because of [his sex]." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 440 (2d Cir. 1999). Such "sex-related" conduct "is a fundamental and necessary element of a hostile environment claim under Title VII." Hill v. Pinkerton Security & Investigation Servs., Inc., 977 F. Supp. 148, 158 (D. Conn. 1997). As the Second Circuit has noted,

> Everyone can be characterized by sex, race, ethnicity or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002).

The incidents on which Plaintiff bases his hostile work environment claim are facially neutral and devoid of sex-based discriminatory animus. There is nothing remotely discriminatory in Plaintiff's allegations that Ms. Rhodes repeatedly came to his desk, stared at him, forced him to go for walks with her, called him excessively at work and left him long voice mail messages. This alleged conduct of Ms. Rhodes, while annoying, irritating or bothersome, lacks the sex-based component necessary to support liability for a sexually hostile work environment actionable under Title VII.

As a result, Plaintiff cannot meet his burden of presenting evidence that a "hostile environment was created by . . . sex-related conduct on the part of the defendant." Hill, 977 F. Supp. at 157. Courts in the Second Circuit "have consistently dismissed sexual harassment and gender discrimination claims when the alleged harassment did not relate to the plaintiff's gender." Carrasco v. Lenox Hill Hosp., No. 99 Civ. 924 (AGS), 2000 U.S. Dist. LEXIS 5637, *24 (S.D.N.Y. April 27, 2000) (rejecting non-sexual allegations as basis for sexual harassment claim). See Galdieri-Ambrosini v. National Realty & Dev. Corp, 136 F.3d 276, 290-91 (2d Cir. 1998) (rejecting sexual harassment claim because plaintiff did not establish that the complained of working conditions were based on her sex); Ortega v. New York City Off-Track Betting Corp., No. 97 Civ. 7582 (KMW), 1999 U.S. Dist. LEXIS 7948, *10-11 (S.D.N.Y. May 27, 1999) (dismissing hostile work environment claim where facts failed to establish that defendant's

14

actions "created an atmosphere that was abusive or hostile because of plaintiff's race, ethnicity or sex -- i.e., that the alleged hostile environment was created by race-related, ethnicity-related, or sex-related conduct on the part of the defendant"); Phillips v. Merchants Ins. Corp., 3 F. Supp. 2d 204, 208 (N.D.N.Y. 1998) (supervisor's comments, while offensive, were more hostile and angry than sexual, and behavior that is immature, nasty, or annoying, without more, is not actionable as sexual harassment); Ketchum v. Agway Energy Products, 988 F. Supp. 610, 616 (N.D.N.Y. 1997)(dismissing sexual harassment claim based on conduct which may have been nasty but was not sexual in nature); Johnson v. Tower Air, 149 F.R.D. 461, 469 (E.D.N.Y. 1993) (dismissing plaintiff's hostile work environment sexual harassment claim where offensive comments were hostile and angry, but not sexual); Porras v. Montefiore Medical Ctr., 742 F. Supp. 120, 126-27 (S.D.N.Y. 1990)("[u]nfair, overbearing, or annoying treatment of an employee, standing alone, cannot constitute a Title VII sex discrimination claim"); Fair v. Guiding Eyes for Blind, Inc., 742 F. Supp. 151, 156 (S.D.N.Y. 1990) (dismissing sexual harassment claim where alleged harassment was not "based on her sex"). See also Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994), cert. denied, 516 U.S. 826 (1995)("General harassment if not . . . sexual is not actionable."). In the absence of conduct overtly based on his sex, Plaintiff cannot prevail on his claim that he experienced a sexually hostile work environment.

Consequently, the alleged conduct of Ms. Rhodes, which was not sexual in nature, cannot give rise to liability for sexual harassment under Title VII and Count One should be dismissed.

3.    Plaintiff's Claim Fails Because He Cannot Establish The Existence Of A Hostile Or Abusive Work Environment

Count One should also be dismissed because Plaintiff's claim fails, as a matter of law, to establish the existence of a hostile or abusive work environment. To sustain a hostile work environment claim under Title VII, Plaintiff must establish that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2nd Cir. 1997)(citations omitted). To determine whether a work environment is sufficiently hostile or abusive to support liability under Title VII, courts examine all the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, (1993). "In order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." Tomka v. Seiler Corp., 66 F.3d 1295, 1306 n.5 (2d Cir. 1995). The alleged harassing conduct "must be extreme to amount to a change in terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

An "objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (emphasis added). To satisfy the objective component of the analysis, the conduct must be offensive or pervasive enough to create an environment that a reasonable person would find hostile or abusive. Torres v. Pisano, 116 F.3d 625, 631 (2nd Cir.), cert. denied, 522 U.S. 997 (1997). In evaluating claims of hostile work environment harassment, courts must keep in mind that Title VII "is not a general civility code."

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (citation omitted; internal quotations omitted). While Ms. Rhodes' alleged conduct may have been annoying, irritating or bothersome, it simply did rise to the level of actionable harassment under Title VII.

