UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FERRON SHORTER JR. <br> Plaintiff, <br> <br> v. <br> <br> HARTFORD FINANCIAL SERVICES GROUP, INC. and MARYANNE RHODES <br> Defendants. | CIVIL NO.: 303 CV 0149(WIG) <br> <br> <br> JANUARY 23, 2004 |

## DEFENDANT'S LOCAL RULE 56(a)(1) STATEMENT

Pursuant to Local Rule 56(a)(1) of this Court, Hartford Financial Services Group, Inc. ("The Hartford") respectfully submits the following statement of material facts as to which there is no genuine issue to be tried:

1. Ferron Shorter ("Plaintiff") commenced employment with The Hartford in 1989 as a data entry clerk. At the time of Plaintiff's discharge on January 23, 2002, he was employed as a Developer. (Pl. Dep. Vol. I, p. 110.)

2. In June 2001, Plaintiff and Maryanne Rhodes, who was also employed at The Hartford, commenced a romantic relationship. (Pl. Dep. Vol. I, pp. 108, 116.) Ms. Rhodes and Plaintiff did not work together. (Pl. Dep. Vol. I, p. 106.)

3. During Plaintiff's employment, The Hartford maintained an Electronic Communications Policy ("ECP"). (Ames Dep., pp. 39, 47-48; ECP, Strange Aff., Ex. 2.)

4. The ECP stated, in pertinent part,

> It is The Hartford's policy to procure and maintain electronic communication systems for purposes of supporting the business objectives of the company. Personal use that interferes in any way with company

1

<u>business is strictly prohibited</u>. . . . The electronic communications systems to which this policy applies, include, but are not limited to . . . voice mail. (ECP, Strange Aff., Ex. 2.)

5. The ECP also described several examples of prohibited conduct including, "access[ing] others' proprietary information . . . even if you are given a password by an authorized person." (ECP, Strange Aff., Ex. 2.)

6. The ECP further stated, "Violations of this policy by a company employee, including the first offense, are considered serious and may lead to disciplinary action, up to and including termination of employment." (ECP, Strange Aff., Ex. 2.)

7. At approximately 1:15 pm on the afternoon of Monday, January 21, 2002, Ms. Rhodes contacted Lisa Anderson of The Hartford's Office of Equal Opportunity Development ("EOD"). (Anderson Aff., ¶ 3.)

8. Ms. Rhodes told Ms. Anderson that she and Plaintiff had shared a consensual relationship for about six months and that for approximately two months, they lived together at her apartment. Ms. Rhodes told Ms. Anderson that at some point during her relationship with Plaintiff, "I had shared my password . . . to allow him to listen to my messages because he was jealous and would accuse me of things." (Rhodes Stmnt., Strange Aff., Ex. 5.)

9. Ms. Rhodes also told Ms. Anderson that on the previous Friday, January 18, 2002, she flew to Florida to visit a friend. (Rhodes Stmnt., Strange Aff., Ex. 5.)

10. While Ms. Rhodes was in Florida, Plaintiff accessed her voice mail account and changed her password so that she was could not obtain her voice mail messages. As a result, Ms. Rhodes had to contact her supervisor to notify him that she did not have access to voice mail. (Rhodes Stmnt., Strange Aff., Ex. 5.)

11. Ms. Rhodes told Ms. Anderson that during their relationship, "Ferron could be very jealous. He had had a bad temper and would scream at me. He has squeezed my arm and it bruised, and he kicked me. When he moved in, he told me that he had a gun and he showed it to me." She told Ms. Anderson that Plaintiff had threatened her brother and that, on one occasion, her sister-in-law called the police because she heard Plaintiff screaming at Ms. Rhodes over the phone. (Rhodes Stmnt., Strange Aff., Ex. 5.)

12. Since her relationship with Plaintiff ended, Ms. Rhodes stated that Plaintiff had harassed her, that she was frightened of him and that she did not know how to handle the situation. (Rhodes Stmnt., Strange Aff., Ex. 5; Anderson Dep., pp. 18-19.)

