## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
                                                  :
FERRON SHORTER JR.                                :
    Plaintiff,                 :
                                                  :     CIVIL NO.: 303 CV 0149(WIG)
v.                                                :
                                                  :
HARTFORD FINANCIAL SERVICES GROUP, :
INC. and MARYANNE RHODES                          :
    Defendants.                :     February 19, 2004
_____:


## DEFENDANT MARYANNE RHODES' MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


**DEFENDANT,**
**MARYANNE RHODES**


**David L. Metzger, Esq. (ct02035)**
**Metzger & Associates**
**25 Capitol Avenue**
**Hartford, CT  06106**
**(860) 549-5026**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................1

II.   SUMMARY OF ARGUMENT ....................................................................2

III.  FACTUAL BACKGROUND ......................................................................4

      A.    The Parties....................................................................................4
      B.    The Relationship Between Plaintiff and Rhodes. ........................5
      C.    The Weekend of January 18, 2002. ...........................................6
      D.    Rhodes' Complaint To The Hartford ............................................8
      E.    Rhodes' Written Statement. .......................................................11
      F.    Portions of Written Statement Plaintiff Claims Are False. .........13
      G.    Investigation Conducted By The Hartford. .................................14
      H.    Disciplinary Action Taken By The Hartford................................15

IV.  SUMMARY JUDGMENT STANDARD ....................................................16

V.   ARGUMENT ..........................................................................................17

      A.    Rhodes Is Entitled To Judgment As A Matter Of Law On Count Twelve Alleging Defamation……………………………………………………17

      1.    Rhodes' Written Statement Was Subject To A Qualified Privilege And Not Defamatory……………………………………………..17
            a.    Rhodes Communications With Ms. Anderson And The Written Statement dated January 21, 2002 Were Made On Occasion Of Privilege…………………………………………..18
            b.    Rhodes Did Not Abuse The Qualified Privilege And, Therefore, Summary Judgment As To Count Twelve Should Be Granted As A Matter Of Law…………………………………20

      2.    The Statement Is Substantially True…………………………………..23

3.     Those Specific Portions Of The Statement Claimed To Be False Are Not Actionable As Defamation……………………………………………………24

    a.    Nearly All Portions Of The Statement Claimed To Be False Are Not Actionable As Defamation…..……………………24

    b.    Statement That Plaintiff Bruised, Kicked And Threatened Rhodes And Her Brother Are Substantially True And Not Defamatory…………………………………………………..………27

    c.    Some Portions Of The Written Statement Claimed To Be False Are Expressions Of Opinion And Are Not Defamatory……………………………………………………29

4.     Plaintiff Has No Pecuniary Loss Attributable To The Claimed Defamatory Statements As The Statements Did Not Cause His Termination…………………………………..……………………..…32

5.     Conclusion:  There Are No Disputed Issues Of Fact Requiring A Trial Of The Defamation Claim………………………………………33

B.     Count Eleven, Tortious Interference With Contract And Prospective Economic Advantage, Should Be Dismissed As Rhodes Conduct Was Not Tortious And Did Not Cause Plaintiff's Discharge.. ................................35

1.     Rhodes' Conduct In Making A Complaint To The Hartford About Plaintiff Was Not Tortious...……………………………………………34.

2.     Even If Plaintiff Could Establish That Rhodes' Actions In Complaining To The Hartford Were Tortious, He Cannot Establish That As A Result Of The Alleged Interference, He Suffered Actual Loss………………………………………………35

VI.   CONCLUSION…………………………………………………………37

# TABLE OF AUTHORITIES

Celotex Corp. v. Catret, 477 U.S. 317, 324 (1986)…………………………………....15

Anderson v. Liberty Lobby, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986)….……15
Matsushita Elec. Indus. co. v. Zenith Radio Corp.,
  475 U.S. 574, 586, 106 S.Ct. 1348, 1355 (1986)………………….…………..…16

Malik v. Carrier Corp., 202 F. 3d 97, 108 (2d Cir. 2000)…………………...16, 17, 27, 28

Kelley v. Bonney, 221 Conn. 549, 563 (1992)……………………………….…………16

Grossman v. Computer Curriculum Corp.,
  131 F. Supp. 2d 299, 312 (D. Conn. 2000)……………………………..17, 24, 26

Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,
  234 Conn. 1, 29 (1995)……………………………………………………17, 18, 20

King v. Cablevisions Systems of Southern Connecticut Limited Partnership,
  CV 940135725, 1998 WL 556162 *4 (Ct. Super. Aug. 24, 1998)…………17, 19

Miles v. Perry, 11 Conn. App. 584, 595 (1987)………………………………………18, 32

Gaudio v. Griffin Health Services Corp., 249 Conn. 523, 545 (1999)…………………20

Chadha v. Shimelman, 75 Conn. App. 819, 827 (2003)……………………………20, 21

Abdelwayed v. Narumanchi, 39 Conn. App. 778, 781,
  cert. denied 237 Conn. 915, cert. denied 519 U.S. 868 (1996)………………20, 22

Wadira Enterprises Inc. v. Hirschfeld, 27 Conn. App. 162, 170,
  aff'd 224 Conn. 240 (1992)………………………………………………………21,33

Tyszka v. Edward McMahon Agency, 188 F. supp. 2d 186, 195 (D. Conn. 2001)…………….21

Stow v. Converse, 4 Conn. 17, 33 (1821)…………………………………………23, 29

Griffin v. Clemow, 28 Conn.Supp. 109, 111 (1968)…………………………………23, 24

Fleckenstein v. Friedman, 266 N.Y. 19, 23, 193 N.E. 537………………………………23

Goodrich v. Waterbury Republican-American, Inc.,
       188 Conn. 107, 113, (1982)……………………………………………..…23, 29, 30

Estate of Gomez Larson, 1999 WL 417819 (Ct. Super. Jan. 19, 1999)……………...…27

Strada v. Connecticut Newspapers, Inc., 193 Conn. 313, 326 (1984)…..…………….…..27

Mr. Chow of New York v. Ste. Jour Azur S.A., 759 F.2d 219, 230 (2d Cir. 1985)……..29

Hotchner v. Castillo-Puche, 551 F. 2d 910, 913 (2d Cir. 1977)………………………30, 32

Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 795-96 (1999)………………30, 32

Appleton v. Board of Ed., 254 Conn. 205, 212-13 (2000)………………………34, 35, 36

Blake v. Levy, 191 Conn. 257, 262 (1983)……………………………………………34

Robert S. Weiss and Assoc., Inc. v. Wiederlight, 208 Conn. 525, 536 (1988)…………34

Taylor v. Sugar Hollow Park, Inc., 1 Conn. App. 38, 39 (1983)…………………………35

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

_____
                                :
FERRON SHORTER JR.                :
       Plaintiff,                        :
                                  :     CIVIL NO.: 303 CV 0149(WIG)
v.                                   :
                                  :
HARTFORD FINANCIAL SERVICES GROUP, :
INC. and MARYANNE RHODES      :
       Defendants.                   :     February 19, 2004
_____:

**DEFENDANT MARYANNE RHODES' MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

         Defendant MaryAnne Rhodes ("Rhodes"), pursuant to Rule 56 of the

Federal Rules of Civil Procedure and Local Rule 56, respectfully submits this

Memorandum of Law in support of her Motion for Summary Judgment.  Rhodes moves

for summary judgment as to Counts Eleven and Twelve of Plaintiff's Amended

Complaint dated April 28, 2003 (the "Complaint"). [1]  Count Eleven alleges a claim for

_____

[1] Counts One through Ten and Thirteen of the Complaint are claims made solely against Defendant Hartford Financial Services Group, Inc.  At his deposition, Plaintiff stated that the only claims for which he is suing Rhodes are Counts 11 and 12.

tortious interference with contract and prospective economic advantage and Count Twelve alleges a claim for defamation of character.

