UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                    :
FERRON SHORTER, JR.,                :
     Plaintiff,                     :
                                    :   CIVIL NO.
                                    :   303 CV149(WIG)
v.                                  :
                                    :
HARTFORD FINANCIAL SERVICES GROUP,  :
INC. and MARYANNE RHODES,           :
     Defendants.                    :   February 19, 2004
_____:

**DEFENDANT MARYANNE RHODES' LOCAL RULE 56(a)(1)
STATEMENT IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The Defendant, MaryAnne Rhodes ("Rhodes"), pursuant to Fed. R. Civ. P. 56 and L. R. Civ. P. 56(A)(1), respectfully submits this statement of undisputed material facts in support of her motion for summary judgment.

**The Parties**

1. The Defendant, MaryAnne Rhodes ("Rhodes"), was an employee of Hartford Financial Services Group ("The Hartford") until she resigned her employment in April 2003. During the period relevant to the complaint, Rhodes worked as a Senior Accountant in the Corporate Financial Reporting Department at The Hartford.[1] (Affidavit of MaryAnne Rhodes ("Rhodes Aff.")[2], ¶ 1.)

---

[1] Rhodes resigned her employment with The Hartford in April 2003 and no longer works for the company.
[2] Affidavit of MaryAnne Rhodes is attached as Exhibit A..

2. The Plaintiff, Ferron Shorter (the "Plaintiff"), was an employee of The Hartford from October 9, 1989 until The Hartford terminated his employment was effective January 23, 2002. (Deposition of Ferron Shorter dated April 15, 2003 ("Shorter Dep. I")[3], pp. 38-39.)

3. At the time his employment was terminated, Plaintiff worked as a Technician for The Hartford. (Shorter Dep. I, pp. 38-39, 91-92.)

4. Plaintiff and Rhodes did not work in the same Department and their desks were not in the same building. (Complaint, ¶¶ 19 and 20.)

**Relationship Between Rhodes and Plaintiff**

5. By July 2001, Plaintiff and Rhodes had become involved in a consensual, romantic relationship. (Shorter Dep. I, pp. 116, 118; Rhodes Aff., ¶ 3.)

6. During the period from July through November, Plaintiff and Rhodes regularly met in the cafeteria at The Hartford. They also spoke to each other regularly on the phone and exchanged e-mail. (Shorter Dep. I, pp. 118, 130; Rhodes Aff. ¶ 4.)

7. In November 2001, Plaintiff moved into Rhodes apartment in Vernon, Connecticut. (Amended Complaint dated April 28, 2003 ("Complaint"), ¶ 28; Rhodes Statement[4]; Rhodes Aff. ¶ 5.)

8. In order to assure Plaintiff that she was not involved with other men, Rhodes gave Plaintiff the password for her personal voicemail and also told

---

[3] Excerpts from the transcript of the Deposition of Ferron Shorter dated April 15, 2003 are attached as Exhibit B.

2

Plaintiff that this was the same password she used for her voicemail at work. (Complaint, ¶ 27; Rhodes Aff., ¶ 8; Rhodes Statement.)

9. Plaintiff and Rhodes lived together in the Vernon apartment until on or about December 16, 2001, when Plaintiff moved out of the apartment. (Complaint, ¶ 31; Rhodes Aff. ¶ 6.)

10. During the period they lived together, Rhodes and Plaintiff had a volatile relationship. (Deposition of Ferron Shorter dated September 5, 2003 ("Shorter Dep. II")[5], p. 83; Rhodes Aff., ¶ 7; Rhodes Statement.)

11. During the relationship, Plaintiff could be very jealous of other men in Rhodes' life. (Rhodes Statement.)

12. Late in December and around December 27, 2001, Plaintiff and Rhodes reconciled for a short period of time. (Shorter Dep. I, p. 131.)

13. On or about December 30, 2001, Plaintiff accessed Rhodes voicemail at work and listened to a message from a man named Scott, who was Rhodes' former boyfriend. The message referred to a lunch date and Plaintiff became jealous believing that Rhodes had lied to him about being involved with other men. (Shorter Dep. I, p. 132-133; Shorter Dep. II, p. 26; Shorter Statement[6]; Rhodes Aff. ¶ 9; Rhodes Statement.)

