UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FERRON SHORTER JR., | : | |
| | : | |
| Plaintiff, | : | CASE NO. 3:03CV0149(WIG) |
| | : | |
| v. | : | |
| | : | |
| HARTFORD FINANCIAL SERVICES | : | |
| GROUP, INC., et al., | : | |
| | : | |
| Defendants. | : | MARCH 22, 2004 |

**SHORTER'S MEMORANDUM OF LAW IN SUPPORT OF OBJECTION TO
DEFENDANT HARTFORD FINANCIAL SERVICES GROUP, INC.'S
AND DEFENDANT MARYANNE RHODES'
MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Ferron Shorter Jr. ("Shorter") submits this memorandum in response to

Defendant Hartford Financial Services Group, Inc. ("The Hartford")'s Motion for Summary

Judgment as to Counts One through Ten, inclusive, and Count Thirteen of his Amended

Complaint and in response to Defendant MaryAnne Rhodes ("Rhodes")'s Motion for Summary

Judgment as to Counts Eleven and Twelve of his Amended Complaint.

I.    **Introduction and Outline of Memorandum**

In this memorandum, Shorter addresses four courses of action taken by The Hartford

which provide adequate measure of inference, and, at least as regards inappropriate handwritten

notations made by Lisa Anderson ("Ms. Anderson"), a company Equal Opportunity

Development (EOD) Department consultant, direct evidence, that race and sex were considered

and account for the differential in treatment between Defendant MaryAnne Rhodes ("Rhodes"),

a white woman with a professional degree, and Shorter, a black man with a high school

education who had overcome the hardship of his youth to maintain a twelve year honorable and

meritorious career at The Hartford.

A.    <u>Circumstantial and Direct Evidence of Discrimination</u>

The first course of action taken by The Hartford, referenced above and addressed in section II(D)(i), below, was the company's biased and discriminatory investigation of the allegations attributed to Rhodes about Shorter's violent tendencies. From the first investigatory notes written by Ms. Anderson on January 21, 2002, indicating that Rhodes was a "S, W, F" and Shorter a "S, B, M," the investigation never progressed beyond the company's perceptions about Shorter as the black, male perpetrator and Rhodes as the white, female victim. (Anderson Notes, Affidavit of Rachel M. Baird, Ex. 1 at pp. 1-2; hereinafter, "Baird Aff., Ex. ___.") The company maintains that Shorter was terminated for violating the company's Electronic Communications Policy (ECP), the perceived safety threat, and for his failure to be truthful during The Hartford's investigation. (The Hartford's Interrogatories, Baird Aff., Ex. 2 at No. 3.) The perceived safety threat arose from (a) a taped phone conversation that Rhodes presented to Ms. Anderson on January 21, 2002, (b) an email transmitted from Shorter to Rhodes, (c) the company's contention that Shorter had a criminal record for threatening, (d) Rhodes' false statements that she feared Shorter, and (4) voicemail activity reported on Rhodes' account. (The Hartford CHRO Affidavit; Baird Aff., Ex. 3 at ¶ 45.) The company's consideration of each was a function of Ms. Anderson's initial contact with Rhodes.

The second course of action taken by The Hartford, referenced above and addressed in section II(D)(ii), below, was the company's determination that Shorter would be terminated and a written warning issued to Rhodes. This determination was made despite the fact that (a) Rhodes had been disciplined previously for an ECP violation, (b) Shorter had a twelve year employment record at The Hartford with no disciplinary record, and (c) the lack of any written or

unwritten company policy supporting the more adverse employment action imposed upon

Shorter than imposed upon Rhodes. (Rhodes Interrogatories, Baird Aff., Ex. 4 at No. 6.)

The third course of action taken by The Hartford, referenced above and addressed in

section II(D)(iii), below, was the company's complete disregard for Shorter's complaint of

sexual harassment against Rhodes, which, unknown to Shorter until after the disposition of his

administrative discrimination filing, was supported by a work colleague's voluntary and

unsolicited written, notarized statement taken by the company on February 8, 2002. (Kuck

Statement, Baird Aff., Ex 5.)

The fourth course of action taken by The Hartford, referenced above and addressed in

section II(D)(iv), below, was the company's decision not to hold Rhodes responsible for her

untruthfulness even when evidence was presented to The Hartford, and Rhodes' behavior

indicated, that Rhodes had never been fearful of Shorter and had been intentionally and

maliciously untruthful in her statements about Shorter to the company.

B.    Discrimination Biased Company's Conduct of the Investigation

In its Motion for Summary Judgment, The Hartford attempts to provide neutral reasons

for terminating Shorter's employment on January 23, 2002, but its neutral reasons are founded in

an investigation tainted by perceptions about black men and violence and white women as their

victims.  From the commencement of the company's investigation on January 21, 2002, when

Ms. Anderson determined that, in obtaining a statement from Rhodes, she would deviate from

The Hartford's policies of (a) requiring employees to swear to the truth of statements made in the

course of an investigation and (b) informing the employee of the contingency of continued

employment upon such truthfulness, every fact consistent with Ms. Rhodes' version of her

position as a victim was accepted as truth and every fact not so consistent ignored as irrelevant,

and every allegation consistent with The Hartford's perception that Shorter was a violent threat

not only to Rhodes but to the workplace in general was accepted as truth and every fact so

inconsistent ignored. Shorter had no chance to be heard because of the class he belongs, that of a

black male. Rhodes' unsworn, non-employment contingent statements were accepted as credible

against Shorter because of the class she belongs, white female.

   C.    Discriminatory Conduct of the Company's Investigation Resulted in Unlawful
         Termination

   In the course of its investigation, the company assumed the racist, gender biased, and,

therefore, by default, false premises (1) that Shorter could not have experienced harassment

when Rhodes stalked him at his work after he ended their relationship in December of 2001; (2)

that Rhodes must have been Shorter's victim; (3) that Rhodes' violation of the company's ECP

and Corporate Code of Conduct could be blamed on Rhodes' fear of Shorter and was not

attributable to Rhodes' actions as an adult, professional woman; and (4) that Shorter's actions

could not be attributed to his feeling of helplessness in attempting to avoid Rhodes' continued

sexual advances. The Hartford's conclusion that Shorter's actions merited termination and

Rhodes' actions did not, identical to any conclusion founded in false premises, rendered the

decision to terminate Shorter illogical. The fact that the falsity of the premises was attributable

to racist and gender biased perceptions made the decision not only illogical but illegal under state

and federal anti-discrimination laws, including Title VII of the Civil Rights Act of 1964, the

Civil Rights Act of 1866, and The Connecticut Fair Employment Practices Act, Conn. Gen. Stat.

§ 46a-60.

