UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER JR.,                       :

       Plaintiff,                          :        Case No. 3:03CV0149(WIG)

       v.                                  :

HARTFORD FINANCIAL SERVICES         :
GROUP, INC., MARYANNE RHODES,        :

       Defendants.                         :        MARCH 5, 2004

## AFFIDAVIT OF FERRON SHORTER JR.

Ferron Shorter Jr., being duly sworn and according to law, deposes and states:

1.  I am the Plaintiff and have filed a complaint against Hartford Financial Services Group, Inc. ("The Hartford") and MaryAnne Rhodes ("Ms. Rhodes") that is pending at the United States District Court for the District of Connecticut under civil case number 3:03CV0149(WIG).

2.  This Affidavit is based on my personal knowledge and is submitted in support of my Objection to The Hartford's and Ms. Rhodes' separate Motions for Summary Judgment.

3.  The text of this Affidavit enclosed in quotation punctuation marks is taken from (a) taped recordings of conversations that I participated in and transcribed from the recordings and (b) voice mail messages addressed to me.

4.  I was employed by The Hartford from October 9, 1989, through January 23, 2002.

5.  From February of 2001 through December of 2001, I participated in a consensual, romantic relationship with Ms. Rhodes that became sexual in May or June of 2001.

6.  After I ended the romantic and sexual relationship with Ms. Rhodes on or about December 16, 2001, and moved from her apartment in Vernon after residing there for

approximately one month, I did not want any further contact and provided notice to Ms. Rhodes that the relationship was ended.

7. Ms. Rhodes had become violent and emotional when I had attempted to move out previously so I declined her invitation to attend a New York Jets football game on December 16, 2001, and used her absence on that day to move out without confrontation.

8. Ms. Rhodes left long, frequent messages on my cell phone on December 16, 2001, and December 17, 2001, asking me why I had moved from her apartment.

9. Ms. Rhodes harassed me at work after I ended our relationship and urged me to begin a new sexual relationship with her.

10. Ms. Rhodes left long, frequent messages on my business and personal voice mails in December of 2001 and January of 2002 after I moved from her apartment.

11. I did not want to begin a new sexual relationship with Ms. Rhodes and as a result had to endure her unwelcome and harassing visits to my work station which embarrassed and humiliated me and prevented me from accomplishing the work I otherwise would have accomplished.

12. In January of 2002, Ms. Rhodes told me that I was making her very mad and "pissed off" for not giving the relationship an opportunity to work.

13. On January 17, 2002, Ms. Rhodes left a message on my voice mail threatening me, as follows: "You'd better hurry up and fucking call me back!"

14. Ms. Rhodes would not take "no" for an answer.

15. I accepted Ms. Rhodes voice mail password on January 18, 2002, so that I could access her voicemail and confront her with a message from another man she was dating as a last resort

2

to convince Ms. Rhodes that I knew she was dating another man and therefore no possibility existed that I would be convinced to begin a new sexual relationship with her.

16. But for the fact that I am a man, Ms. Rhodes would not have harassed me to begin a sexual relationship with her in January of 2002.

17. The first time Ms. Rhodes provided me her confidential password was in October of 2001, when I received an email from her that included the password. This email was forwarded using The Hartford's email messaging system.

18. The second time that Ms. Rhodes provided me her voice mail password was on January 18, 2002.

19. Ms. Rhodes gave me her password on two separate occasions. The first time in October of 2001 she provided her department voice message code of 547-4771 and her password was 092173. The second time was on January 18, 2002 when she gave me her new password of 092273. On January 18, 2002, I already knew the voice message code for Ms. Rhodes' department because she had provided it previously in her October of 2001 email.

20. I never asked Ms. Rhodes for her department's code number to its voice messaging system and I never asked Ms. Rhodes for her password.

21. On January 18, 2002, when I tried to convince Ms. Rhodes to leave me alone by having her listen to a message left by a man on her voice mail, Ms. Rhodes became furious, refused to listen, and would not allow me to give her the new password.

22. On Saturday, January 19, 2002, while I was at work, Ms. Rhodes harassed and threatened me by telephone at work.

23. After I left work on January 19, 2002, Ms. Rhodes contacted me on my cell phone and told me that I "would see what happens when she returned."

