UNITED STATES DISTRICT COURT

**FILED**

DISTRICT OF CONNECTICUT

FERRON SHORTER JR.,

          Plaintiff,

          v.

HARTFORD FINANCIAL SERVICES
GROUP, INC., MARYANNE RHODES

          Defendants.

2004 APR -5 P 3: 39

Case No. 3:03CV0149(WIG) DISTRICT COURT
BRIDGEPORT CT

APRIL 5, 2004

## SECOND AFFIDAVIT OF RACHEL M. BAIRD

Rachel M. Baird, being duly sworn and according to law, deposes and states:

1. I represent Ferron Shorter Jr., and appear on his behalf, in the above-referenced matter. This Affidavit is submitted in support of Plaintiff's Objection to Defendant Hartford Financial Services Group, Inc.'s and Defendant MaryAnne Rhodes' Motions for Summary Judgment.

2. I affirm that true and correct copies of the deposition transcript pages included herein from the April 15, 2003, deposition of Ferron Shorter Jr. are attached as Exhibit 1.

3. I affirm that true and correct copies of the deposition transcript pages included herein from the September 5, 2003, deposition of Ferron Shorter Jr. are attached as Exhibit 2.

4. I affirm that a true and correct copy of the deposition transcript pages included herein from the August 29, 2003, deposition of Lisa Anderson are attached as Exhibit 3.

Rachel M. Baird (ct12131)

Subscribed and sworn to before me on this 5ᵗʰ day of April, 2004.

Notary Public

My Commission Expires:

KELLY M. GRAHAM
NOTARY PUBLIC
MY COMMISSION EXPIRES AUG. 31, 2004

**EXHIBIT 1**

Shorter, Jr. vs Hartford Financial Services

4/15/2003                                                                              Ferron Shorter, Jr.

Page 130

1    Q. Would she stop by your work station on a pretty
2  regular basis when you were dating?
3    A. Yes.
4    Q. And would you go out to lunch a regular basis?
5    A. We would go to the cafeteria, or we would take
6  a walk to some lounge area or break area in the place.
7  We didn't go out to lunch.
8    Q: And when you two were dating, would you leave
9  each other voice mails and e-mails?
10   A. Yes.
11   Q. Would you go to her work area when you two were
12 dating each other?
13   A. Only time I stopped by her work area was a
14 couple of times in the morning back in November of
15 2001, and that was because my food that I would bring
16 in, I used to work on the 14th floor, and I used their
17 refrigerator, because the refrigerator -- the floor I
18 worked on did not have a refrigerator.
19   Q. So, the refrigerator you used was closer to
20 Maryanne Rhodes' work area than your area?
21   A. Right.  And she suggested that I might as well
22 come by and pick her up and walk down to take a break
23 together.
24   Q. And did you continue to use the refrigerator in
25 December and January, December 2001 and January 2002?

Page 131

1    A. I continued to bring food.  And we continued
2  to not have a refrigerator on that floor that I worked
3  on.  So, yes, I used to work to in that department,
4  and they welcomed me to use their refrigerator.
5    Q. Now, you said you went on vacation, a planned
6  vacation.  Do you know if that was from December 16th
7  through January 7th?
8    A. I believe that was the time, but that whole
9  time frame with the exception of three days I came in,
10 I had to come in and finish some work that I had going
11 on.
12   Q. While you were on that vacation, did you renew
13 your relationship with Maryanne Rhodes?
14   A. We somewhat renewed it.
15   Q. When did you renew the relationship?
16   A. I believe it was from around December 27th,
17 which was Thursday, to December 29th, two days later.
18   Q. When you renewed that relationship, was that
19 when you first started to access her voice mail at
20 work?
21   A. Yes.
22   Q. Had you accessed her voice mail at any time
23 before December 27th?
24   A. I don't believe I did.
25   Q. What was your purpose in accessing her voice

Page 132

1  mail around the December 27th time frame?
2    A. I accessed it that weekend, I think it was.
3  And it was because she had convinced me that all
4  honesty was coming from her.  And then she showed just
5  some type of suspect behavior.  So, I accessed the
6  voice mail, and there was a message.
7    Q. Did you tell her before you accessed the voice
8  mail that you were going to do it?
9    A. I don't remember, but she gave me the
10 password, and told me to use it any time.
11   Q. Who was the message from?
12   A. A guy named Scott.
13   Q. Did you then call Scott?
14   A. At that time, no.  That day, I called her.
15 And then on my three-way phone when I called her, I
16 accessed her voice mail so we can both hear it.  And
17 when the message began, she pressed her phone to
18 delete so we couldn't hear the message.  At that
19 point, I told her there was no need to call me, just
20 leave everything alone, and let it go.  So, I hung up.
21 And then, I believe that was on Sunday,
22 December 30th.  And then later on that day, she called
23 me and was asking me to come to her house, to her
24 apartment.  And I told her no.  And I hung up on her a
25 couple of times.  And then she called later on that

