United States District Court
District of Connecticut
FILED AT
July 23, 2004
Kevin F. Rowe, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER JR., :
:
Plaintiff, : Case No. 3:03CV0149(WIG)
:
v. :
:
HARTFORD FINANCIAL SERVICES :
GROUP, INC., MARYANNE RHODES, :
:
Defendants. : JUNE 26, 2004

## SECOND AFFIDAVIT OF FERRON SHORTER JR.

Ferron Shorter Jr., being duly sworn and according to law, deposes and states:

1. I am the Plaintiff and have filed a complaint against Hartford Financial Services Group, Inc. ("The Hartford") and MaryAnne Rhodes ("Ms. Rhodes") that is pending at the United States District Court for the District of Connecticut under civil case number 3:03CV0149(WIG).

2. This Affidavit is based on my personal knowledge and is submitted in support of my Objection to Rhodes' Motion to Strike the Affidavit of Ferron Shorter Jr.

3. I affirm that the cassette tapes attached to this affidavit as Exhibit 1 and Exhibit 2 are true and accurate copies of tape recordings that I made of conversations that I was a party to on March 22, 2002, and March 27, 2002, (Ex. 2) and of voice mail recordings left by Rhodes on my voice mail systems (Ex. 1).

4. Every message on Side A of Exhibit 1 was available to The Hartford prior to my termination and contains threatening messages from Rhodes to my voice mail. (Ex. 1, Side A)

5. Side B of Exhibit 1 contains recorded voice mails from Rhodes to Plaintiff between March 22, 2002, and March 28, 2002. (Ex. 1, Side B)

6. Side A of Exhibit 2 contains a recorded conversation between me and Rhodes that occurred on March 22, 2002. (Ex. 2, Side A)

7. Side B of Exhibit 2 contains a recorded conversation between me and Rhodes that occurred on March 27, 2002. (Ex. 2, Side B)

8. Exhibit 1, Side A, to the instant affidavit is a tape containing six (6) voice mail messages left by Rhodes and preserved by me on cassette that I personally heard and taped.

9. The first two messages contained on Side A of Exhibit 1 were placed from Rhodes' work station at The Hartford to my work voice mail on December 6, 2001, and December 13, 2001. (Ex. 1, Side A)

10. On December 6, 2001, Rhodes demanded that I return her phone call and threatened to continue calling my work number to leave non-work related messages until I call. (Ex. 1, Side A)

11. In a December 13, 2001, voice message, which was left three days before I moved from her apartment, Rhodes threatened me, indicated that she was angry that I did not want to continue our relationship, and asked for a chance to work out our relationship. (Ex. 1, Side A)

12. Rhodes stated that if I really cared about her then I would try to work things out and let her work things out with her family about my race. (Ex. 1, Side A)

13. Rhodes concluded the voice mail on December 13, 2001, by telling me that I would never want her to hate me. (Ex. 1, Side A)

14. Prior to my termination, I told The Hartford's investigator, Richard Wardell, about these obscene, threatening messages.

15. At the time of the investigation, The Hartford's Human Resources Consultant Lisa Anderson ("Anderson") obtained a non-work-related message from the voice mail of Scott, an

2

individual not employed by The Hartford, and incorporated that message into the investigation against me.

16. The Hartford never reviewed the obscene, threatening messages that Rhodes recorded on my voice mail at work. (Ex. 1)

17. After my termination, I asked The Hartford for voice mail messages recorded on my voice mail but was told by counsel for The Hartford that these messages were unavailable even though The Hartford later submitted as evidence the non-work related voice mail taken from Scott's voice mail.

18. The third and fourth messages contained on Side A of Exhibit 1 were left by Rhodes on December 30, 2001, just hours before the non-work related message on Scott's voice mail that The Hartford claimed indicated that I was a threat in the work place. (Ex. 1, Side A)

19. During the day of December 30, 2001, in the first message, Rhodes told me that she was frightened of Scott and that Scott was jealous of Rhodes and angry at her.

