UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

|  | : |  |
|---|---|---|
| FERRON SHORTER JR. | : | |
| Plaintiff, | : | |
| | : | CIVIL NO.: 303 CV 0149(WIG) |
| v. | : | |
| | : | |
| HARTFORD FINANCIAL SERVICES GROUP, | : | |
| INC. and MARYANNE RHODES | : | |
| Defendants. | : | SEPTEMBER 30, 2004 |

_____

## DEFENDANT'S MOTION TO BIFURCATE

Pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, Hartford Financial Services Group, Inc. ("The Hartford") hereby moves to bifurcate Plaintiff's claims against it and Defendant Maryanne Rhodes ("Ms. Rhodes") into separate trials. The claims against The Hartford and Ms. Rhodes should be bifurcated because: 1) separate trials will prevent prejudice to The Hartford; and 2) separate trials will be more convenient, expeditious and economical for the parties and the Court.

As set forth in more detail below, Plaintiff's claims against Ms. Rhodes for tortious interference with contract and defamation involve detailed evidence of their personal relationship, including communications following Plaintiff's discharge, which is irrelevant to Plaintiff's claims of wrongful termination against The Hartford and which is unfairly prejudicial to The Hartford's defense. The admission of this evidence in a consolidated trial will prejudice The Hartford's defense by introducing inflammatory statements by Ms. Rhodes which may be relevant to Plaintiff's claims against her, but which are irrelevant to his claims against The Hartford. The admission of this evidence may also confuse the jury in its consideration of the

1

separate issues of Ms. Rhodes' alleged liability and The Hartford's alleged liability and may, if the jury finds against Ms. Rhodes, contaminate The Hartford's defense.

Separate trials are also warranted because Plaintiff's claims against Ms. Rhodes and The Hartford require proof of different facts which, for the most part, do not overlap. Plaintiff's claims against Ms. Rhodes are based on evidence involving the personal, intimate details of his romantic relationship with her over an 18 month period between February 2001 and August 2002. In contrast, Plaintiff's claims against The Hartford involve evidence concerning The Hartford's investigation and his termination of employment over a brief six day period in January 2002. Separating the trials of these claims will avoid prejudice, minimize jury confusion and create efficiency by obviating the need to admit large amounts of evidence which is relevant to Plaintiff's claims in only one trial or the other.

I.    INTRODUCTION

A.    Factual Background

Plaintiff's thirteen count Complaint alleges various statutory and common law claims arising out of the termination of his employment with The Hartford on January 23, 2002. Plaintiff was discharged for circumstances surrounding his violation of The Hartford's Electronic Communications Policy ("ECP"). Plaintiff violated the ECP by accessing Ms. Rhodes' voice mail account, changing her password and deleting messages during the weekend of January 18, 2002.[1] Because of Plaintiff's conduct, Ms. Rhodes could not access her voice mail account and could not obtain work-related messages. When Ms. Rhodes returned to work on January 21,

---

[1]  Beginning in approximately June 2001, Plaintiff and Ms. Rhodes commenced a romantic relationship which culminated with Plaintiff moving into Ms. Rhodes' apartment in November 2001. While Plaintiff moved out of the apartment in December 2001, the two continued a turbulent on-again, off-again relationship for several additional months

2002, she reported the violation to her supervisor and to Lisa Anderson of The Hartford's Office of Equal Opportunity Development.

Ms. Rhodes told Ms. Anderson that she and Mr. Shorter had shared a consensual relationship for about six months and that for approximately two months, they lived together at her apartment. Ms. Rhodes told Ms. Anderson that at some point during their relationship, she shared her password to allow Mr. Shorter to listen to her messages because he was jealous and would accuse her of being unfaithful to him. On the previous Friday, January 18, 2002, Ms. Rhodes stated she flew to Florida to visit a friend. While Ms. Rhodes was in Florida, Mr. Shorter accessed her voice mail account and changed her password so that she was could not obtain her voice mail messages.

Ms. Rhodes also told Ms. Anderson that her relationship with Mr. Shorter ended in December 2001 when he moved out of her apartment. Ms. Rhodes prepared a written statement for Ms. Anderson in which she wrote, "Ferron could be very jealous. He had had a bad temper and would scream at me. He has squeezed my arm and it bruised, and he kicked me. When he moved in, he told me that he had a gun and he showed it to me."[2] Ms. Rhodes also told Ms. Anderson that Mr. Shorter had threatened her brother and that, on one occasion, her sister-in-law called the police because she heard Mr. Shorter screaming at Ms. Rhodes over the phone. Ms. Rhodes also provided Ms. Anderson with a message Mr. Shorter left on the answering machine of a friend of Ms. Rhodes named Scott. The message from Scott's answering machine recorded an obscenity-laced tirade by Mr. Shorter berating, threatening and screaming at Ms. Rhodes.

---

[2]   A copy of Ms. Rhodes' written statement is attached as Exhibit 1.

After meeting with Ms. Rhodes, Ms. Anderson began to investigate Ms. Rhodes' complaint. As part of her investigation, she obtained Ms. Rhodes' voice mail records. These records indicated that Mr. Shorter accessed Ms. Rhodes' voice mail more than 40 times between 3:00 pm on Friday, January 18, 2002 and 1:30 am on Monday, January 21, 2002. The records also indicated that her password was changed at 5:01 pm and 5:18 pm on January 18, 2002 and that her password was changed an additional two times during the weekend. The records also showed that several messages were deleted from Ms. Rhodes' voice mail.

Ms. Anderson also met with Jennifer Ames, a human resources generalist for Mr. Shorter's department, to notify her of Ms. Rhodes' complaint. Ms. Anderson and Ms. Ames enlisted the assistance of Richard Wardell, an investigator in The Hartford's Department of Special Investigations.

As part of his investigation, Mr. Wardell interviewed Ms. Rhodes and reviewed her statement. In addition to confirming the information in her statement, Ms. Rhodes told Mr. Wardell that she feared for her personal safety. Mr. Wardell also interviewed Mr. Shorter and obtained a written statement from him. Mr. Shorter admitted to Mr. Wardell that he violated the ECP by accessing Ms. Rhodes' voice mail ten to fifteen times over the weekend and changing her password twice. Mr. Shorter claimed that he did this to attempt to catch Ms. Rhodes in a lie. Mr. Wardell also obtained an email message Mr. Shorter sent Ms. Rhodes on the morning of January 18, 2002. In his email, Mr. Shorter referred to himself as a "real jealous type of dude" and stated, "Remember this nigga won't forget about you right away!"

Following Mr. Shorter's admission that he accessed Ms. Rhodes voice mail and changed her password, Ms. Anderson met with Ms. Ames and they concluded that Mr. Shorter's conduct warranted his termination. Mr. Shorter was terminated for violating The Hartford's ECP

4

by accessing Ms. Rhodes' voice mail and changing her password so that she could not access her voice mail account. Based on the information obtained during The Hartford's investigation, including Ms. Rhodes' statement, Mr. Shorter's email to Ms. Rhodes on January 18, 2002 and the message Mr. Shorter left for Ms. Rhodes' friend Scott, Ms. Anderson and Ms. Ames were also concerned about a potential threat of violence in the workplace. Ms. Anderson and Ms. Ames made the decision to terminate Plaintiff based on the information obtained during their investigation.

B.    Plaintiff's Claims Against The Hartford

Counts One through Ten allege the following causes of action against The Hartford: 1) sexual harassment in violation of Title VII; 2) race and sex discrimination in violation of Title VII; 3) race discrimination in violation of 42 U.S.C. § 1981; 4) retaliation in violation of Title VII; 5) retaliation under 42 U.S.C. § 1981; 6) race and sex discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"); 7) retaliation in violation of CFEPA; 8) intentional infliction of emotional distress; 9) negligent infliction of emotional distress; and 10) breach of implied covenant of good faith and fair dealing. Count Thirteen alleges a common law claim for invasion of privacy.