Courts have routinely found conduct far more egregious than that alleged here to be insufficient to create a hostile work environment. See Alfano, 294 F.3d at 376 (holding that twelve alleged incidents of harassment over a four year period were insufficient as a matter of law to create a hostile work environment); Williams v. Westchester, 171 F.3d 98, 100-01 (2d Cir. 1999)(setting aside verdict for plaintiff on his hostile work environment claim because his subjective feeling that he was uncomfortable about his work environment were insufficient to create hostile work environment); Hunter v. St. Francis Hosp., 281 F. Supp. 2d 534, 549 (E.D.N.Y 2003) (holding that poor evaluations, disciplinary action, denial of Plaintiff's vacation request, denial of bonuses and pay increases, excessive amounts of work and the requirement that Plaintiff document his work assignments were insufficient to support hostile work environment claim); Johnson, 149 F.R.D. at 470 (supervisor sitting on plaintiff's desk, using her phone, casually touching her and placing his hand on her thigh insufficient to establish hostile work environment); Trotta v. Mobil Oil Corp., 788 F. Supp. 1336, 1342, 1350 (S.D.N.Y. 1992)(strippers and offensive slides at company functions insufficient to establish prima facie case of hostile work environment); Fair, 742 F. Supp. at 155-56 (rejecting as insufficient repeated and uninvited conversations on sexual matters by plaintiff's supervisor).

Plaintiff's hostile environment claim is, in essence, an improper attempt to convert Title VII into a general civility code. See Oncale, 523 U.S. at 81. Plaintiff's claim is based on nothing more than his belief that Ms. Rhodes should have left him alone and not bothered him when he wanted to terminate their relationship. In essence, Plaintiff seeks to hold The Hartford

liable for conduct resulting from the break-up of his relationship with Ms. Rhodes. Plaintiff admitted, for instance, that the conduct he found harassing in December 2001 and January 2002, also occurred while he was dating Ms. Rhodes in September and October 2001. Plaintiff did not, however, find Ms. Rhodes' alleged conduct harassing at that time. (Pl. Dep. Vol. I, pp. 122-24, 129-30.) The Court should reject Plaintiff's attempt to transform conduct arising out of his break-up with Ms. Rhodes into liability under Title VII.

Accordingly, as Plaintiff cannot establish the existence of conduct sufficiently severe or pervasive to alter the terms and conditions of his employment, The Hartford is entitled to judgment as a matter of law and Count One should be dismissed.

C.    The Hartford Is Entitled To Judgment As A Matter Of Law On Counts Two And Six Alleging Race And Sex Discrimination Because Plaintiff Cannot Show That He Was Terminated Due To His Race Or Sex

In Counts Two and Six, Plaintiff alleges that he was terminated based on his race and sex in violation of Title VII and Conn. Gen. Stat. § 46a-60. In support of his claim, Plaintiff testified that The Hartford "viewed me as a black criminal based on what their white female employee falsely said to them about me." (Pl. Dep. Vol. I, p. 34.) His claim is based on "[t]he difference of treatment between Ms. Rhodes and myself." (Pl. Dep. Vol. I, p. 40.)

1.    Plaintiff Must First Establish A Prima Facie Case Of Discrimination

To prevail on his claims of race or sex discrimination, Plaintiff must allege: 1) membership in a protected class; 2) qualification for the position; 3) an adverse employment action; and 4) the existence of circumstances giving rise to an inference of discrimination based on his race and/or sex. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000); Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997), cert. denied, 522 U.S. 1075 (1998); McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997). The burden then shifts to

18

The Hartford to produce a legitimate, nondiscriminatory reason for the adverse employment action. Sanderson, 530 U.S. at 142 (citation omitted). Once The Hartford meets its burden of production, Plaintiff must demonstrate that the legitimate reasons offered by The Hartford were not its true reasons, but were merely a pretext for impermissible discrimination. Sanderson, 530 U.S. at 143 (citation omitted).

Plaintiff cannot avoid summary judgment "through reliance on unsupported assertions," but "must come forward with evidence that would be sufficient to support a jury verdict in [his] favor." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). "[T]o defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997).

Plaintiff cannot establish a prima facie case of sex or race discrimination because he cannot show that his employment was terminated under circumstances giving rise to an inference of discriminatory intent. There is no evidence in this case of any comments, incidents, statements or actions that indicate ill will or animus towards Plaintiff based on his race or sex. Nor can Plaintiff point to a white or female employee who engaged in the same or similar conduct in violation of the ECP, but who was not terminated.

The lack of any race or sex-related conduct supporting his claims, coupled with Plaintiff's conclusory allegations of discrimination, is insufficient to support an inference of discrimination under the McDonnell Douglas burden shifting framework. In essence, Plaintiff asserts that he was terminated, that he is a member of a protected class and that, therefore, the Court should conclude that he was discriminated against. This is insufficient to avoid summary

19

judgment. See Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001) (affirming summary judgment finding, "Plaintiff have done little more that cite to their mistreatment and ask the court to conclude that it must have been related to their race. This is not sufficient.").