13. After her meeting with Ms. Rhodes, Ms. Anderson began to investigate Ms. Rhodes' complaint. (Anderson Aff., ¶ 5.)

14. Ms. Anderson contacted Ms. Rhodes' supervisor, Brian Vadney, who confirmed that Ms. Rhodes had contacted him Friday evening to ask him to leave any messages for her at her hotel since she could not access her voice mail. (Anderson Aff., ¶ 6; Anderson Dep., p. 18.)

15. Ms. Anderson also obtained Ms. Rhodes' flight records to Florida, Ms. Rhodes' voice mail records indicating the number of times her voice mail was accessed and when her password was changed, and building security records which showed that Plaintiff had been at work for a few hours on Saturday morning and that he returned to work for approximately eight minutes that afternoon. (Anderson Aff., ¶ 7; Anderson Dep., p. 17.)

16. Ms. Anderson also obtained a message which Plaintiff left on the answering machine of a friend of Ms. Rhodes named Scott. The message from Scott's answering machine recorded an obscenity-laced tirade by Plaintiff berating, threatening and screaming at Ms. Rhodes. (Anderson Aff., ¶ 8.)

17. Ms. Rhodes' voice mail records indicated that her voice mail was accessed more than 40 times between 3:00 pm on Friday, January 18, 2002 and 1:30 am on Monday, January 21, 2002. The records also indicated that her password was changed at 5:01 pm and 5:18 pm on January 18, 2002 and that her password was changed an additional two times during the weekend. (Anderson Aff., ¶ 9.)

18. The records also showed that several messages were deleted from Ms. Rhodes' voice mail. (Anderson Aff., ¶ 9.)

19. After Plaintiff changed Ms. Rhodes' password on January 18, 2002, he was the only person who had access to her voicemail account. (Pl. Dep. Vol. I, 45-46.)

20. On Tuesday, January 22, 2002, Ms. Anderson notified Jennifer Ames, a human resources generalist for Plaintiff's department, of Ms. Rhodes' complaint. (Anderson Aff., ¶ 10; Ames Dep. pp. 5-6.) The two agreed that Ms. Rhodes' complaint about Plaintiff's conduct was a serious matter. They also agreed that if Plaintiff admitted to accessing Ms. Rhodes' voice mail and changing her password, it would constitute a serious violation of the ECP. (Anderson Aff., ¶ 10.)

21. On Wednesday, January 23, 2002, Ms. Anderson contacted Jack Jacewicz, Director of the Department of Special Investigations ("DSI"), to discuss conducting an investigation into the matter. (Anderson Aff., ¶ 11; Anderson Dep., pp. 14-17.)

22. Mr. Jacewicz assigned the matter to an Investigator, Richard Wardell, to investigate. (Wardell Dep., pp. 7-8.)

23. As part of his investigation, Mr. Wardell interviewed Ms. Rhodes and reviewed her statement. (Wardell Dep., p. 18.)

24. Mr. Wardell also interviewed Plaintiff and obtained a written statement from him. Plaintiff admitted to Mr. Wardell that he accessed Ms. Rhodes' voice mail ten to fifteen times over the weekend and that he changed her password twice. (Pl. Stmnt, Strange Aff., Ex. 7.)

25. As part of his investigation, Mr. Wardell requested a criminal background check on Plaintiff and obtained Plaintiff's email messages from his computer. (Wardell Dep., pp. 30-31.)

26. Mr. Wardell obtained a criminal conviction report which indicated that Plaintiff had two criminal convictions – one in 1990 for breach of the peace and one in 1996 for threatening. (Strange Aff., Ex. 8.)

27. Mr. Wardell also obtained an email message Plaintiff sent Ms. Rhodes on the morning of January 18, 2002. In his email, Plaintiff referred to himself as a "real jealous type of dude" and stated, "Remember this nigga won't forget about you right away!" (Strange Aff., Ex. 9.)