## II.    SUMMARY OF ARGUMENT

MaryAnne Rhodes and Ferron Shorter fell in love.  It was a powerful and volatile love affair.  Ferron classified himself as a "real jealous type of dude," with an admitted bad temper.  He lived up to that description.

Although they were both employed by The Hartford, they did not work together and were not co-workers in the usual sense.  But they saw each other while at work and used The Hartford's e-mail and phone system to communicate with each other.  In an effort to gain his trust early in their relationship, MaryAnne shared the password she used for both her personal and business voicemail with Ferron.

After three or four months they moved in together.  It did not go well. Ferron moved out of MaryAnne's apartment after barely a month of living together.[2] They briefly reconciled and continued to communicate, but the volatility and intensity had a new edge.

MaryAnne tried to hide the fact she was going to Florida for a weekend to see a male friend, knowing Ferron would be insanely jealous.  He was.  He checked her

---

[2] Although not material to this motion, it is interesting to note that he moved back in with the woman with whom he had been living immediately before he moved in with MaryAnne.

voicemail for clues of her unfaithfulness. He found an incriminating message. He changed her password, taking control of her voicemail, and then obsessively called her on her cell phone – dozens of times, at least hourly for the entire time she was away for the weekend.

MaryAnne, before leaving for the fateful weekend, had told her boss that she would be checking her voicemail if he needed her. When she realized she could no longer access her voicemail, she called Ferron and asked him to change the password back. When he didn't change it back, MaryAnne called her boss to tell him to leave messages at her hotel as she couldn't access her voicemail. MaryAnne then told Ferron she would have to report him to security if he didn't change her password back by the time she returned. Ferron called her back and told her that he had reported her to security first for harassing him.

When MaryAnne returned she had to explain to her boss how she had lost access to her voicemail and had to get assistance to reset the password. She was worried about many things and didn't know what to expect of Ferron now that she was back. She took another employee's advice to go to EOD to talk to someone about all of this for her own protection. She was interviewed by Lisa Anderson of EOD, who took a written statement from her. The Hartford then conducted an investigation which led to her discipline and to Ferron's termination.

Ferron Shorter, the Plaintiff here, then brought this lawsuit against The Hartford for terminating his employment and against MaryAnne Rhodes for defamation

contained in the written statement taken by The Hartford and for tortious interference with his employment relationship based on the same statement.

Count Twelve, defamation, should be dismissed on any of the following grounds, all of which are supported by the facts:

1. Rhodes' statement was given on an occasion of privilege which was not abused;

2. The statement is substantially true; and

3. The specific portions of the statement that are claimed to be false are not actionable as defamation as they are: not capable of defamatory meaning; substantially true, or are expressions of opinion.  In addition, plaintiff has no pecuniary loss attributable to the challenged portions of the statement.

Count Eleven, tortious interference with contract, should be dismissed as the facts show Rhodes conduct was not tortious and she did not cause plaintiff's discharge.

## III.    FACTUAL BACKGROUND

### A.    The Parties.

Plaintiff, Ferron Shorter, was an employee of the Defendant, Hartford Financial Services Group, Inc. ("The Hartford'), from October 9, 1989 until January 23, 2002, when his employment was terminated by The Hartford.  (Defendant MaryAnne Rhodes' Local Rule 56(a)(1) Statement ("Facts"), ¶ 2.)

4

MaryAnne Rhodes ("Rhodes") was also an employee of The Hartford until she resigned her employment in April 2003.  During the period relevant to the Complaint, Ms. Rhodes worked as a Senior Accountant in the Corporate Financial Reporting Department at The Hartford.  (Facts, ¶ 1.)

Hartford Financial Services Group, Inc., the other defendant in this case, employed both Plaintiff and Rhodes.  (Facts, ¶¶ 1, 2.)

**B.    The Relationship Between Plaintiff and Rhodes.**

Plaintiff and Rhodes did not work in the same department at The Hartford and their desks were not in the same building.  (Facts, ¶ 4.)  Rhodes and Plaintiff did not work together or report to one another.

By July 2001, Plaintiff and Rhodes had become involved in a consensual, romantic relationship.  (Facts, ¶ 5.)  During the period from July through November 2001, they regularly met in the cafeteria at The Hartford.  (Facts, ¶ 6.)  They also spoke to each other regularly on the phone and exchanged e-mails.  (Facts, ¶ 6.)

In November 2001, Plaintiff moved into Rhodes' apartment in Vernon, Connecticut.  (Facts, ¶ 7.)  The two had a volatile relationship.  (Facts, ¶ 10.)  Plaintiff was jealous of other men in Rhodes' life.  (Facts, ¶ 11.)   In order to assure Plaintiff that she was not involved with other men, Rhodes gave Plaintiff the password for her personal voicemail and also told Plaintiff that this was the same password she used for her voicemail at work.  (Facts, ¶ 8.)

On or about December 16, 2001, Plaintiff moved out of the Vernon apartment that he had been sharing with Rhodes.  (Facts, ¶ 9.)  The two continued to have a volatile on-again-off-again relationship.  They reconciled on or about December 27, 2001. (Facts, ¶ 12.)  On or about December 30, 2001, Plaintiff accessed Rhodes voicemail at work and listened to a message from Rhodes' former boyfriend, Scott. (Facts, ¶ 13.)  The message referred to a lunch date and Plaintiff became jealous, believing that Rhodes had lied to him about being involved with other men.  (Facts, ¶ 13.)  Plaintiff deleted messages he had left for Rhodes that she had saved on her voicemail at work.  (Facts, ¶ 14.)  On or about December 31, 2001, Plaintiff called Rhodes and then connected the call to Scott's voicemail in a three-way call.  (Facts, ¶ 15.)  Plaintiff's "obscenity-laced tirade" in which he berated and screamed at Rhodes was recorded on Scott's answering machine.  (Facts, ¶ 15.)  Plaintiff was out of work on vacation for a large part of the next two weeks.  (Facts, ¶ 16.)

### C.    The Weekend of January 18, 2002.

During the week of January 14, 2002, Plaintiff and Rhodes talked on several occasions and spoke on the phone.[3]  (Facts, ¶ 16.)  At some point during these conversations, Rhodes told Plaintiff that she was going away for the upcoming weekend to see her sister in South Carolina.  (Facts, ¶ 16.)  In fact, Rhodes flew to Florida on Friday, January 18, 2002, to visit an old friend named Rich.  (Facts, ¶ 17.)  Rhodes did

not tell Plaintiff where she was really going because she believed he would be jealous and would get angry.  (Facts, ¶ 16.)