14. In addition to listening to the voice mail left by Scott, Plaintiff also deleted messages he had left for Rhodes on her voicemail at work. (Shorter Dep. II, pp. 90-91; Rhodes Aff., ¶ 10; Rhodes Statement.)

---

[4] Rhodes' Statement is attached as Exhibit C.
[5] Excerpts from the Deposition of Ferron Shorter dated September 5, 2003 are attached as Exhibit D
[6] Statement of Ferron Shorter is attached as Exhibit E.

15. On or about December 31, 2001, Plaintiff called Rhodes and then connected the call to Scott's voice mail in a three-way call. Plaintiff's "obscenity-laced tirade" in which he berated and screamed at Rhodes was recorded on Scott's answering machine. (Complaint, ¶ 46; Shorter Dep. I, pp. 133-135; Rhodes Aff., ¶ 10; Rhodes Statement; Affidavit of Lisa Anderson dated January 22, 2004 ("Anderson Aff.")[7], ¶ 8.)

16. Plaintiff was out of work on vacation for most of the first two weeks of January 2002. During the week of January 14, 2002. Plaintiff and Rhodes talked on several occasions and spoke on the telephone. During one of these conversations, Rhodes told Plaintiff she was going away during the weekend of January 18, 2002 to visit her sister in South Carolina. Rhodes did not tell Plaintiff where she was really going because she believed he would be jealous and would get angry. (Shorter Dep. I, pp. 128, 139, 154-155; Rhodes Aff., ¶ 12; Rhodes Statement.)

**The Weekend of January 18, 2002**

17. On or about Friday, January 18, 2002, Rhodes flew to Florida to visit an old friend named Rich. (Rhodes Statement; Rhodes Aff., ¶ 13; Shorter Statement; Shorter Dep. I, pp. 154-155.)

18. When Rhodes arrived in Florida around 6:00 p.m., she tried to check her messages at work and was unable to access her voicemail. (Rhodes Aff., ¶ 14; Rhodes Statement.)

---

[7] Affidavit of Lisa Anderson dated January 22, 2004 is attached as Exhibit F.

19. Rhodes called Plaintiff on her cell phone and asked him what he did with her voicemail. (Rhodes Statement; Shorter Statement; Rhodes Aff. ¶ 15.)

20. Plaintiff admitted that he had changed the password so that she could not access her work voicemail. Rhodes asked Plaintiff to change the password back. (Complaint, ¶ 54; Rhodes Statement; Shorter Statement; Rhodes Aff. ¶ 16.)

21. Prior to leaving for Florida, Rhodes told her supervisor, Brian Vadney, that she would check voice mail and be available to work, if necessary. (Rhodes Statement; Rhodes Aff., ¶ 17.)

22. Unable to access her voice mail, Rhodes called her supervisor on Friday, January 18, 2002 and asked him to leave messages for her at her hotel and not on either her work or cell phone voicemail. Rhodes told her supervisor someone had changed her voicemail password. (Rhodes Statement; Rhodes Aff., ¶ 18; Anderson Aff. ¶ 6; Deposition of Lisa Anderson dated August 29, 2003 ("Anderson Dep."), P. 18[8].)

23. Plaintiff called Rhodes on Saturday morning, January 19, 2002. Rhodes told Plaintiff that if he didn't change her password back, she would report him to security when she returned to work. (Rhodes Statement; Shorter Statement; Rhodes Aff. ¶ 20.)

24. Shortly after this conversation in which Rhodes told him she would report him to security if he didn't change her password back, Plaintiff returned to work and told two security guards who worked for the security company that

5

serviced The Hartford that a woman kept coming to his desk and he wanted her to stop. He was at work on that Saturday afternoon for a total of eight (8) minutes. (Shorter Statement; Shorter Dep. I, pp. 190-192; Anderson Dep., pp. 26-27.)

25. Late in the day on Sunday, January 20, 2002, Rhodes took one of the many calls from Plaintiff. Plaintiff told Rhodes that he went to security first and reported that Rhodes was allegedly harassing him. (Rhodes Statement; Complaint, ¶ 58; Rhodes Aff. ¶ 21.)