## II.    Facts

### A.    Rhodes Stalks and Harasses Shorter

From February of 2001 through December 16, 2001, Shorter participated in a consensual, romantic relationship with Rhodes that became sexually intimate in May or June of 2001. (Affidavit of Ferron Shorter Jr., ¶ 5; hereinafter, "Shorter Aff., ¶ ___.")  Shorter and Rhodes cohabitated at Rhodes' apartment in Vernon for approximately one month before Shorter ended the relationship on December 16, 2001, and moved.  (Shorter Aff., ¶ 6.)  Rhodes harassed Shorter at work and called Shorter constantly after December 16, 2001, in an attempt to renew a sexual relationship with Shorter.  (Shorter Aff., ¶¶ 8-10.)  Shorter did not want to begin a new relationship with Rhodes and was embarrassed and humiliated by Rhodes' unwelcome and harassing visits to his work station.  (Shorter Aff., ¶ 11.)  (Affidavit of Maurice P. Kuck, ¶¶ 4, 5, 11; hereinafter, Kuck Aff., ___.")  (Kuck Statement, Baird Aff., Ex. 5)  In January of 2002, Rhodes told Shorter that she was mad and "pissed off" that Shorter would not give the relationship an opportunity to work.  (Shorter Aff., ¶ 12.)  On January 17, 2002, Rhodes left a voicemail message at Shorter's work number threatening Shorter with obscenities.  (Shorter Aff., ¶ 13.)  Rhodes would not accept Shorter's refusal to have sex.  (Shorter Aff., ¶ 14.)

### B.    Shorter Attempts to End the Harassment

Rhodes' appearances at Shorter's work station during the week of January 14, 2002, through January 18, 2002, were unwelcome, disturbing, disruptive, and unrelated to The Hartford's business.  (Am. Compl., ¶ 50.)  (Kuck Aff., ¶ 5.)  When Shorter told Rhodes that Shorter had ended the relationship, in part, because Rhodes had lied to him and dated other men, Rhodes gave Shorter her password so that she could prove to Shorter that she was not receiving messages from other men.  (Shorter Statement, The Hartford's Mem. of Law in Supp. of Mot. for

Summ. J., Affidavit of Margaret J. Strange, Ex. 7; hereinafter, "Strange Aff., Ex. __.")  (Shorter Aff., ¶¶ 19-21.)

Rhodes told Shorter that she was going away during the weekend of January 18, 2002, to visit her sister in South Carolina.  (Rhodes Mot. for Summ. J, Affidavit of MaryAnne Rhodes, ¶ 12; hereinafter, Rhodes Aff., ¶ __.")  Shorter used Rhodes' password and determined from a voice message that Rhodes was visiting a man named "Rich" in Florida.  (Rhodes Aff., ¶ 13.) Shorter, believing that he would finally be able to convince Rhodes that he knew definitively that she had lied about her weekend and was seeing other men, planned to ask Rhodes to listen to the voicemail message from Rich.  (Shorter Aff., ¶ 21.)  Rhodes became furious when she called Shorter and found out that Shorter had heard the message from Rich.  (Shorter Aff., ¶ 21.) Shorter changed Rhodes' password so that Rhodes would not erase the message before Shorter had an opportunity to present the message to Rhodes.  Rhodes, caught in a lie and unable to deny that she was involved with other men, recognized that she would not be able to convince Shorter to come back to her.  Rhodes was furious and while she refused to listen to the voice message from Rich or to allow Shorter to provide her the new password so she could access her voicemail, she continued to call Shorter throughout the weekend of January 18, 2002, through January 20, 2002, to harass and threaten him.  (Kuck Statement, Baird Aff., Ex. 5.)     Shorter asked Rhodes to leave him alone when Rhodes called him at work on January 19, 2002.   After Shorter left work on January 19, 2002, Rhodes called him on his cell phone and threatened him. (Shorter Aff., ¶ 23.)  Shorter returned to work on January 19, 2002, to file a complaint with security and ask that action be taken to stop the harassment.  (Shorter Aff., ¶ 24.)  (Shorter Statement, Strange Aff., Ex. 7.)  (Kuck Statement, Baird Aff., Ex. 5.)  On January 20, 2002, after

Shorter told Rhodes that he had reported her to security, Rhodes told Shorter that he would not have a desk when he returned to work. (Shorter Aff., ¶ 26.)

C.    Rhodes Retaliates against Shorter for his Refusal to Have Sex

When Rhodes, as she alleges, spoke by phone from Florida to her supervisor, Brian Vadney, on January 18, 2002, regarding the fact that she could not obtain her messages, she was aware that Shorter had access to her voicemail because (a) she had provided him the password, (b) she had discussed with Shorter the message from Rich, and (c) Shorter had attempted to provide her the new password earlier that evening. (Rhodes Aff., ¶ 16.) (Shorter Aff., ¶ 21.) However, Rhodes did not reveal this information to her supervisor on January 18, 2002. (Rhodes, Aff., ¶ 18.) Instead, after telling Shorter that he would not have a desk on January 22, 2002, when he returned to work, Rhodes located a tape recording of a December 31, 2001, phone conversation between her and Shorter and took it to work on January 21, 2002. Rhodes "was worried about the situation" and "felt it was out of control." (Rhodes Aff., ¶ 26.) According to Rhodes, her supervisor was aware that Shorter "had changed her voicemail password" and Shorter "said he had reported her to security." (Rhodes Aff., ¶ 26.) When her supervisor confronted Rhodes about Rhodes' inability to access her voicemail, Rhodes provided information to her supervisor that "disturbed" him. (Rhodes Aff., ¶ 23.) Rhodes then provided information to an administrative assistant that led to a referral to the EOD and ultimately Ms. Anderson. (Rhodes Aff., ¶ 25.)

Rhodes gave the December 31, 2001, tape recording to Ms. Anderson. Ms. Anderson determined that the tape contained a message left by Shorter on the answering machine of a friend of Rhodes named Scott. (The Hartford Mot. for Summ. J., Affidavit of Lisa Anderson, ¶ 8; hereinafter, "Anderson Aff., ¶ __.) According to Ms. Anderson, the tape recorded "an

obscenity-laced tirade by [Shorter] berating, threatening and screaming at Ms. Rhodes."
(Anderson Aff., ¶ 8.) This tape was used by Ms. Anderson to support her determination that
Shorter presented a threat of workplace violence and was cause for his termination. Neither
Rhodes nor Shorter were at work or were using workplace systems when the December 31,
2001, phone call was made. In fact, the tape that Rhodes provided to Ms. Anderson on January
21, 2002, records a phone call that Rhodes asked Shorter to make to Scott whom Rhodes claimed
to fear. (Shorter Aff., ¶ 42.) In the December 31, 2001, phone call to Scott, which included
Rhodes and Shorter calling Scott, Shorter asked Rhodes to stop harassing him and told her
Rhodes would have to be the one who confronted Scott to tell him to leave her alone if she was
really afraid of him. (Shorter Aff., ¶ 43.) During the entire day leading up to the phone call to
Scott on December 31, 2001, Ms. Rhodes asked Shorter to come to her apartment, adding that
she need him there because she was fearful of Scott. (Shorter Aff., ¶ 44.)  Shorter knew that
Rhodes was not really afraid of Scott and was using it as an excuse to get attention and to get
what she wanted. (Shorter Aff., 45.)  Just hours before leaving the phone message for Scott, the
tape of which Rhodes brought to Ms. Anderson on January 21, 2002, Ms. Rhodes left a message
on Shorter's cell phone on December 31, 2001 at 4:10 P.M, stating, "Hey, I don't know if my
cell phone went dead or what. But please call me back, I don't know if you're serious about
coming over here but you know I want you to, you know how much I love you and I miss you.
Please call me!" (Shorter Af., ¶ 46.) Less than twenty-four hours after Rhodes and Shorter left
the phone message for Scott, Rhodes called Shorter on January 1, 2002, at 12:02 A.M., stating,
"Hey Sweetie, I just had to say Happy New Year. I know I shouldn't call. I'm sorry but you
know I can't stop thinking about you and I love you to death, and be careful wherever you are
okay, Love you! Bye." (Shorter Aff., Ex. 47.)