3

24. I returned to work on January 19, 2002, to report Ms. Rhodes' harassment to the security officers on duty at that time.

25. I wanted there to be a record of Ms. Rhodes' harassment and threats and action taken.

26. On Sunday, January 20, 2002, Ms. Rhodes told me that I would not have a desk when I returned to work on Tuesday, January 22, 2002. Ms. Rhodes made this threat after I told her that I had reported her to security to keep her away from my desk.

27. Ms. Rhodes suspected that I had a new girlfriend when she threatened my job on January 20, 2002, telling me that I was not going to have a desk on January 22, 2002, and mentions this in her statement to Lisa Anderson on January 21, 2002.

28. Ms. Rhodes had indicated to me during our relationship, and, specifically, during the week of December 10, 2001, through December 14, 2001, the week prior to my moving out of her apartment, that if anything ever happened between us, the police and The Hartford would believe her because she is a white female and I am a black male.

29. In a December 13, 2001, voice mail message that Ms. Rhodes left on my business voice mail, Ms. Rhodes told me that I should not look at other women because I would not want Ms. Rhodes to "hate me."

30. Even after The Hartford terminated my employment, Ms. Rhodes continued to harass me from her work station at The Hartford by calling me.

31. On March 28, 2002, more than two months following my termination, Ms. Rhodes left a message on my voice mail, as follows: "Hey Sweetie, you'd better still not be at the gym flirting with those girls. Um I'll call you later. I'm on my lunch break but I'll call you when I get out and hopefully I'm gonna see you tonight. Love you. Bye."

32. The next day that I reported to work after speaking by telephone to Ms. Rhodes on Sunday, January 20, 2002, was Tuesday, January 22, 2002.

33. During the morning of Wednesday, January 23, 2002, while I was engaged in a team meeting with my colleagues, I was approached by an investigator, Richard Wardell, who demanded that I had to accompany him to The Hartford's Department of Special Investigations.

34. Mr. Wardell, told me that my employment was contingent upon my truthfulness in making a statement and my cooperation in an investigation.

35. In the statement that Mr. Wardell drafted I never indicated that Ms. Rhodes had nothing to worry about from me because I had no criminal convictions. I responded truthfully to two separate questions from Mr. Wardell asking about the relationship between Ms. Rhodes and me and asking whether I had a criminal record.

36. After Mr. Wardell drafted a statement that I signed, I was informed that I was being terminated because I had lied about not having a criminal record.

37. Mr. Wardell showed me documents attributing a criminal record to me and I told him the documents were wrong and I also told Jennifer Ames Haber and Ms. Anderson that they were wrong when they told me that I had lied when I denied having a criminal record.

38. I do not have a criminal record.

39. While Mr. Wardell was taking my statement, I informed him of obscene messages that Ms. Rhodes had left on my voice mail at work that I had saved and could still be found on the my voice mail system.

40. I never had the opportunity to provide Mr. Wardell the taped messages from Ms. Rhodes on my work station voice mail because I was escorted from the building by security following my statement to Mr. Wardell, denied the opportunity to return to my desk, and informed by Ms.

Haber on January 24, 2002, that The Hartford could do whatever it pleased with the messages remaining at my work station.

41. I told Mr. Wardell that I did not believe what I had done was a violation of The Hartford Code of Corporate Conduct or the Electronics Communication Policy because the policy that I had received in a red pamphlet specifically had listed providing proprietary data and information as an offense but not accessing such data. At that time, I had never seen the Electronics Communications Policy submitted by The Hartford in the CHRO proceeding.

42. The December 31, 2001, taped conversation that Ms. Rhodes provided to Lisa Anderson on January 21, 2002, is a tape of a phone call that Ms. Rhodes asked me to make at 3:30 A.M. to a man named Scott whom Ms. Rhodes told me she feared.

43. In the December 31, 2001, phone call which included Ms. Rhodes and me calling Scott and leaving a message, I wanted Ms. Rhodes to stop playing games with me and told her she would have to be the one who confronted Scott and tell him to leave her alone if she was really afraid of him.

44. During the whole day leading up to the phone call to Scott on December 31, 2001, Ms. Rhodes was begging me to come to her apartment and told me that she was afraid of Scott to convince me to come.