Page 133

1  day from her brother's house and told me she was
2  afraid to go home, because she had met Scott for lunch
3  that day before, on Saturday, December 29th.  When she
4  met him for lunch, she was telling him how much she
5  loved me.  She was afraid of him for that, and that he
6  was very mad.  And she felt he was going to do
7  something to her.  So, she was at her brother's house.
8    Q. Did she ask you to call Scott?
9    A. Yes.
10   Q. And did you do that?
11   A. I finally agreed to do it at, like, 3:30 that
12 next morning, Monday morning.
13   Q. What was your purpose in calling Scott?
14   A. I really didn't think that Maryanne was being
15 truthful, but I felt it is possible she might be.  So,
16 I agreed to call him, hoping that that would end
17 everything, she could leave me alone if I take care of
18 it.
19   Q. Were you interested in renewing the
20 relationship as of December 31, 2002, the relationship
21 with Maryanne?
22   A. Not after that morning when she accessed her
23 voice mail and she deleted the message before she can
24 listen to it with me on the phone.
25   Q. Then why were you concerned with whether she

34 (Pages 130 to 133)

**EXHIBIT 2**

Shorter, Jr. vs Hartford

II )              0003

Ferron Shorter ( Volime II )

Page 33

problems for her with her job as possible.

Q     So the goal of your complaint was to get her to leave you alone at your desk, correct?

A     For her to stop harassing me, yes.

Q     Now, you also said you complained to Mr. Wardell.  Is that the -- is that complaint contained in the statement that was marked -- previously marked as Exhibit 10?

A     Correct.

Q     And what complaint do you claim that you made to Mr. Wardell?

A     I know in our conversation I told him that she was harassing me.

Q     What specifically do you recall telling him about that?

A     She was coming to my desk out of control, from what I remember.

Q     And again, were you complaining about the conduct that you just testified to?

A     I believe so.

Q     And why did you complain about this conduct Mr. Wardell?

A     Because he told me that there was an estigation going on.  So at that point I knew that nything had to be brought out and that I couldn't

47f4a2bd-5933-40b5-856c-962c3ac7e7f9

**EXHIBIT 3**

Broke it off — calls for stupid things —

Went 1 wk without hearing something

Must have been hearing msgs on her cell

Called this AM to reset password

She / Tower 16                              NP / 6

Used to work on T-14 — Brings lunch there
Why? They don't like 5th floor people lezg

Parks in Garden St

Called @ work — are you happy about lezg?
She hang up

Brother has friend detective —

Scared — Don't know if he'll do anything
He has squeezed her arms — not hit
Wants to see brother

Gets buddies to go after brother

Knows he has hand gun — saw it —
Does not know where he keeps it —
It was in her storage rm — may have switchblade

Must have happened after 3:00 Friday

Called — Sister in law — Marlboro — (Bro / Bosnia)
Threatened to call parents about her —
Knows what town parents live in
He's worked here for 12 yrs

**CONFIDENTIAL**
**HAR 000952**

**EXHIBIT 4**

1     A    I don't remember if I said that exactly, but

2  as I was debriefing Mr. Jacewicz and Mr. Wardell with

3  the particulars of what I had done so far, where we

4  were with the case, I explained where we were coming

5  from as far as what we thought about the violation,

6  and I didn't hear anything from Mr. Jacewicz or

7  Mr. Wardell that changed the course of the

8  investigation or that led me to believe that we were

9  going down the wrong road.

10     Q    After the interview of Ferron Shorter by

11  Mr. Wardell, did you meet with anyone at that point?

12     A    Yes.

13     Q    Who did you meet with?

14     A    Jennifer Ames.

15     Q    Was anyone else present at that meeting?

16     A    No.

17     Q    When was the determination made that

18  Mr. Shorter should be fired?

19     A    Prior to the time he was interviewed.

20     Q    Did you have enough information prior to his

21  interview to terminate him?

22     A    No.

23     Q    Were you there when Mr. Shorter was told he

24  would be terminated?

25     A    Yes.

```
1        Q     Did you attempt to find out?

2        A     No.

3                   MS. BAIRD:  That's it.

4                   MS. STRANGE:  I just have a

5              quick follow-up question on something

6              from earlier.

7

8                   CROSS-EXAMINATION

9

10   BY MS. STRANGE:

11       Q     You testified earlier in your deposition

12   that the decision to terminate Mr. Shorter was made

13   prior to his interview; is that accurate?

14       A     That's not accurate if that's what I said.

15   I didn't intend to say that.

16       Q     When was the decision made to terminate his

17   employment?

18       A     The decision that the behavior was a

19   terminable offense was made prior to the time that we

20   interviewed Ferron Shorter.  The -- but we didn't know

21   what Ferron Shorter's side was.  We needed to talk to

22   Ferron and understand what his reaction to that was

23   going to be.

24             It wasn't until after he admitted to that

25   conduct that the decision was he's going to have to be
```