20. Rhodes told me that she had met Scott for lunch on December 29, 2001, and told him how much she loved me.

21. Rhodes concludes the first December 30, 2001, message by begging me to call her back. (Ex. 1, Side A)

22. During the afternoon of December 30, 2001, in the second message, Rhodes left a voice mail message.

23. Two weeks to the day after I moved from Rhodes' apartment by choice, the second message on December 30, 2001 where Ms. Rhodes stated "[Y]ou know how much I love you and I miss you. Please call me," occurred at 4:10 P.M. less than twelve hours before the phone call and message to Scott's voice mail. (Ex. 1, Side A)

3

24. Rhodes begged me to stay at her apartment on December 30, 2001, and claimed that she was afraid of Scott.

25. Shortly after midnight on December 31, 2001, Rhodes called me and told me that she had to stay at her brother's apartment because I had not come to her apartment to protect her from Scott.

26. I was angry at Rhodes for constantly calling me about Scott when Rhodes knew that I was living with another woman and this would cause problems.

27. Rhodes called me at 3:00 A.M. and 3:30 A.M. on December 31, 2001, and asked me to call Scott to tell him to leave Rhodes alone.

28. I was angry and told Rhodes that the only way I would call Scott would be if Rhodes was also on the phone and I could hear her tell Scott to leave her alone and if she promised to then stop calling me and to leave me alone.

29. Rhodes provided Scott's phone number to me and I made the three-way phone call.

30. I believed that Rhodes was harassing me and using Scott as an excuse to get my attention.

31. At the time of The Hartford's investigation prior to my termination, The Hartford never asked me about the circumstances of that non-work related phone call and voice message on Scott's voice mail.

32. The fifth message contained on Side A of Exhibit 1 from Rhodes to me was left on January 1, 2002, less than twenty-four hours after the non-work related message left on Scott's voice mail that The Hartford claimed presented a potential threat in the workplace and after Rhodes agreed not to call me anymore. (Ex. 1, Side A)

33. Rhodes message was that she knew she was not supposed to call but that she could not help herself and loved me to death. (Ex. 1, Side A)

34. From my relationship with Rhodes, I knew that her use of the term "death" was meant as a threat. (Ex. 1, Side A)

35. The sixth message contained on Side A of Exhibit 1 was left on January 17, 2002, and is an obscene, threat from Rhodes to me. (Ex. 1, Side A)

36. The obscene message left by Rhodes on January 17, 2002, was left four days prior to Rhodes complaint against me at The Hartford which alleged that I was violent and abusive toward her. (Ex. 1, Side A)

37. Early in the evening of January 17, 2002, Rhodes called me and demanded that I come to her apartment before she left for the weekend because she was going to be at her sister's house in South Carolina.

38. I told Rhodes that I would not meet her and that I was with another woman which she knew and indicated in her letter to me postmarked March 1, 2002.

39. After 9:00 P.M. on January 17, 2002, Rhodes called me and told me to check all of her voice mail messages with her new passcode.

40. This was the second time that Rhodes had provided me her passcode.

41. I hung up on Rhodes but she called me back at 9:17 P.M. and demanded in a threatening tone that I better "hurry up and *** call her back." (Ex. 1, Side A)

42. I did not call Rhodes back on January 17, 2002, and she continued to harass me on January 18, 2002.

43. I attempted to explain to her by email on January 18, 2002, that I did not want to be in a relationship with a woman who was seeing other men because that bothered me and when I am intimate with a woman and she is intimate with other men I become jealous and therefore do not like those kinds of relationships.

44. I was desperate to convince Rhodes that our relationship was permanently finished but I did not want to report her harassing behavior if I could convince her to stop on her own.

45. I knew that if I could present Rhodes with proof that I knew she was with other men then she would accept the fact that I would not resume our relationship.

46. I used the passcode on January 18, 2002, that Rhodes had provided me to access her voice mail system and listen to a message from a man in Florida regarding Rhodes' weekend visit.

47. I had to change Rhodes' passcode or else Rhodes would have erased the message and continued to harass me at work and jeopardize my job.

48. When I attempted to call Rhodes on the morning of January 18, 2002 to connect her to the message from the man in Florida, she hung up the phone.

49. On January 19, 2002, however, when Rhodes knew that I had to report to work for four hours she called me at work to harass me and warned me about what would happen when she returned to Connecticut.

50. After my conversation with Rhodes on January 19, 2002, my co-worker, Peter Kuck ("Kuck"), asked me if I was O.K. (Affidavit of Peter Kuck, doc. #56)

51. I told Kuck that that the blonde girl who had been coming to my desk would not leave me alone. (Affidavit of Peter Kuck, doc. #56)

52. After I left work on Saturday, January 19, 2002, Rhodes called me and threatened me again.

53. I begged Rhodes to listen to the voice mail from the man in Florida that had been left at her work station but Rhodes refused and hung up the phone.