With the exception of Plaintiff's retaliation and invasion of privacy claims, Plaintiff's claims against The Hartford arise out conduct related to the termination of his employment on January 23, 2002.[3] In Count One, Plaintiff alleged that Ms. Rhodes sexually

---

[3] Plaintiff did not contest The Hartford's Motion for Summary Judgment with respect to either of these claims. In Counts Four, Five and Seven, Plaintiff alleged that an employee of The Hartford, Robert Begley, retaliated against him in April 2003 when he called Plaintiff and threatened to have him arrested. (Cmplt., ¶¶ 130, 140, 144.) In Count Thirteen, Plaintiff alleged that The Hartford invaded his privacy by falsely portraying him to the Commission on Human Rights and Opportunities as a citizen who had been convicted of a crime. (Cmplt., ¶ 165.) Neither of these claims, nor the evidence supporting either claim, is related to Plaintiff's claims against Ms. Rhodes.

harassed him by visiting him at his desk, staring at him calling him and leaving him long voice mail messages. (Cmplt., ¶ 33.) In Counts Two, Three and Six, Plaintiff alleged that The Hartford discriminated against him and discharged him based on his sex and race. (Cmplt., ¶¶ 106, 142.) In Counts Eight, Nine and Ten, Plaintiff alleged that The Hartford caused him emotional distress and that it breached the implied covenant of good faith and fair dealing in terminating his employment. (Cmplt., ¶¶ 148, 151, 154.)

Evidence concerning Plaintiff's claims against The Hartford will revolve around Plaintiff's accessing Ms. Rhodes' voicemail and changing her password during the weekend of January 18, 2002, Ms. Rhodes' complaint to Lisa Anderson on Monday, January 21, 2002, information obtained by Ms. Anderson during her investigation on January 22, and 23, 2002, and the decision to discharge Plaintiff on January 23, 2002. This evidence will be limited to the information The Hartford possessed as of January 23, 2002 and the circumstances which led to The Hartford's termination decision. Plaintiff's claims against The Hartford, and The Hartford's defense of those claims, are premised on evidence related to his employment at The Hartford and his admitted misconduct in violating the ECP. These claims do not involve evidence concerning the details of the status and nature of Plaintiff's complicated and turbulent personal relationship with Maryanne Rhodes or evidence of communications between them after Plaintiff's termination on January 23, 2002.

C.    Plaintiff's Claims Against Maryanne Rhodes

Counts Eleven and Twelve allege claims against Ms Rhodes for tortious interference with contract and defamation, respectively. These claims are based on the contents of the written statement Ms. Rhodes submitted to Lisa Anderson on January 21, 2002 as part of The Hartford's investigation. Plaintiff claims that portions of the statement were untrue and

6

constituted an attempt to interfere with his employment relationship with The Hartford. (Cmplt., ¶¶ 69, 158, 160.) Specifically, Plaintiff contends that Ms. Rhodes' lied in her statement when she stated that she feared Plaintiff and that she defamed him by accusing him of abusing her. (Pl. Obj. to Summ. Judgmnt., pp. 29-30.)

Based on the Amended Complaint, the Affidavit of Ferron Shorter Jr. dated March 5, 2004 (submitted in support of Plaintiff's Objection to Defendants' Motions for Summary Judgment) and the Second Affidavit of Ferron Shorter Jr. dated June 26, 2004 (submitted in support of Plaintiff's Objection to Ms. Rhodes' Motion to Strike), it appears that Plaintiff will attempt to prove that Ms. Rhodes' written statement was false and defamatory by offering extensive and highly detailed evidence regarding the nature his intimate relationship with her and their various private communications between December 2001 and August 2002.[4] Plaintiff believes that this evidence, which nothing to do with his termination, will prove that Ms. Rhodes did not really fear him and that she actually wanted to resume her relationship with him. (Pl. Obj. to Summ. Judgmnt., p. 30.)

For example, in the Amended Complaint, Plaintiff alleged certain facts which he believes will establish that Ms. Rhodes lied in her written statement and which he will seek to introduce at trial. It appears that Plaintiff intends to offer evidence regarding the feelings of Ms. Rhodes' family toward Plaintiff (Cmplt., ¶ 29), Plaintiff's attempts to move out of Ms. Rhodes' apartment (Cmplt., ¶ 30), their break-up and subsequent attempt to reconcile in late December 2001 (Cmplt., ¶¶ 36, 37), Plaintiff's communications with Ms. Rhodes in March 2002 (Cmplt, ¶¶ 111-27), Ms. Rhodes' pregnancy in the spring of 2002 (Cmplt., ¶ 128) and Plaintiff's attempt to

---

[4] Copies of Plaintiff's affidavits are attached as Exhibits 2 and 3, respectively.

obtain a restraining order against Ms. Rhodes in August 2002. (Cmplt., ¶ 82). None of this evidence is in any way related to The Hartford's termination decision.

Plaintiff will also seek to introduce evidence from his affidavits in support of his claim that Ms. Rhodes lied in her written statement. Plaintiff intends to offer evidence of approximately nine voice mail messages Ms. Rhodes left with him between March 22 and March 28, 2002, two months after Plaintiff's termination, two conversations with Ms. Rhodes which Plaintiff surreptitiously tape recorded on March 22 and 27, 2002, and the circumstances surrounding a restraining order which Plaintiff obtained against Ms. Rhodes in August 2002.[5]

In the voice mail messages, Ms. Rhodes refers to Plaintiff as "Sweetie" and "Sweetstuff," she asks how he is, she asks him to call her later and she tells him that she loves him. (Pl. First Aff., ¶¶ 31, 61, 63-65, 73-76; Pl. Sec. Aff., ¶ 5.) In the tape recorded conversations, Plaintiff pressed Ms. Rhodes for information about her complaint to The Hartford and elicited statements in which Ms. Rhodes denied ever fearing Plaintiff. (Pl. First Aff., ¶¶ 59, 72.) Plaintiff also pressured Ms. Rhodes into agreeing with his statement that he would not have been terminated if he were white. (Pl. First Aff., ¶¶ 59, 66, 68-72; Pl. Sec. Aff., ¶¶ 6-7, 61.) This evidence, as well as evidence of Plaintiff's restraining order in August 2002 (Pl. First Aff., ¶ 79), is irrelevant to Plaintiff's claims against The Hartford and is prejudicial to The Hartford's defense of this matter.

---

[5] The cassette tapes of the voice mail messages and tape recorded conversations are attached as Exhibits 1 and 2 to the Second Affidavit of Ferron Shorter Jr. dated June 26, 2004 submitted in support of Plaintiff's Objection to Maryanne Rhodes' Motion to Strike the Affidavit of Ferron Shorter Jr. The voice mail messages from March 2002 are found on Side B of Exhibit 1. The taped recorded conversations of March 22 and 27, 2002 are found on Sides A and B of Exhibit 2. In its Motion in Limine, The Hartford moved to preclude the introduction of this evidence, and of evidence concerning Plaintiff's restraining order obtained in August 2002, on the grounds that such evidence is irrelevant to Plaintiff's claims against it and because it is inflammatory and unfairly prejudicial to The Hartford.