In support of his discrimination claim, Plaintiff simply believes that he was treated differently than a similarly situated white, female employee, Ms. Rhodes. Although an inference of discrimination may be drawn from evidence showing that an employer treated a plaintiff less favorably than another employee outside the protected class, before such an inference is permissible, a plaintiff must first show that he is similarly situated to the other employee in "all material respects." Hunter, 281 F. Supp. 2d at 542 (citing Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994); Shumway v. United Parcel Serv. Inc., 118 F.3d 60, 63 (2d Cir. 1997)).

Plaintiff cannot meet his burden of establishing that he was similarly situated to Ms. Rhodes. There is no genuine issue of material fact that Plaintiff's violation of ECP was different in nature and scope than Ms. Rhodes' violation of the ECP. It is also undisputed that Ms. Anderson and Ms. Ames concluded that Plaintiff's admitted violation of the ECP was more serious than Ms. Rhodes' violation of the ECP. (Anderson Dep., p. 69.) This conclusion is fully supported by the evidence in the record. Clearly, Ms. Rhodes' conduct in giving her password to her boyfriend, Plaintiff, was a different violation of the ECP than Plaintiff's changing Ms. Rhodes' password so that she could not access her voice mail and deleting messages. It is also undisputed that Ms. Rhodes was disciplined for her violation of company policy. (Anderson Dep. pp. 63-65.) Thus, as Plaintiff was not similarly situated to Ms. Rhodes, evidence regarding The Hartford's treatment of her cannot support his allegations of discrimination.

2.    There Is No Evidence That The Hartford's Reason For Plaintiff's Termination Was A Pretext For Discrimination

Even if Plaintiff's evidence were sufficient to establish a prima facie case of discrimination, The Hartford is entitled to summary judgment because he cannot show that The Hartford's reason for terminating his employment, violations of the ECP, was a pretext for discrimination. It is undisputed that Plaintiff violated the ECP by accessing Plaintiff's voice mail account and changing her password. In addition to his written statement in which he admitted to the conduct, Plaintiff testified at his deposition that he accessed Ms. Rhodes' voice mail and changed her password without her authorization. (Pl. Dep. pp. 42, 44-46, 96.) Plaintiff also admitted that he knew his conduct was inappropriate and that it could result in his termination. (Pl. Dep. Vol. I, pp. 98-99.)

It is also well-established that Plaintiff cannot create a material issue of fact by challenging The Hartford's business judgment. It is not the role of this Court to review or second guess the fairness or merit of a company's personnel decisions. See Scaria v. Rubin, 117 F.3d 652, 655 (2d Cir. 1997). The undisputed evidence establishes that Plaintiff engaged in the conduct which led to his termination. The Hartford conducted a thorough investigation into Ms. Rhodes' complaint to Ms. Anderson. During the course of that investigation, Plaintiff admitted to violating the ECP by accessing Ms. Rhodes's voice mail and changing her password. Plaintiff cannot avoid the consequences of his conduct by challenging the fairness of The Hartford's decision.

D.    The Hartford Is Entitled To Judgment As A Matter Of Law On Counts Four And Seven Alleging Retaliation Because Plaintiff Did Not Experience An Adverse Employment Action Based On Protected Activity

In Counts Four and Seven, Plaintiff claims that The Hartford retaliated against him in violation of Title VII and Conn. Gen. Stat. § 46a-60(a)(4) when an employee of The Hartford, Bob Begley, threatened to have him arrested in April 2002. (Pl. Dep. Vol. II, pp. 39-41; Cmplt., ¶¶ 130, 138.) According to Plaintiff, Begley contacted him on or about April 9, 2002 and falsely accused him of calling Ms. Rhodes at work. Mr. Begley also threatened to have Plaintiff arrested if he did not stop calling Ms. Rhodes. Plaintiff was not arrested and Mr. Begley did not contact Plaintiff again. Plaintiff testified that Mr. Begley's threat was in response to letters submitted by his attorney to The Hartford in which she complained that Plaintiff was discriminated against. (Pl. Dep. Vol. II, pp. 41-43; Cmplt., ¶¶ 130, 138.) Plaintiff's retaliation claim is premised on two letters his counsel sent to The Hartford in January and February 2002. (Pl. Dep. Vol. II, p. 42, Cmplt., ¶ 137.)

To prevail on his claim of retaliation, Plaintiff must first establish a prima facie case by showing: 1) participation in a protected activity known to the employer; 2) an employment action disadvantaging him; and 3) a causal connection between the protected activity and the adverse employment action. Quinn v. Greentree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998). Under Title VII, protected activity consists of opposition to an "unlawful employment practice." 42 U.S.C. § 2000e-3(a). See Conn. Gen. Stat. § 46a-60(a)(4) (limiting retaliation to opposition to a "discriminatory employment practice"). An adverse employment action includes conduct "injurious to current employment or the ability to secure future employment." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997); Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881, 891 (7th Cir. 1996).