28. Following Plaintiff's admission that he accessed Ms. Rhodes voice mail and changed her password, Ms. Anderson met with Ms. Ames and they concluded that Plaintiff's conduct warranted his termination. (Anderson Aff., ¶ 12; Anderson Dep., pp. 20-22, 67, 75-76; Ames Dep. pp. 40-41, 50-52.)

29. Plaintiff was terminated for violating The Hartford's ECP by accessing Ms. Rhodes' voice mail and changing her password so that she could not access her voice mail account.

30. Also of concern to Ms. Ames was Plaintiff's statement that he did not have any criminal convictions and the email he sent to Ms. Rhodes on the morning of January 18, 2002. (Ames Dep., p. 52.)

31. Based on the information obtained during The Hartford's investigation, including, but not limited to, Ms. Rhodes' statement, Plaintiff's email to Ms. Rhodes on January 18, 2002 and the message Plaintiff left for Ms. Rhodes' friend Scott, Ms. Anderson was also concerned about a potential threat of violence in the workplace. (Anderson Dep., pp. 35-36, 68-69.)

32. In making the determination to discharge Plaintiff, Ms. Anderson and Ms. Ames relied on the documentation obtained during The Hartford's investigation and on Plaintiff's admission that he violated company policy. (Anderson Dep., p. 76; Ames Dep. pp. 42-43, 51-52.)

33. Ms. Ames considered Plaintiff's conduct to constitute "a serious violation of the electronic communications policy." (Ames Dep., p. 43.)

34. Ms. Anderson and Ms. Ames made their decision with input from Mr. Wardell. (Ames Dep., p. 40.)

35. After meeting with Ms. Anderson, Ms. Ames met with Plaintiff and notified him that his employment was terminated. (Ames Dep., p. 9.)

36. During their meeting, Ms. Ames told Plaintiff that he was not allowed to go back to his desk. Ms. Ames obtained Plaintiff's personal items for him and Plaintiff was escorted out of the building by a security officer. (Ames Dep., p. 12.)

37. As a result of The Hartford's investigation, Ms. Rhodes was also disciplined for violating the ECP by giving her voicemail password to Plaintiff. Ms. Rhodes received a written warning. (Strange Aff., Ex. 10.)

38. While Ms. Rhodes violated The Hartford's ECP, Ms. Anderson believed that her violation in disclosing her password was not as serious as Plaintiff's conduct in accessing her

voice mail account and changing the password so that she could not access her voice mail messages. (Anderson Dep., pp 65-66, 69.)

39.     On or about April 9, 2002, Robert Begley, Manager of Physical Security at The Hartford, contacted Plaintiff regarding hang up calls Ms. Rhodes had received at work. At the time he contacted Plaintiff, Mr. Begley was unaware of any correspondence sent by Attorney Baird to Jennifer Ames, The Hartford's Legal Department or any other individual at The Hartford. (Begley Aff., ¶ 6.)

DEFENDANT,
HARTFORD FINANCIAL SERVICES
GROUP, INC.

By: *Margaret J. Strange*
Margaret J. Strange (ct08212)
James F. Shea (ct16750)
Jackson Lewis LLP
55 Farmington Avenue, Suite 1200
Hartford, CT 06105
Phone: (860) 522-0404/Fax: (860) 247-1330
email: strangem@jacksonlewis.com
email: sheaj@jacksonlewis.com

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent via first class mail, postage prepaid, on this 23rd day of January 2004, to the following counsel of record:

>Rachel M. Baird
>Law Office of Rachel M. Baird
>379 Prospect Street
>Torrington, CT 06790
>(860) 626-9991
>Attorney for Plaintiff

>David L. Metzger
>Metzger & Associates
>25 Capitol Avenue
>Hartford, CT 06106-1707
>Ph. (860) 549-5026
>Attorney for Defendant Maryanne Rhodes

_____
Margaret J. Strange

H:\Client Folder\H\The Hartford\Shorter\Pld\MSJ\Rule 56(a)(1) Statement02 DOC
64532