Prior to leaving for Florida, Rhodes told her supervisor at The Hartford, Brian Vadney, that she would check her voicemail and be available to work, if necessary.  (Facts, ¶ 21.)  At approximately 6:00 p.m., upon arriving in Florida, Rhodes tried to check her messages at work and was unable to access her voicemail.  (Facts, ¶ 18.)  Rhodes called Plaintiff and asked him what he did with her voicemail.  (Facts, ¶ 19.)  Plaintiff admitted that he had changed the password so that she could not access voicemail. (Facts, ¶ 20.)  Rhodes asked him to change the password back.  (Facts, ¶ 20.)  Unable to access her voice mail, Rhodes called her supervisor on Friday, January 18, 2002, and asked him to leave messages for her at her hotel and not on either her work or cell phone voicemail.  She told him someone had changed her voicemail password.  (Facts, ¶ 22.)

Plaintiff called Rhodes on Saturday morning, January 19, 2002.  (Facts, ¶ 23.)  During this phone call, Rhodes told Plaintiff that if he did not change her password back, she would report him to security when she returned to work.  (Facts, ¶ 23.)  Shortly after this conversation in which Rhodes told him she would report him to security if he didn't change her password back, Plaintiff returned to work and told two security guards who worked for the security company that serviced The Hartford that a woman

---

[3] There is a dispute as to who initiated these conversations and phone calls.  However, that

kept coming to his desk and he wanted her to stop. (Facts, ¶ 24.)  He was at work on that Saturday afternoon for a total of eight (8) minutes. (Facts, ¶ 24.)

Plaintiff repeatedly called Rhodes on her cell phone while she was out of town for the weekend.  (Facts, ¶ 28.)  Plaintiff stated that he tried to call Rhodes "probably … at least every hour … it was dozens" of times.  (Facts, ¶ 28.)  He also admitted that over the weekend of January 18 through January 20, 2002, he repeatedly accessed Rhodes' voicemail, changed her voicemail password and deleted messages from her voicemail account.  (Facts, ¶ 26.)  The Hartford's phone records show that Rhodes' voicemail was accessed more than forty (40) times during this period and that the password was changed four (4) times.  (Facts, ¶ 27.)

Late in the day on Sunday, January 20, 2002, Rhodes took one of the many calls from Plaintiff.  (Facts, ¶ 25.)   Plaintiff told Rhodes that he went to security first and reported that she was harassing him and that he did not want Rhodes at his desk any more.  (Facts, ¶ 29.)  Rhodes responded by telling Plaintiff that if he did not change her password back before she got back to work on Monday, she would go to security and he wouldn't have to worry about her going over to his desk because he wouldn't have one.  (Facts, ¶ 29.)

**D.    Rhodes' Complaint To The Hartford.**

---

dispute is not material for purposes of this motion and there is no dispute that such conversations took place.

Upon returning to work on Monday, January 21, 2002, Rhodes' supervisor, Brian Vadney, spoke with her about her inability to access her voicemail over the weekend and how that had occurred. (Facts, ¶ 30.) Rhodes briefly explained what happened but did not share the details about her relationship with Plaintiff. (Facts, ¶ 30.) Rhodes felt that her supervisor was understandably disturbed by what had happened. (Facts, ¶ 30.)

Rhodes asked Mr. Vadney's administrative assistant what she needed to do to reset her password, which was then done. (Facts, ¶ 31.) The administrative assistant then suggested to Rhodes that she speak with someone in The Hartford's Equal Oportunity Division ("EOD") about the situation. (Facts, ¶ 31.) Rhodes was worried about the situation, as she felt it was out of control. Her supervisor was aware that Plaintiff had changed her voicemail password and Plaintiff said he had reported her to security. (Facts, ¶ 32.) In addition, Rhodes was very concerned about Plaintiff's behavior over the weekend of January 18, 2002, and she didn't know what he would do now that she was back. His obsessive behavior, in combination with past incidents when Plaintiff yelled and had been jealous, made her fearful of him when she returned to work on January 21, 2002. (Facts, ¶ 36.)

Rhodes called EOD and was referred to Lisa Anderson. (Facts, ¶ 33.) In her capacity as a Consultant in EOD, Ms. Anderson, among other things, was one of the individuals at The Hartford responsible for taking and responding to employee complaints. (Facts, ¶ 35.)

Rhodes told Ms. Anderson about what had occurred over the weekend.  In particular, Rhodes told Ms. Anderson about Plaintiff's conduct in changing the voicemail password, calling her repeatedly over the weekend and that he claimed to have reported Rhodes to security over the weekend.  (Facts, ¶ 34.)   Rhodes told Ms. Anderson that she had a personal relationship with Plaintiff and that she gave him the password to her work voicemail.  (Facts, ¶ 37.)   Rhodes said that she knew she should not have given him the password.  (Facts, ¶ 37.)   However, she did not give Plaintiff permission to change the password or delete messages from her voicemail.  (Facts, ¶ 37.)   Rhodes explained that Plaintiff had accessed her voicemail and changed her password over the weekend.  (Facts, ¶ 38.)  Rhodes also told Ms. Anderson that she had contacted her supervisor, Brian Vadney, on Friday, January 18, 2002, to let him know she was having trouble with voicemail in case he needed to reach her.  (Facts, ¶ 38.)  Rhodes also told Ms. Anderson about the incident in December 2001, when Plaintiff accessed her voicemail, heard the message from Scott and also deleted messages from Rhodes voicemail.  (Facts, ¶ 38.)

Ms. Anderson interviewed Rhodes and asked her specific questions about her relationship with Plaintiff.  (Facts, ¶ 39.)   In particular, Ms. Anderson asked Rhodes if Plaintiff had access to a weapon.  (Facts, ¶ 39.)   In response to this question, Rhodes told Ms. Anderson that when Plaintiff moved into her apartment in November 2001, he told her he had a gun because he knew Rhodes did not like guns and he wanted Rhodes to be aware it was in the apartment.  He then showed Rhodes the gun, which

he kept in a box. (Facts, ¶ 39.) Ms. Anderson also asked Rhodes questions about whether Plaintiff had ever hit her or been violent with her. (Facts, ¶ 40.) Rhodes noted that during their relationship, Plaintiff "could be very jealous. He had a bad temper and would scream at her. (Facts, ¶ 40.) Rhodes shared with Ms. Anderson the incident when Plaintiff bruised her arm and kicked her. (Facts, ¶ 40.) Rhodes also told Ms. Anderson that Plaintiff had threatened her brother. (Facts, ¶ 40.) Rhodes told Ms. Anderson that at that time, she was afraid of Plaintiff. (Facts, ¶ 40.)

### E.    Rhodes' Written Statement.

After the interview, at Ms. Anderson's request, Rhodes signed a written statement summarizing the interview. The statement and summary were prepared by Ms. Anderson. (Facts, ¶ 41.) It is this written statement that is claimed to be defamatory and the basis for the tortious interference claim. (Facts, ¶ 42.)

Rhodes' statement was given to Ms. Anderson, one of the individuals at The Hartford whose job included dealing with employee complaints. (Facts, ¶ 35.) Rhodes statement was only available to individuals at The Hartford with a need to know and who were involved in the investigation of the matter and the decisions related to discipline. (Facts, ¶ 45.) Plaintiff does not claim the statement was published to anyone else within or outside of The Hartford. (Facts, ¶ 45.) At the time Rhodes made her statement to Ms. Anderson, Rhodes was not aware that Plaintiff had previously been arrested for threatening or that he had any type of criminal record or record of any infraction. (Facts, ¶ 44.)