26. Plaintiff admitted in a written statement to The Hartford that over the weekend of January 18 through 20, 2002, he accessed Rhodes voicemail up to ten (10) to fifteen (15) times, that he changed her voicemail password at least twice and deleted messages from her voicemail. (Shorter Dep. I, pp. 46, 176, 205; Shorter Statement.)

27. Rhodes' voice mail records at The Hartford indicated that her voice mail was accessed more than forty (40) times between 3:00 p.m. on Friday, January 18, 2002 and 1:30 a.m. on Monday, January 21, 2002. The records also indicated that her password was changed at 5:01 p.m. and 5:18 p.m. on January 18, 2002 and that her password was changed an additional two times during the weekend. (Anderson Aff., ¶ 9; Shorter Dep. I, p. 46.)

28. In addition, Plaintiff repeatedly called Rhodes on her cell phone over the same weekend. At his deposition, Shorter stated "I was trying to call her probably every, at least every hour to try to connect her so she can hear that message." Shorter went on to say that "half the times she hang up. Half the

---

[8] Excerpts from the Deposition of Lisa Anderson dated August 29, 2003 are attached as Exhibit G.

time, she didn't pick up the phone … It was dozens." (Shorter Dep. I, pp. 162-163; Rhodes Aff. ¶ 19.)

29. When Rhodes spoke to Plaintiff late in the day on Sunday, January 20, 2002, in addition to telling Rhodes that he reported her to security first, Plaintiff told Rhodes that he told security he did not want her at his desk any more. Rhodes responded by telling Plaintiff that if he didn't change her password back before she got back to work on Monday, she would go to security and he wouldn't have to worry about her going over to his desk because he would not have one. (Rhodes Aff., ¶ 21; Shorter Dep. I, p. 207; Shorter Statement.)

**Rhodes' Complaint To The Hartford About Plaintiff**

30. When Rhodes returned to work on Monday, January 21, 2002, Rhodes' supervisor, Brian Vadney, spoke with her about her inability to access her voicemail over the weekend and how that had occurred. Rhodes briefly explained what had happened, but did not share any details regarding the relationship with Plaintiff. Rhodes felt that her supervisor was understandably disturbed by what had happened. (Rhodes Aff., ¶¶ 22, 23.)

31. Rhodes asked Mr. Vadney's administrative assistant what she needed to do to reset her password, which was then done. The administrative assistant then suggested to Rhodes that she speak with someone in The Hartford' Equal Opportunity Division ("EOD") about the situation. (Rhodes Aff., ¶¶ 24-25.)

32. Rhodes was worried about the situation as she felt it was out of control. Her supervisor was aware that Plaintiff had changed her voicemail

password and Plaintiff claimed to have reported her to security. (Rhodes Aff., ¶ 26.)

33. Rhodes took the administrative assistant's advice and called EOD. Rhodes was referred to Lisa Anderson, a Consultant in EOD. (Rhodes Aff. ¶ 28.)

34. Rhodes told Ms. Anderson about what had occurred over the weekend. In particular, Rhodes told Ms. Anderson about Plaintiff changing her voicemail password, calling her repeatedly over the weekend, and that he claimed to have reported her to security over the weekend. (Anderson Dep., pp. 8-10; Rhodes Aff., ¶ 28; Rhodes Statement.)

35. In her capacity as a Consultant in EOD, Ms. Anderson was one of the individuals at The Hartford responsible for hearing and responding to employee complaints of harassment and discrimination. (Anderson Aff., ¶ 1.)

36. Rhodes was very concerned about Plaintiff's behavior over the weekend of January 18, 2002 and she didn't know what he would do now that she was back. This obsessive behavior, in combination with past incidents when he yelled and had been jealous, made her fearful of him when she returned to work on January 21, 2002. (Rhodes Aff., ¶ 27.)

37. Rhodes told Ms. Anderson that she had a personal relationship with Plaintiff, that she gave Plaintiff the password to her work voicemail and that she should not have given him the password. However, she did not give him permission to change the password or delete messages from her voicemail. (Shorter Dep. I, p. 44; Rhodes Statement; Rhodes Aff., ¶ 29.)