Rhodes was aware that she had violated the ECP and withheld her knowledge about the violation from her supervisor for more than 48 hours. According to Rhodes, a mere phone call by an administrative assistant was enough to have the password reset. (Rhodes Aff., ¶ 24.) By providing an explanation for her violation that she knew The Hartford would find acceptable, specifically, Rhodes was afraid of a black man's violence and therefore had to provide the password and maintain her silence, Rhodes avoided termination and any discipline beyond a written warning. (Rhodes Written Warning, Strange Aff., Ex. 10.) Rhodes had told Shorter that if anything ever happened between Rhodes and Shorter, the police and The Hartford would believe Rhodes because she is a white female and Shorter is a black male. (Shorter Aff., ¶ 28.)

Rhodes admitted to Ms. Anderson that she had provided Shorter her work voicemail password and The Hartford, as Rhodes had predicted to Shorter, adopted her justification entirely. According to The Hartford, Rhodes "did it [violated the ECP] in an attempt to quell Shorter's jealousy and because she was afraid of his temper." (The Hartford CHRO Affidavit, Baird Aff., Ex. 3 at ¶ 27.) However, approximately one week following Shorter's termination, a colleague of Shorter's provided a written statement to The Hartford, which was inconsistent with Rhodes' statements that she feared Shorter. In his February 8, 2002, sworn statement, Maurice P. Kuck ("Mr. Kuck") told The Hartford that Rhodes had been harassing Shorter at his work station and in at least one phone call that Mr. Kuck had witnessed on January 19, 2002. (Kuck Statement, Baird Aff., Ex. 5.) However, by this time, Ms. Anderson, with regard to Rhodes, had provided the following closing remarks to the investigation: (1) "Talked to MaryAnne – Investigation + Ferron Stmt – admitted violation of co. policy – terminated"; (2) "She [MaryAnne] should follow the advice of DSI [Department of Special Investigations]"; (3) "Sharing password is still violation – perhaps disciplinary action"; (4) "She can call EAP

[Employee Assistance Program]; and (5) "She should call me anytime – any question and even
to have lunch in a week or so." (Anderson Notes, Baird Aff., Ex. 1.)  Rhodes' written warning
does not even conform to The Hartford's policy of progressive discipline which provides for an
action plan or probation that attach to step two and step three written warnings, respectively.
(Progressive Discipline Policy, Baird Aff., Ex. 6.)

        D.    <u>Rhodes' Accusations and Allegations Conformed to The Hartford's
             Perceptions About Race and Gender</u>

           i.    <u>The Discriminatory Company Investigation</u>

On January 21, 2002, Ms. Anderson prepared a written statement summarizing the
discussion she had with Rhodes and asked Rhodes to sign the document. (Anderson Aff., ¶ 4.)
Anderson's summary is entitled, "Statement of MaryAnne Rhodes." (Rhodes Statement, Strange
Aff., Ex. 5.)  The statement and summary were prepared by Ms. Anderson.  (Rhodes Aff., ¶ 32.)
Rhodes did not swear to the truth of the statement and was not told that she should not discuss
the statement with anyone, nor was she advised that her continued employment was contingent
upon her truthfulness.  (Rhodes Interrogatories, Baird Aff., Ex. 4 at No. 7.)

On January 23, 2002, Shorter's second day back to work following Rhodes' threat that he
would not have a desk, an investigator, Richard Wardell, from The Hartford's Department of
Special Investigations (DSI) approached Shorter during a team meeting in Shorter's department
and demanded that he follow Mr. Wardell to DSI offices. (Shorter Aff., ¶ 33.)  Mr. Wardell
advised Shorter that his continued employment was contingent upon his truthfulness and
cooperation in the investigation. (Shorter Aff., ¶ 34.) (Shorter Statement, Strange Aff., Ex. 7.)
Mr. Wardell told Shorter not to discuss the investigation or his statement with anyone.  (Shorter
Statement, Strange Aff., Ex. 7.)  Mr. Shorter executed the statement under oath.  (Shorter
Statement, Strange Aff., Ex. 7.)

On February 8, 2002, Mr. Kuck approached Jennifer Ames, f/k/a Jennifer Ames Haber ("Ms. Ames"), the Human Resources Representative for the Commercial Lines Automation Division where Mr. Kuck had worked with Shorter to provide information about a female employee who had been harassing and stalking Mr. Shorter. (Kuck Aff., ¶ 4.) Ms. Ames referred Mr. Kuck to DSI where Mr. Wardell advised Mr. Kuck that his continued employment was contingent upon his truthfulness. (Kuch Statement, Baird Aff., Ex. 5.) Mr. Wardell told Mr. Kuck not to discuss the investigation or his statement with anyone. (Kuck Statement, Baird Aff., Ex. 5.) Mr. Kuck executed his statement under oath. (Kuck Statement, Baird Aff., Ex. 5.)

Mr. Wardell, in the course of the investigation, relied upon a company template to gather subject information about three employees, Ferron Shorter Jr., MaryAnne Rhodes, and Maurice P. Kuck, from whom statements were taken. (Templates, Baird Aff., Ex. 7.) Mr. Wardell's reason for using the template for all employees was to "keep it the same – by all means feel we attempt to treat everyone the same way, that we don't try to deviate, the same facts and circumstances preformatted is information gathering, a person giving their personal information." (Deposition of Richard Wardell, p. 23; hereinafter, "Wardell Dep., p. __," Baird Aff., Ex. 8.) In obtaining statements from employees, the method to ensure accuracy, accountability and truthfulness is to require such statements be made under oath upon notice that the employee's job was contingent upon that truth. (Wardell Dep., pp. 26, 47, Baird Aff., at Ex. 8.) Shorter was informed, as would be any company employee involved in an investigation, that his continued employment was contingent on truthfulness. (Letter from Ian Veitzer, Esq., Baird Aff., Ex. 9.)

Ms. Anderson did not follow any of the company's procedures to ensure the accuracy, accountability, and truthfulness of the investigation when she obtained a statement from Rhodes.

(Rhodes Interrogatories, Baird Aff., Ex. 4 at No. 7.)  (Rhodes Statement, Strange Aff., Ex. 5.)

She did not inform Rhodes that her continued employment was contingent on truthfulness, even

though, in Ms. Anderson's estimate, what Rhodes had reported was the most outrageous report

she had ever heard.  (Deposition of Lisa Anderson, p. 11; hereinafter, "Anderson Dep., p. __,"

Baird Aff., Ex. 10.)  Also, dissimilar and contrary to the company's and Mr. Wardell's method

of using a template to ensure that employees are treated equally and fairly, was Ms. Anderson's

method of taking written notes on a blank piece of paper to memorialize the important facts of

the investigation.  Notably absent on the company's and Mr. Wardell's template is any reference

to the race of the subject.  Notably conspicuous on two handwritten documents prepared by Ms.