45. The phone call to Scott was an attempt to finally make Ms. Rhodes stop bothering me because I knew she was not really afraid of Scott and was using it as an excuse to get attention and to get what she wanted.

46. Just hours before leaving the phone message for Scott, the tape of which Ms. Rhodes brought to Ms. Anderson on January 21, 2002, Ms. Rhodes left this message on my cell phone on December 31, 2001 at 4:10 P.M.: "Hey, I don't know if my cell phone went dead or what. But

6

please call me back, I don't know if you're serious about coming over here but you know I want you to, you know how much I love you and I miss you. Please call me!"

47. Less than twenty-four hours after Ms. Rhodes and I left the phone message for Scott, Ms. Rhodes called me on January 1, 2002, at 12:02 A.M.: "Hey Sweetie, I just had to say Happy New Year. I know I shouldn't call. I'm sorry but you know I can't stop thinking about you and I love you to death, and be careful wherever you are okay, Love you! Bye."

48. The Hartford's claim that a January 18, 2002, email from me to Ms. Rhodes was threatening ignored the reality that the term "nigga" is used in many contexts as urban slang indicating familiarity. Ms. Rhodes often used urban slang during our relationship such as when she ended her March of 2002 letter to me with the word "one" which is an abbreviated term for "one love" and is used to say "good-bye." In addition, during a conversation with Ms. Rhodes on March 22, 2002, described in more detail below, and during many other conversations with Ms. Rhodes, I used the term "nigga" and Ms. Rhodes never indicated that she felt threatened.

49. Ms. Rhodes had become more familiar with urban slang during our relationship and had heard me with the term "nigga" previously.

50. In the January 18, 2002, email to Ms. Rhodes, I described myself as "real jealous" because I wanted to convince Ms. Rhodes that I would not consider renewing our sexual relationship and to convince her that it would be futile to continue harassing me at work.

51. I was not threatening Ms. Rhodes in the January 18, 2002, email and had attached a beautiful religious message to the email which The Hartford had access to after my termination and I did not.

7

52. I never displayed behavior or acted in any way towards Ms. Rhodes or anybody at The Hartford to give The Hartford a reason to bring Ms. Rhodes or anybody to the police station to file a complaint or restraining order.

53. I informed Mr. Wardell on January 23, 2002, that Ms. Rhodes had left obscene messages for me at work as well as talking to me at work with obscene language when I refused to give her the attention she wanted.

54. After my termination I did not have access to the emails and voice mail messages left by Ms. Rhodes on my work email address and voice mail system even though I specifically told Mr. Wardell of their existence.

55. I made specific requests through my attorney and on my own to Ms. Haber that the email and voice mail messages be preserved.

56. I contacted Ms. Haber on January 24, 2002, following my termination to request that The Hartford preserve Ms. Rhodes threatening and harassing emails and voice mail messages that she had forwarded me when I refused to have sex with Ms. Rhodes.

57. Approximately five weeks after I was terminated, Ms. Rhodes contacted me by letter and by telephone and asked me to come to her apartment.

58. I received a letter post-marked Mach 1, 2002, from Ms. Rhodes.

59. I arranged to meet Ms. Rhodes in a public parking lot on March 22, 2002, and not at her apartment, as she requested, because I wanted to know what Ms. Rhodes had told The Hartford prior to my termination but did not want to risk another false allegation of violence were I to visit her at her apartment.

60. Approximately three hours following a meeting in the parking lot of Oscar's Café in Rocky Hill, Connecticut, between Ms. Rhodes and me on March 22, 2002, Ms. Rhodes started to

8

call me continuously and request that I come to her apartment. At the end of the meeting, Ms. Rhodes had asked my plans for later that evening and I had indicated that I might return to Oscar's Café.

61. At 10:54 P.M. on the evening of March 22, 2002, after I had not returned any of her phone calls, Ms. Rhodes left a message on my cell phone, as follows: "Hey Sweetie, where are you. I'm getting worried. Give me a call okay. Bye."

62. I did return to Oscar's Café later in the evening of March 22, 2002, and when I left at 12:45 A.M. on the morning of March 23, 2002, I was startled to see Ms. Rhodes waiting for me in the parking lot. I refused her offer to go back to her apartment.