54. Rhodes had threatened me that she would call the police and report me to The Hartford so I discussed these threats with the woman I was living with and she accompanied me when I decided to go back to The Hartford and file a complaint of workplace harassment on January 19, 2002.

55. I filed my complaint of harassment with the two security guards on duty, Officer Salvatore and Officer Jackson, with whom I was personally acquainted, at The Hartford

56. A third security guard was behind the desk writing Rhodes' name and extension when I reported the complaint to Officer Jackson but I am not aware of the third security guard's name.

57. I provided Rhodes' name and telephone extension to the security guards on January 19, 2002.

58. On Wednesday, January 23, 2002, I told The Hartford's investigator, Richard Wardell that I had filed a complaint on January 19, 2002, and mentioned it in my statement but I was never informed of any investigation based on my complaint and do not believe that an investigation occurred.

59. I know that The Hartford did not investigate my complaint against Rhodes prior to my termination.

60. Shortly after I was terminated, when I was not receiving any response from The Hartford concerning my complaint, I hired an attorney to facilitate an investigation of my complaint and to seek reinstatement, however, I remained unaware until more than one year had passed and the administrative proceedings had terminated at the CHRO that a colleague of mine, Kuck, had filed a complaint also corroborating my complaint.

7

61. I also met with Rhodes on two occasions on March 22, 2002, and March 27, 2002, at her insistence and tape recorded our conversations where she stated that she did not believe that I would have been terminated if I were not black. (Ex. 2)

62. During February of 2002, when I was seeking reinstatement and asking The Hartford to investigate my complaint and reconsider its decision, I knew that (a) The Hartford had falsely accused me of having a criminal record and told me on January 23, 2002, that I was being terminated because I had denied having a criminal record; (b) I was treated differently and received more adverse treatment than Rhodes, a white, female employee of three years who had violated The Hartford's policy repeatedly; (c) The Hartford knew that I had filed a complaint of harassment with security regarding Rhodes' disruptive and threatening behavior that was affecting my work and jeopardizing my job; and (d) The Hartford was aware of the taped voice mail messages from Rhodes to me at my work station that supported my complaint and allegations against Rhodes.

63. During the eighteen months subsequent to my termination, I learned (a) that The Hartford had focused on my race and gender during my termination despite The Hartford investigator's representation that race was not information considered in the termination process; (b) that The Hartford's alleged reliance on a program named People Soft was not revealed to justify Anderson's notes about my race and gender until after I submitted my objection to the Defendants' summary judgment motions even though I had requested all documents related to the investigation in the course of discovery; (c) that Rhodes had received discipline for violating the Electronics Communication Policy (ECP) previously; (d) that The Hartford used a non-work related voice mail message on Scott's voice mail as cause for my termination; (e) that The Hartford refused to investigate threatening messages that Rhodes had left at my work station

number; (f) that two other employees of The Hartford, Rhodes and Kuck, had stated that I was treated unfairly, first, when Rhodes stated that I would not have been terminated if I was not black and second, Kuck, when he stated that the Rhodes' violation was as severe as mine; and (g) that the stated reasons for my discharge from The Hartford, as represented by The Hartford have changed from an allegation that I had lied about not having a criminal record to an allegation that I presented a danger of workplace violence and finally when those were disproved to an allegation that I violated the ECP.

64. However, Rhodes, a worker identified as a single, white, female by The Hartford was not terminated even though she violated the ECP multiple times by providing me her passcode twice, by using the voice mail system and phone to harass me, and in receiving a previous disciplinary warning and I was terminated, after I was identified as a single, black, male, even though I had worked at The Hartford for twelve years with no previous ECP violations.

FERRON SHORTER JR. being duly sworn, on oath, states that he is the Plaintiff herein; that he has read the foregoing Affidavit and knows the content thereof; that the same is true of his own knowledge, except as to the matter herein stated on information and belief and that as to these matters he believes the same to be true.

Dated at ___June___, _26_ on this _____ day of June, 2004.

_____
Ferron Shorter Jr.

Subscribed and sworn to before me on this _26_ day of June, 2004.

_____
Notary Public
My Commission Expires:

**SHARON REDMOND**
Notary Public, Gwinnett County, Georgia
My Commission Expires Dec. 19, 2006