In support of his claims against Ms. Rhodes, Plaintiff will also seek to introduce evidence involving the circumstances of his move out of Ms. Rhodes' apartment, his assertions that he never showed her a gun, that he never hit or kicked her, that he never wanted to begin a new sexual relationship with her, and the fact that he had a new girlfriend in January 2002. (Pl. First. Aff., ¶¶ 11, 27, 80-82.) All of this evidence, which Plaintiff believes supports his claims of defamation and tortious interference against Ms. Rhodes, is completely unrelated and irrelevant to his claims against The Hartford.

II.    ANALYSIS

Rule 42(b) provides, in pertinent part, "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim . . . or of any number of claims. . . ." Fed. R. Civ. Pro. 42(b). Under Rule 42, a "district court has broad discretion to order separate trials. . . ." Daniels v. Loizzo, 178 F.R.D. 46, 47 (S.D.N.Y. 1998)(citation omitted). "A Court may order separate trials in order to (1) avoid prejudice; (2) provide for convenience; or (3) expedite the proceedings and be economical." Ismail v. Cohen, 706 F. Supp. 243, 251 (S.D.N.Y. 1989)(citation omitted), aff'd, 899 F.2d 183 (2d Cir. 1990). "Only one of these conditions need be met for the Court to order a separate trial. In a complex case with complex issues, justice is often best served if issues are separated." Id.

A.    Separate Trials Will Avoid Prejudice To The Hartford

Separate trials of Plaintiff's claims against The Hartford and Ms. Rhodes are warranted to avoid prejudice to The Hartford. "In addressing the issue of prejudice, the courts have usually been concerned with the effect that trying several issues will have on a jury. Prejudice, for instance, may occur when evidence is admissible only on a certain issue, and it is

feared that the party may be prejudiced in the minds of the jury." Ismail, 706 F. Supp. at 251.

See Daniels, 178 F.R.D. at 47-48 (ordering separate trials of claims against municipal and

individual defendants on grounds that introduction of evidence admissible as to municipal

defendant might prejudice defense of the individual defendants).

If Plaintiff's claims against The Hartford and Ms. Rhodes are tried together, The

Hartford will be prejudiced by 1) the admission of inflammatory evidence of post-termination

communications between Plaintiff and Ms. Rhodes which are irrelevant to Plaintiff's claims

against The Hartford, but which may be admissible as to his claims against Ms. Rhodes; and 2)

by the admission of detailed evidence regarding Plaintiff's personal relationship with Ms.

Rhodes which may contaminate the jury's consideration of Plaintiff's wrongful termination

claim against The Hartford.

As set forth in more detail in Defendant's Motion in Limine, Plaintiff will attempt

to introduce inflammatory evidence of Ms. Rhodes' voice mail messages, his tape recorded

conversations with her and other post-termination communications with Ms. Rhodes. Plaintiff

believes that this evidence will establish that Ms. Rhodes' lied in her statement to Ms. Anderson.

This evidence is prejudicial to The Hartford's defense of this matter which will be based, in large

part, on its receipt and good faith investigation of Ms. Rhodes' complaint regarding Plaintiff.

The Hartford's defense will rely on evidence of the good faith nature of its

investigation, the facts discovered during its investigation and the information it possessed at the

time of the termination decision. The Hartford's defense will be unfairly undermined and

prejudiced by the admission of testimony from Ms. Rhodes that the termination decision was

biased and discriminatory. The Hartford's defense will be further prejudiced by statements from

Ms. Rhodes which seem to contradict the information she provided to Ms. Anderson in her

10

written statement and which The Hartford confirmed and relied on in conducting its investigation.

Ms. Rhodes did not make the decision to discharge Plaintiff and did not conduct The Hartford's investigation. Thus, evidence of her beliefs or opinions about the reasons for Plaintiff's discharge is inadmissible and cannot be used to establish either Plaintiff's prima facie case or that The Hartford's reason for Plaintiff's discharge was a pretext for unlawful conduct. Such evidence also lacks any basis in Ms. Rhodes' personal knowledge and is unsupported opinion testimony of a fact witness. Thus, such evidence is inadmissible under Rules of Evidence 602 and 701. Evidence of Ms. Rhodes' conversations with Plaintiff in March 2002 is also inadmissible because it is an improper attempt by a non-decision maker to second guess the results of The Hartford's investigation and its good faith business judgment. Such evidence does not support a claim of discrimination and is irrelevant to Plaintiff's claims. Ms. Rhodes' statements to Plaintiff following his termination, coming from a witness who played no role in the conduct of The Hartford's investigation or in the termination decision, can only inflame and confuse the jury.

The Hartford's defense will be also be prejudiced by the introduction of extensive and detailed evidence regarding the turbulent, on-again, off-again relationship between Plaintiff and Ms. Rhodes. This evidence, which may be relevant to Plaintiff's claims against Ms. Rhodes, had no bearing on The Hartford's termination decision and has no place in the trial of Plaintiff's wrongful termination case. This evidence is personal in nature, it is polarizing, it is inflammatory, and it is provocative. Plaintiff should not be permitted to transform his case against The Hartford for discriminatory termination into a case about who was right and who was wrong in his relationship with Ms. Rhodes.

The Hartford's defense may be further prejudiced if the jury, after considering this evidence, finds against Ms. Rhodes and concludes that her statement to Ms. Anderson was not truthful. Wuch evidence is not evidence of discrimination and can only prejudice the jury's consideration of The Hartford's defense. The introduction of detailed evidence regarding their relationship, and the jury's simultaneous consideration of Plaintiff's claims against both Ms. Rhodes and The Hartford, may contaminate the jury's evaluation of The Hartford's investigation and its consideration of The Hartford's alleged liability.

      B.      <u>Separate Trials Will Expedite The Proceedings And Avoid Jury Confusion</u>

Separate trials are also warranted because they will be more convenient, expeditious and economical for the parties and the Court. When considering this issue, it is "important to determine whether or not documentary proof required by the two issues to be separated overlaps. . . . The presentation of divergent standards and factual evidence in one trial could lead to jury confusion." <u>Ismail</u>, 706 F. Supp. at 251. When a claim against one party involves "a great deal of evidence which is entirely unnecessary to the resolution of all of the other claims in the case," separate trials are appropriate. <u>Id.</u>

As set forth above, there is very little overlap between the evidence supporting Plaintiff's claims against The Hartford and his claims against Ms. Rhodes. Plaintiff's claims against The Hartford involve evidence concerning The Hartford's investigation and his termination of employment. These are discreet issues which involve a relatively short time frame in January 2002. In contract, Plaintiff's claims against Ms. Rhodes involve evidence concerning the nature and status of their romantic relationship. This evidence has very little to do with The Hartford's termination decision and involves a much broader period of time from February 2001 to August 2002.

12

Plaintiff's claims against Ms. Rhodes involve a great deal of evidence regarding their personal relationship which is entirely unnecessary to the resolution of Plaintiff's wrongful termination claim against The Hartford.   Likewise, Plaintiff's claims against The Hartford involve evidence regarding The Hartford's investigation and Plaintiff's termination which is unnecessary to the resolution of his claims against Ms. Rhodes.   Consequently, separate trials will avoid prejudice, minimize jury confusion and create efficiency by obviating the need to admit large amounts of evidence which are relevant to Plaintiff's claims in only one trial or the other.

III.   CONCLUSION

For the foregoing reasons, Defendant's Motion to Bifurcate should be granted.

DEFENDANT,
HARTFORD FINANCIAL SERVICES
GROUP, INC.