22

Counts Four and Seven should be dismissed because Plaintiff cannot establish the essential elements of a claim for retaliation. First, with respect to the second prong of Plaintiff's prima facie case, there is no evidence that Plaintiff experienced an adverse employment action. Plaintiff's claim that Mr. Begley threatened to have him arrested in April 2002 does not implicate either his employment at The Hartford (because Plaintiff already had been terminated) or his ability to secure future employment. Thus, there is no evidence that Mr. Begley's alleged threat constituted an adverse employment action for purposes of Title VII or CFEPA.

Plaintiff's claim also fails because he cannot establish the existence of any causal connection between his attorney's alleged complaints to The Hartford and Mr. Begley's threat to have him arrested. The undisputed evidence is that when Mr. Begley contacted Plaintiff in April 2002, he was unaware of any correspondence sent by Attorney Baird to Jennifer Ames, The Hartford's Legal Department or any other individual at The Hartford. (Affidavit of Robert Begley, ¶ 6.) Thus, Plaintiff cannot establish a causal connection between his attorney's letters to The Hartford and Mr. Begley's alleged threat to have him arrested.[14]

Based on the foregoing, Plaintiff cannot, as a matter of law, prevail on his claims of retaliation. Consequently, Counts Four and Seven of the Complaint should be dismissed.

---

[14] Plaintiff's own testimony confirms his failure of proof on this issue. Plaintiff testified that Mr. Begley threatened to have him arrested, not because of Attorney Baird's letters to The Hartford, but rather, "for calling [Ms. Rhodes], and if I did not stop calling her." (Pl. Dep. Vol. I, pp. 39-40, 43; Cmplt, ¶ 130.) Thus, Plaintiff's own testimony contradicts his claim that Mr. Begley called him to retaliate for the letters Plaintiff's counsel sent to The Hartford following Plaintiff's discharge.

23

E.    The Hartford Is Entitled To Judgment As A Matter Of Law On Counts Three And Five Alleging Violations Of 42 U.S.C. § 1981 Because Plaintiff Cannot Prevail On His Claim Of Race Discrimination Or Retaliation

Counts Three and Five allege claims against The Hartford under 42 U.S.C. § 1981.[15]  Count Three alleges that The Hartford violated 42 U.S.C. § 1981 by discharging Plaintiff based on his race in violation of his employment contract. (Cmplt., ¶ 108.)  Count Five alleges that The Hartford violated 42 U.S.C. § 1981 by retaliating against Plaintiff when Mr. Begley threatened to have him arrested if he did not stop calling Ms. Rhodes at work.  (Cmplt., ¶¶ 130, 138, 140.)  Counts Three and Five should be dismissed because Plaintiff cannot prevail, as a matter of law, on his claims under 42 U.S.C. § 1981.

To prevail on his claims under 42 U.S.C. § 1981, Plaintiff must prove: 1) that he is a member of a racial minority; 2) that the defendant intended to discriminate against him based on his race; and 3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.).  Mian v. Donaldson, Lufkin & Jenrette Sec., 7 F.3d 1085, 1087 (2d Cir. 1993).  Plaintiff must prove "that similarly situated individuals have been treated differently, not that they would be treated differently."  Boomer v. Bruno, 134 F. Supp. 2d 262, 269 (N.D.N.Y. 2001).

1.    Count Three Should Be Dismissed Because Plaintiff Cannot Establish That He Was Terminated Due To His Race

Count Three should be dismissed for the same reasons Plaintiff's discrimination claims under Title VII and CFEPA should be dismissed.  As set forth in Section II.C. above, there is no evidence that Plaintiff was terminated due to his race or that he was treated differently

---

[15]  42 U.S.C. § 1981 provides, in pertinent part, "All persons . . . shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the fully and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."

than Ms. Rhodes because of his race. Nor is there an issue of fact that Plaintiff violated the ECP by accessing Ms. Rhodes' voice mail and changing her password.

    2.    <u>Count Five Should Be Dismissed Because Plaintiff Cannot Prevail On His Claim Of Retaliation</u>

Plaintiff's retaliation claim in Count Five should be dismissed for the same reasons Plaintiff's retaliation claims under Title VII and CFEPA should be dismissed. As set forth in Section II.D. above, Plaintiff cannot establish that he experienced an adverse employment action because he engaged in protected activity or that there existed a causal relationship between the two.

Plaintiff's claim of retaliation in Count Five should also be dismissed for several additional reasons. First, Mr. Begley's alleged threat to have Plaintiff arrested does not concern any of the activities enumerated in 42 U.S.C. § 1981. <u>See</u> <u>Mian</u>, 7 F.3d at 1087. The statute prohibits racial discrimination in making and enforcing contracts, accessing the court system and giving evidence. It also guarantees to all persons the full and equal benefit "of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981. Mr. Begley's alleged conduct in threatening to have Plaintiff arrested is not enumerated in the statute and does not state a claim under 42 U.S.C. § 1981. <u>See</u> 42 U.S.C. §§ 1981(a) and (b).