11

**F.    Portions of Written Statement Plaintiff Claims Are False.**

At his deposition, Plaintiff testified that only some of what Rhodes said about him in the written statement was false.  He claims that the following statements in that document were false:  (Facts, ¶ 46.)

- "After he found out about my having lunch with Scott, he told me that he was going to delete all the messages he left for me that I had saved on my personal cell phone and work phone."

- "He has squeezed my arm and it bruised, and he kicked me."

- "he told me that he had a gun and he showed it to me."

- "he threatened Michael (Rhodes' brother); saying that he was going to get his buddies and go after him."

- "Things were kind of quiet in the past week."

- "He called me on my cell phone and was asking questions about who I was going with, and where I was going."

- "He said, 'I'm just messing with you.'"

- "I told him that it was important that I be able to hear work messages over the weekend.  He said, don't worry, there's nothing from your boss."

- "He told me something like, that if I did that and he lost his job, then he'd have nothing to lose and he would come after me."  (In response to Rhodes telling him she was going to security.)

- "I am afraid of this guy.  He has threatened me and my brother.  It frightens me that he knows my sister-in-law's telephone number."

- "it's strange that he leaves his lunch in the refrigerator on T-14 (the 14th floor of her building at work) when he works on NP-6" (the 6th floor of another building).

These are the only portions of Rhode's written statement of January 21, 2002, that Plaintiff claims were false. (Facts, ¶ 47.)  Moreover, during his deposition, Plaintiff testified that he recalled an incident when he tried to push by Rhodes to get to the door of the apartment they were sharing and that she told him he was hurting her arm.  (Facts, ¶ 47.)

### G.   Investigation Conducted By The Hartford.

After taking Rhodes' statement, Ms. Anderson told Rhodes that she would look into things. (Facts, ¶ 48.)  The Hartford obtained records that verified Rhodes' account with regard to what had occurred over the weekend from January 18 through January 20, 2002.  (Facts, ¶ 48.)   The Hartford confirmed that Rhodes had been on a plane to Florida when her voicemail password had been changed during the afternoon of Friday, January 18, 2002.  (Facts, ¶ 49.)  The Hartford also confirmed through phone records that Rhodes' voicemail account was accessed approximately forty (40) times between 3:00 p.m. on Friday, January 18, 2002 and 1:30 p.m. on Monday, January 21, 2002.  (Facts, ¶ 50.)  In addition, The Hartford confirmed that Plaintiff had changed the password more than once and deleted messages from Rhodes voicemail.  (Facts, ¶ 50.)

14

As part of its investigation, The Hartford also reviewed the e-mails stored on the computer Plaintiff used at work and found an e-mail Plaintiff sent to Rhodes on January 18, 2002.  (Facts, ¶ 51.)  In the e-mail, Plaintiff referred to himself as a "real jealous type of dude" and stated he wouldn't forget about her.  (Facts, ¶ 51.)  Finally, The Hartford obtained records indicating that Plaintiff had been arrested for threatening and other criminal offenses and that he had been found guilty of a misdemeanor. (Facts, ¶ 52.)

After reviewing these records, Ms. Anderson called Rhodes on January 22, 2002 and told her that The Hartford was going to speak with Plaintiff about his changing the voicemail password.  (Facts, ¶ 53.)  At this point, Rhodes was very afraid of how Plaintiff would react and for a week or more she stayed with her friend, Lisa, rather than at her apartment alone.  (Facts, ¶ 53.)

An employee in The Hartford's Department of Special Investigations interviewed Plaintiff.  (Facts, ¶ 54.)  Plaintiff acknowledged that he had accessed Rhodes' voicemail and that he had changed her password over the weekend of January 18 through January 20, 2002.  (Facts, ¶ 54.)

**H.    Disciplinary Action Taken By The Hartford.**

Rhodes was given a written warning for sharing her password with Plaintiff.  (Facts, ¶ 55.)  Plaintiff's employment was terminated.  (Facts, ¶ 56.) Immediately following the termination of Plaintiff's employment, Rhodes began receiving

a large volume of calls both at work and on her cell phone in which the caller would hang up on her.  (Facts, ¶ 57.)

IV.    **SUMMARY JUDGMENT STANDARD**

A Federal Court may grant summary judgment in a civil action "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.  56(c).  Once the movant has made the showing that there exists no genuine issue of material fact, the non-movant must contradict the showing by pointing to specific facts demonstrating that there is indeed a trial worthy issue.  Celotex Corp. v. Catret, 477 U.S. 317, 324 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; its requirement is that there be no genuine issue of material fact." Anderson v. Liberty, Inc., 477 U.S. 242, 247-48 (1986) (citations omitted).

To satisfy the criterion of trial worthiness an issue must be "genuine"; that is, the relevant evidence, viewed in the light most favorable to the party opposing the motion, must be sufficiently open-ended to permit a rational fact-finder to resolve the issue in favor of either side.  Anderson v. Liberty Lobby, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511 (1986).  Trial worthiness necessitates "more than simply showing that there is

some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. co. v. Zenith Radio Corp</u>., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355 (1986).

Trial worthiness also requires an issue that involves a "material" fact. <u>Liberty Lobby</u>, 477 U.S. at 248, 106 S.Ct. at 2510. In this context, the term "material" means that a fact has the capacity to sway the outcome of the litigation under the applicable law. <u>Id.</u> If the facts on which the non-movant relies are not material, or if its evidence "is not significantly probative", summary judgment is appropriate. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party ... [i]f the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u> 477 U.S. 242, 249-50 (1986)(citations omitted).

## V.   ARGUMENT

### A.   Rhodes Is Entitled To Judgment As A Matter Of Law On Count Twelve Alleging Defamation.

In Count Twelve of the Complaint, Plaintiff alleges a claim for defamation based on Rhodes' written statement dated January 21, 2002. "Under Connecticut law, liability for defamation requires proof 'that the [defendant] published false statements that harmed the [plaintiff], and that the [defendants] were not privileged to do so.'" <u>Malik v. Carrier Corp</u>., 202 F. 3d 97, 108 (2d Cir. 2000) (<u>quoting</u> <u>Kelley v. Bonney</u>, 221 Conn. 549, 563 (1992)). "Defamation is defined as [a]n intentional communication, either

published or publicly spoken, that injures another's reputation or good name; the unprivileged publication of false statements which naturally and proximately result in injury to another." Grossman v. Computer Curriculum Corp., 131 F. Supp. 2d 299, 312 (D. Conn. 2000) (internal quotations omitted). Summary judgment should be granted as a matter of law as to Count Twelve primarily because the statement was privileged. In addition, summary judgment may also be granted because the words Rhodes used in her statement were substantially true, were not defamatory, were expressions of opinion and did not cause injury to Plaintiff.