8

38. Rhodes explained that Plaintiff had accessed her voicemail and changed her password over the weekend. Rhodes also told Ms. Anderson that she had contacted her supervisor Brian Vadney, on Friday, January 18, 2002, to let him know she was having trouble with voicemail in case he needed to reach her. Rhodes also told Ms. Anderson about the incident in December 2001, when Plaintiff accessed her voicemail heard the message from Scott and also deleted messages from Rhodes' voicemail. (Rhodes Statement.)

39. Rhodes was interviewed by Ms. Anderson who asked Rhodes specific questions about her relationship with Plaintiff. In particular, Ms. Anderson asked Rhodes something to the effect of whether Plaintiff had access to a weapon. In response to this question, Rhodes told Ms. Anderson that when Plaintiff moved into her apartment in November 2001, he told her he had a gun because he knew Rhodes did not like guns and he wanted Rhodes to be aware it was in the apartment. Rhodes also told Ms. Anderson that Plaintiff then showed her the gun, which he kept in a box. (Rhodes Aff., ¶ 30.)

40. Ms. Anderson also asked Rhodes questions about whether Plaintiff had ever hit her or been violent with her. Rhodes noted that during their relationship, Plaintiff "could be very jealous. He had a bad temper and would scream at her." Rhodes shared with Ms. Anderson the incident when Plaintiff bruised her arm and kicked her. She also told Ms. Anderson that Plaintiff had threatened her and her brother. Rhodes told Ms. Anderson that at that time, she was afraid of Plaintiff. (Rhodes Aff. ¶ 31; Rhodes Statement.)

9

**Rhodes' Written Statement**

41.     After the interview with Ms. Anderson, at Ms. Anderson's request, Rhodes signed a written statement summarizing the interview. The statement and summary were prepared by Ms. Anderson. (Rhodes Aff., ¶ 32; Anderson Aff., ¶ 4.)

42.     It is the written statement that is claimed to be defamatory and the basis for the tortious interference claim. (Complaint, Count Eleven, ¶ 158 and Count Twelve, ¶ 160.)

43.     Ms. Anderson told Rhodes that she would look into things and find out when the voicemail password had been changed. (Rhodes Statement; Anderson Dep., pp. 9-10; Rhodes Aff., ¶ 32.)

44.     At the time she made her statement to Ms. Anderson, Rhodes was not aware that Plaintiff had previously been arrested for threatening or that he had any type of criminal record or record of any infraction. (Rhodes Aff., ¶ 33.)

45.     Plaintiff acknowledged that Rhodes' statement was not circulated beyond the people at The Hartford with a need to know and who were involved in the investigation of the matter and the decisions related to discipline. (Shorter Dep. II, p. 81.)

**Portions of Written Statement Plaintiff Claims Are False**

46.     At his deposition, Plaintiff testified that only some of what Rhodes said about him in the written statement was false. He claims that the following statements in that document were false: (Shorter Dep. II, pp. 81-90; Shorter Statement.)

- "After he found out about my having lunch with Scott, he told me that he was going to delete all the messages he left for me that I had saved on my personal cell phone and work phone."

- "He has squeezed my arm and it bruised, and he kicked me."

- "he told me that he had a gun and he showed it to me."

- "he threatened Michael (Rhodes' brother); saying that he was going to get his buddies and go after him."

- "Things were kind of quiet in the past week."

- "He called me on my cell phone and was asking questions about who I was going with, and where I was going." (In reference to Rhodes' January 18th.)

- "He said, 'I'm just messing with you.'"

- "I told him that it was important that I be able to hear work messages over the weekend. He said, don't worry, there's nothing from your boss."

- "He told me something like, that if I did that and he lost his job, then he'd have nothing to lose and he would come after me." (In response to Rhodes telling him she was going to Security.)

- "I am afraid of this guy. He has threatened me and my brother. It frightens me that he knows my sister-in-law's telephone number.

- "it's strange that he leaves his lunch in the refrigerator on T-14 (the 14th floor of her building at work) when he works on NP-6 (the 6th floor of another building).