Anderson are the facts that Shorter is a "S, B, M" and Rhodes is a "S, W, F."  (Anderson Notes,

Baird Aff., Ex. 1.)  On a document dated January 21, 2002, the day that Ms. Anderson first

received notice from Rhodes about a complaint, a handwritten document provides Shorter's race

at the top left hand corner of the page, primary in importance.  (Anderson Notes, Baird Aff., Ex.

1.)  Another document, prepared by Ms. Anderson, but undated, apparently lists information to

gather in the investigation and prominently indicates that Shorter is a 34 year old "S, B, M." and

Rhodes is a 28 year old "S, W, F."  (Anderson Notes, Baird Aff., Ex. 1.)  Of the notes that Ms.

Anderson may have taken when she initially was introduced to the allegations, the race of the

parties was of obvious relevance in her discussion with Rhodes.  Ms. Anderson testified as

regarding assessing complaints of sexual harassment and the scope of the investigation of

Rhodes complaint:

| | |
|---|---|
| Attorney Baird: | You found – or you state in 11-B that Shorter did not make a complaint of sexual harassment, is that correct? |
| Ms. Anderson: | Correct. |
| Attorney Baird: | How did you come to that determination? |

| | |
|---|---|
| Ms. Anderson: | He did not report any behavior that would rise to the level of sexual harassment. |
| Attorney Baird: | Is one standard for – is it a standard – what does someone have to include in their report for it to rise to the level of harassment? |
| Ms. Anderson: | It depends. |
| Attorney Baird: | What does it depend on? |
| Ms. Anderson: | It depends on the offense. It depends on the circumstances. It depends on the complainant. It depends on the alleged perpetrator. It depends. |
| Attorney Baird: | What factors about the alleged perpetrator would it depend on? |
| Ms. Anderson: | It's wide open. You have to look at each situation individually and consider all the factors, the behavior, the people involved. |
| Attorney Baird: | When MaryAnne Rhodes made a complaint, did you consider all the factors surrounding the complaint? |
| Ms. Anderson: | I tried to be as thorough as I possibly could in that investigation. |
| Attorney Baird: | Did you review voicemail messages that Miss Rhodes had left on Mr. Shorter's voicemail system? |
| Ms. Anderson: | No, I did not. |
| Attorney Baird: | Did you obtain e-mails that had been forwarded from Mary Anne Rhodes to Mr. Shorter's business e-mail address? |
| Ms. Anderson: | I did not. |
| Attorney Baird: | Did you talk to anybody in Shorter's work unit about Miss Rhodes coming to his desk? |
| Ms. Anderson: | I did not. |
| Attorney Baird: | Did you ask anyone else to talk to people in Mr. Shorter's work unit about Mary Anne Rhodes coming to his desk? |
| Ms. Anderson: | When Maurice Kuck complained, I forwarded that complaint to Officer Wardell, and we decided that he needed to be – we needed to understand what his statement was. |
| Attorney Baird: | Was Mr. Kuck ever informed of any action taken in response to his statement? |
| Ms. Anderson: | I don't know. |

(Anderson Dep., pp. 47-48, Baird Aff., Ex. 10.)

The reference to "11-B" at the beginning of the quoted material above, references The Hartford's responses to the CHRO "Schedule A – Employment" requests for information. The Schedule A asks whether Shorter had made a formal complaint about Rhodes and The Hartford responded that Shorter had not. The Schedule A, which was dated September 13, 2002, also asked whether there had been any other complaints by other employees at The Hartford about the same person whom Shorter had complained. The Hartford responded: "There have been no complaints about Ms. Rhodes." (The Hartford CHRO Schedule A, Baird Aff., Ex. 14 at No. 11.) Mr. Kuck provided a statement to The Hartford on February 8, 2002. (Kuck Statement, Baird Aff., Ex. 5.)

Once the investigation was handed to Mr. Wardell in DSI, the bias of Ms. Anderson's initial notes and actions carried through to Shorter's termination and beyond. When Ms. Anderson interviewed Rhodes she asked Rhodes whether Shorter had access to a weapon. (Rhodes Aff., ¶ 30.) Rhodes answered in the affirmative. (Rhodes Statement, Strange Aff., Ex. 7.) Rhodes did not volunteer the information until prompted to do so by Ms. Anderson. (Rhodes Aff., ¶ 30.) The line of questioning about a gun continued when Mr. Wardell questioned Shorter. (Shorter Statement, Strange Aff., Ex. 7.) Shorter denied owning or showing Rhodes a gun. (Shorter Aff., ¶ 80.) Mr. Wardell did not obtain the voicemail messages left by Rhodes on Shorter's work phone that would have indicated Rhodes did not fear Shorter. The same messages would have demonstrated the veracity of Shorter's complaint that Rhodes had been harassing him. The Hartford's electronic and voicemail systems retain and store messages in memory even after they have been deleted. (Electronic Communications FAQS, Baird Aff., Ex. 11.) Mr. Wardell did not interview any of Shorter's colleagues to corroborate any statements by Rhodes that Shorter presented a threat in the workplace. The Hartford did not perform a criminal

background check on Rhodes as it did for Shorter. (The Hartford Interrogatories, Baird Aff., Ex. 2 at No. 13.) When Mr. Wardell asked Shorter whether he had any record of criminal convictions, Shorter replied that he did not. (Shorter Aff., ¶¶ 35-38.) At the conclusion of his statement to Mr. Wardell, Ms. Ames informed Shorter that his employment at The Hartford was terminated because Shorter had been untruthful in his statement concerning his record of criminal convictions. (Shorter Aff., ¶ 37.) This reason was repeated to the Commission on Human Rights and Opportunities (CHRO) in The Hartford's Affidavit of Particulars responding to Shorter's complaint. (The Hartford CHRO Affidavit, Baird Aff., Ex. 3 at ¶ 45.) The Hartford alleged that Shorter had a misdemeanor conviction record for the crime of "Threatening," as proscribed under state law pursuant to § 53a-62 of the Connecticut General Statutes ("General Statutes"), and argued for dismissal on that basis. (Mem. of Law in Supp. of Mot. to Dismiss, p. 6.) However, The Hartford received verification twelve (12) days after Shorter's termination, that Shorter had been truthful in stating that he did not have a record of criminal convictions. This verification arrived by facsimile dated February 4, 2002, with certified copies of state superior court informations demonstrating that Shorter did not have a record of criminal conviction because he did not have any criminal convictions. (Court Records, Strange Aff., Ex. 8.) (Court Records, Baird Aff., Ex. 12.) The assigned investigator, Mr. Wardell, is a retired member of the Connecticut department of public safety and is a thoroughly experienced and competent investigator. (Deposition of Jack Jacewicz, p. 13, Baird Aff., Ex. 13.) Finally, The Hartford relies upon a January 18, 2002, email forwarded from Shorter to Rhodes as support for its perception that Shorter presented a threat of workplace violence. (The Hartford CHRO Affidavit, Baird Aff., Ex. 3 at ¶ 10.) (January 18, 2002, Email, Strange Aff., Ex. 9.) As a black man, Shorter used the term, "nigga," to refer to himself in the email. Rhodes often used urban

slang that she had learned from Shorter during their relationship. (Shorter Aff., ¶ 48.) For

example, in a letter from Rhodes to Shorter, postmarked March 1, 2002, Rhodes used the term

"one" which is an abbreviated term for "one love" and can mean "good-bye." (Shorter Aff., ¶