63. At 9:02 A.M. on the morning of March 23, 2002, Ms. Rhodes left a message on my cell phone, as follows: "Hey Sweetstuff, I'm on my way to my race. I'll call you later, Love You, miss you."

64. At 12:59 P.M. in the afternoon of March 23, 2002, Ms. Rhodes left a message on my cell phone, as follows: "Hey Sweetie, I just got home. I went to my mom's for a little bit after the race, so, um, call me later okay. I'm just going to clean and probably go in the shower so if I don't answer then I was just in the shower but call me later okay. Love you. Bye."

65. At 4:24 P.M. in the afternoon of March 23, 2002, Ms. Rhodes left a message on my cell phone, as follows: "Hey Sweetie, it's like 4:30, I'm going to church. I'm going to stop calling you because I feel like I'm stalking you or harassing you or whatever if you're not gonna call me back so. Um I'll be here until like 5:30. I was hoping I would be able to see you later but if you're not going to call me back then, I don't know. Talk to you later. Bye."

9

66. On March 27, 2002, Ms. Rhodes and I met in the parking lot of the Ground Round restaurant in Rocky Hill, Connecticut, because I wanted to gather more information about my termination from The Hartford.

67. Ms. Rhodes told me that she had never asked The Hartford to transport her to the Vernon Police Department on January 23, 2002, and told me that the police officer on duty acted as if he had no idea why Ms. Rhodes and the The Hartford investigator were there.

68. During our meeting at the Ground Round restaurant parking lot, the following conversation occurred between me and Ms. Rhodes concerning The Hartford's transport of Ms. Rhodes to the Vernon Police Department on January 22, 2002:

> **Ms. Rhodes:** "Yeah but at the police station they didn't even do anything."
> **Plaintiff:** "I remember you said that". What did .....
> **Ms. Rhodes:** "We sat. The guy. We were sitting in the lobby and the guy finally comes out and he's just sitting there like he's bored".
> **Plaintiff:** "Who, the cop?"
> **Ms. Rhodes:** "Yeah. And he had like a little piece of scrap paper. And he's like, did he hit her? I was like, no. He's like, what do you want. He's like, if he hits you, call. (giggling) I was like"
> **Plaintiff:** "That's it"
> **Ms. Rhodes:** "Pretty much. And he wrote something down and the guy is like, I knew they wouldn't do anything. And I'm like, well why are you making me come down here? Then he's like."
> **Plaintiff:** "That's my point"
> **Ms. Rhodes:** "Then he's like taking me to the courthouse. Now were going to get the papers. I'm like. I looked at him. I'm like I'm not filling this out. And he was like, just take them. And I was like whatever.

69. During our meeting at the Ground Round restaurant parking lot, when I refused Ms. Rhodes' offers to come to her apartment because I was concerned about the fact that she had gone to the police station for a restraining order, Ms. Rhodes said: "Yeah but even if, even if they, even I filed the restraining order like they wanted to and I'm inviting you over my house?

They can't even say that you, that you broke the restraining order or whatever because I'm telling you to come over. There is no restraining order."

70. During our meeting at the Ground Round restaurant parking lot, Ms. Rhodes said she thought she would have been terminated and not me because she was the one who had violated the very strict The Hartford policies about compromising protected data and information.

71. Ms. Rhodes and I discussed the fact that she had received a warning and I had been terminated in the following exchange that occurred during the March 27, 2002, meeting:

> **Plaintiff:** Seriously do you think if I was a white dude it would have gone like this?"
> **Ms. Rhodes:** [Unintelligible]
> **Plaintiff:** "See what I'm sayin'!" See! I mean, what do you think they would've done? They probably. Who knows they probably would've said hey you guys just stay away from each other."
> **Ms. Rhodes:** "Or would've gotten the same thing I did, a written. Had to sign something."
> **Plaintiff:** "If I was white you mean?"
> **Ms. Rhodes:** "'Cause I had. Yeah I got a written."
> **Plaintiff:** "A written warning, we would've both gotten written warnings probably. That's my point".
> **Ms. Rhodes** "That's what they tried to tell me".
> **Plaintiff:** "What."
> **Ms. Rhodes:** "That that's all it was going to be."
> **Plaintiff:** "For me too?"
> **Ms. Rhodes:** "Mostly for me. I didn't think you would get in trouble. I thought it was me because I gave it to you."
> ...
> **Ms. Rhodes:** "I was like I'm the one who gave him the password. That's what I said. I said if anything I'm the one, I thought I would be the, if anyone is going to get fired it would be me because I was the one who gave it to you."