By:   _Margaret J. Strange_____

Margaret J. Strange (ct08212)
James F. Shea (ct16750)
Jackson Lewis LLP
55 Farmington Avenue, Suite 1200
Hartford, CT  06105
Phone: (860) 522-0404/Fax: (860) 247-1330
email: strangem@jacksonlewis.com
email: sheaj@jacksonlewis.com

CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent via first class mail, postage

prepaid, on this 30th day of September 2004, to the following counsel of record:

> Rachel M. Baird
> Law Office of Rachel M. Baird
> 379 Prospect Street
> Torrington, CT 06790
> (860) 626-9991
> Attorney for Plaintiff


> David L. Metzger
> Metzger & Associates
> 25 Capitol Avenue
> Hartford, CT 06106-1707
> Ph. (860) 549-5026
> Attorney for Defendant Maryanne Rhodes


_____
Margaret J. Strange

H:\Client Folder\H\The Hartford\Shorter\Trial\Motion to Bifurcate Trial.DOC
64532

14

EXHIBIT  1

## STATEMENT OF MARYANNE RHODES

Date: January 21, 2002

My name is MaryAnne Rhodes. My home address is 169 Vernon Avenue. I have been employed by The Hartford since 1999. I am currently employed as a Staff Accountant in Hartford, CT.

I make the following voluntary statement to Lisa Anderson, Consultant with The Hartford's Equal Opportunity Development Department on January 21, 2002.

Ferron Shorter is another employee who works at The Hartford  He and I had a consensual relationship that lasted about six months in 2001. He works in North Plaza on the 6th Floor in the IT Department. Our relationship ended in December of 2001. He had moved into my apartment for about two months and things did not work out. He moved out in December.

In December, after Ferron moved out, I had lunch with an old boyfriend, Scott, sometime between Christmas and New Year's. Ferron found out and I believe the only way he could have found out would be to listen to my work voice mail messages. Earlier in our relationship, I had shared my password with Ferron to allow him to listen to my messages because he was jealous and would accuse me of things. I know that I should not have shared my password with him. After he found out about my having lunch with Scott, he told me that he was going to delete all the messages he left for me that I had saved on my personal cell phone and work phone. I tried to access my work messages right away, but his messages to me were already gone. Ferron called Scott and left messages, one was a three way message where he was screaming at me. Scott's personal answering machine recorded the message

During our relationship, Ferron could be very jealous. He had a bad temper and would scream at me. He has squeezed my arm and it bruised, and he kicked me. When he moved in, he told me that he had a gun and he showed it to me. He has called my brother's home and talked to my sister-in-law Deanna and my brother Michael. He has screamed at them and threatened Michael, saying that he was going to get his buddies and go after him. Deanna had called the Vernon police because she heard him screaming at me on the phone. They showed up at my apartment but we weren't there.

Things were kind of quiet in the past week. Ferron and I had some calm conversations. I told him that I was going away for the weekend, but I lied about where because I didn't want him to know. I told him I was going to my sister's in South Carolina when I was really going to Florida to visit and old friend, Rich. I arrived at the airport after 1:00 on Friday afternoon. He called me on my cell phone and was asking questions about who I was going with, and where I was going. I arrived in Florida around 6:00pm and tried to check voice mail at work but it didn't work. I called Ferron on his cell phone and asked

CONFIDENTIAL
HAR 000732

him what he did with my voice mail. He said, "I'm just messing with you." I hung up and called my boss, Brian Vadney, to tell him that my voice mail was messed up and that he should leave messages for me at the hotel and not voice mail or on my cell phone. I couldn't access my cell phone voice mail either. Both phones use the same password, and I had only changed one number from the time Ferron first knew what my password was. Ferron called me on Saturday morning. I told him that it was important that I be able to hear work messages over the weekend. He said, don't worry, there's nothing from your boss. I told him that I was going to Security at work. He told me something like, that if I did that and he lost his job, then he'd have nothing to lose and he would come after me. He called again on Sunday and told me that he had been to Security to report me. He then played a message that my friend Liz had left for me on my personal cell phone.

I am afraid of this guy. He has threatened me and my brother. It frightens me that he knows my sister-in-law's telephone number. He has not confronted me at work, but it's strange that he leaves his lunch in the refrigerator on T-14 when he works on NP-6. (I work on T-16.)

Lisa had told me how important it is to take every precaution at work and get a Security Guard to escort me to my car. We talked about the fact that I've reported harassing phone calls from Ferron's new girlfriend to the telephone company, and I now know how to use the *57 feature.

I understand that The Hartford takes complaints of harassment very seriously and that this matter will be looked into. I have read the above statement and been given the opportunity to make changes, deletions, or additions. The statements above are true and voluntary

MaryAnne Rhodes (January 21, 2002)          witness Lisa Anderson (January 21, 2002)

CONFIDENTIAL
HAR 000733

EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER JR ,                            :
                                               :
                    Plaintiff,                 :       Case No. 3:03CV0149(WIG)
                                               :
            v.                                 :
                                               :
HARTFORD FINANCIAL SERVICES                    :
GROUP, INC , MARYANNE RHODES,                  :
                                               :
                    Defendants                 :       MARCH 5, 2004

## AFFIDAVIT OF FERRON SHORTER JR.

Ferron Shorter Jr , being duly sworn and according to law, deposes and states:

1. I am the Plaintiff and have filed a complaint against Hartford Financial Services Group,
Inc. ("The Hartford") and MaryAnne Rhodes ("Ms. Rhodes") that is pending at the United States
District Court for the District of Connecticut under civil case number 3:03CV0149(WIG)

2. This Affidavit is based on my personal knowledge and is submitted in support of my
Objection to The Hartford's and Ms Rhodes' separate Motions for Summary Judgment

3. The text of this Affidavit enclosed in quotation punctuation marks is taken from (a) taped
recordings of conversations that I participated in and transcribed from the recordings and (b)
voice mail messages addressed to me.

4. I was employed by The Hartford from October 9, 1989, through January 23, 2002.

5. From February of 2001 through December of 2001, I participated in a consensual,
romantic relationship with Ms Rhodes that became sexual in May or June of 2001

6. After I ended the romantic and sexual relationship with Ms. Rhodes on or about
December 16, 2001, and moved from her apartment in Vernon after residing there for

approximately one month, I did not want any further contact and provided notice to Ms. Rhodes , that the relationship was ended

7. Ms. Rhodes had become violent and emotional when I had attempted to move out previously so I declined her invitation to attend a New York Jets football game on December 16, 2001, and used her absence on that day to move out without confrontation.

8. Ms. Rhodes left long, frequent messages on my cell phone on December 16, 2001, and December 17, 2001, asking me why I had moved from her apartment.

9. Ms. Rhodes harassed me at work after I ended our relationship and urged me to begin a new sexual relationship with her.

10. Ms. Rhodes left long, frequent messages on my business and personal voice mails in December of 2001 and January of 2002 after I moved from her apartment.

11. I did not want to begin a new sexual relationship with Ms. Rhodes and as a result had to endure her unwelcome and harassing visits to my work station which embarrassed and humiliated me and prevented me from accomplishing the work I otherwise would have accomplished

12. In January of 2002, Ms. Rhodes told me that I was making her very mad and "pissed off" for not giving the relationship an opportunity to work.

13. On January 17, 2002, Ms. Rhodes left a message on my voice mail threatening me, as follows: "You'd better hurry up and fucking call me back!"

14. Ms. Rhodes would not take "no" for an answer

15. I accepted Ms. Rhodes voice mail password on January 18, 2002, so that I could access her voicemail and confront her with a message from another man she was dating as a last resort

2

to convince Ms. Rhodes that I knew she was dating another man and therefore no possibility existed that I would be convinced to begin a new sexual relationship with her

16 But for the fact that I am a man, Ms. Rhodes would not have harassed me to begin a sexual relationship with her in January of 2002.