Moreover, Plaintiff alleges that Mr. Begley threatened to have him arrested in April 2002, approximately four months after his termination of employment. To prevail on his claim under 42 U.S.C. § 1981, Plaintiff must first establish the existence of an employment relationship on which to base The Hartford's alleged breach of contract in violation of the statute. <u>See</u> <u>Lauture v. I.B.M. Corp.</u>, 216 F.3d 258, 259-60 (2d Cir. 2000) (recognizing that an

at-will employee may sue for breach of employment contract under 42 U.S.C. § 1981); Mian, 7

F.3d at 1087 (a claim under 42 U.S.C. § 1981 must concern one of the activities enumerated in

the statute). Upon his termination in January 2002, Plaintiff no longer had an at-will contract of

employment with The Hartford, and thus, he cannot establish retaliation in violation of that

contract in April 2002.

F.    <u>The Hartford Is Entitled To Judgment As A Matter Of Law On Count Eight
      Alleging Intentional Infliction Of Emotional Distress Because Plaintiff Cannot
      Establish The Existence Of Extreme And Outrageous Conduct</u>

In Count Eight, Plaintiff alleges a claim for intentional infliction of emotional

distress. Plaintiff bases his claim on "[t]he way I was treated on the final day of my employment

at The Hartford." (Pl. Dep. Vol. I, p. 44.) In support of his claim, Plaintiff testified that 1) on

January 23, 2002, Mr. Wardell interrupted Plaintiff's conversation with a co-worker to request a

meeting with Plaintiff; 2) Plaintiff was refused an opportunity to go to his desk to retrieve his

possessions after he was terminated; 3) Plaintiff was forced to wait approximately 30 minutes

while his personal items were retrieved from his work station; and 4) he was physically escorted

from the building by a security officer. (Pl. Dep. Vol. I, pp. 196-97; 209-14; Pl. Dep. Vol. II, p.

47; Cmplt., ¶¶ 73, 146-147.) Count Eight should be dismissed because Plaintiff cannot establish

facts showing that The Hartford engaged in extreme and outrageous conduct.

In <u>Appleton v. Bd. of Education of the Town of Stonington</u>, 254 Conn. 205

(2000), the Connecticut Supreme Court affirmed the critical elements that must be alleged and

established to prevail under the theory of intentional infliction of emotional distress:

> It must be shown: (1) that the actor intended to inflict emotional distress or
> that he knew or should have known that emotional distress was the likely
> result of his conduct; (2) that the conduct was extreme and outrageous; (3)
> that the defendant's conduct was the cause of the plaintiff's distress; and
> (4) that the emotional distress sustained by the plaintiff was severe.

26

(Internal quotation marks omitted.) <u>Petyan v. Ellis</u>, 200 Conn. 243, 253, 510 A.2d 1337 (1986).

Liability for intentional infliction of emotional distress requires conduct that exceeds 'all bounds usually tolerated by decent society . . . .' <u>Petyan v. Ellis</u>, <u>supra</u>, 200 Conn. 254 n.5, quoting W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 12, p. 60.

<u>Appleton</u>, 254 Conn. at 210-11.

Whether a defendant's conduct satisfies the extreme and outrageous standard is initially a question for the court to determine.  <u>Appleton</u>, 254 Conn. at 211.  Only where reasonable minds disagree does it become an issue for the jury.  <u>Id.</u>

In <u>Appleton</u>, the Court affirmed that extreme and outrageous conduct can only be found:

> where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!". . .  Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress.

<u>Appleton</u>, 254 Conn. at 211 (citations omitted; internal quotations omitted).

In <u>Appleton</u>, the plaintiff was a teacher who alleged that her school principal "made condescending comments" to her in front of her fellow colleagues questioning her vision and ability to read; telephoned the plaintiff's daughter, representing that the plaintiff had been acting "differently" and should take a few days off from work; and telephoned the police, who came to the school and escorted the plaintiff out of the building to her car. The plaintiff also asserted in her affidavit that she was subjected to two psychiatric examinations at the request of

27

the board, and that she was forced to take a suspension and a leave of absence and, ultimately, forced to resign. Appleton, 254 Conn. at 211.

The Connecticut Supreme Court held that even conduct of that magnitude did not rise to the level of "extreme and outrageous" necessary to support a claim of intentional infliction.