### 1. Rhodes' Written Statement Was Subject To A Qualified Privilege And Not Defamatory.

"Connecticut affords a qualified privilege to intracorporate communications." Malik v. Carrier Corp., 202 F. 3d 97, 108 (2d Cir. 2000); see also Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 29 (1995) ("Such communications … are necessary to effectuate the interests of the employer in efficiently managing its business"); King v. Cablevisions Systems of Southern Connecticut Limited Partnership, CV 940135725, 1998 WL 556162 *4 (Ct. Super. Aug. 24, 1998)[4] ("Intra-company communications made during an internal investigation into employee misconduct are generally privileged"). "There are two facets to the defense of privilege. The occasion must be one of privilege, and the privilege must not be abused … Whether the privilege was abused depends upon whether there was malice in fact …

---

[4] Copies of unpublished cases are attached as Exhibit A.

in uttering and broadcasting the alleged defamatory matter." <u>Malik v. Carrier Corp</u>., 202

F.3d at 108 (<u>citing</u> <u>Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc</u>., 234 Conn.

at 89).    Rhodes' written statement dated January 21, 2002 was made on occasion of

privilege and she did not abuse the privilege.

> **a.    Rhodes Communications With Ms. Anderson And The Written Statement Dated January 21, 2002 Were Made On An Occasion Of Privilege.**

There are five elements of a conditional privilege.  "(1) an interest to be

upheld, (2) a statement limited in its scope to this purpose, (3) good faith, (4) a proper

occasion, and (5) a publication in a proper manner to proper parties only." <u>Miles v.</u>

<u>Perry</u>, 11 Conn. App. 584, 595 (1987).  Rhodes had a legitimate interest to uphold when

she went to speak with Ms. Anderson and her statement was limited in scope.  In

addition, the statement was made in good faith, on a proper occasion and only to proper

parties.

It is undisputed that Rhodes and Plaintiff had been involved in a

consensual, personal relationship that went sour and, what had been a volatile, on-

again-off-again relationship, had evolved into a domestic dispute that Plaintiff brought

into the workplace when he changed Rhodes' voicemail password and denied her

access to her work voicemail.  He called her obsessively over the weekend and refused

to change her password back, requiring Rhodes to explain to her supervisor what had

happened to her voicemail and to ask the administrative assistant for help in getting the

password reset.  Moreover, Plaintiff claimed that he had reported Rhodes to security for allegedly harassing him.

It was only after Plaintiff interfered with Rhodes' ability to receive messages from her supervisor that she decided she needed to talk with someone at The Hartford about the situation.  She knew she would have to admit that she gave Plaintiff her password and that she could be disciplined for this violation of company policy.  However, Rhodes was afraid of what Plaintiff might do next and was very concerned about Plaintiff's obsessive behavior during the time she was in Florida. Accordingly, she called EOD and spoke to Ms. Anderson.  Rhodes explained about her relationship with Plaintiff and the situation with her voicemail password.  Rhodes answered Ms. Anderson's questions and signed a statement prepared by Ms. Anderson.  Rhodes only discussed the details of the situation privately with Ms. Anderson, one of the appropriate individuals at The Hartford to take and investigate employee complaints.[5]  Plaintiff himself admits that Rhodes' statement was only distributed to those individuals at The Hartford involved in the investigation and subsequent discipline of both Plaintiff and Rhodes.  There can be no question that Rhodes' responses to Ms. Anderson's questions and subsequent written statement were made on an occasion of privilege.   See King v. Cablevisions Systems of Southern Connecticut Limited Partnership, CV 940135725, 1998 WL 556162 *4 (Ct. Super. Aug.

24, 1998). ("Intra-company communications made during an internal investigation into

employee misconduct are generally privileged"

> **b.     Rhodes Did Not Abuse The Qualified Privilege And,
> Therefore, Summary Judgment As To Count Twelve Should
> Be Granted As A Matter Of Law.**

Once the defendant has shown, as in this case, that the statements

were made on an occasion of privilege, Plaintiff must present evidence establishing that

Rhodes abused that privilege.    "Although a qualified privilege insulates many

defamatory statements and shields many defendants from liability, the privilege does

not protect a defendant who makes statements that are both defamatory and malicious."

Gaudio v. Griffin Health Services Corp., 249 Conn. 523, 545 (1999).  The privilege is

abused if the defendant "made the statement about the plaintiff with actual malice – that

is, with knowledge of its falsity or reckless disregard as to its truth."  Torosyan v.

Boehringer Ingelheim Pharmaceuticals, Inc., *supra*, 234 Conn. 29.  "'A negligent

misstatement of fact will not suffice; the evidence must demonstrate a purposeful

avoidance of the truth.'"  Chadha v. Shimelman, 75 Conn. App. 819, 827, *cert. denied*

264 Conn. 909 (2003) (quoting Abdelwayed v. Narumanchi, 39 Conn. App. 778, 781,

*cert. denied* 237 Conn. 915, *cert. denied* 519 U.S. 868 (1996)).

In his Complaint, Plaintiff alleges that when Rhodes complained to Ms.

Anderson and said that she was afraid of Plaintiff, she wanted to get him fired.

---

[5] Plaintiff has made no claim that Rhodes' published her statement beyond the people in Human
Resources, Security and the Department of Special Investigations at The Hartford, the

(Complaint, ¶ 72.)  Plaintiff further alleges that in order to get him fired, Rhodes lied in her written statement and helped "The Hartford to portray [him] as a violent black criminal, and a threat of violence in the workplace."[6]  (Shorter Dep. II, p. 92)  These allegations are nothing more than conclusory statements and Plaintiff cannot come forward with solid evidence supporting this allegation.  See Chadha v. Shimelman, 75 Conn. App. 819, 827, cert. denied 264 Conn. 909 (2003) (quoting Wadira Enterprises Inc. v. Hirschfeld, 27 Conn. App. 162, 170, aff'd 224 Conn. 240 (1992)) ("Mere bald statements of legal conclusions … and bald assertions of fact, without more, are insufficient to raise a genuine issue of material fact capable of defeating summary judgment").

In Chadha, the court noted that although there was some evidence supporting the plaintiff's contention that the defendant's evaluation report was inadequate and incorrect; this did not provide a factual basis from which a trier of fact could conclude that the defendant prepared the evaluation with actual malice.  The court concluded that the evidence, at most, could only support a finding that the defendant had been negligent and "[a] negligent misstatement of fact will not suffice [to

_____

individuals involved in the investigation into Plaintiff's conduct.
[6]   Plaintiff seems to suggest that Rhodes in some way aided and abetted The Hartford in discriminating against him on the basis of his race.  Even though the Connecticut Fair Employment Practices Act.("CFEPA") provides for a cause of action against an individual for aiding and abetting, Plaintiff did not name Rhodes as a respondent in the charge of discrimination he filed with the Connecticut Commission on Human Rights and Opportunities and, therefore, failed to exhaust his administrative remedies with regard to such a claim.  Failure

establish malice]; the evidence must demonstrate a purposeful avoidance of the truth"
(Internal quotation marks omitted.) Id. at 829 (quoting Abdelsayed v. Narumanchi,
supra, 39 Conn. App. at 781).   "Although the existence of malice is an issue that must
be determined by the trier of fact, the plaintiff, to defeat summary judgment, [bears] the
burden of presenting a factual predicate for his contention that the defendant's actions
were taken with malice."  Id. at 831.