47. These are the only portions of Rhodes' written statement of January 21, 2002 that Plaintiff claims were false. (Shorter Dep. II, pp. 81-90; Shorter Statement.) Moreover, during his deposition, Plaintiff testified that he recalled an incident when he tried to push by Rhodes to get to the door of the apartment in which they were living and that she told him at the time, that he was hurting her arm. (Shorter Dep. II, PP. 82-83.)

**Investigation Conducted By The Hartford**

48. After taking Rhodes' statement, Ms. Anderson told Rhodes that she would look into things. The Hartford obtained records verifying Rhodes' account of what had occurred between Rhodes and Plaintiff during the period from January 18 through 20, 2002. (Anderson Dep., p. 17; Anderson Aff. ¶¶ 5-9, 11.)

49. The Hartford confirmed that Rhodes had been on a plane to Florida when her voicemail password had been changed during the afternoon of Friday, January 18, 2002. (Anderson Dep., p. 17; Anderson Aff. ¶ 7.)

50. The Hartford also confirmed through phone records that Rhodes' voicemail account had been accessed approximately forty (40) times between 3:00 p.m. on Friday, January 18, 2002 and 1:30 p.m. on Monday, January 21, 2002. In addition, The Hartford confirmed that Plaintiff had changed the password more than once and deleted messages from Rhodes' voicemail. (Anderson Dep., p. 17; Anderson Aff. ¶ 9.)

51. The Hartford also reviewed the e-mails stored on the computer Plaintiff used at work and found an e-mail Plaintiff sent to Rhodes on January 18, 2002. In the e-mail, Plaintiff referred to himself as a "real jealous type of dude" and stated, "Remember this nigga won't forget about you right away!" (Anderson Dep., p. 35; Shorter Dep. I, P. 145, 154.)

52. In addition, The Hartford obtained records indicating that Plaintiff had been arrested for threatening and other criminal offenses and that he had been found guilty of a misdemeanor. (Anderson Dep., p. 23.)

53. On Tuesday, January 22, 2002, Ms. Anderson called and told Rhodes that The Hartford was going to speak with Plaintiff about his changing the voicemail password. At this point, Rhodes was afraid of how Plaintiff would react and for a week or more she stayed with her friend, Lisa, rather than at her apartment alone. (Rhodes Aff. ¶ 34.)

54. An employee in The Hartford's Department of Special Investigations interviewed Plaintiff. Plaintiff acknowledged that he had accessed Rhodes' voicemail and changed her password over the weekend of January 18, 2002. (Shorter Statement; Anderson Dep., p. 35.)

**Disciplinary Action Taken By The Hartford**

55. Rhodes was given a written warning for sharing her password with Plaintiff. (Anderson Dep., pp. 64-67; Rhodes Aff., ¶ 35.)

56. Plaintiff's employment was terminated. (Anderson Dep., pp. 20-23, 67, 75-76; Anderson Aff. ¶ 12; Deposition of Jennifer L. Ames dated August 29, 2003 ("Ames Dep.")[9], pp. 40-41, 50-51.)

57. Immediately following the termination of Plaintiff's employment, Rhodes began receiving a large volume of calls both at work and on her cell phone in which the caller would hang up on her. (Rhodes Aff. ¶ 36.)

**DEFENDANT,
MARYANNE RHODES**

By_____
David L. Metzger, Esq. (ct02035)
Metzger & Associates
25 Capitol Avenue
Hartford, CT  06106
(860) 549-5026

---

[9] Excerpts from the Deposition of Jennifer L. Ames dated August 29, 2003 are attached as Exhibit H.

## **CERTIFICATION OF SERVICE**

This is to certify that a copy of the foregoing was sent via first class mail, postage prepaid, on this 19th day of February 2004, to the following counsel of record:

Rachel M. Baird
Law Office of Rachel M. Baird
379 Prospect Street
Torrington, CT 06790

Margaret J. Strange
James F. Shea
Jackson Lewis LLP
55 Farmington Avenue, Suite 1200
Hartford, CT  06105

                                               _____
                                               David L. Metzger