48.) (Rhodes Letter, Baird Aff., Ex. 15.) Rhodes had heard Shorter use the term, "nigga,"

during their relationship and never indicated she felt threatened. (Shorter Aff., ¶¶ 48-49.) In the

email, Shorter described himself as a "real jealous" type of guy to convince Rhodes that he was

not the type of guy who can be in a relationship and not mind that his significant other is dating

other men. (Shorter Aff., ¶ 50.) Shorter was not demanding that Rhodes stop seeing other men,

he was telling her that because he is susceptible to jealousy when in an intimate relationship with

a woman who continues to date other men, that the relationship between Rhodes and Shorter was

doomed. (Shorter Aff., ¶ 50.) The email even had an uplifting and religious message attached

that Shorter was never able to obtain because he was not permitted back to his work station

following his statement to Mr. Wardell. (Shorter Aff., ¶¶ 51, 54.) Shorter made specific

requests to Ms. Ames that the email and voicemail messages at his work station be preserved

(Shorter Aff., ¶ 55) however, Ms. Ames informed Shorter on January 24, 2002, that The

Hartford "had the right to manage [its] computer systems and information as necessary and had

no obligation to get information to him." (Haber Notes, Baird Aff., Ex. 16.)

Even Anthony Vitale ("Mr. Vitale"), a DSI investigator assisting Mr. Wardell in the

investigation, had difficulty explaining to an officer at the Vernon Police Department why he had

brought Rhodes there on January 23, 2002, for a restraining order. The desk officer wrote: "The

employer suggested she report that he [Shorter] may have eluded [sic] to getting back at her for

making a complaint although no specific threat was made to her." (Incident Report, Baird Aff.,

Ex. 17.) (Shorter Aff., ¶ 68.)  Rhodes never sought or obtained a restraining order.  (Shorter

Aff., ¶ 68.)

ii.    Shorter's Termination and Rhodes' Written Warning

In their respective positions, Rhodes and Shorter were subject to The Hartford's Code of

Corporate Conduct, which stated, in relevant part:

> The Hartford is an information-based company … . [E]mployees
> must take steps to ensure the confidentiality, integrity and
> availability of corporate data and information.  This includes …
> granting access to protected data to only those individuals who
> must use it in the performance of their job related duties.

(Code, Baird Aff., Ex. 18.)  The Code of Corporate Conduct reflects the company's position that

information is "one of The Hartford's most valuable assets" and protecting it enhances the

company's "competitiveness by ensuring that information is accurate, available when needed,

and is kept confidential." (Data/Info Confidentiality Policy, Baird Aff., Ex 19.)  In fact, as

regards the use of computers, an employee authorized to access information on a computer by

using a confidential logon identification and password, is responsible for any access made to that

computer using the employee's logon identification and password.  (Information Protection,

Baird Aff., Ex. 20.)  The company's ECP, which applies to the use of computers as well as

voicemail systems, provides examples of information protection violations including the use of

company systems to "disburse company confidential or proprietary information to unauthorized

persons" and "to access others' proprietary information or restricted websites even if you are

given a password by an authorized person." (ECP, Strange Aff., Ex. 2.)  The ECP does not

specify by category or description the comparative seriousness among the twenty-one (21)

examples of violations listed in the policy.  Similar to the company's information protection

guidelines regarding computer access, "[p]roviding someone with an unauthorized password that

they are unauthorized to possess is as serious an offense under The Hartford's Code of Conduct and Electronics Communication Policy as is accessing and using the functions of someone's voicemail using that password." (Kuck Aff., ¶ 20.)  In the following exchange at her deposition, Ms. Ames described the process of determining the seriousness of a violation under the ECP:

| | |
|---|---|
| Attorney Baird: | Okay.  Is it correct that The Hartford employees can violate a policy but not be terminated? |
| Ms. Ames: | Under certain circumstances. |
| Attorney Baird: | What was it about this circumstance of Mr. Shorter that led to your conclusion that his behavior warranted termination? |
| Ms. Ames: | It was considered a serious violation of the electronic communications policy. |
| Attorney Baird: | Does the electronic communications policy have different degrees of violations? |
| Ms. Ames: | Certainly. |
| Attorney Baird: | And what are the different degrees? |
| Ms. Ames: | It would depend. |
| Attorney Baird: | But are there formal categories, is what I'm asking, of violations? |
| Ms. Ames: | I'm not sure they are categorized. |
| Attorney Baird: | For instance, if I were to ask you what are the violations of the electronic communications policy that are categorized at The Hartford as serious, can you answer that? |
| Ms. Ames: | No. |
| Attorney Baird: | Why not? |
| Ms. Ames: | The policy doesn't say these are serious and these are not. |
| Attorney Baird: | So there's nothing about the policy that classifies the seriousness of the violation. |
| Ms. Ames: | Not in those words, no. |
| Attorney Baird: | That's something that you do as a human resources generalist? |
| Ms. Ames | No. |
| Attorney Baird: | Who is responsible for that then? |
| Ms. Ames: | The electronic communications policy spells out violations. |

(Deposition of Jennifer Ames, pp. 43-44, Baird Aff., Ex. 21.)

The Hartford mitigated Rhodes' responsibility for her violation of the ECP by explaining

that Rhodes had acted "in an attempt to quell Shorter's jealousy and because she was afraid of

his [Shorter's] violent temper." (The Hartford CHRO Affidavit, Baird Aff., Ex. 3 at ¶ 27.)  The

Hartford also stated that Rhodes and Shorter's cohabitation at the time the password was

provided mitigated Rhodes actions.  (Letter from Ian Veitzer, Esq., Baird Aff., Ex. 9 at p. 3.)

However, Rhodes and Shorter were not living together in either October of 2001 or January of

2002 when Rhodes provided her password.  (Shorter Aff., ¶¶ 17-19.)  In his statement, Shorter

indicated that he had lived with Rhodes from the middle of November of 2001 through the

middle of December of 2001.  (Shorter Statement, Strange Aff., Ex. 7.)

Furthermore, when Rhodes gave Shorter her password in January of 2002, Shorter had

already ended the relationship and told Rhodes to leave him alone.  Regardless, The Hartford

cannot provide any caveat to its Code of Corporate Conduct or ECP that makes an exception to

the data and information protection policies for those having sex or living together.  (Code and

Data/Info Confidentiality Policy, Baird Aff., Ex. 1 and Ex. 2.)  (ECP, Strange Aff., Ex. 2.)  The

Hartford's attempts to mitigate Rhodes responsibility only support Shorter's argument that once

Ms. Anderson placed Shorter in the "S, B, M" category and Rhodes in the "S, W, F" category,

further consideration inconsistent with Shorter's role as a perpetrator and Rhodes' role as a

victim would not be entertained.