72. Ms. Rhodes told me that she was never scared of me or felt threatened by me and asked me each time we met in March of 2002 to accompany her to her apartment for sex.

73. On March 28, 2002, at 4:38 P.M. in the afternoon, Ms. Rhodes left the following voice message on my cell phone: "Hey Sweetie, Um, it's like 4:40 I'm leaving to go home now. Um I

11

hope you're still going to come see me tonight. You better not be scared to be calling or coming over so I'll try you again later but call me before, you know. Call me as soon as you get this and if, you know. If I don't hear from you, I'll try you again but I feel like I have to keep calling you. But um, I hope I see you later. Love you. Bye."

74. On March 28, 2002, at 5:55 P.M. in the evening, Ms. Rhodes left the following voice message on my cell phone: "Hey Sweetie, It's like 6 o'clock. Is this a repeat of Saturday night. You're blowing me off again? Um, I don't know if I'm want to keep calling you. I hope you're going to call me. But, I don't know. If I don't hear from you by seven I guess I'll try you again. If not, I guess I'll see that you're blowing me off again. I was hoping we'd watch survivor together. Alright, I'll call you later. Or call me as soon as you get this. Love you."

75. On March 28, 2002, at 8:57 P.M. in the evening, Ms. Rhodes left the following voice message on my cell phone: "Well she ruined our night for watching survivor together. I know I'm being a pain by calling every two seconds but I'm going to keep calling until I fall asleep. So, call me when you get a chance or at least answer when I call. Love you. Bye"

76. On March 28, 2002 Ms. Rhodes called me forty (40) times to ask that I visit her at her apartment to watch the show "Survivor."

77. On April 9, 2002, I received a phone call from Robert Begley at The Hartford accusing me of making phone calls to Ms. Rhodes and then hanging up the phone.

78. I never contacted Ms. Rhodes at her cell phone number or at her business number and I never visited her at her apartment after I was terminated from The Hartford.

79. Ms. Rhodes finally stopped contacting me after I filed for and obtained a restraining order against her in August of 2002 following a decision after hearing at the Superior Court in Hartford where she was represented by counsel and I was not.

80. I never showed Ms. Rhodes a gun.

81. I never hit, kicked, or threatened Ms. Rhodes.

82. I have never been abusive toward Ms. Rhodes.

83. I never engaged in any violence in the workplace.

84. The only messages I deleted from Ms. Rhodes' voice mail were "romantic" messages that I had left for her during our relationship.

85. My career and reputation have been damaged personally and professionally and in my community such that I had to relocate to my family's home in another state to gain employment.

86. As a result of my termination, I am devastated, embarrassed, humiliated, very depressed and have felt and do feel at times that my life is hopeless.

87. I never sought therapy for my depression because I did not have health insurance and instead relied upon my faith and prayer.

88. I pleaded with The Hartford, through my attorney, to gain back my career at The Hartford and attempted to present evidence showing The Hartford's errors.

89. My plans for my daughter and her future have been severely damaged as a result of losing my job at The Hartford and the difficulty I have experienced finding comparable employment.

FERRON SHORTER JR. being duly sworn, on oath, states that he is the Plaintiff herein; that he has read the foregoing Affidavit and knows the content thereof; that the same is true of his own knowledge, except as to the matter herein stated on information and belief and that as to these matters he believes the same to be true.

Dated at _Lawrenceville_ , _2:50 p.m._ on this ___5th___ day of March, 2004.


_Ferron Shorter Jr._
Ferron Shorter Jr.


Subscribed and sworn to before me on this ___5th___ day of March, 2004.


_Tammy Simpson_
Notary Public
My Commission Expires:

TAMMY D. SIMPSON
NOTARY
GEORGIA
EXPIRES
MAY 14, 2006
PUBLIC
GWINNETT COUNTY