17 The first time Ms Rhodes provided me her confidential password was in October of 2001, when I received an email from her that included the password  This email was forwarded using The Hartford's email messaging system

18. The second time that Ms. Rhodes provided me her voice mail password was on January 18, 2002

19 Ms. Rhodes gave me her password on two separate occasions. The first time in October of 2001 she provided her department voice message code of 547-4771 and her password was 092173  The second time was on January 18, 2002 when she gave me her new password of 092273. On January 18, 2002, I already knew the voice message code for Ms Rhodes' department because she had provided it previously in her October of 2001 email

20 I never asked Ms. Rhodes for her department's code number to its voice messaging system and I never asked Ms Rhodes for her password.

21 On January 18, 2002, when I tried to convince Ms Rhodes to leave me alone by having her listen to a message left by a man on her voice mail, Ms. Rhodes became furious, refused to listen, and would not allow me to give her the new password

22 On Saturday, January 19, 2002, while I was at work, Ms. Rhodes harassed and threatened me by telephone at work

23 After I left work on January 19, 2002, Ms Rhodes contacted me on my cell phone and told me that I "would see what happens when she returned."

3

24  I returned to work on January 19, 2002, to report Ms. Rhodes' harassment to the security
officers on duty at that time

25  I wanted there to be a record of Ms Rhodes' harassment and threats and action taken.

26  On Sunday, January 20, 2002, Ms Rhodes told me that I would not have a desk when I
returned to work on Tuesday, January 22, 2002  Ms Rhodes made this threat after I told her that
I had reported her to security to keep her away from my desk

27  Ms Rhodes suspected that I had a new girlfriend when she threatened my job on January
20, 2002, telling me that I was not going to have a desk on January 22, 2002, and mentions this
in her statement to Lisa Anderson on January 21, 2002.

28  Ms Rhodes had indicated to me during our relationship, and, specifically, during the
week of December 10, 2001, through December 14, 2001, the week prior to my moving out of
her apartment, that if anything ever happened between us, the police and The Hartford would
believe her because she is a white female and I am a black male.

29.  In a December 13, 2001, voice mail message that Ms. Rhodes left on my business voice
mail, Ms Rhodes told me that I should not look at other women because I would not want Ms
Rhodes to "hate me "

30  Even after The Hartford terminated my employment, Ms Rhodes continued to harass me
from her work station at The Hartford by calling me

31. On March 28, 2002, more than two months following my termination, Ms Rhodes left a
message on my voice mail, as follows: "Hey Sweetie, you'd better still not be at the gym flirting
with those girls  Um I'll call you later  I'm on my lunch break but I'll call you when I get out and
hopefully I'm gonna see you tonight  Love you. Bye "

4

32  The next day that I reported to work after speaking by telephone to Ms. Rhodes on Sunday, January 20, 2002, was Tuesday, January 22, 2002

33  During the morning of Wednesday, January 23, 2002, while I was engaged in a team meeting with my colleagues, I was approached by an investigator, Richard Wardell, who demanded that I had to accompany him to The Hartford's Department of Special Investigations

34  Mr Wardell, told me that my employment was contingent upon my truthfulness in making a statement and my cooperation in an investigation

35  In the statement that Mr Wardell drafted I never indicated that Ms Rhodes had nothing to worry about from me because I had no criminal convictions  I responded truthfully to two separate questions from Mr. Wardell asking about the relationship between Ms Rhodes and me and asking whether I had a criminal record.

36  After Mr Wardell drafted a statement that I signed, I was informed that I was being terminated because I had lied about not having a criminal record.

37  Mr Wardell showed me documents attributing a criminal record to me and I told him the documents were wrong and I also told Jennifer Ames Haber and Ms Anderson that they were wrong when they told me that I had lied when I denied having a criminal record

38  I do not have a criminal record.

39  While Mr Wardell was taking my statement, I informed him of obscene messages that Ms Rhodes had left on my voice mail at work that I had saved and could still be found on the my voice mail system.

40  I never had the opportunity to provide Mr Wardell the taped messages from Ms Rhodes on my work station voice mail because I was escorted from the building by security following my statement to Mr Wardell, denied the opportunity to return to my desk, and informed by Ms

Haber on January 24, 2002, that The Hartford could do whatever it pleased with the messages remaining at my work station

41  I told Mr Wardell that I did not believe what I had done was a violation of The Hartford Code of Corporate Conduct or the Electronics Communication Policy because the policy that I had received in a red pamphlet specifically had listed providing proprietary data and information as an offense but not accessing such data  At that time, I had never seen the Electronics Communications Policy submitted by The Hartford in the CHRO proceeding

42  The December 31, 2001, taped conversation that Ms Rhodes provided to Lisa Anderson on January 21, 2002, is a tape of a phone call that Ms Rhodes asked me to make at 3:30 A.M. to a man named Scott whom Ms Rhodes told me she feared

43  In the December 31, 2001, phone call which included Ms Rhodes and me calling Scott and leaving a message, I wanted Ms. Rhodes to stop playing games with me and told her she would have to be the one who confronted Scott and tell him to leave her alone if she was really afraid of him.

44  During the whole day leading up to the phone call to Scott on December 31, 2001, Ms Rhodes was begging me to come to her apartment and told me that she was afraid of Scott to convince me to come

45  The phone call to Scott was an attempt to finally make Ms Rhodes stop bothering me because I knew she was not really afraid of Scott and was using it as an excuse to get attention and to get what she wanted

46  Just hours before leaving the phone message for Scott, the tape of which Ms Rhodes brought to Ms Anderson on January 21, 2002, Ms. Rhodes left this message on my cell phone on December 31, 2001 at 4:10 P M : "Hey, I don't know if my cell phone went dead or what. But

6

please call me back, I don't know if you're serious about coming over here but you know I want you to, you know how much I love you and I miss you  Please call me!"

47  Less than twenty-four hours after Ms  Rhodes and I left the phone message for Scott, Ms. Rhodes called me on January 1, 2002, at 12:02 A M :  "Hey Sweetie, I just had to say Happy New Year  I know I shouldn't call  I'm sorry but you know I can't stop thinking about you and I love you to death, and be careful wherever you are okay, Love you! Bye "

48  The Hartford's claim that a January 18, 2002, email from me to Ms. Rhodes  was threatening ignored the reality that the term "nigga" is used in many contexts as urban slang indicating familiarity  Ms  Rhodes often used urban slang during our relationship such as when she ended her March of 2002 letter to me with the word "one" which is an abbreviated term for "one love" and is used to say "good-bye "  In addition, during a conversation with Ms. Rhodes on March 22, 2002, described in more detail below, and during many other conversations with Ms. Rhodes, I used the term "nigga" and Ms  Rhodes never indicated that she felt threatened

49  Ms  Rhodes had become more familiar with urban slang during our relationship and had heard me with the term "nigga" previously.

50  In the January 18, 2002, email to Ms  Rhodes, I described myself as "real jealous" because I wanted to convince Ms  Rhodes that I would not consider renewing our sexual relationship and to convince her that it would be futile to continue harassing me at work.

51  I was not threatening Ms  Rhodes in the January 18, 2002, email and had attached a beautiful religious message to the email which The Hartford had access to after my termination and I did not

7

52 I never displayed behavior or acted in any way towards Ms. Rhodes or anybody at The Hartford to give The Hartford a reason to bring Ms. Rhodes or anybody to the police station to file a complaint or restraining order

53. I informed Mr. Wardell on January 23, 2002, that Ms. Rhodes had left obscene messages for me at work as well as talking to me at work with obscene language when I refused to give her the attention she wanted.

54. After my termination I did not have access to the emails and voice mail messages left by Ms. Rhodes on my work email address and voice mail system even though I specifically told Mr. Wardell of their existence.