> These occurrences may very well have been distressing and hurtful to the plaintiff. They do not, however, constitute extreme and outrageous conduct within the meaning of the precedents to which we referred previously. In fact, this court has noted that "it is not patently unreasonable for an employer to remove a discharged employee from its premises under a security escort." Parsons v. United Technologies Corp., 243 Conn. 66, 89, 700 A.2d 655 (1997) (upholding trial court's granting of motion to strike claim for negligent infliction of emotional distress based on circumstances of employee's termination where employee escorted out of building by security after termination); see also Toth v. Square D Co., 712 F. Sup. 1231, 1238 (D.S.C. 1989) (holding that it was not unreasonable for employer to escort former employee off of premises after termination and that such action did not provide basis for claim of intentional infliction of emotional distress). As the defendants' actions in the present case were not so atrocious as to exceed all bounds usually tolerated by decent society, their conduct is insufficient to form the basis of an action for intentional infliction of emotional distress.

Appleton, 254 Conn. at 211-12.

The Hartford's alleged conduct, even if it did occur, is insufficient, as a matter of law, to meet Plaintiff's burden of proving extreme and outrageous conduct. In fact, The Hartford's alleged conduct does not even approach that necessary to support a claim for intentional infliction of emotional distress. See Davis v. Liberty Mutual Ins. Co., 218 F. Supp. 2d 256, 265 (D. Conn. 2002) (allegation that following her discharge, plaintiff was escorted out the building without an opportunity to clean out her desk held insufficient to support claim for intentional infliction of emotional distress); DeLeon v. Little, 981 F. Supp. 728, 737-739 (D.

Conn. 1997)(dismissing intentional infliction claim where supervisor requested that plaintiff purchase drugs and stand guard while the supervisor ingested drugs; required plaintiff to perform personal errands; called plaintiff at home; repeatedly degraded and criticized plaintiff in front of other co-workers; and threatened to terminate plaintiff); Dollard v. Board of Educ., 63 Conn. App. 550, 555 (2001) (plaintiff's allegations that the defendants hypercritically scrutinized every aspect of the plaintiff's work and personal life, publicly admonished her and organized a plan to force her to resign were insufficient to show that defendant's conduct was extreme and outrageous); Daigneault v. Consolidated Controls/Eaton Corp., No. CV 99 0334518, 2002 Conn. Super. LEXIS 2003, *15-16 (Conn. Super Ct. June 11, 2002) (granting summary judgment on plaintiff's intentional infliction of emotional distress claim alleging discriminatory enforcement of workplace rules, withdrawal of plaintiff's opportunity to work overtime, and unwanted shoulder massages and hugs); Rock v. Mott Metallurgical Corp., No. CV 99 0492215 S, 2001 Conn. Super. LEXIS 207, *10-*33 (Conn. Super. Ct. Jan. 10, 2001)(dismissing intentional infliction claim based on allegations that plaintiff was ordered to lift and carry heavy objects that were beyond her capacity; she was insulted by her supervisor; called stupid and lame brained; referred to as an idiot; made the subject of ridicule by being used as an example of a poor employee on a daily basis; was falsely accused of not completing her assigned tasks and screamed at by her supervisor; and told by a co-worker to "f___ herself"); Finucane v. Dandio, No. CV 366182, 1999 Conn. Super. LEXIS 479, *8 (Conn. Super. Ct. Feb. 26, 1999) ("[I]nsults, indignities, threats, annoyances, petty oppressions, or other trivialities,' do not justify a claim of intentional infliction of emotional distress."); Valencia v. St. Francis Hospital., No. CV 538867, 1996 Conn. Super. LEXIS 894 (Conn. Super. Ct. Apr. 2, 1996)(conduct insufficient as a matter

of law to sustain a claim where plaintiff alleged that she was physically and verbally assaulted by her supervisor in front of co-workers and patients).

Based on the foregoing, The Hartford's alleged conduct in interrupting Plaintiff's discussion with a co-worker, refusing to allow him to go to his desk to retrieve his possessions after his termination, and escorting him out the building fail, as a matter of law, to rise to the level of extreme and outrageous conduct. Therefore, The Hartford is entitled to judgment as a matter of law and Count Eight should be dismissed.

G.    The Hartford Is Entitled To Judgment As A Matter Of Law On Count Nine Alleging Negligent Infliction Of Emotional Distress Because Plaintiff Cannot Establish That The Hartford Engaged In Unreasonable Conduct In The Termination Process

Count Nine alleges a claim for negligent infliction of emotional distress against The Hartford. In support of his claim, Plaintiff testified that on January 23, 2002, Ms. Ames informed him that his employment was terminated. Plaintiff then waited approximately 30 minutes while his personal items were retrieved from his work station and he was escorted from the building by a security officer. (Pl. Dep. Vol. I, pp. 196-97; 209-14; Pl. Dep. Vol. II, p. 47; Cmplt., ¶¶ 88, 151.) The Hartford is entitled to judgment as a matter of law as to Count Nine because there is no evidence that The Hartford engaged in unreasonable conduct in the termination process.

Connecticut courts do not recognize claims for negligent infliction of emotional distress based on "conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment." Perodeau v. City of Hartford, 259 Conn. 729, 762-63 (2002) (finding individuals cannot be found liable for negligent infliction of emotional distress based on conduct arising out of the ongoing employment relationship.)

"Negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct . . . in the termination process.  The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress."  Parsons v. United Technologies Corp., 243 Conn. 66, 88-89 (1997) (citation omitted; internal quotations omitted).

The threshold for establishing unreasonable conduct in a discharge is high.  As stated in Saloomey v. A Child's Garden, Inc., No. CV 324092, 1996 Conn. Super. LEXIS 1186, *15-17 (Conn. Super. Ct. Apr. 24, 1996)(citations omitted; internal quotations omitted):

> The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior.  Termination of employment is a relatively commonplace event.  It is likely that a person whose employment is terminated will suffer some degree of stress and anxiety regardless of whether the termination was lawful and proper or wrongful and tortuous in nature. . . .  An example of unreasonable conduct occurring at the time of discharge is where a meeting or any other aspect of the actual discharge was done in [a] . . . humiliating manner . . . However, the protection the law accords to the interest in one's peace of mind . . . must be limited so as no to open up a wide vista of litigation in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law.

In Saloomey, the court granted the defendants' motion to strike the plaintiff's negligent infliction of emotional distress claim where, without notice, the plaintiff's supervisor called her into a meeting and demanded her resignation without reason and in violation of her contract and staff manual.  The plaintiff's supervisor then ordered the plaintiff to clear out her personal belongings and questioned her whether she had taken company property that did not belong to her.  The court concluded that this was "not conduct which the defendants should have realized involved an unreasonable risk of causing emotional distress which might have resulted in illness or bodily harm."  Id. at *17.  See Pavliscak v. Bridgeport Hosp., 48 Conn. App. 580,

598 (1998) (termination of at-will employee without advance warning did not give rise to negligent infliction of emotional distress claim where she was advised in a private meeting that she was being terminated effective immediately and that she must take her personal items and leave the premises).

There is no evidence that The Hartford engaged in unreasonable conduct in the termination process. Plaintiff's claim that he had to wait for Ms. Haber to retrieve his personal items from his work station does not, as a matter of law, rise to the level of unreasonable conduct. See Davis, 218 F. Supp. 2d at 263-64 (allegation that following her discharge, plaintiff was escorted out the building without an opportunity to clean out her desk held insufficient to establish unreasonable conduct in the termination process). Nor is Plaintiff's claim that he was escorted from the building by a security officer sufficient to prevail on a claim for negligent infliction of emotional distress. Parsons, 243 Conn. at 89 ("[I]t is not patently unreasonable for an employer to remove a discharged employee from its premises under a security escort."); Meola v. Eagle Snacks Corp., No. CV 960384760, 2000 Conn. Super. LEXIS 2318, *18-*19 (Conn. Super. Ct. Sept. 6, 2000)(dismissing negligent infliction claim based on allegations that plaintiff was given 10 minutes to get his things and escorted from the premises by a security guard).

There are no facts establishing that Plaintiff was terminated in a humiliating, embarrassing or otherwise unreasonable manner. Accordingly, Plaintiff cannot prevail on his claim of negligent infliction of emotional distress and Count Nine should be dismissed.

H.  The Hartford Is Entitled To Judgment As A Matter Of Law On Count Ten Alleging Breach Of Implied Covenant Of Good Faith And Fair Dealing Because There Is No Evidence That Plaintiff Had An Employment Contract Or That Plaintiff Was Terminated In Violation Of An Important Public Policy

In Count Ten, Plaintiff alleges a claim for breach of implied covenant of good faith and fair dealing based on The Hartford's alleged failure to implement its discipline policy consistently and impartially.  (Cmplt., ¶ 154.)  Plaintiff testified, "I admitted to violating the electronic communications code.  And Maryanne Rhodes violated the same policy . . . . And I was terminated without warning and she was given a warning." (Pl. Dep. Vol. II, pp. 48-49.)

To prevail on his claim for breach of the implied covenant of good faith and fair dealing, Plaintiff must prove "either that an enforceable employment contact exists, or that the employer's actions in discharging the employee violated a recognized public policy." Cowen v. Federal Express Corp., 25 F. Supp. 2d 33, 38 (D.Conn. 1998) (citing Carbone v. Atlantic Richfield Co., 204 Conn. 460, 467 (1987)); Magnan v. Anaconda Indust., Inc., 193 Conn. 558, 572 (1984)).  In this case, Plaintiff cannot establish either basis as support for his claim for breach of the implied covenant of good faith and fair dealing.

"Under Connecticut law, contracts of permanent employment or for an indefinite term of employment are terminable at will by the employer." Davis, 218 F. Supp. 2d at 260 (citation omitted).  "Although the default rule of employment at will can be modified by an agreement of the parties, to prevail on such a claim, a plaintiff must prove that the employer had agreed, either by words or action or conduct, to undertake some form of actual contractual commitment under which the employee could not be terminated without just cause.  An implied contract, like an express contract, depends on an actual agreement between the parties."