There is likewise no evidence to support Plaintiff's claim that Rhodes
went to Ms. Anderson for the purpose of lying to get Plaintiff fired by portraying him as a
violent black man.  Rather, she went to Ms. Anderson because the situation had gotten
out of control and was affecting her life at work and at home.  Rhodes did not know
what to do.  Plaintiff, a self-described "jealous dude", had just demonstrated an
obsession with Rhodes that would be frightening to any reasonable woman, or man.
While she was away, Plaintiff attempted to dominate and control Rhodes by taking away
and controlling her voicemail, a critical component of her work and personal life.  Now
that she was back from Florida, she did not know what to expect from Plaintiff.  He said
he had reported her to security.  She knew she had to do something.  Her supervisor's
administrative assistant gave her advice she followed: go to EOD.

At the time she met with Ms. Anderson, Rhodes did not know that
Plaintiff had previously been arrested for threatening or that he had a criminal record of

---

to exhaust administrative remedies is fatal under the CFEPA.  See Tyszka v. Edward McMahon

any kind.  Rather, she knew that by discussing the issue with Ms. Anderson, she would

be admitting to her own violation of company policy and that she would likely be

disciplined for this violation.

Rhodes made her January 21, 2002 statement to The Hartford on

occasion of privilege.  Plaintiff cannot establish that Rhodes in any way abused this

privilege.  Therefore, the Court should grant the motion for summary judgment as to

Count Twelve.

### 2.    The Statement Is Substantially True.

A statement that injures a person's reputation is not defamatory if it is true.

Substantial truth forms a basis for the defense of truth. <u>Stow v. Converse</u>, 4 Conn. 17,

33 (1821). "A workable test [of the substantial truth of the statement] is whether the libel

as published would have a different effect on the mind of the reader from which the

pleaded truth would have produced.  <u>Griffin v. Clemow</u>, 28 Conn.Supp. 109, 111 (1968)

(<u>quoting</u>  <u>Fleckenstein v. Friedman</u>, 266 N.Y. 19, 23, 193 N.E. 537). "It is not necessary

for the defendant to prove the truth of every word of the libel.  If he succeeds in proving

that 'the main charge, or gist, of the libel' is true, he need not justify statements or

comments which do not add to the sting of the charge or introduce any matter by itself

actionable."  <u>Goodrich v. Waterbury Republican-American, Inc.</u>, 188 Conn. 107, 113

(1982) (<u>quoting</u> Gatley, Libel and Slander (2d Ed.) p. 178).

---

<u>Agency</u>, 188 F. Supp. 2d 186, 195 (D. Conn. 2001).

In the instant case, Plaintiff admits that much of Rhodes' written statement dated January 21, 2002 is true, including that he accessed her work voicemail on January 18, 2002, changed her password, denied her access to her voicemail and called her obsessively over the weekend.  He also admits that on at least one prior occasion he had accessed Rhodes' work voicemail and deleted messages, and that he had yelled and screamed at her.  He also does not deny screaming at Rhodes' sister-in-law Deanna and her brother Michael.  He also admits to having some sort of physical altercation with her in which she complained that he was hurting her arm.  The statements Plaintiff does dispute describe similar conduct and do not change the essential nature of the statement Rhodes was asked to give to The Hartford.  Some of the statements Plaintiff claims to be false are simply Rhodes' opinion or are not capable of a defamatory meaning.

Thus, taking the statement as a whole, "the main charge, or gist," of the statement is true.  Thus it is not defamatory and Rhodes motion for summary judgment on this count should be granted. ."  <u>Griffin v. Clemow</u>, <u>*supra*</u>, <u>Goodrich v. Waterbury Republican-American, Inc.</u>, <u>*supra*</u>.

3. **Those Specific Portions Of The Statement Claimed To Be False Are Not Actionable As Defamation.**

a. **Nearly All Portions Of The Statement Claimed To Be False Are Not Capable Of Defamatory Meaning.**

Some of the statements made by Rhodes that Plaintiff claims are false could not be defamatory as they were not statements that "injure another's reputation or good name."  See Grossman v. Computer Curriculum Corp., 131 F. Supp. 2d 299, 312 (D. Conn. 2000) (internal quotations omitted).  The following statements at issue fall into this category:

- "After he found out about my having lunch with Scott, he told me that he was going to delete all the messages he left for me that I had saved on my personal cell phone and work phone."

- "he told me that he had a gun and he showed it to me."

- "Things were kind of quiet in the past week."

- "He called me on my cell phone and was asking questions about who I was going with, and where I was going." (In reference to Rhodes' January 18th.)

- "He said, 'I'm just messing with you.'"

- "I told him that it was important that I be able to hear work messages over the weekend.  He said, don't worry, there's nothing from your boss."

- "it's strange that he leaves his lunch in the refrigerator on T-14 (the 14th floor of her building at work) when he works on NP-6" (the 6th floor of another building).

Plaintiff and Rhodes had been involved in a consensual, romantic relationship that didn't work out.  They quite understandably disagree about who is at

fault in the break-up of that relationship.  In her written statement dated January 21, 2002, Rhodes said that when she spoke to Plaintiff on the phone before her flight on January 18, 2002, Plaintiff asked her questions about where she was going.  Rhodes also stated that when she later asked Plaintiff what he had done with her voicemail, he responded by saying something to the affect of "I am just messing with you."  Rhodes also stated that she told Plaintiff she needed to be able to access her voicemail so she could get messages from her supervisor.  Plaintiff denies that he asked Rhodes questions about where she was going and that he said, "I am just messing with you." He also denies that Rhodes told him she needed to get messages from her supervisor over the weekend of January 18, 2002.  Even accepting Plaintiff's version of these conversations as true, these statements are not defamatory.  See Grossman v. Computer Curriculum Corp., 131 F. Supp. 2d 299, 312 (D. Conn. 2000) (internal quotations omitted) ("Defamation is defined as [a]n intentional communication, either published or publicly spoken, that injures another's reputation or good name").

            Plaintiff claims that Rhodes' statement that he had a gun and had once shown it to Rhodes was false.  Rhodes explains in her affidavit that Ms. Anderson of The Hartford asked her whether Plaintiff had access to a weapon.  Rhodes responded recalling that when Plaintiff moved into her apartment in November 2001, he told her that he wanted her to know that he had a gun in the apartment and then showed her the gun in a box.  At the time, Rhodes appreciated that Plaintiff let her know he had a gun in the house.  She did not claim that Plaintiff ever threatened her with the gun and she did

not claim that she ever saw the gun again after November 2001.  Given the

Constitutional protection of the right to have fire arms, the simple fact of having a gun

cannot be defamatory.

Plaintiff suggests that by saying he had a gun and that she was afraid of

him, Rhodes sought to portray him as a violent, black criminal.   There is simply no

factual basis for this claim and it is a conclusion that does not follow from Rhodes'

response to a questions asked by Ms. Anderson.  Rather, Plaintiff would have the court

imply this meaning to Rhodes' statement.  However, the courts in Connecticut have

rejected a claim of defamation by implication. See Estate of Gomez Larson, 1999 WL

417819   (Ct. Super. January 19, 1999) (citing Strada v. Connecticut Newspapers, Inc.,

193 Conn. 313, 326 (1984)).

No claim of defamation may be maintained based on any of these

statements and, therefore, summary judgment should be granted as a matter of law.