Ms. Anderson, in testifying that Shorter had not been terminated for accessing Rhodes'

account but for changing the password and performing other functions with the voicemail

account that Rhodes' password allowed him access, maintained that Shorter had changed the

password "and then just ha[d] his way with that account … ."  (Anderson Dep., p. 76, Baird Aff.,

Ex. 10.)  Ms. Anderson relied upon her summary of her discussion with Rhodes on January 21,

19

2002, Shorter's January 18, 2002, email (without the attachment), and a tape recorded message from a December 31, 2001, phone call that Rhodes brought to work on January 21, 2002, to corroborate Ms. Anderson's perceptions about Shorter's potential for workplace violence. (Anderson Dep., pp. 35-36, 68-69, Baird Aff., Ex. 10.)   The Hartford viewed all these factors and "perceived a "safety threat."  (The Hartford Interrogatories, Baird Aff., Ex. 2 at No. 3.)  The particulars of the investigations and Shorter's termination create more than an inference that the perception fo the threat arose from the race and gender characteristics of the "victim" or Rhodes and the "perpetrator" or Shorter.

iii.     The Hartford's Disregard of Shorter's Complaint of Sexual Harassment

In her testimony, Ms. Anderson stated that Shorter's complaint to The Hartford security on January 19, 2002, was "nothing to investigate." (Anderson Dep., p. 28, Baird Aff., Ex. 10.) Ms. Anderson concluded that Shorter's complaint did not mean that Rhodes' behavior was unwelcome. (Anderson Dep., p. 28, Baird Aff., Ex 10.)  Ms. Anderson assumed that "given the fact that you've got two people living together, to have one of those people go to the other's one's desk and sit there is not unusual behavior." (Anderson Dep., p. 37, Baird Aff., Ex. 10.) On the other hand, in the summary of her January 21, 2002, discussion with Rhodes, Ms. Anderson wrote that Shorter had moved out of the apartment in December of 2001. (Rhodes Statement, Strange Aff., Ex. 5)  Therefore, it should have been clear to Ms. Anderson that when Shorter complained to security on January 19, 2002, about Ms. Rhodes and when Mr. Kuck told Mr. Wardell on February 8, 2002, that Rhodes had harassed Shorter by phone on January 19, 2002, that Shorter and Rhodes were not living together and Rhodes' behavior may have been unwelcome.

Furthermore, Ms. Anderson did not produce Mr. Kuck's February 8, 2002, statement in response to the CHRO's request for statements relevant to Shorter's complaint of sexual harassment. Ms. Anderson deemed Mr. Kuck's Febrary 8, 2002, statement as "irrelevant to Plaintiff's Affidavit of Illegal Discriminatory Practice." (The Hartford Interrogatories, Baird Aff., ¶ 2 at No. 9.) Ms. Anderson told the CHRO that The Hartford had no "operational knowledge that Shorter was ever harassed in the workplace." (The Hartford CHRO Affidavit, Baird Aff., Ex. 3 at ¶ 16.) As regards Shorter's complaint to security, Ms. Anderson admitted:

> Shorter went to The Hartford security on Saturday afternoon January 19, 2002 for <u>eight minutes</u> and told two security guards to tell Ms. Rhodes to stop coming to his desk. Given that he had already blocked Ms. Rhodes access to her voicemail, and told her that he blocked her access, one can only speculate at his motivation for making this brief appearance at The Hartford and his failure to provide any details about his 'complaint.'

(The Hartford CHRO Affidavit, Baird Aff., Ex. 3 at ¶ 22.) (underline and quotation marks in original) It is not clear why Ms. Anderson emphasizes the fact that Shorter went to security on January 19, 2002, for eight minutes but it is clear that Shorter's motivations were subject to scrutiny in a manner that Rhodes' motivations were not. If The Hartford had endeavored to corroborate and question Shorter's and Rhodes' statements and actions equally, then accuracy, accountability and truthfulness may have been ensured.

Perhaps the complaint to security took too much time or too little time from Ms. Anderson's perspective. However, clearly, security was the proper party to approach. After Shorter was terminated, a mere call by Rhodes to security was enough to bring an officer to her desk. This occurred on April 9, 2002. Rhodes had contacted Shorter more than forty (40) times on March 28, 2002, asking him to come to her apartment. Shorter did not respond. (Shorter Aff., ¶¶ 73-76.) On April 9, 2002, Shorter received a phone call from Robert Begley ("Mr.

Begley"), a security officer at The Hartford. (Shorter Aff., ¶ 77.) Rhodes had reported

numerous hang-up phone calls to security. Shorter never contacted Rhodes on her cell phone or

business phone after he was terminated from The Hartford. (Shorter Aff., ¶ 78.) In his notes,

however, Mr. Begley lists Rhodes as the "victim" of hang-up phone calls attributed to Shorter.

(Begley Notes, Baird Aff., Ex. 22.) On April 9, 2002, Mr. Begley told Shorter that if the calls

continued then HPD [Hartford Police Department] and SNET Security would be notified.

(Begley Notes, Baird Aff., Ex. 22.) Rhodes admitted to Mr. Begley that she called Shorter on

April 8, 2002. (Begley Notes, Baird Aff., Ex. 22.) The contrast between security's response to

Shorter's January 19, 2002, complaint and Rhodes' April 9, 2002, complaint is vivid. When

Rhodes complained to security about Shorter, Shorter was threatened with arrest based on no

evidence. When Shorter complained to security about Rhodes, his motivations were questioned

and the complaint ignored as irrelevant.

    iv.    <u>The Hartford's Refusal to Hold Rhodes Accountable for her Untruthfulness</u>

In her testimony, Ms. Anderson denied the relevance of evidence that came to her

attention contradicting Rhodes' statements that she was afraid of Shorter. (Anderson Dep., ¶ 58,

Baird Aff., p. 10.) She listened to a taped conversation of Shorter and Rhodes meeting on March

22, 2002, or March 27, 2002, in a car to discuss the termination and Ms. Anderson did "not recall

formulating an opinion about what she [Rhodes] does outside the workplace." (Anderson Aff., ¶

58, Baird Aff., Ex. 10) This was a change of course from The Hartford's earlier concern about a

December 31, 2001, phone conversation that Rhodes had taped and brought to work on January

21, 2002, to demonstrate Shorter's violent temper. The December 31, 2001, phone conversation

took place outside of work. In addition, The Hartford's decision to transport Rhodes to the

Vernon Police Department in the town where she resided instead of the Hartford Police

Department in the city where she worked demonstrated a concern for Rhodes outside the workplace. As long as Shorter was in the role of perpetrator and Rhodes the victim., the distinction between workplace and non-workplace did not exist and The Hartford's mission was to protect Rhodes. Even when it became apparent that Shorter did not have a criminal record and had not lied in his statement to Mr. Wardell, The Harford refused to reexamine the matter or Rhodes' untruthfulness. Rhodes did not stop harassing Shorter until he obtained a restraining order against her in August of 2002. (Shorter Aff., ¶ 79.) As soon as evidence came to the attention of Ms. Anderson and The Hartford that Shorter was the victim and Rhodes the perpetrator not only of sexual harassment toward Shorter but of untruthfulness toward The Hartford, then The Hartford was no longer willing to consider behavior outside the workplace as relevant.

III.    **Legal Analysis**

     A.    Standard for Summary Judgment

"A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that he moving party is entitled to judgment as a matter of law." Fink v. Magner, 988 F.Supp.2d 70 (D.Conn. 1997) (internal citations omitted). "The substantive law governing the case identifies those facts that are material on a motion for summary judgment." Id.