55 I made specific requests through my attorney and on my own to Ms. Haber that the email and voice mail messages be preserved.

56. I contacted Ms. Haber on January 24, 2002, following my termination to request that The Hartford preserve Ms. Rhodes threatening and harassing emails and voice mail messages that she had forwarded me when I refused to have sex with Ms. Rhodes

57 Approximately five weeks after I was terminated, Ms. Rhodes contacted me by letter and by telephone and asked me to come to her apartment

58 I received a letter post-marked Mach 1, 2002, from Ms. Rhodes

59 I arranged to meet Ms. Rhodes in a public parking lot on March 22, 2002, and not at her apartment, as she requested, because I wanted to know what Ms. Rhodes had told The Hartford prior to my termination but did not want to risk another false allegation of violence were I to visit her at her apartment

60 Approximately three hours following a meeting in the parking lot of Oscar's Café in Rocky Hill, Connecticut, between Ms. Rhodes and me on March 22, 2002, Ms. Rhodes started to

call me continuously and request that I come to her apartment. At the end of the meeting, Ms. Rhodes had asked my plans for later that evening and I had indicated that I might return to Oscar's Café

61. At 10:54 P.M. on the evening of March 22, 2002, after I had not returned any of her phone calls, Ms. Rhodes left a message on my cell phone, as follows: "Hey Sweetie, where are you. I'm getting worried. Give me a call okay. Bye."

62. I did return to Oscar's Café later in the evening of March 22, 2002, and when I left at 12:45 A.M. on the morning of March 23, 2002, I was startled to see Ms. Rhodes waiting for me in the parking lot. I refused her offer to go back to her apartment.

63. At 9:02 A.M. on the morning of March 23, 2002, Ms. Rhodes left a message on my cell phone, as follows: "Hey Sweetstuff, I'm on my way to my race. I'll call you later, Love You, miss you."

64. At 12:59 P.M. in the afternoon of March 23, 2002, Ms. Rhodes left a message on my cell phone, as follows: "Hey Sweetie, I just got home. I went to my mom's for a little bit after the race, so, um, call me later okay. I'm just going to clean and probably go in the shower so if I don't answer then I was just in the shower but call me later okay. Love you. Bye."

65. At 4:24 P.M. in the afternoon of March 23, 2002, Ms. Rhodes left a message on my cell phone, as follows: "Hey Sweetie, it's like 4:30, I'm going to church. I'm going to stop calling you because I feel like I'm stalking you or harassing you or whatever if you're not gonna call me back so. Um I'll be here until like 5:30. I was hoping I would be able to see you later but if you're not going to call me back then, I don't know. Talk to you later. Bye."

9

66 On March 27, 2002, Ms Rhodes and I met in the parking lot of the Ground Round restaurant in Rocky Hill, Connecticut, because I wanted to gather more information about my termination from The Hartford.

67 Ms Rhodes told me that she had never asked The Hartford to transport her to the Vernon Police Department on January 23, 2002, and told me that the police officer on duty acted as if he had no idea why Ms Rhodes and the The Hartford investigator were there

68 During our meeting at the Ground Round restaurant parking lot, the following conversation occurred between me and Ms Rhodes concerning The Hartford's transport of Ms Rhodes to the Vernon Police Department on January 22, 2002:

> **Ms. Rhodes:** "Yeah but at the police station they didn't even do anything "
> **Plaintiff:** "I remember you said that" What did . . . .
> **Ms. Rhodes:** "We sat. The guy We were sitting in the lobby and the guy finally comes out and he's just sitting there like he's bored".
> **Plaintiff:** "Who, the cop?"
> **Ms. Rhodes:** "Yeah And he had like a little piece of scrap paper. And he's like, did he hit her? I was like, no. He's like, what do you want He's like, if he hits you, call (giggling) I was like"
> **Plaintiff:** "That's it"
> **Ms. Rhodes:** "Pretty much And he wrote something down and the guy is like, I knew they wouldn't do anything And I'm like, well why are you making me come down here? Then he's like "
> **Plaintiff:** "That's my point"
> **Ms. Rhodes:** "Then he's like taking me to the courthouse Now were going to get the papers I'm like I looked at him I'm like I'm not filling this out And he was like, just take them And I was like whatever.

69 During our meeting at the Ground Round restaurant parking lot, when I refused Ms Rhodes' offers to come to her apartment because I was concerned about the fact that she had gone to the police station for a restraining order, Ms Rhodes said: "Yeah but even if, even if they, even I filed the restraining order like they wanted to and I'm inviting you over my house?

They can't even say that you, that you broke the restraining order or whatever because I'm

telling you to come over  There is no restraining order "

70  During our meeting at the Ground Round restaurant parking lot, Ms Rhodes said she

thought she would have been terminated and not me because she was the one who had violated

the very strict The Hartford policies about compromising protected data and information

71  Ms. Rhodes and I discussed the fact that she had received a warning and I had been

terminated in the following exchange that occurred during the March 27, 2002, meeting:

> **Plaintiff:**  Seriously do you think if I was a white dude it would
> have gone like this?"
> **Ms. Rhodes:**  [Unintelligible]
> **Plaintiff:**  "See what I'm sayin'!" See! I mean, what do you think
> they would've done? They probably  Who knows they probably
> would've said hey you guys just stay away from each other "
> **Ms. Rhodes:**  "Or would've gotten the same thing I did, a written
> Had to sign something."
> **Plaintiff:**  "If I was white you mean?"
> **Ms. Rhodes:**  "'Cause I had. Yeah I got a written "
> **Plaintiff:**  "A written warning, we would've both gotten written
> warnings probably  That's my point".
> **Ms. Rhodes**  "That's what they tried to tell me"
> **Plaintiff:**  "What "
> **Ms. Rhodes:**  "That that's all it was going to be "
> **Plaintiff:**  "For me too?"
> **Ms. Rhodes:**  "Mostly for me  I didn't think you would get in
> trouble.  I thought it was me because I gave it to you."
> ...
> **Ms. Rhodes:**  "I was like I'm the one who gave him the password
> That's what I said.  I said if anything I'm the one, I thought I
> would be the, if anyone is going to get fired it would be me
> because I was the one who gave it to you "

72  Ms. Rhodes told me that she was never scared of me or felt threatened by me and asked

me each time we met in March of 2002 to accompany her to her apartment for sex.

73  On March 28, 2002, at 4:38 P.M. in the afternoon, Ms  Rhodes left the following voice

message on my cell phone: "Hey Sweetie, Um, it's like 4:40 I'm leaving to go home now  Um I

hope you're still going to come see me tonight  You better not be scared to be calling or coming    ,
over so I'll try you again later but call me before, you know  Call me as soon as you get this and
if, you know  If I don't hear from you, I'll try you again but I feel like I have to keep calling you
But um, I hope I see you later  Love you. Bye "

74  On March 28, 2002, at 5:55 P M  in the evening, Ms  Rhodes left the following voice
message on my cell phone: "Hey Sweetie, It's like 6 o'clock  Is this a repeat of Saturday night
You're blowing me off again? Um, I don't know if I'm want to keep calling you  I hope you're
going to call me  But, I don't know  If I don't hear from you by seven I guess I'll try you again
If not, I guess I'll see that you're blowing me off again  I was hoping we'd watch survivor
together  Alright, I'll call you later  Or call me as soon as you get this  Love you "

75  On March 28, 2002, at 8:57 P M  in the evening, Ms  Rhodes left the following voice
message on my cell phone: "Well she ruined our night for watching survivor together  I know
I'm being a pain by calling every two seconds but I'm going to keep calling until I fall asleep
So, call me when you get a chance or at least answer when I call  Love you  Bye"

76  On March 28, 2002 Ms  Rhodes called me forty (40) times to ask that I visit her at her
apartment to watch the show "Survivor "

77  On April 9, 2002, I received a phone call from Robert Begley at The Hartford accusing
me of making phone calls to Ms  Rhodes and then hanging up the phone.