33

Schermerhorn v. Mobil Chem., No. 3:99 CV 941 (GLG), 2001 U.S. Dist. LEXIS 519, *11-12 (D. Conn. Jan. 17, 2001).

Count Ten should be dismissed because there is no evidence that Plaintiff had an employment contract with The Hartford or that Plaintiff's employment was terminated for a reason which violated public policy.[16]  In support of his alleged contract, Plaintiff testified, "I was employed by the Hartford for over 12 years. . . .  From what I remember in 1989 I was offered a job with the company and I accepted it.  And I've been working for them ever since that point until January 23rd, 2002."  (Pl. Dep. Vol. II, pp. 38-39.)  Plaintiff testified that there was no other basis for his alleged contract with The Harford.  (Pl. Dep. Vol. II, p. 39.)

Based on Plaintiff's deposition testimony, there is absolutely no evidence that The Hartford undertook any contractual commitment to him or that there existed an actual agreement between the parties.  Indeed, Plaintiff does not even allege the existence of a contract in his Complaint.  The undisputed evidence is that Plaintiff was employed at-will.  His employment for 12 years does not, as a matter of law, alter Plaintiff's employment at-will status.  Thus, Plaintiff cannot prevail on his claim of breach of the implied covenant of good faith and fair dealing and Count Ten should be dismissed.

I.    The Hartford Is Entitled To Judgment As A Matter Of Law On Count Thirteen Alleging Invasion Of Privacy Because Communications Made In The Course Of Judicial Proceedings Are Absolutely Privileged

In Count Thirteen, Plaintiff alleges a claim for invasion of privacy against The Hartford.  In support of his claim, Plaintiff testified that The Hartford represented to the CHRO and to this Court that Plaintiff had a criminal record when he did not.  (Pl. Dep. Vol. II, pp. 49-50; Cmplt, ¶¶ 162, 165.)

---

[16]  Plaintiff does not allege in the Complaint, nor is there any evidence, that his termination violated a public policy.

34

Based on the allegations in Count Thirteen, it appears that Plaintiff alleges a claim for false light invasion of privacy.  See Perkins v. Freedom of Information Commission, 228 Conn. 158, 171 n.16 (1993).  "The essence of a false light privacy claim is that the matter published concerning the plaintiff (1) is not true; and (2) is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in his position."  Goodrich, 188 Conn. 107, 131 (1982) (citing Restatement (Second) Torts § 652E, comment c.).

Plaintiff cannot prevail on his claim of invasion of privacy because The Hartford's representations to the CHRO and this Court regarding Plaintiff's criminal background are absolutely privileged and cannot give rise to liability.  The Restatement is clear: "The rules on absolute privileges to publish defamatory matter . . . apply to the publication of any matter that is an invasion of privacy."  Restatement (Second) Torts § 652F.  Comment a. of § 652F of the Restatement (Second) of Torts further states, "The circumstances under which there is an absolute privilege to publish matter that is an invasion of privacy are in all respects the same as those under which there is an absolute privilege to publish matter that is personally defamatory."

It is well established that "that there is an absolute privilege for statements made in judicial proceedings. . . . The effect of an absolute privilege is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously."  Petyan v. Ellis, 200 Conn. 243, 245 (1986).  See Alexandru v. Dowd, 79 Conn. App. 434, 438-39 (2003)("It is well-settled that communications uttered or published in the course of judicial proceedings are absolutely privileged. . . . The privilege applies also to statements made in pleadings or other documents prepared in connection with a court proceeding.")(citations

omitted; internal quotations omitted). The applicability of the privilege is a question of law for the Court. <u>Alexandru</u>, 79 Conn. App. at 439.

Any representations The Hartford made to the CHRO or this Court regarding Plaintiff's criminal background are absolutely privileged and cannot support liability for invasion of privacy as a matter of law. Consequently, Plaintiff cannot prevail on his claim of invasion of privacy and Count Thirteen should be dismissed.

III.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment should be granted.

DEFENDANT,
HARTFORD FINANCIAL SERVICES
GROUP, INC.

By:    _Margaret J. Strange_

Margaret J. Strange (ct08212)
James F. Shea (ct16750)
Jackson Lewis LLP
55 Farmington Avenue, Suite 1200
Hartford, CT 06105
Phone: (860) 522-0404/Fax: (860) 247-1330
email: strangem@jacksonlewis.com
email: sheaj@jacksonlewis.com

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent via first class mail, postage prepaid, on this 23rd day of January 2004, to the following counsel of record:

Rachel M. Baird
Law Office of Rachel M. Baird
379 Prospect Street
Torrington, CT 06790
(860) 626-9991
Attorney for Plaintiff


David L. Metzger
Metzger & Associates
25 Capitol Avenue
Hartford, CT 06106-1707
Ph. (860) 549-5026
Attorney for Defendant Maryanne Rhodes


_Margaret J. Strange_
Margaret J. Strange

H:\Client Folder\H\The Hartford\Shorter\Pld\Motion for Summary Judgment Memo.DOC
64532