> **b.   Statement That Plaintiff Bruised, Kicked and Threatened
> Rhodes And Her Brother Are Substantially True and Not
> Defamatory.**

Plaintiff has identified specific statements or parts of statements made by

Rhodes that he claimed were false.  The undisputed facts in this case establish that

some of these statements are true and thus not actionable as defamation.  See Malik v.

Carrier Corp., 202 F.3d 97, 109 (2000) (quoting Strada v. Connecticut Newspapers,

Inc., 193 Conn. 313, 316 (1984)) (truth is an absolute defense to an allegation of liable)[7].

First, Rhodes stated that on one occasion Plaintiff squeezed her arm and caused a bruise, and kicked her. At his deposition Plaintiff admitted having physical contact with Rhodes in an altercation near the door to the apartment they shared. There are disputes over the details of this, but he admits that Rhodes told him he was hurting her arm. By this admission, Plaintiff admits to circumstances in which she could have been bruised and cannot establish that this statement by Rhodes was false. It was during this same physical altercation at the door that Rhodes recalls Plaintiff kicking her. Even accepting Plaintiff's account of this incident for purposes of this motion, her statement remains substantially true. "Minor errors in a statement that is substantially true are not enough to give rise to liability." Malik v. Carrier Corp., 202 F.3d 97, 109 (2000).

Plaintiff acknowledges that he had screamed and yelled at Rhodes on more than one occasion. One of these occasions was after Plaintiff discovered that

_____

[7] During The Hartford's investigation and at his deposition, Plaintiff did not dispute the majority of the things Rhodes said in her January 21, 2002 written statement. He admitted that in December he accessed Rhodes voicemail and listened to a message from Rhodes' former boyfriend, Scott. He admitted that he screamed and yelled at Rhodes during a three-way phone call and this call was captured on Scott's answering machine. Plaintiff does not deny that Rhodes' sister-in-law heard him screaming and yelling at Rhodes. Finally, Plaintiff does not deny that he changed the password on Rhodes work voicemail more than once during the weekend of January 18, 2002, deleted her messages and called her dozens of times, at least every hour, while she was away over the weekend. Plaintiff also does not deny that he was a

Rhodes had lunch with her former boyfriend, Scott.  Plaintiff does not deny screaming at

Rhode's brother and sister-in-law.  During the weekend of January 18, 2002, after

discovering that Rhodes was in Florida visiting an old friend named Rich, he changed

her voicemail password at work and, told her that he reported her to security and called

her dozens of times, which by his own admission was at least on an hourly basis.

Plaintiff also told Rhodes via e-mail on January 18, 2002 e-mail that he was a "jealous

dude" and that he wouldn't forget her.  Plaintiff cannot dispute that Rhodes felt

threatened and felt Plaintiff threatened her brother.  To the extent this is factual, it is

solely within Rhodes' knowledge how she felt, but there certainly are sufficient

undisputed facts to give rise to such a feeling in any reasonable person.[8]  In her

statement, Rhodes did not specify the exact nature of Plaintiff's threat.  Plaintiff cannot

establish that Rhodes' statement was false or that Rhodes did not perceive his actions

as threatening.  See Stow v. Converse, 4 Conn. 17, 33 (1821) (holding that substantial

truth forms a basis for the defense of truth);  see also Goodrich v. Waterbury

Republican-American, Inc., 188 Conn. 107, 113, (1982) (quoting Gatley, Libel and

Slander (2d Ed.) p. 178) ("It is not necessary for the defendant to prove the truth of

every word of the libel.  If he succeeds in proving that 'the main charge, or gist, of the

---

jealous person.  As Plaintiff admits the truth of these statements they cannot be the basis for a
claim of defamation.
[8] The statements regarding threats may be more appropriately analyzed as expressions of
opinion which are not actionable.  See below.

libel' is true, he need not justify statements or comments which do not add to the sting of the charge or introduce any matter by itself actionable").

      **c.**     **Some Portions Of The Written Statement Claimed To Be False Are Expressions Of Opinion and Are Not Defamatory.**

"'To be actionable, the statement in question must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." See <u>Mr. Chow of New York v. Ste. Jour Azur S.A</u>., 759 F.2d 219, 230 (2d Cir. 1985) (no liability where restaurant review conveyed author's opinion rather than literal fact); <u>Hotchner v. Castillo-Puche</u>, 551 F. 2d 910, 913 (2d Cir. 1977 ("[a] writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be")"'.  <u>Daley v. Aetna Life & Casualty Co</u>., 249 Conn. 766, 795-96 (1999).

The following statements made by Rhodes on January 21, 2002, which are claimed to be false, are expressions of her opinion and, therefore, not defamatory:

- "Things were kind of quiet in the past week."

- "it's strange that he leaves his lunch in the refrigerator on T-14 (the 14th floor of her building at work) when he works on NP-6" (the 6th floor of another building).

- "he threatened Michael (Rhodes' brother); saying that he was going to get his buddies and go after him."

- "I am afraid of this guy.  He has threatened me and my brother.  It
  frightens me that he knows my sister-in-law's telephone number."

"A statement can be defined as factual if it relates to an event or state of affairs that existed in the past or present and is capable of being known ... In a libel action, such statements of fact usually concern a person's conduct or character ... An opinion, on the other hand, is a personal comment about another's conduct, qualifications or character that has some basis in fact..." (Citations omitted; emphasis in original.)  Goodrich v. Waterbury Republican-American, Inc., 188 Conn. 107, 111 (1982).   Although "this distinction [between fact and opinion] may be somewhat nebulous ... [t]he important point is whether ordinary persons hearing or reading the matter complained of would be likely to understand it as an expression of the speaker's or writer's opinion, or as a statement of existing fact." (Citations omitted, internal quotation marks omitted.) Id., 188 Conn. 111-12.

Rhodes statement that she found it odd that Plaintiff kept his lunch on the 14th floor in her building was an expression of her opinion.   Indeed, even though he worked on the 6th floor of another building, Plaintiff did keep his lunch in the refrigerator on the 14th floor of the building where Rhodes worked.  Likewise, in Rhodes' opinion things had been quiet during the week prior to her trip to Florida.  These completely innocuous statements of opinion are not defamatory.

The remaining statements concerning threats and that she was afraid of Plaintiff and/or that she was frightened that Plaintiff had her sister-in-law's phone

32

number, are the personal feelings and opinion of Rhodes in reaction to Plaintiff's conduct during the weekend of January 18 through January 20, 2002 and throughout their relationship.  To the extent these statements can be considered factual, they were true expressions of Rhodes' feelings at the time and were not defamatory regardless of whether Plaintiff believes them to be true or not.  To the extent statements are not capable of being proven true or false, they are Rhodes' opinion and cannot be defamatory.  The statements based on Rhodes perception of threats by Plaintiff are also expressions of opinion.

Based on the undisputed facts in this case, Rhodes reasonably interpreted Plaintiff's actions as threatening to her and to her brother.  In her opinion they were threatening.  Plaintiff may very well have a different opinion, but neither his nor Rhodes' opinion, as a matter of law, can be the basis for a defamation claim.  Applying the law as articulated by the Connecticut Supreme Court shows that these words are not defamatory.  "A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be."  Hotchner v. Castillo-Puche, 551 F. 2d 910, 913 (2d Cir. 1977); see also Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 795- 796 (1999) (same).