"A trial court must be especially cautious in deciding whether to grant [summary judgment] in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999); see also Newtown v. Shell Oil Co., et al., 52 F.Supp.2d 366, 372 (D.Conn. 1999) ("Considering the factors delineated by the Supreme Court

in Harris[v. Forklift Sys., Inc., 510 U.S. 17 (1993)], and looking at all of the circumstances, we are doubtful that the conduct complained of rises to the level of a hostile work environment amounting to unwelcome sexual conduct which is sufficiently severe or pervasive to alter the conditions of plaintiff's employment. However, as the Second Circuit has repeatedly cautioned in employment cases, reasonable jurors might disagree.") (citation omitted)

"The burden of showing that no genuine dispute about any material fact exists rests on the party seeking summary judgment." Fink, 988 F.Supp.2d 70.

B.    The Hartford Ignored Shorter's Hostile Work Environment Complaint

Shorter alleges in Count One of his amended complaint that The Hartford refused to respond to or consider his complaint of harassment against Rhodes. (Am. Compl., ¶¶ 55, 62-63.) Rhodes' behavior was calculated to bring Shorter back into a relationship and to elicit further sexual relations. In Perez v. MCI Worldcom, 154 F.Supp.2d 932, 942 (N.D.Tx. 2001), the court, in finding that harassment was not based on sex in that particular case, differentiated the facts of its case from a case where there is "evidence that the behavior was intended to bring the plaintiff back into the relationship or to elicit further sexual relations." The Perez court stated:

> In finding that the harassment was not based on sex in this case, the court does *not* find as a matter of law that simply because a person has had an affair gone wrong, he or she is unable to state a cause of action for sexual harassment in the context of a hostile work environment.

Id (internal citations omitted). Rhodes' harassment of Shorter is identical to any case in which an individual harasses another individual at work for the purpose of eliciting sex. The fact that Rhodes and Shorter once had a consensual relationship does not make the harassment any more welcome and may even make it less so under the circumstances. The cliché of the employee

chasing another employee around the desk in an attempt to elicit sex is the quintessential form of sexual harassment and is no different from Rhodes' attempts to capture Shorter.

Shorter was subjected to constant phone calls and visits to his desk after he ended the relationship with Rhodes. The frequency of Rhodes' contacts during this time repeated itself when Rhodes called Shorter more than forty (40) times in one day on March 28, 2002. (Shorter Aff., ¶ 76.) The Hartford's liability for the harassment arose when it refused to consider Shorter's complaint except to question his motivation for filing it. The Hartford's discriminatory bias against Shorter that prevented the company from considering his complaint allowed Rhodes to use that bias to achieve her own reprisal against Shorter by accusing him of violence. The hostile environment was created from a combination of (a) Rhodes' actions toward Shorter in stalking Shorter and impeding his work, (b) The Hartford's refusal to accept Shorter's complaint of harassment, and (c) The Hartford's acceptance of Rhodes' statement that she was fearful of Shorter.

The fact that Rhodes was successful in such a short period of time in using the company's bias against Shorter, and that the effect was as severe as termination so that the hostile environment was not pervasive for a greater period of time, does not mean that a hostile work environment did not exist. Shorter's loss of employment was the most severe employment action possible. In a balancing test between severity and pervasiveness, the severity of Rhodes' reprisal for Shorter's refusal to have sex compensates for the less than five (5) week pervasiveness of the harassment. "[I]f the evidence creates an issue of fact as to whether an employer's action is effectively remedial and prompt, summary judgment is inappropriate. Whether an employer has fulfilled its responsibility in this regard is to be determined from the facts of each case. Factors that may be considered include the gravity of the harm, the nature of

the work environment, and the resources available to the employer." Dobrich v. General

Dynamics Corp., 40 F.Supp.3d 90 (1999).

C.   The Hartford's Biased Investigation, Differential Treatment of Rhodes and
Shorter, Disregard of Shorter's Harassment Complaint, and Refusal to Hold
Rhodes Accountable for Untruthfulness, Imply Race and Gender Discrimination

In Counts Two and Six, Shorter alleges he was terminated based on his race and sex in

violation of Title VII of the Civil Rights Act of 1964 and the Connecticut Fair Employment

Practices Act, Conn. Gen. Stat. § 46a-60.  Count Three alleges that he was terminated based on

his race in violation of the Civil Rights Act of 1966, 42 U.S.C. § 1981.  There is direct evidence

in handwritten notes that Ms. Anderson considered Shorter's race and Rhodes' race in

determining the course and conclusion of the investigation.  Shorter was treated differently for

no reason that could be characterized as neutral.  Rhodes was an employee involved in an

investigation but her statements were not scrutinized as were Shorter's statements.  She violated

the ECP policy and Code of Conduct but her actions were justified by The Hartford.  Any

evidence supportive of Shorter's claim of harassment and duress was ignored while any evidence

brought forth by Rhodes was interpreted under the perception that Shorter was threatening and

potentially violent.  The fact that both Rhodes and Shorter violated the ECP but received entirely

different disciplinary actions for no reason that either Ms. Anderson or Ms. Ames were able to

articulate in testimony demonstrates that the termination was a pretext for the discrimination that

was apparent in the different manners in which Rhodes and Shorter were treated in all aspects of

their separate complaints and the investigation.

D.   Shorter Claims Intentional Infliction of Emotional Distress

Shorter alleges in Count Eight of the Amended Complaint that he has suffered and

continues to suffer emotional distress.  This distress arises from Shorter's termination on January

23, 2002, and The Hartford's actions which it knew or should have known would cause such stress. In her testimony, Ms. Anderson stated that she found what Rhodes reported about Shorter on January 21, 2002, to be the most outrageous report she had ever heard. (Anderson Dep., p. 11, Baird Aff., Ex., 10.)  Rhodes presented Shorter as a violent threat to her individually and the workplace in general to justify her own actions and avoid termination.  Shorter denies ever threatening Rhodes and has denied the allegations set forth by Rhodes and Ms. Anderson in the summary of their January 21, 2002, discussion about Shorter's potential for violence.  However, because he was perceived as violent, The Hartford treated his termination accordingly.

In Appleton v. Board. of Educ. of the Town of Stonington, 254 Conn. 205 (2000), the Connecticut supreme court provides the elements for a state law claim of intentional infliction of emotional distress.  The Hartford contends in its motion for summary judgment that the actions alleged in Shorter's Amended Complaint, even if true, do not rise to extreme and outrageous conduct.  However, it is difficult to imagine how an employee, considered to have committed the most outrageous acts ever heard by the individual making the decision to terminate, would not find equally outrageous and extreme the termination if in fact the acts attributed to the individual were false.  The outrageous and extreme nature of the termination is a function of the falsity of the allegations and assumptions underlying the termination.  In Shorter's case, he has denied ever presenting a threat to the workplace, provided reasonable counterpoints to the tape recording and email relied upon by Ms. Anderson, provided proof that he does not have a criminal record, and demonstrated that he was under the duress of sexual harassment when he violated the ECP.  The circumstances of his termination are made outrageous and extreme by his contention that he was terminated based on outrageous allegations. (Conviction Information Request, Baird Aff., Ex. 23.)

E.    Shorter Claims Negligent Infliction of Emotional Distress

Shorter alleges in Count Nine of the Amended Complaint that he has suffered and continues to suffer emotional distress. This distress arises from Shorter's termination on January 23, 2002, and The Hartford's actions which it knew or should have known would cause an unreasonable risk of such stress. Shorter was humiliated by the accusations that he was a criminal and a violent threat to those in the workplace where he had spent the previous twelve (12) years of his life. These accusations caused Shorter to submit to an intrusive and prolonged, interrogation followed by the outrage of not being allowed to return to his desk to retrieve his possessions, and finally physical escort from the building. (Am. Compl., ¶ 147.)