78  I never contacted Ms  Rhodes at her cell phone number or at her business number and I
never visited her at her apartment after I was terminated from The Hartford

79  Ms  Rhodes finally stopped contacting me after I filed for and obtained a restraining
order against her in August of 2002 following a decision after hearing at the Superior Court in
Hartford where she was represented by counsel and I was not

12

80. I never showed Ms. Rhodes a gun.

81  I never hit, kicked, or threatened Ms  Rhodes

82. I have never been abusive toward Ms  Rhodes

83.  I never engaged in any violence in the workplace

84  The only messages I deleted from Ms  Rhodes' voice mail were "romantic" messages that I had left for her during our relationship

85  My career and reputation have been damaged personally and professionally and in my community such that I had to relocate to my family's home in another state to gain employment

86  As a result of my termination, I am devastated, embarrassed, humiliated, very depressed and have felt and do feel at times that my life is hopeless

87. I never sought therapy for my depression because I did not have health insurance and instead relied upon my faith and prayer

88  I pleaded with The Hartford, through my attorney, to gain back my career at The Hartford and attempted to present evidence showing The Hartford's errors

89  My plans for my daughter and her future have been severely damaged as a result of losing my job at The Hartford and the difficulty I have experienced finding comparable employment

13

FERRON SHORTER JR. being duly sworn, on oath, states that he is the Plaintiff herein; that he has read the foregoing Affidavit and knows the content thereof; that the same is true of his own knowledge, except as to the matter herein stated on information and belief and that as to these matters he believes the same to be true.

Dated at _Lawrenceville_ , _2:50 p.m_ on this _5 th_ day of March, 2004.

_Ferron Shorter Jr._
Ferron Shorter Jr

Subscribed and sworn to before me on this _5th_ day of March, 2004.

_Tammy Simpson_
Notary Public
My Commission Expires:

TAMMY D. SIMPSON
NOTARY
EXPIRES
GEORGIA
MAY 14, 2006
PUBLIC
GWINNETT COUNTY

EXHIBIT  3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FERRON SHORTER JR , | : | |
| | : | |
| Plaintiff, | : | Case No. 3:03CV0149(WIG) |
| | : | |
| v. | : | |
| | : | |
| HARTFORD FINANCIAL SERVICES | : | |
| GROUP, INC , MARYANNE RHODES, | : | |
| | : | |
| Defendants | : | JUNE 26, 2004 |

## SECOND AFFIDAVIT OF FERRON SHORTER JR.

Ferron Shorter Jr , being duly sworn and according to law, deposes and states:

1.  I am the Plaintiff and have filed a complaint against Hartford Financial Services Group,

Inc ("The Hartford") and MaryAnne Rhodes ("Ms. Rhodes") that is pending at the United States

District Court for the District of Connecticut under civil case number 3:03CV0149(WIG).

2.  This Affidavit is based on my personal knowledge and is submitted in support of my

Objection to Rhodes' Motion to Strike the Affidavit of Ferron Shorter Jr.

3.  I affirm that the cassette tapes attached to this affidavit as Exhibit 1 and Exhibit 2 are true

and accurate copies of tape recordings that I made of conversations that I was a party to on

March 22, 2002, and March 27, 2002, (Ex. 2) and of voice mail recordings left by Rhodes on my

voice mail systems (Ex. 1).

4.  Every message on Side A of Exhibit 1 was available to The Hartford prior to my

termination and contains threatening messages from Rhodes to my voice mail.  (Ex. 1, Side A)

5.  Side B of Exhibit 1 contains recorded voice mails from Rhodes to Plaintiff between

March 22, 2002, and March 28, 2002.  (Ex. 1, Side B)

6. Side A of Exhibit 2 contains a recorded conversation between me and Rhodes that occurred on March 22, 2002. (Ex. 2, Side A)

7. Side B of Exhibit 2 contains a recorded conversation between me and Rhodes that occurred on March 27, 2002. (Ex. 2, Side B)

8. Exhibit 1, Side A, to the instant affidavit is a tape containing six (6) voice mail messages left by Rhodes and preserved by me on cassette that I personally heard and taped.

9. The first two messages contained on Side A of Exhibit 1 were placed from Rhodes' work station at The Hartford to my work voice mail on December 6, 2001, and December 13, 2001. (Ex. 1, Side A)

10. On December 6, 2001, Rhodes demanded that I return her phone call and threatened to continue calling my work number to leave non-work related messages until I call. (Ex. 1, Side A)

11. In a December 13, 2001, voice message, which was left three days before I moved from her apartment, Rhodes threatened me, indicated that she was angry that I did not want to continue our relationship, and asked for a chance to work out our relationship. (Ex. 1, Side A)

12. Rhodes stated that if I really cared about her then I would try to work things out and let her work things out with her family about my race. (Ex. 1, Side A)

13. Rhodes concluded the voice mail on December 13, 2001, by telling me that I would never want her to hate me. (Ex. 1, Side A)

14. Prior to my termination, I told The Hartford's investigator, Richard Wardell, about these obscene, threatening messages.

15. At the time of the investigation, The Hartford's Human Resources Consultant Lisa Anderson ("Anderson") obtained a non-work-related message from the voice mail of Scott, an

individual not employed by The Hartford, and incorporated that message into the investigation against me.

16. The Hartford never reviewed the obscene, threatening messages that Rhodes recorded on my voice mail at work. (Ex. 1)

17. After my termination, I asked The Hartford for voice mail messages recorded on my voice mail but was told by counsel for The Hartford that these messages were unavailable even though The Hartford later submitted as evidence the non-work related voice mail taken from Scott's voice mail.

18. The third and fourth messages contained on Side A of Exhibit 1 were left by Rhodes on December 30, 2001, just hours before the non-work related message on Scott's voice mail that The Hartford claimed indicated that I was a threat in the work place. (Ex. 1, Side A)

19. During the day of December 30, 2001, in the first message, Rhodes told me that she was frightened of Scott and that Scott was jealous of Rhodes and angry at her.

20. Rhodes told me that she had met Scott for lunch on December 29, 2001, and told him how much she loved me.

21. Rhodes concludes the first December 30, 2001, message by begging me to call her back. (Ex. 1, Side A)

22. During the afternoon of December 30, 2001, in the second message, Rhodes left a voice mail message.

23. Two weeks to the day after I moved from Rhodes' apartment by choice, the second message on December 30, 2001 where Ms. Rhodes stated "[Y]ou know how much I love you and I miss you. Please call me," occurred at 4:10 P.M. less than twelve hours before the phone call and message to Scott's voice mail. (Ex. 1, Side A)

3

24. Rhodes begged me to stay at her apartment on December 30, 2001, and claimed that she was afraid of Scott

25. Shortly after midnight on December 31, 2001, Rhodes called me and told me that she had to stay at her brother's apartment because I had not come to her apartment to protect her from Scott

26. I was angry at Rhodes for constantly calling me about Scott when Rhodes knew that I was living with another woman and this would cause problems.

27. Rhodes called me at 3:00 A.M. and 3:30 A.M. on December 31, 2001, and asked me to call Scott to tell him to leave Rhodes alone.

28. I was angry and told Rhodes that the only way I would call Scott would be if Rhodes was also on the phone and I could hear her tell Scott to leave her alone and if she promised to then stop calling me and to leave me alone.