> **4.   Plaintiff Has No Pecuniary Loss Attributable To The Claimed Defamatory Statements As The Statements Did Not Cause His Termination.**

The absence of pecuniary harm is another reason summary judgment may be granted.  Without a showing of special damages for actual pecuniary loss, there is no viable defamation claim.  <u>Miles v. Perry</u>, 11 Conn. App. 584, 602 (1987).  Obviously Plaintiff wants to blame Rhodes for causing his termination.  However, it was his own conduct which was verified by The Hartford's investigation that caused his termination.  As is shown more fully below in the analysis of the claim for tortious interference, Rhodes did not cause Plaintiff's discharge.

5.    **Conclusion:  There Are No Disputed Issues of Fact Requiring A Trial Of The Defamation Claim.**

Given the privilege afforded Rhodes in responding to her employer's request for a statement as part of an internal investigation, the substantial truth of that statement, the opinions expressed by Rhodes, and that Rhodes's statement was not the cause of Plaintiff's termination, no trial is required to dismiss this Count.  See Wadira Enterprises, Inc. v. Hirschfeld, 27 Conn. App. 162, 170, *aff'd* 224 Conn. 240 (1992) (holding that "mere … bald assertions of fact, without more, are insufficient to raise a genuine issue of material fact capable of defeating summary judgment"); see also Matsushita Elec. Indus. co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1355 (1986) (trial worthiness necessitates "more than simply showing that there is some metaphysical doubt as to the material facts.")

Accordingly, summary judgment should be granted as to Count Twelve, Plaintiff's claim of defamation against Rhodes.

B.    **Count Eleven, Tortious Interference With Contract And Prospective Economic Advantage, Should Be Dismissed As Rhodes Conduct Was Not Tortious And Did Not Cause Plaintiff's Discharge.**

Plaintiff claims that Rhodes intentionally sought to interfere with his employment relationship with The Hartford by making false and defamatory allegations about him.  (Complaint, ¶ 158.)  In order to establish that Rhodes tortiously interfered

35

with Plaintiff's employment contract, Plaintiff must establish (1) the existence of a

contract between him and another party; (2) that Rhodes knew of that relationship; (3)

that Rhodes intended to interfere with that relationship; (4) that the interference was

tortious; and (5) that as a result of the interference, Plaintiff suffered actual loss.

Appleton v. Board of Ed., 254 Conn. 205, 212-13 (2000).

Plaintiff cannot establish that Rhodes tortiously interfered with his

employment relationship with The Hartford.  Furthermore, he cannot establish that the

termination of his employment relationship with The Hartford was caused by Rhodes'

January 21, 2002 statement to The Hartford.

**1.    Rhodes' Conduct In Making A Complaint To The Hartford About Plaintiff Was Not Tortious.**

In order to be tortious, the conduct must be wrongful by some measure

beyond the fact of the interference itself.  Blake v. Levy, 191 Conn. 257, 262 (1983)

(holding that not every act that disturbs a contract is actionable).  "[F]or a plaintiff

successfully to prosecute such an action it must prove that the defendant's conduct was

in fact tortious.  This element may be satisfied by proof that the defendant was guilty of

fraud, misrepresentation, intimidation or molestation … or that the defendant acted

maliciously."  Robert S. Weiss and Assoc., Inc. v. Wiederlight, 208 Conn. 525, 536

(1988).

Plaintiff relies on the same allegations he made in support of his claim for

defamation.  He claims that Rhodes' written statement dated January 21, 2002 was

36

defamatory and that she "told The Hartford that she was fearful of Plaintiff to ensure that

Plaintiff would be terminated and to justify [her own] violation of The Hartford's

Electronics Communications Policy."   (Complaint, ¶ 72.)

In order to establish either a claim for defamation or for tortious

interference with a contract based on these allegations, Plaintiff must establish that

Rhodes acted maliciously when she made her statement to Ms. Anderson.  As

discussed in detail in the previous section, there is no evidence to support Plaintiff's

conclusory allegations that Rhodes acted with malice.

>    **2.**    **Even If Plaintiff Could Establish That Rhodes' Actions In**
>         **Complaining To The Hartford Were Tortious, He Cannot**
>         **Establish That As A Result Of The Alleged Interference, He**
>         **Suffered Actual Loss.**

"'Unlike other torts in which liability gives rise to nominal damages even in

the absence of proof of actual loss … it is an essential element of the tort of unlawful

interference with business relations that the plaintiff suffers actual loss.'"   Appleton v.

Board of Ed., 254 Conn. 205, 213 (2000) (quoting Taylor v. Sugar Hollow Park, Inc., 1

Conn. App. 38, 39 (1983)).  Plaintiff cannot establish that the termination of his

employment was caused by Rhodes' complaint and written statement dated January 21,

2002.  Even though Rhodes' complaint resulted in The Hartford conducting an

investigation into Plaintiff's conduct, it was the information obtained during the

investigation that led to the termination of Plaintiff's employment.  The most damaging

information was not obtained from Rhodes, but directly from Plaintiff himself in that he admitted to most of the conduct and to violations of The Hartford's policies.

In particular, The Hartford confirmed through phone records and by Plaintiff's own admission that he had accessed Rhodes' voicemail repeatedly during the period from January 18 through 20, 2002 and had changed Rhodes' voicemail password four times during this same period, denying her access to her voicemail. The Hartford made the decision to terminate Plaintiff's employment finding his violation of the Electronics Communications Policy to be very serious.  Rhodes did not have any input into this decision and did not have the power or authority to terminate Plaintiff's employment.

In <u>Appleton v. Board of Education</u>, the court upheld the trial court's decision to grant judgment for the defendant on the plaintiff's claim for tortious interference with her employment contract.  In that case, the plaintiff alleged that the defendants forced her to take a leave of absence suggesting she was under too much stress.  After taking the leave, plaintiff voluntarily resigned her employment.  The court held that the plaintiff did not suffer any injury as a result of any tortious conduct on the part of the defendants because she voluntarily resigned her employment and, therefore, the defendants' actions did not cause her termination.   Even though in the instant case Plaintiff did not resign his employment, his employment was terminated as a result of his own misconduct and admitted violations of The Hartford's policies.  The undisputed facts in this case, establish that Rhodes' was not the cause of the termination of

Plaintiff's employment and, therefore, summary judgment should be granted as to Count

Eleven of the Complaint.

**VI.    CONCLUSION.**

For the foregoing reasons, Defendant Rhodes' motion for summary

judgment should be granted as to Counts Eleven and Twelve.

**DEFENDANT,**
**MARYANNE RHODES**


By_____
     David L. Metzger, Esq.(ct02035)
     Metzger & Associates
     25 Capitol Avenue
     Hartford, CT  06106
     (860) 549-5026

<u>CERTIFICATION OF SERVICE</u>

This is to certify that a copy of the foregoing was sent via first class mail, postage prepaid, on this 19th day of February 2004, to the following counsel of record:

Rachel M. Baird
Law Office of Rachel M. Baird
379 Prospect Street
Torrington, CT 06790

Margaret J. Strange
James F. Shea
Jackson Lewis LLP
55 Farmington Avenue, Suite 1200
Hartford, CT  06105


_____
David L. Metzger