F.    Rhodes is not Entitled to Judgment as a Matter of Law on Count 12 Alleging Defamation and Count 13 Alleging Tortious Interference with Contract

In her memoranda in support of her motion for summary judgment, Rhodes portrays her actions as those of a victim swept up in the chaos of Shorter's violent and jealous temper. Rhodes claims to have gone to work on January 21, 2002, feeling that events were out of control but with enough foresight to remember to bring a tape recording of a phone call from December 31, 2001, to assist whomever she spoke to in determining that Shorter was violent and Rhodes so much a victim of his rage that she was forced to violate the ECP and give him her password. Ms. Anderson was outraged by the December 31, 2002, tape recording but Rhodes failed to reveal to Ms. Anderson the fact that Rhodes had been calling Shorter the entire day of December 31, 2001, and would call him on January 1, 2002, at 12:02 A.M., to ask him to her apartment. (Shorter Aff., ¶¶ 42-47.) Rhodes knew the exact effect the tape would have on someone at The Hartford but she did not reveal the entire story. Just as Rhodes had told Ms. Anderson that she feared Shorter, Rhodes had told Shorter that she feared Scott to get results. The result that

Rhodes sought with Ms. Anderson was to keep her job. The result that Rhodes sought with Shorter on December 31, 2001, was to convince him to come to her apartment.

As Rhodes prepared for work on January 21, 2002, she knew at least three things: (1) She had violated the ECP, again; (2) Her supervisor, Brian Vadney, would question her about the problems with her voicemail; and (3) Shorter had reported her to security for harassing him. Despite these factors not in her favor, Rhodes managed to keep her job and even receive an invitation from Ms. Anderson to lunch while Shorter lost his job and was escorted unceremoniously out of the building.

Rhodes had been prepared for such an occasion if her interests and those of Shorter's ever diverged. She told Shorter that the police and The Hartford would always believe her over him because she was white and he was black. By March of 2002, after Shorter had been terminated from The Hartford for less than two months, Rhodes was ready to again pursue him. She wrote him a letter and began to call. Shorter met Rhodes in public parking lots to obtain information about his termination. Rhodes tried to convince Shorter to come to her apartment. When Shorter emerged from Oscar's Café in Rocky Hill, Connecticut at 12:45 A.M. in the morning in March 23, 2002, Rhodes was waiting for him. (Shorter Aff., ¶ 62.) Shorter met her once more in a restaurant parking lot on March 27, 2002, and was confronted on March 28, 2002, with over forty (40) phone calls from Rhodes. (Shorter Aff., ¶ 76.) Shorter by this time did not wish to meet Rhodes any more and did not receive her calls. In response, Shorter was contacted by a security officer at The Hartford accusing him of placing hang-up phone calls to Rhodes department.

Although The Hartford never questioned Rhodes or her motivations, it is not reasonable to believe that a fact-finder will be as unquestioning as the pieces of evidence are placed before

it. Not one action ever taken by Rhodes was consistent with her report to Ms. Anderson that she feared Shorter. Rhodes sought him constantly, even after he was terminated. Every action taken by Rhodes was consistent with the facts that she wanted to resume a relationship with Shorter and she wanted to keep her job. At the hearing on August 5, 2002, on Shorter's application for a restraining order, Rhodes testified that Shorter had been terminated from The Hartford for harassing her, yet less than two (2) months after the termination Rhodes believed it was possible to resume a relationship with Shorter. In that way she would have accomplished both her goals of maintaining her employment and resuming a relationship with Shorter. (Hearing Transcript, Baird,, Aff., Ex. 24.)

Rhodes statements do not deserve nor are they entitled to the qualified privilege to intracorporate communications asserted by Rhodes. They were by definition maliciously orchestrated and when Rhodes approached Ms. Anderson it was not in good faith or for a legitimate purpose conducive to the constructive operation of the company. Rhodes knew that the statements and tape recording she provided were false and defamatory in substance and by omission. While Rhodes maintains that a statement of feeling or opinion cannot be defamatory because it cannot be shown to be false, certainly a person who claims to be in fear but acts otherwise as Rhodes did, makes a false statement. In fact, the one question that Mr. Wardell wished to find out for sure was whether Rhodes was in fear for her personal safety (Wardell Dep., pp. 18-19, Baird Aff., Ex. 8.) Rhodes also defamed Shorter by accusing him of kicking her. Finally, although Rhodes is correct that owning a gun is not illegal under our Constitution, the statement cannot be taken out of its context to separate it from its effect. Rhodes lied about being fearful of Shorter; she brought a tape to work on January 21, 2002, that contained a recording of only one of a series of phone calls made by her throughout the day, asking Shorter

to come to her apartment; she told Ms. Anderson that Plaintiff had kicker her; in the context of all these false assertions, falsely stating that Shorter had a gun certainly had more import for Ms. Anderson than a recognition that Shorter may have been exercising his Constitutional rights.

Finally, Shorter has never alleged that Rhodes aided and abetted The Hartford in discriminating against Shorter as Rhodes contemplates in footnote 6 to the memorandum of law. Rhodes and The Hartford acted separately against Shorter's interests and his rights. Therefore, it is impossible to know what effect one may have had upon the other and ultimately upon The Hartford's decision regarding Shorter's termination. Certainly, if Rhodes had approached Ms. Anderson on January 21, 2002, with a full rendition of her past four weeks stalking Shorter at his desk, threatening him, leaving constant voicemail messages, Ms. Anderson may have sought more information and provided Shorter an opportunity to defend himself. Ms. Anderson may even have written that Shorter violated the ECP but only to quell Rhodes' attempts to resume their relationship and stop her from harassing him. Or if Ms. Anderson had questioned Rhodes as Mr. Wardell questioned Shorter and Mr. Kuck, and followed up on Shorter's harassment complaint and checked Shorter's voicemail messages, perhaps Shorter would not have been terminated. However, Rhodes' motivations to keep her job led her to defame Shorter and The Hartford's discriminatory bias allowed the defamation to survive without scrutiny. Only a finder of fact could determine to what degree each Defendant is responsible for Shorter's pecuniary loss.

31

## IV.    **Conclusion**

For the foregoing reasons, Plaintiff objects to Defendant The Hartford's Motion for

Summary Judgment as to Counts One, Two, Three, Six, Eight, and Nine, and to Defendant

Rhodes' Motion for Summary Judgment as to Counts Eleven and Twelve.


PLAINTIFF
FERRON SHORTER JR.


BY:    _____
Rachel M. Baird (ct12131)
Law Office of Rachel M. Baird
379 Prospect St
Torrington CT 06790-5239
Tel:  (860) 626-9991
Fax:  (860) 626-9992

## CERTIFICATION

I HEREBY CERTIFY that a copy of the foregoing was mailed first-class, postage paid to

the following counsel of record on March 22, 2004:

Margaret J. Strange, Esq.
Jackson Lewis LLP
55 Farmington Ave Ste 1200
Hartford CT 06105

David L. Metzger, Esq.
Metzger & Associates
25 Capitol Ave
Hartford CT 06106

Rachel M. Baird