29. Rhodes provided Scott's phone number to me and I made the three-way phone call.

30. I believed that Rhodes was harassing me and using Scott as an excuse to get my attention.

31. At the time of The Hartford's investigation prior to my termination, The Hartford never asked me about the circumstances of that non-work related phone call and voice message on Scott's voice mail.

32. The fifth message contained on Side A of Exhibit 1 from Rhodes to me was left on January 1, 2002, less than twenty-four hours after the non-work related message left on Scott's voice mail that The Hartford claimed presented a potential threat in the workplace and after Rhodes agreed not to call me anymore (Ex. 1, Side A)

33. Rhodes message was that she knew she was not supposed to call but that she could not help herself and loved me to death. (Ex. 1, Side A)

4

34. From my relationship with Rhodes, I knew that her use of the term "death" was meant as a threat. (Ex. 1, Side A)

35. The sixth message contained on Side A of Exhibit 1 was left on January 17, 2002, and is an obscene, threat from Rhodes to me. (Ex. 1, Side A)

36. The obscene message left by Rhodes on January 17, 2002, was left four days prior to Rhodes complaint against me at The Hartford which alleged that I was violent and abusive toward her. (Ex. 1, Side A)

37 Early in the evening of January 17, 2002, Rhodes called me and demanded that I come to her apartment before she left for the weekend because she was going to be at her sister's house in South Carolina.

38. I told Rhodes that I would not meet her and that I was with another woman which she knew and indicated in her letter to me postmarked March 1, 2002.

39. After 9:00 P.M. on January 17, 2002, Rhodes called me and told me to check all of her voice mail messages with her new passcode.

40. This was the second time that Rhodes had provided me her passcode.

41. I hung up on Rhodes but she called me back at 9:17 P.M. and demanded in a threatening tone that I better "hurry up and *** call her back." (Ex. 1, Side A)

42 I did not call Rhodes back on January 17, 2002, and she continued to harass me on January 18, 2002

43. I attempted to explain to her by email on January 18, 2002, that I did not want to be in a relationship with a woman who was seeing other men because that bothered me and when I am intimate with a woman and she is intimate with other men I become jealous and therefore do not like those kinds of relationships.

44. I was desperate to convince Rhodes that our relationship was permanently finished but I did not want to report her harassing behavior if I could convince her to stop on her own.

45. I knew that if I could present Rhodes with proof that I knew she was with other men then she would accept the fact that I would not resume our relationship

46. I used the passcode on January 18, 2002, that Rhodes had provided me to access her voice mail system and listen to a message from a man in Florida regarding Rhodes' weekend visit

47. I had to change Rhodes' passcode or else Rhodes would have erased the message and continued to harass me at work and jeopardize my job.

48. When I attempted to call Rhodes on the morning of January 18, 2002 to connect her to the message from the man in Florida, she hung up the phone.

49. On January 19, 2002, however, when Rhodes knew that I had to report to work for four hours she called me at work to harass me and warned me about what would happen when she returned to Connecticut.

50. After my conversation with Rhodes on January 19, 2002, my co-worker, Peter Kuck ("Kuck"), asked me if I was O.K. (Affidavit of Peter Kuck, doc. #56)

51. I told Kuck that that the blonde girl who had been coming to my desk would not leave me alone. (Affidavit of Peter Kuck, doc. #56)

52. After I left work on Saturday, January 19, 2002, Rhodes called me and threatened me again.

53. I begged Rhodes to listen to the voice mail from the man in Florida that had been left at her work station but Rhodes refused and hung up the phone.

6

54  Rhodes had threatened me that she would call the police and report me to The Hartford so
I discussed these threats with the woman I was living with and she accompanied me when I
decided to go back to The Hartford and file a complaint of workplace harassment on January 19,
2002

55  I filed my complaint of harassment with the two security guards on duty, Officer
Salvatore and Officer Jackson, with whom I was personally acquainted, at The Hartford

56. A third security guard was behind the desk writing Rhodes' name and extension when I
reported the complaint to Officer Jackson but I am not aware of the third security guard's name

57. I provided Rhodes' name and telephone extension to the security guards on January 19,
2002

58. On Wednesday, January 23, 2002, I told The Hartford's investigator, Richard Wardell
that I had filed a complaint on January 19, 2002, and mentioned it in my statement but I was
never informed of any investigation based on my complaint and do not believe that an
investigation occurred.

59. I know that The Hartford did not investigate my complaint against Rhodes prior to my
termination

60. Shortly after I was terminated, when I was not receiving any response from The Hartford
concerning my complaint, I hired an attorney to facilitate an investigation of my complaint and
to seek reinstatement, however, I remained unaware until more than one year had passed and the
administrative proceedings had terminated at the CHRO that a colleague of mine, Kuck, had
filed a complaint also corroborating my complaint.

7

61. I also met with Rhodes on two occasions on March 22, 2002, and March 27, 2002, at her insistence and tape recorded our conversations where she stated that she did not believe that I would have been terminated if I were not black. (Ex. 2)

62. During February of 2002, when I was seeking reinstatement and asking The Hartford to investigate my complaint and reconsider its decision, I knew that (a) The Hartford had falsely accused me of having a criminal record and told me on January 23, 2002, that I was being terminated because I had denied having a criminal record; (b) I was treated differently and received more adverse treatment than Rhodes, a white, female employee of three years who had violated The Hartford's policy repeatedly; (c) The Hartford knew that I had filed a complaint of harassment with security regarding Rhodes' disruptive and threatening behavior that was affecting my work and jeopardizing my job; and (d) The Hartford was aware of the taped voice mail messages from Rhodes to me at my work station that supported my complaint and allegations against Rhodes.

63. During the eighteen months subsequent to my termination, I learned (a) that The Hartford had focused on my race and gender during my termination despite The Hartford investigator's representation that race was not information considered in the termination process; (b) that The Hartford's alleged reliance on a program named People Soft was not revealed to justify Anderson's notes about my race and gender until after I submitted my objection to the Defendants' summary judgment motions even though I had requested all documents related to the investigation in the course of discovery; (c) that Rhodes had received discipline for violating the Electronics Communication Policy (ECP) previously; (d) that The Hartford used a non-work related voice mail message on Scott's voice mail as cause for my termination; (e) that The Hartford refused to investigate threatening messages that Rhodes had left at my work station

8

number; (f) that two other employees of The Hartford, Rhodes and Kuck, had stated that I was treated unfairly, first, when Rhodes stated that I would not have been terminated if I was not black and second, Kuck, when he stated that the Rhodes' violation was as severe as mine; and (g) that the stated reasons for my discharge from The Hartford, as represented by The Hartford have changed from an allegation that I had lied about not having a criminal record to an allegation that I presented a danger of workplace violence and finally when those were disproved to an allegation that I violated the ECP

64  However, Rhodes, a worker identified as a single, white, female by The Hartford was not terminated even though she violated the ECP multiple times by providing me her passcode twice, by using the voice mail system and phone to harass me, and in receiving a previous disciplinary warning and I was terminated, after I was identified as a single, black, male, even though I had worked at The Hartford for twelve years with no previous ECP violations

FERRON SHORTER JR. being duly sworn, on oath, states that he is the Plaintiff herein; that he has read the foregoing Affidavit and knows the content thereof; that the same is true of his own knowledge, except as to the matter herein stated on information and belief and that as to these matters he believes the same to be true.

Dated at ___June___, _26_ on this _____ day of June, 2004.

_Ferron Shorter Jr._
Ferron Shorter Jr.

Subscribed and sworn to before me on this _26_ day of June, 2004.

_Sharon Redmond_
Notary Public
My Commission Expires:

SHARON REDMOND
Notary Public, Gwinnett County, Georgia
My Commission Expires Dec. 19, 2006

10