UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FERRON SHORTER JR. | : | |
| Plaintiff, | : | |
| | : | CIVIL NO.: 303 CV 0149(WIG) |
| v. | : | |
| | : | |
| HARTFORD FINANCIAL SERVICES GROUP, | : | |
| INC. and MARYANNE RHODES | | |
| Defendants. | : | NOVEMBER 9, 2004 |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO
PRECLUDE EVIDENCE OF POST-TERMINATION COMMUNICATIONS
BETWEEN PLAINTIFF AND MARYANNE RHODES**

Pursuant to Local Rule 7(d) of this Court, Hartford Financial Services Group, Inc.

("The Hartford") hereby submits its Reply Memorandum in Support of its Motion in Limine to

Preclude Evidence of Post-Termination Communications between Plaintiff and Maryanne

Rhodes.   In its Motion in Limine, The Hartford moved to preclude evidence of voice mail

messages Ms. Rhodes left with Plaintiff between March 22 and March 28, 2002, two

conversations with Ms. Rhodes which Plaintiff surreptitiously tape recorded on March 22 and

27, 2002, and a restraining order Plaintiff obtained against Ms. Rhodes in August 2002.

In his Memorandum in Opposition to Defendant Hartford Financial Services

Group's Motion to Bifurcate and Motion in Limine and Defendant Maryanne Rhodes' Motion in

Limine ("Opposition"), Plaintiff provides no legitimate basis supporting the admissibility of the

foregoing evidence.[1]   Instead, Plaintiff engages in rank speculation, fails to address the principal

---

[1]  In his Opposition, Plaintiff combined his objection to The Hartford's Motion in Limine and Motion to Bifurcate
and his objection to Maryanne Rhodes' Motion in Limine into a single memorandum   The Hartford's Reply

1

arguments raised in The Hartford's Motion in Limine and makes conclusory statements of admissibility absent any legal analysis or factual support. Plaintiff also distorts the basis of The Hartford's Motion in Limine by suggesting that The Hartford moved to bar all evidence of Plaintiff's communications with The Hartford following his termination and all evidence outside the six day period between January 18, 2002 and January 23, 2002. (Pl. Opp., pp. 4-6.) Plaintiff's claim is fundamentally inaccurate as The Hartford's Motion in Limine seeks to preclude only the introduction of specific, identifiable communications between Plaintiff and Ms. Rhodes following Plaintiff's termination.

As set forth in more detail in The Hartford' Motion in Limine, Ms. Rhodes' voice mail messages should be precluded because they are irrelevant to Plaintiff's claims in this case, they have no bearing on Plaintiff's wrongful termination case against The Hartford, and they can only confuse the jury in its consideration of Plaintiff's discharge. Plaintiff's tape recorded conversations with Ms. Rhodes, in addition to being irrelevant, are also inflammatory and unfairly prejudicial to The Hartford. Ms. Rhodes' statements to Plaintiff about The Hartford's investigation and decision-making process are irrelevant to The Hartford's termination decision and lack any basis in Ms. Rhodes' personal knowledge. Finally, evidence of a restraining order Plaintiff obtained in August 2002 against Ms. Rhodes is irrelevant to the circumstances leading to his termination and is unfairly prejudicial to The Hartford.

Plaintiff does not refute any of the foregoing claims, but appears to believe that any evidence which casts doubt on Ms. Rhodes' statement to Lisa Anderson in January 2002, no matter how far removed or how tangential to his employment, is admissible in his wrongful

Memorandum is limited to issues raised in Plaintiff's Opposition and does not address issues raised in its Motion in Limine, but not addressed or refuted in Plaintiff's Opposition. D. Conn. L. Civ. R. 7(d).

termination case against The Hartford. Plaintiff's belief is incorrect and contrary to the Rules of Evidence and should be rejected.

I.    ANALYSIS

    A.    Plaintiff Provides No Basis Supporting The Admissibility Of Ms. Rhodes' Voice Mail Messages Following Plaintiff's Termination

        Between March 22 and March 28, 2002, Ms. Rhodes left approximately nine voice mail messages for Plaintiff. In these messages, Ms. Rhodes indicates an interest in resuming her personal relationship with Plaintiff. She refers to Plaintiff as "Sweetie" and "Sweetstuff," she asks how he is, she asks him to call her and she tells him that she loves him. (Pl. First Aff., ¶¶ 31, 61, 63-65, 73-76; Pl. Sec. Aff., ¶ 5.)

        In his Opposition, Plaintiff abandons his claim that Ms. Rhodes' voice mail messages are evidence of sexual harassment and now claims that the voice mail messages are evidence that Ms. Rhodes lied in her statement to Ms. Anderson. Plaintiff states,

> The fact that . . . within two months after Plaintiff's termination, [Rhodes] was frantically leaving voice mail messages for Plaintiff to join her at her apartment is probative of Rhodes['] intent and truthfulness when she made her statement to Lisa Anderson on January 21, 2002. The Hartford's lack of interest in terminating Rhodes for her malicious intent and untruthfulness is evidence of The Hartford's discriminatory bias against Plaintiff.

(Pl. Opp., p. 8.)

        Even assigning the worst possible motivation to Ms. Rhodes, as Plaintiff does, and assuming that she lied in her statement to Ms. Anderson, as Plaintiff does, evidence of Ms. Rhodes' voice mail messages is inadmissible in her case against The Hartford because that evidence did not exist in January 2002 and thus cannot have played a role in The Hartford's

termination decision.[2]  Evidence of Ms. Rhodes' voice mail messages is not evidence of a discriminatory investigation because no matter how thorough, exhaustive and unbiased The Hartford's investigation, it could not have discovered evidence of these voice mail messages in January 2002.  Consequently, this evidence is irrelevant and inadmissible because The Hartford's investigation cannot be evaluated in light of statements Ms. Rhodes allegedly made months after Plaintiff's discharge.

In his Opposition, Plaintiff does not address this critical disconnect between Ms. Rhodes' voice mail messages in March 2002 and The Hartford's termination decision in January 2002.  Instead, Plaintiff appears to believe that any evidence which might cast doubt on the results of The Hartford's investigation, including evidence which did not exist in January 2002, is admissible because it shows that The Hartford conducted a discriminatory and biased investigation.  (Pl. Opp., p. 8.)  Plaintiff's claim is flawed on its face and should be rejected.

B.  Plaintiff Provides No Basis Supporting The Admissibility Of Ms. Rhodes' Conversations With Plaintiff In March 2002

In its Motion in Limine, The Hartford also moved to preclude evidence of Ms. Rhodes' conversations with Plaintiff on March 22 and 27, 2002, including Ms. Rhodes' concurrence with Plaintiff's statement that he would not have been terminated if he were white.  Such evidence is irrelevant because Ms. Rhodes did not make the decision to discharge Plaintiff,

---

[2]  The Hartford does not presume to have any insight or to understand Ms. Rhodes' apparent intent and desire to resume her relationship with Plaintiff in March 2002.  Maybe she changed her mind about Plaintiff after having time to reassess the situation, maybe she never changed her mind about Plaintiff at all and loved him even as she feared his temper, maybe she interpreted Plaintiff's communications with her in March 2002 as a sincere desire to rekindle their relationship, maybe she loved Plaintiff and knew that she was locked in a bad relationship, but could not help herself.  Whatever Ms. Rhodes' reasons, they have nothing to do with The Hartford's termination decision and do not belong in Plaintiff's wrongful termination case.  These issues are a sideshow which can only distract and confuse the jury with respect to Plaintiff's employment discrimination claims against The Hartford.  As a further aside, Plaintiff's theory that Ms. Rhodes' maliciously lied to get Plaintiff discharged, while at the same time harboring a desperate love for him and a desire to be with him, makes no sense.

4

it is outside Ms. Rhodes' personal knowledge, and it is an improper attempt by Plaintiff to second guess The Hartford's business judgment.

Plaintiff does not contest that Ms. Rhodes was not a decision-maker and that she played no role in the termination decision. Instead, Plaintiff attempts to dispute the legal principle that statements by non-decision-makers do not constitute evidence of discrimination by arguing that the standard for summary judgment is different than the standard for admissibility at trial.

Plaintiff's claim is a distinction without a difference. Plaintiff ignores that summary judgment requires facts "admissible in evidence." (Fed. R. Civ. Pro. 56(c).) Thus, admissible evidence is admissible evidence whether at summary judgment or trial. There is no difference. Plaintiff also incorrectly accuses The Hartford of misrepresenting the holding of Burrell v. Bentsen, No. 91 CV 2654, 1993 U.S. Dist. LEXIS 18005, *29-*30 (S.D.N.Y. Dec. 21, 1993)(Ex. A), but omits the court's statement which undermines her attempt to distinguish between summary judgment and trial: "Unless the remarks upon which the plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge." Indeed, in Burrell, the court further concluded that it was unnecessary to examine statements from individuals not involved in the termination decision because such statements "are not probative of discrimination." Burrell, 1993 U.S. Dist. LEXIS at *36. The case law relied upon by The Hartford in its Motion in Limine establishes that stray remarks by non-decision-makers like Ms. Rhodes are not evidence of discrimination, and thus are not admissible, regardless of whether the case is at summary judgment or trial.

Plaintiff also asserts that Ms. Rhodes is entitled to render an opinion as to why Plaintiff was discharged, even though she has no personal knowledge of that decision, because

The Hartford can cross examine her on this issue. (Pl. Opp., p. 11.) Plaintiff's claim ignores the requirements of Rules 602 and 701 and which require the introduction of evidence sufficient to support a finding that a witness has personal knowledge of a matter <u>before</u> the witness is permitted to testify to that matter. Thus, Ms. Rhodes is not entitled to render an opinion as to Plaintiff's discharge in the absence of evidence establishing that she has personal knowledge of the matter. As Plaintiff concedes that Ms. Rhodes has no personal knowledge of The Hartford's termination decision, her opinion as to the basis for that decision is not admissible evidence.

    C.    <u>Plaintiff Provides No Grounds Supporting The Admissibility Of Plaintiff's Restraining Order Against Ms. Rhodes In August 2002</u>

In its Motion in Limine, The Hartford also moved to preclude evidence of a restraining order obtained by Plaintiff against Ms. Rhodes in August 2002. In his Opposition, Plaintiff asserts that Ms. Rhodes testified at the hearing for the restraining order that Plaintiff did not threaten or abuse her – he only bruised her arms. (Pl. Opp., p. 12.) Plaintiff asserts that this testimony and evidence of the restraining order itself is admissible in his case against The Hartford because it is circumstantial evidence that Ms. Rhodes was not truthful in her statement to Ms. Anderson in January 2002.

Plaintiff repeats here the same mistakes he makes in arguing that evidence of Ms. Rhodes' voice mail messages in March 2002 is admissible against The Hartford. Again, even if the Court assumes the truth of Plaintiff's claim that Ms. Rhodes was untruthful in her statement to Ms. Anderson in January 2002, statements by Ms. Rhodes in August 2002 are not admissible in Plaintiff's wrongful discharge case against The Hartford because those statements did not exist in January 2002. Moreover, evidence that Plaintiff obtained a restraining order arising out

6

of his relationship with Ms. Rhodes eight months after his discharge is, on its face, completely irrelevant to The Hartford's investigation and termination decision.

II.    <u>CONCLUSION</u>

        For the foregoing reasons, Defendant's Motion in Limine To Preclude Evidence Of Post-Termination Communications Between Plaintiff And Maryanne Rhodes should be granted.

<div style="margin-left: 40%">

DEFENDANT,
HARTFORD FINANCIAL SERVICES
GROUP, INC.

</div>

By:     _Margaret J. Strange_____

           Margaret J. Strange (ct08212)
           James F. Shea (ct16750)
           Jackson Lewis LLP
           55 Farmington Avenue, Suite 1200
           Hartford, CT  06105
           Phone: (860) 522-0404/Fax: (860) 247-1330
           email: strangem@jacksonlewis.com
           email: sheaj@jacksonlewis.com

<u>CERTIFICATION OF SERVICE</u>

This is to certify that a copy of the foregoing was sent via first class mail, postage

prepaid, on this 9th day of November 2004, to the following counsel of record:

> Rachel M. Baird
> Law Office of Rachel M. Baird
> 379 Prospect Street
> Torrington, CT 06790
> (860) 626-9991
> Attorney for Plaintiff
>
> David L. Metzger
> Metzger & Associates
> 25 Capitol Avenue
> Hartford, CT 06106-1707
> Ph. (860) 549-5026
> Attorney for Defendant Maryanne Rhodes

_Margaret J. Strange_
Margaret J. Strange

H:\Client Folder\H\The Hartford\Shorter\Trial\Motion Limine Post Termination Evid Reply DOC
64532

8

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                        :
FERRON SHORTER JR.                      :
        Plaintiff,                      :
                                        :    CIVIL NO.: 303 CV 0149(WIG)
v.                                      :
                                        :
HARTFORD FINANCIAL SERVICES GROUP,      :
INC. and MARYANNE RHODES                :
        Defendants.                     :    NOVEMBER 9, 2004
_____ :

**<u>EXHIBIT A</u>**

BEVERLY E. BURRELL, Plaintiff, v. LLOYD M. BENTSEN, SECRETARY, DEPARTMENT OF THE TREASURY, Defendant.
91 Civ. 2654 (KMW) (NRB)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1993 U.S. Dist. LEXIS 18005; 64 Empl. Prac. Dec. (CCH) P43,104

December 21, 1993, Decided
December 21, 1993, Filed

CASE SUMMARY:

PROCEDURAL POSTURE: Defendant employer sought summary judgment in plaintiff employee's action brought pursuant to Title VII, *42 U.S.C.S. § 2000e-5* et seq., charging that he was dismissed from his position as a clerk-typist at the Internal Revenue Service (IRS) on the basis of race, color, gender, and handicap.

OVERVIEW: Employee, an African American male, worked at the IRS and received above-average ratings on periodic work performance evaluations. However, while the quality of his work was acceptable, his behavior in the office was not. Employee acknowledged that he suffered from a drinking problem and that his outbursts were triggered by his intake of alcohol at lunchtime. Eventually, he was dismissed because of unsatisfactory conduct during the probationary period following official reprimands. After an administrative complaint, employee entered into a settlement with the IRS. In employee's current complaint, he contended that the IRS discriminated against him by twice firing him and by failing to credit him with annual leave pursuant to the settlement agreement. The court held that there was no genuine issue as to any material fact, and that the facts assumed in employee's favor failed as a matter of law to support a finding that employer violated the relevant provisions of either Title VII or *29 U.S.C.S. § 706*(8)(c) of the Rehabilitation Act. The court found that employee failed to allege facts from which a reasonable jury could infer a prima facie case of discrimination.

OUTCOME: Summary judgment was granted.

CORE TERMS: supervisor, disability, discriminatory, outburst, prima facie case, termination, settlement agreement, Rehabilitation Act, annual, summary judgment, alcohol, disruptive, handicap, accrued, alcoholism, alcoholic, racist, co-worker, motive, color, counseling, duty, male, retaliatory discharge, employment decision, preponderance, workplace, gender, similarly situated, eight ball

LexisNexis(R) Headnotes

JUDGES: [*1] BUCHWALD

OPINIONBY: NAOMI REICE BUCHWALD

OPINION: OPINION

NAOMI REICE BUCHWALD
UNITED STATES MAGISTRATE JUDGE

Plaintiff Beverly E. Burrell, appearing pro se, brought this action pursuant to *42 U.S.C. § 2000e-5* et seq. ("Title VII") charging that he was dismissed from his position as a clerk-typist at the Internal Revenue Service ("IRS") on the basis of race, color, gender, and handicap. n1 In a complaint filed on April 17, 1991, plaintiff specifically alleged that the IRS: (1) failed to comply with its settlement agreement (the "Settlement Agreement") of October 3, 1984 resolving an administrative complaint filed by plaintiff with the Equal Employment Opportunity Commission ("EEOC") on March 12, 1982; (2) engaged in unlawful employment practices and terminated plaintiff as a result of his opposition to their unlawful employment practices (retaliatory discharge); (3) failed to inform him of his rights under *29 C.F.R. § 1613.214-1613.217*(c) (regarding complaint procedures) and failed to adhere to *29 C.F.R. § 1613.222* (regarding procedures for establishment and access to EEOC complaint file); (4) failed to recognize his request for leave "until[*2] the

leave problem was resolved"; and (5) falsified, misrepresented, and concealed official records causing the breach of the Settlement Agreement. Subsequently, on August 5, 1991 and November 8, 1991, plaintiff amended his complaint adding, inter alia, the allegation that he was discriminated against on account of his gender and stating that the breach of the Settlement Agreement and the willful denial of leave by the IRS were the proximate causes of his termination.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n1 Because the plaintiff is acting pro se, his complaint must be "liberally construed" and "held to 'less stringent standards than formal pleadings drafted by lawyers.'" *Ferran v. Town of Nassau, No. 92-9290, 1993 U.S. App. LEXIS 31409,* at *3 (2d Cir. Dec. 1, 1993) (quoting *Hughes v. Rowe, 449 U.S. 5, 9, 66 L. Ed. 2d 163, 101 S. Ct. 173 (1980)* (per curiam)). Therefore, since Title VII only applies to discriminatory employment practices with respect to "race, color, religion, sex or national origin," *42 U.S.C. § 2000e-2*(a), we will consider Mr. Burrell's claim of discrimination based on handicap as though it were brought under the Rehabilitation Act of 1973, *29 U.S.C. §§ 701* et seq. (the "Rehabilitation Act")

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

[*3]

Presently before the Court n2 is defendant Lloyd M. Bentsen's n3 motion of October 19, 1993 for summary judgment pursuant to *Fed. R. Civ. P. 56.* n4 For the reasons set forth below, defendant's motion is granted. n5

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 By Stipulation dated September 3, 1991, both parties consented to the jurisdiction of a United States Magistrate Judge for all purposes pursuant to *28 U.S.C. § 636*(c) and *Fed. R. Civ. P. 73.*

n3 With the change in presidential administrations, Lloyd M. Bentsen became Secretary of the Treasury on January 20, 1993. Pursuant to *Fed. R. Civ. P. 25(d)(1)*, Mr. Bentsen is automatically substituted for Nicholas F. Brady as the defendant herein.

n4 On January 15, 1992, defendant Nicholas F. Brady moved to dismiss plaintiff's Second Amended Complaint for lack of subject matter jurisdiction pursuant to *Fed. R. Civ. P. 12(b)(1)*, or, alternatively, for failure to state a claim pursuant to *Fed. R. Civ. P. 12(b)(6)*. The motion was denied by this Court in an opinion dated September 3, 1992. Regarding defendant's claim of lack of subject matter jurisdiction, we held that plaintiff had not withdrawn his complaint with prejudice by entering into the Settlement Agreement and that the EEOC's March 14, 1991 determination that defendant had complied with the Settlement Agreement did not render this suit moot. In addition, defendant's argument that plaintiff had failed to exhaust his administrative remedies with respect to his 1988 termination was rejected because the claim was "reasonably related" to another claim for which administrative remedies had been exhausted. See *Almendral v. New York State Office of Mental Health, 743 F.2d 963, 967 (2d Cir. 1984).* Finally, regarding the motion to dismiss for failure to state a claim, we felt that plaintiff's failure to comply with the technical pleading requirements for filing this lawsuit was understandable in light of the fact that he is acting pro se, see *Patrick v. LeFevre, 745 F.2d 153, 160 (2d Cir. 1984),* and that the EEOC decision granting his request to reopen contained certain ambiguities.

[*4]

n5 Even though plaintiff is acting pro se, we are satisfied that he had an ample opportunity to develop a full record of defendant's allegedly discriminatory treatment for our review. In considering this motion, we have examined the following submissions from plaintiff: (1) his first affidavit ("Affirmation in Opposition to Defendant's Motion to Dismiss"), filed February 24, 1992, and the sixty-five attached exhibits; (2) his second affidavit ("Opposition to the Defendant's Motion for Summary Judgement [sic]"), filed November 10, 1993, and the fourteen attached exhibits; (3) an addendum to the second affidavit ("Addendum to Affirmation in Opposition to Motion"), filed November 23, 1993; (4) approximately seventy-seven attachments to his

complaint, filed April 17, 1991, and second amended complaint, filed Nov. 8, 1991; (5) a memorandum of law ("Some Case Law That I Believe Supports the Plaintiff's Affirmation in Opposition to the Defendant's Motion for Summary Judgment"), filed on November 10, 1993; and (6) a copy of the EEOC investigative report, containing fifty-four exhibits, which was submitted with plaintiff's opposition papers. In addition, we reviewed the full transcript of plaintiff's five-day deposition, which filled 932 pages.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*5]

BACKGROUND

Plaintiff Beverly E. Burrell, a black male, began his employment as a GS-4 clerk-typist with the New York City office of the IRS on December 8, 1980. Declaration of Lorraine Novinsky, dated October 18, 1993 ("Novinsky Decl."), Ex. A. Mr. Burrell learned his job quickly, and at least a few co-workers initially found him to be quite enthusiastic about his work. See Report of Investigation of Equal Employment Opportunity Complaint Filed By Beverly E. Burrell ("EEOC Report"), Exs. 15, 16. Over the next year, Mr. Burrell received above-average ratings on periodic work performance evaluations. Id. at Exs. 21, 26, 32.

However, while the quality of his work was acceptable, his behavior in the office was not. Mr. Burrell interrupted the office on at least eight occasions during 1981 with noisy outbursts directed at fellow employees. See Novinsky Decl. Exs. B, C, E, F, G, H, and I. Typically during an outburst, Mr. Burrell would display great rage and lack of self-control, screaming and cursing at co-workers until a supervisor could calm him down. Once Mr. Burrell regained his composure, a supervisor would instruct him that the outbursts had to stop because they[*6] were highly disruptive. The supervisor would then place a short memorandum documenting the outburst in Mr. Burrell's personnel file.

Mr. Burrell now acknowledges that he suffered from a drinking problem and that the outbursts were triggered by his intake of alcohol at lunchtime. Deposition of Beverly E. Burrell, conducted on Jan. 5, 27, Feb. 10, 18, 23, 1993 ("Burrell Dep."), 192-94. Furthermore, Mr. Burrell admits that his drunken outbursts did disturb other employees and the workplace in general. Id. at 192. Mr. Burrell recalls that after having "a few drinks" with lunch, he would return to the office behaving in "a loud,

disruptive, boisterous kind of way which was disturbing, now that I look at it, to those co-workers." Id. at 193. Mr. Burrell acknowledges that both his alcoholism and his behavior grew steadily worse over the course of his employment in 1981. Id. at 194.

In order to gain some insight into the impact of the outbursts on the workplace, we will briefly review the numerous memoranda filed by Mr. Burrell's supervisors describing the behavior at issue. On April 13, 1981, a supervisor [*7]observed Mr. Burrell "screaming expletives" (emphasis original) at a revenue agent. Novinsky Decl. Ex. B. Afterwards, Mr. Burrell's supervisor warned him that in spite of the quality of his work, "this type of outburst would never be tolerated again." Id. A second outburst occurred on May 6, 1981. Mr. Burrell was again instructed "not to yell at others" and to see a supervisor if he had any problems with his co-workers. Id. at Ex. C. Then, on September 24, 1991, Mr. Burrell had to be calmed down three times before finally being sent home for the last hour of the day. Id. at Ex. E. Later, when discussing the incident with a supervisor, Mr. Burrell agreed "that his action was not acceptable to office atmosphere and was disruptive." Id.

Eight days later, on October 2, 1981, Mr. Burrell engaged in another "very disruptive" outburst that caused the entire room of employees to stop their work. Id. at Ex. F. A supervisor then offered Mr. Burrell the opportunity to receive free alcohol counseling during work hours at Project HOPE, the Federal Employees Assistance Program. Id. Although Mr. Burrell denied that his disruptive conduct was caused by a drinking problem, [*8] he agreed to attend the counseling sessions. Id. However, in spite of the therapy, the outbursts continued with increasing frequency throughout October and November.

For example, on October 15, 1981, Mr. Burrell politely interrupted a meeting of his supervisors to recommend that better training procedures be instituted for new batching clerks. Id. at Ex. G. However, when he became unhappy with the reply to his recommendations, "Mr. Burrell left the RPM's office and in a loud and disruptive manner began to berate managements [sic] response to his statements." Id. After being asked by a supervisor to compose himself, Mr. Burrell "continued to be loud and disruptive and began to get abusive." Id. His supervisor placed him on leave for the following day. Id.

On November 12, 1981, Donna Leach, a personnel staffing specialist, filed a written complaint reporting that Mr. Burrell had verbally abused her over the telephone. In her complaint, Ms. Leach indicated that when she asked Mr. Burrell to lower his voice, he continued to scream and told her that "he would yell at the President."

Id. at Ex. H. When confronted by a supervisor about the incident, Mr. Burrell denied[*9] that he had ever spoken to Ms. Leach. Id. One day later, Mr. Burrell yelled at his manager and refused to perform certain work. Id. at Ex. I. Again, a supervisor discussed the incident with Mr. Burrell. Id. However, on November 17, 1981, when the supervisor tried to give Mr. Burrell a copy of the memorandum documenting the incident, Mr. Burrell refused to acknowledge that he ever had the conversation with his supervisor. Id. He then threw the memorandum back onto the supervisor's desk. Id.

In addition to the warnings he received for his outbursts, Mr. Burrell also was reproached for having failed to disclose all his prior convictions on his Personal Qualifications Statement which was submitted upon applying for employment. On July 16, 1981, Murray Navarro, chief of the Examination Division, sent an Official Reprimand to Mr. Burrell for failing to make the required disclosures and advised him that "any recurrence of future misconduct may result in more severe disciplinary or adverse action, up to and including removal from the Service." Id. at Ex. D. Following his receipt of this warning, Mr. Burrell engaged in outbursts on six more occasions.

On November 30, [*10] 1981, Mr. Navarro sent a letter to Mr. Burrell dismissing him from his position at the IRS because of unsatisfactory conduct during the probationary period following the Official Reprimand. Id. at Ex. L. The notice of dismissal described the deficiencies in Mr. Burrell's conduct as follows:

You have behaved in a disruptive manner in your work area on numerous occasions by yelling at fellow employees and openly challenging the authority of your manager. You have been repeatedly counselled on these outbursts and were referred to the Employee Assistance Program. However these outbursts have continued.

Id. Mr. Burrell's dismissal became effective on December 4, 1981.

Following his dismissal, Mr. Burrell filed an administrative complaint with the EEOC on March 12, 1982, charging that the IRS had discriminated against him based on race, color, sex, age, and handicap. Id. at Ex. M. In the complaint, Mr. Burrell specifically identified Murray Navarro, Michael Shulman, Philip Mahler, Robert Skiba, Joseph Schwartz, and Albert Freiman as the individuals who acted in a discriminatory fashion.

On October 3, 1984, Mr. Burrell entered into a settlement with the IRS resolving [*11] the issues raised in the EEOC complaint. Declaration of Elliot M. Carlin,

dated January 15, 1992 ("Carlin Decl."), Ex. A. The Settlement Agreement provided, inter alia: that plaintiff's termination would be rescinded; that he would be reinstated to his position of clerk-typist; that he would receive back pay in the amount of $34,563.20; and that he would receive accrued annual leave and sick leave for the period covering from December 4, 1981 to September 15, 1984. Id. Additionally, the IRS agreed that there would be no reprisals against Mr. Burrell for filing a complaint, and that if the IRS failed to comply with the terms of the Settlement Agreement for any reason not attributable to the acts or conduct of Mr. Burrell, then the EEOC could reopen the complaint for further processing. Id. In return, Mr. Burrell agreed to release the IRS, the Department of Treasury, and the United States government from all liability stemming from the actions underlying the EEOC complaint. Id.

The IRS promptly reinstated Mr. Burrell to his former position, remitted $34,563.20 in back pay, and credited him with all his accrued sick leave. However, because of a series of administrative[*12] errors over a period of years, the IRS never properly credited Mr. Burrell with approximately 200 of the 440 hours of accrued annual leave due to him under the terms of the Settlement Agreement. n6

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n6 The initial reason that plaintiff did not receive the remaining 200 hours of accrued annual leave was that the IRS had an administratively imposed ceiling of 240 hours for any accrued annual leave account. After this problem was discovered, the IRS still took more than a year to credit plaintiff with the 200 hours of accrued annual leave owed to him. Furthermore, when the leave problem was finally solved in September 1986, the IRS apparently failed to notify plaintiff. As a result, plaintiff continued his efforts to be credited with the proper accrued annual leave throughout 1987. In the first week of February 1988, plaintiff learned that the IRS had in fact restored the 200 hours as of September 1986, but that the credited annual leave had an expiration date of one-year after its restoration. It was at this point that plaintiff requested that his original EEOC complaint be reinstated.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

1993 U.S. Dist. LEXIS 18005, *; 64 Empl. Prac. Dec. (CCH) P

[*13]

In a letter on February 7, 1988 to Cozetta H. Green, the regional IRS Equal Employment Opportunity Officer ("EEO Officer") and a witness to the Settlement Agreement, Mr. Burrell requested that his original EEOC complaint be reinstated because of defendant's failure to credit him with all his accrued annual leave. Pl.'s Affirmation in Opp'n to Def.'s Mot. to Dismiss, filed Feb. 24, 1992 ("1st Burrell Aff."), Ex. I. Mr. Burrell also alleged that he had been subject to certain reprisals by the IRS. Id.

Approximately one month later, Mr. Burrell requested, through Ms. Green, immediate official leave with pay until the matter of crediting him with his accrued annual leave was resolved. n7 Id. at Ex. J. Three weeks later, on March 26, 1988, Mr. Burrell wrote two letters to his IRS Branch Chief, Bonnie Holzer. In the first letter, he requested administrative leave beginning March 29, 1988, and explained that he had already requested administrative leave through the EEO Officer "until a legal problem has been resolved." Id. at Ex. L. In the second letter, Mr. Burrell requested leave without pay, stating that he had to deal with two major mental and physical problems which had[*14] impaired his ability to function properly on the job n8 Id. at Ex. L1. On March 29, 1988, having received no permission for leave, Mr. Burrell abandoned his employment with the IRS. One month later, on April 29, 1988, Cathy Cardillo, chief of the Examination, Support, and Processing Branch, reminded plaintiff by letter that the agency required "more detailed information to make a determination on your leave-without-pay request," including a letter from his doctor indicating "the nature of the illness that prevents you from working and the anticipated time you would be able to return to work." Id. at M1.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n7 Plaintiff also requested that a penalty be imposed on the IRS for 1000% of the total monetary value of the Settlement Agreement from October 4, 1984 through the resolution of the problem.

n8 Presumably, plaintiff was referring to his claim that he had begun to sense the symptoms of an alcoholic relapse and that "the leave problem was blooming into a mental and physical catastrophe," rendering him "unable to function properly on the job." 1st Burrell Aff. P 12. Plaintiff appears to have, contradicted this statement in his deposition, however, where he asserted that he had no medical condition that preventing him from working on or after March 29, 1988. Burrell Dep. 585-87.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*15]

On June 2, 1988, the IRS issued Mr. Burrell a notice of proposed adverse action suggesting that he could be discharged based on his continued absence without authorization. Id. at Ex. O. The letter specified the following grounds for the contemplated discharge:

You failed to report for duty on March 29, 1988, nor did you receive permission for leave. You have been absent from duty continuously from March 29, 1988 without authorization and have failed to submit requested documentation relative to your absence, despite being advised specific documentation was required. You have been Absent Without Leave since March 29, 1988.

Mr. Burrell gave a copy of this letter to both Ms. Green and his physician. In response, Mr. Burrell's physician wrote a letter to the IRS dated June 13, 1988, stating that plaintiff was not sufficiently emotionally stable to resume his regular duties and that plaintiff should receive a psychological evaluation before returning to work. Id. at Ex. P. On June 30, 1988, the IRS requested that Mr. Burrell provide a detailed medical history, diagnosis, and prognosis. Id. at Ex. Q. Mr. Burrell responded by informing the IRS that he had two untimely [*16]deaths in his family and that he was unable to comply with the request. Mr. Burrell also suggested that the IRS review the Settlement Agreement. Id. at Ex. P1, Q1. On August 25, 1988, the IRS notified Mr. Burrell of its official decision to terminate his employment effective as of September 2, 1988. Id. at Ex. R. For purposes of this action, Mr. Burrell admits that he was absent without leave from his position at the IRS beginning May 29, 1988. Burrell Dep. 531.

On January 17, 1990, Mr. Burrell discovered that the IRS was holding a check in the amount of $1,761.76, compensating him for his uncredited annual leave. 1st Burrell Aff., Ex. W3. However, Mr. Burrell refused to accept the check apparently out of a fear that by doing so he would impliedly waive certain legal rights important to this action. Id. at Ex. W4. In a decision issued on June 8, 1991, the EEOC declined to reinstate the original complaint, instead ordering the IRS to provide Mr.

Burrell with a check for the amount of his accrued annual leave Id at Ex. Z4. On February 7, 1991, the IRS issued a check to Mr. Burrell and thereafter, on March 14, 1991, he received a letter from the EEOC notifying him [*17] that the IRS had complied with its decision. Id at Exs. Z7, Z8

In the instant suit plaintiff contends that the IRS discriminated against him on the basis of race, color, gender, and handicap both by twice firing him and by failing to credit him with approximately two hundred hours in missing annual leave pursuant to the Settlement Agreement We now turn to the question of whether plaintiff has raised a genuine issue of material fact to warrant that this suit proceed to trial

## DISCUSSION

A. Standard for Summary Judgment in the Context of Employment Discrimination

A court may grant summary judgment under *Fed R Civ P. 56(c)* only when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Where, as here, the nonmovant bears the ultimate burden to prove that the defendant based an employment decision on discriminatory criteria, he may defeat a motion for summary judgment "by producing specific facts to establish that there is a genuine issue of material fact for trial " *Montana v First Fed Sav & Loan Ass'n, 869 F 2d 100, 103 (2d Cir 1989)* Accord *Rosen v Thornburgh, 928 F.2d 528, 532-33 (2d Cir 1991)* [*18] Furthermore, in ruling on a summary judgment motion, a court must "resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Construction Corp v. City of New York, 762 F 2d 243, 249 (2d Cir 1985)*, cert denied, *484 U S  918, 98 L Ed 2d 226, 108 S Ct 269 (1987)* Accord *Donahue v Windsor Locks Bd. of Fire Commissioners, 834 F 2d 54, 57 (2d Cir 1987), Patrick v LeFevre, 745 F 2d 153, 158 (2d Cir 1984)*

To establish a prima facie case of discriminatory treatment that is sufficient to defeat a motion for summary judgment, plaintiff must describe specific actions by the IRS "that if unexplained, give rise to an inference of discriminatory conduct." *Foster v Arcata Assoc , Inc , 772 F 2d 1453, 1459 (9th Cir 1985)* (citing *Furnco Constr Corp v Waters, 438 US 567, 576, 57 L Ed 2d 957, 98 S Ct 2943 (1978), International Brotherhood of Teamsters v. United States, 431 U S 324, 358, 52 L Ed 2d 396, 97 S Ct 1843 (1977))*, cert denied, *475 U S 1048 (1986)* Accord [*19] *Maxine Kilkenny Lees v Case-Hoyt Corp , 779 F Supp 717, 723 (W D N Y 1991)* Significantly, plaintiff is not

required to prove his prima facie case by a preponderance of the evidence on a motion for summary judgment. *Foster, 772 F 2d at 1459* That is because our role at this stage in the litigation is not to resolve issues of fact "Rather, the court may only determine whether the plaintiff has produced evidence sufficient to support a reasonable inference of the existence of the fact at issue " Id. Accordingly, plaintiff must identify facts that, if believed, could give rise to the inference that his dismissals in 1981 and 1988 were probably the result of discriminatory motives.

In considering this motion, we are mindful that summary judgment is "ordinarily inappropriate" in the context of a workplace discrimination case because the allegations usually require an exploration into an employer's true motivation and intent for making a particular employment decision. *Patrick, 745 F 2d at 159* As the Second Circuit cautioned in *Rosen, 928 F 2d at 533* "Employment[*20] discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to discriminatory intent." Because direct evidence of discrimination rarely exists, the complainant usually must rely on the cumulative weight of the circumstantial evidence to prove his or her allegations at trial As a result, courts respond with a strong measure of hesitation before attempting to rule on questions of discriminatory intent in advance of trial

At the same time, this caution does not absolve the plaintiff from the responsibility of producing sufficient evidence from which a reasonable juror could return a verdict in his or her favor. See *Anderson v Liberty Lobby, Inc , 477 U S 242, 249-50, 91 L Ed 2d 202, 106 S Ct 2505 (1986)* "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Meiri v Dacon, 759 F 2d 989, 998 (2d Cir 1985)*, cert denied,[*21] *474 U S 829, 88 L Ed 2d 74, 106 S Ct 91 (1985)*. See also *Lane v Sotheby Parke Bernet, Inc , 758 F 2d 71 (2d Cir 1985)* (affirming a grant of summary judgment in a Title VII action where plaintiff failed to establish a prima facie case); *Heller v Aspin, No 92 Civ 6283, 1993 U S Dist LEXIS 14274* (S D N Y Oct 8, 1993) (granting summary judgment because plaintiff introduced merely conclusory statements of discrimination); *Cadwell v New York City Dept of Correction, 750 F Supp 140 (S D N Y 1990)* (granting summary judgment because no reasonable jury could have found that the pro se plaintiff was a victim of race discrimination) Thus, a plaintiff must offer more than his or her own speculative feelings and visceral

Case 3:03-cv-00149-WIG    Document 97    Filed 11/09/2004    Page 16 of 25

1993 U.S. Dist. LEXIS 18005, *; 64 Empl. Prac. Dec. (CCH) P

instincts to defeat a motion for summary judgment; rather, the plaintiff must allege "concrete particulars" that raise a reasonable inference of discrimination. *SEC v Research Automation Corp., 585 F.2d 31, 33 (2d Cir 1978)*

## B. Title VII Claim

1. Presentation of Proof With Respect to 1981 and 1988 Dismissals

In *McDonnell Douglas Corp v Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*,[*22] and *Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*, the United States Supreme Court set forth a procedure for the order and allocation of proof in a Title VII disparate treatment case. Plaintiff bears the initial burden of proving, by a preponderance of the evidence, a prima facie case of employment discrimination *Burdine, 450 U.S. at 252-53* To establish a prima facie case, plaintiff must demonstrate: (i) that he belonged to a protected class; (ii) that his job performance was satisfactory; (iii) that he was discharged; and (iv) that "the discharge occurred in circumstances giving rise to an inference of discrimination." *Rosen, 928 F.2d at 532* See also *Furnco Constr. Corp. v Waters, 438 U.S. 567, 577, 57 L. Ed. 2d 957, 98 S. Ct. 2943 (1978)*, *McDonnell Douglas, 411 U.S. at 802* The burden then shifts to the defendant to articulate "some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas, 411 U.S. at 802* If the defendant is able to provide evidence of a nondiscriminatory basis [*23] for the discharge, then the burden once again shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's presumptively valid explanation is in fact pretextual. See *Burdine, 450 U.S. at 253*; *McDonnell Douglas, 411 U.S. at 804*. This burden-shifting process is intended to sharpen the presentation of proof for ease of judicial resolution. However, as the Supreme Court recently emphasized in *St. Mary's Honor Ctr. v Hicks, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*, a decision reaffirming McDonnell Douglas, the ultimate burden of persuasion remains at all times with the plaintiff. Id. at 2747. Accord *Cosgrove v. Sears, Roebuck & Co., No 92-7197, 1993 U.S. App. LEXIS 30041*, at *13-14 (2d Cir. Nov. 19, 1993); *Saulpaugh v Monroe Community Hospital, 4 F.3d 134, 141 (2d Cir. 1993)*

### a. Failure to Prove a Prima Facie Case

While we are mindful that "the complainant's initial burden of establishing a prima facie case is not onerous," *Sweeney v Research Found. of the State Univ. of New York, 711 F.2d 1179, 1184 (2d Cir. 1983)*,[*24] we nonetheless conclude that plaintiff in this case has not

made an adequate prima facie showing with respect to either the 1981 or the 1988 terminations. Plaintiff has failed to demonstrate either (1) that he was performing satisfactorily in the periods preceding his dismissals, or (2) that the circumstances of the dismissals give rise to an inference of discrimination.

As to the 1981 termination, plaintiff concedes that his alcoholism caused him to behave in a manner that was disruptive and disturbing to his co-workers. Although he was warned in his Official Reprimand of July 16, 1981 that any future misbehavior would provide cause for dismissal, plaintiff seemed to become increasingly prone to explosive fits. Given the nature and frequency of his outbursts throughout the probationary period, we do not believe that Mr. Burrell has met the requirement of demonstrating satisfactory job performance.

In addition, Mr. Burrell has not established an inference of discrimination such as by showing either that he was replaced in 1981 by a person not a member of the protected group, or if he was not replaced, that similarly situated employees who were not members of the protected group were[*25] retained. n9 In his deposition, plaintiff alleges that a white employee named Danny Alter also became loud and abusive in outbursts driven by alcohol, but that he was retained by defendant Burrell Dep. 265 However, Mr. Alter was not "similarly situated" to plaintiff because each reported to a different supervisor. Declaration of Robert Skiba, dated October 15, 1993 ("Skiba Decl."), P 12. "Similarly situated" is a concept that ought to be strictly construed in this Title VII context:

Employees are not "similarly situated" merely because their conduct might be analogized. Rather, in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would discipline their conduct or the appropriate discipline for it.

*Mazzella v RCA Global Communications, Inc., 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986)*, aff'd, *814 F.2d 653 (2d Cir. 1987)* See also *Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir. 1992)*[*26] ("to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct ."). More generally, given that the IRS provided Mr. Burrell with the opportunity to take advantage of free alcohol counseling during work hours and offered him

numerous chances during the probationary period to improve his behavior, the circumstances do not support an inference that his employer was eager to find a way to replace him with a non-black and/or female employee.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n9 Plaintiff's supervisor at the time, Robert Skiba, cannot now recall whether the IRS replaced Mr. Burrell immediately after his termination, or whether his work was simply redistributed among existing staff. Skiba Decl. P 10.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

As to the 1988 termination, plaintiff acknowledges that, prior to his dismissal, he was absent without proper authorization for over five months beginning March 29, 1988. Therefore, he cannot[*27] establish that his job performance was satisfactory because, quite simply, there was no performance. "It is self-evident that while perfect attendance is not a necessary element for all jobs, reasonably regular and predictable attendance is necessary for many." *Walders v. Garrett, 765 F. Supp. 303, 309 (E.D. Va. 1991)*, aff'd, *956 F.2d 1163 (4th Cir. 1992)* See also *Law v. United States Postal Serv., 852 F.2d 1278, 1279 (Fed. Cir. 1988), Santiago v. Temple Univ., 739 F. Supp. 974, 979 (E.D. Pa. 1990)*, aff'd, *928 F.2d 396 (3d Cir. 1991), Wimbley v. Bolger, 642 F. Supp. 481, 485 (W.D. Tenn 1986)*, aff'd, *831 F.2d 298 (6th Cir. 1987)*

Plaintiff also fails to present a prima facie case with respect to the 1988 termination insofar as he has not demonstrated that defendant replaced him with a member not of the protected group or, if there was no replacement, that defendant retained similarly situated employees who were not members of the protected group. Following Mr. Burrell's[*28] dismissal, defendant did not immediately hire a replacement; however, upon the next round of hirings, both of the new batching clerks were black, one male and the other female. Declaration of Cathy Cardillo, dated October 15, 1993 ("Cardillo Decl."), P 11. Furthermore, Mr. Burrell acknowledges that he does not know of any similarly situated employee -- that is, an employee absent for many months without permission -- who was not terminated. Burrell Dep. 928-29. Therefore, regarding the 1988 termination, Mr.

Burrell has not satisfied two of the four elements of a prima facie case: he has not shown satisfactory job performance, and he has not raised an inference of discrimination.

b. Failure to Prove Pretext

Even if Mr. Burrell could present a prima facie case, defendant easily satisfies its burden to show some legitimate nondiscriminatory basis for the dismissals. In 1981, plaintiff was fired on account of his disruptive outbursts. In 1988, plaintiff was discharged for having abandoned his job without authorization for a period in excess of five months.

Therefore, even assuming that Mr. Burrell could show a prima facie case, he would have the further burden of proving, by a preponderance[*29] of the evidence, that the defendant's purportedly nondiscriminatory explanations for the 1981 and 1988 dismissals were a pretext for discrimination. Although Mr. Burrell cites several specific instances when allegedly discriminatory language was directed at him while at the workplace, we nonetheless do not believe that any of the examples, when viewed either individually or as a whole, would permit a reasonable jury to find that his dismissals were actually based on race, color, or gender. n10

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n10 Plaintiff uses the words "race" and "color" synonymously in this action. Burrell Dep. 271.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

Before turning to a review of each remark, it is worth special emphasis that "not all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision." *Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 448 (8th Cir. 1993)* In particular, "'stray remarks in the workplace,'" "'statements by nondecisionmakers,'" and[*30] "'statements by decisionmakers unrelated to the decisional process'" are not by themselves sufficient to satisfy plaintiff's burden of proving pretext. Id. (quoting *Price Waterhouse v. Hopkins, 490 U.S. 228, 278, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)* (O'Connor, J., concurring)) Accord

1993 U.S. Dist. LEXIS 18005, *; 64 Empl. Prac. Dec. (CCH) P

*Atkin v. Lincoln Property Co., 991 F.2d 268, 272 (5th Cir. 1993)* (when "comments are vague and remote in time and administrative hierarchy, they are no more than stray remarks, which are insufficient to establish discrimination"); *Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 547 (3d Cir. 1993)* (rejecting notion that "several stray remarks by a nondecisionmaker over a period of five years, while inappropriate, were sufficient to prove ... discriminatory bias") "Unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge." *McCarthy v. Kemper Life Ins., 924 F.2d 683, 686 (7th Cir. 1991)*

Plaintiff believes that the true motivation behind his 1981 dismissal was a discriminatory one on account of two[*31] isolated remarks, one made by his immediate supervisor, the other by a fellow clerk. n11 First, Robert Skiba, who was then chief of the 918-A section of the Examination Division in the IRS's Manhattan district office, Skiba Decl. P 3, apparently reprimanded Mr. Burrell after an outburst with the phrase, "Three strikes and you're out." Burrell Dep. 205. Plaintiff construes this remark to be both racist and sexist. In his view, the remark is racist because, quite simply, he is black and Mr. Skiba is white -- "that is the only thing I can go by," plaintiff contends. Id. at 267. Except for this single remark, Mr. Burrell can identify no other action or statement to suggest that Mr. Skiba harbored any animosity toward blacks. Id. at 268, 275. In addition, Mr. Burrell believes the expression conveyed the following sexist message:

I'm an uppity male, I'm a male who has, according to the statement, if I understand it, who has been getting away with quote-unquote murder, and so consequently this is the third strike, I'm a male, so you're out, that is the way I look at that statement because I was a male, and because according to the statement I had two strikes against me and because[*32] I was a male, and this is the third strike, so you're out.

Id. at 275-76. Once again, Mr. Burrell can point to no other action or statement to demonstrate that Mr. Skiba acted in a discriminatory fashion toward men in general.



n11 For purposes of this summary judgment motion, we will assume that the incidents did occur as plaintiff has described them.



We do not believe that Mr. Burrell has provided any plausible reason that this facially neutral remark constitutes a racial and/or sexist slur. Plaintiff's conclusory allegations that the phrase demonstrates Mr. Skiba's discriminatory animus with respect to race and gender plainly do not satisfy his burden of proof. The expression "three strikes and you're out" is one commonly used in ordinary parlance without offensive racial or gender connotations. Therefore, without the benefit of an alternative explanation by the plaintiff, the most reasonable inference is that Mr. Skiba intended the remark simply as a warning to Mr. Burrell that, given his prior misbehavior, [*33] any future outbursts would result in his dismissal. n12

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n12 In a document titled "Addendum to Affirmation in Opposition to Motion," which was received by the Court on November 23, 1993, plaintiff offers the following further explanation of "three strikes and you're out":

The 'three strikes and you are out' remark deals with the plaintiff in this respect: He is black; he is an alcoholic; and he had an alleged argument with a white woman over the telephone. Mr. Skiba knew the plaintiff less than forty days and had the gull [sic] to make a remark that all black people know the meaning of.

P 3. Once again, this interpretation indeed strains credulity given that the remark is a facially neutral, commonly-used expression, spoken in a context where the petitioner was being warned that continued misbehavior would result in his discharge. No reasonable juror could believe that this familiar expression is actually a well-known racial epithet.

Furthermore, in the course of his deposition, plaintiff never suggested that "three strikes and you're out" was intended to imply that he was an alcoholic or that he had an argument with a white woman. Therefore, we view these belated interpretations with great skepticism. "It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a

motion for summary judgment." *Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987).* See also *Perma Research and Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969).*

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

[*34]

The second incident cited by plaintiff as evidence of defendant's discriminatory motive occurred at an employee Christmas party held at a Greek restaurant in December 1980. After a Greek belly dancer finished her routine, plaintiff complimented her, which prompted one of plaintiff's co-workers, a white female named Cathy Romaneillo, to say to him, "Look but don't touch." Pl.'s Opp'n to the Def.'s Mot. for Summ. J. ("2d Burrell Aff.") P 2. Plaintiff charges that this remark was racist:

This racist attitude of what a black man can and can not do based upon a white person's scale of can's and can't's is totally unacceptable in today's society.

Id. at P 12. n13

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - -
- -

n13 Discussion at the party later turned to the subject of drug use. On the next business day, Ms. Romaneillo apparently reported to a supervisor that plaintiff was a drug user. 2d Burrell Aff. P 2. Plaintiff now appears to believe that this incident led to him being reprimanded for misconduct after duty hours in his Official Reprimand of July 16, 1981. Id. at P 3. However, the Official Reprimand explicitly found "no evidence of any misconduct or improper action" on any ground except for plaintiff's unreported arrest record. Novinsky Decl. Ex. D.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

[*35]

We believe that Ms. Romaneillo's comment clearly falls into the "stray remarks" category. The decisive fact is that Ms. Romaneillo had no supervisory authority over Mr. Burrell and no power to order his dismissal. Indeed,

she shared the same classification as plaintiff. Because, her "comments are vague and remote in time and administrative hierarchy," *Turner v. North American Rubber, Inc., 979 F.2d 55, 59 (5th Cir. 1992), Guthrie v. Tifco Indus., 941 F.2d 374, 379 (5th Cir. 1991),* cert. denied, *117 L. Ed. 2d 495, 112 S. Ct. 1267 (1992),* this incident plainly does not satisfy plaintiff's burden.

With respect to the 1981 discharge, Mr. Burrell also bases his allegations of race, color, and gender discrimination on "gut feelings" about two individuals who, while never making any statements or taking any actions that were discriminatory in and of themselves, were superiors of Mr. Skiba. Burrell Dep. 270. Mr. Burrell reasons that because Mr. Skiba is racist and sexist, as evidenced by the "three strikes and you're out" comment, so too are Michael Shulman and Michael Navarro, who impliedly concurred in the termination[*36] decision. Id. at 275. Apart from the fact that we do not believe "three strikes and you're out" to have been a discriminatory comment, plaintiff cannot satisfy his burden of proof by offers of speculative beliefs and gut feelings. In short, plaintiff has produced no credible evidence to support his claim that defendant's nondiscriminatory explanation for the 1981 discharge is mere pretext.

Turning to the 1988 discharge, plaintiff bases his claim of racial discrimination on statements made by two union representatives and one of his supervisors. While the statements are racially neutral on their face, plaintiff strenuously argues that each contains a discriminatory subtext. Notwithstanding the vigor of plaintiff's convictions, the simple fact is that none of the individuals to whom plaintiff attributes discriminatory remarks had any role to play in his 1988 termination. Consequently, the statements are not probative of discrimination, and it is unnecessary to examine them. However, we will do so very briefly, if only to assure the plaintiff that his claims have received the fullest consideration.

First, plaintiff charges that in August 1987, a union official named Peter Conroy [*37] called him "a piece of feces," told him that he was "nothing but the piles," and advised him not to walk by any dark alleys. Burrell Dep. 379-80; 1st Burrell Aff. P 10. Plaintiff characterizes these remarks as racist solely because he does not believe Mr. Conroy would have said them to a non-black person. Burrell Dep. 578. Plaintiff accuses another union official, Morris Goldstein, of having maligned him with the comment, "We have done a lot more for you people." Id. at 579. Mr. Burrell believes that Mr. Goldstein used the phrase "you people" as a racial slur. However offensively plaintiff may have taken these statements, there is no escaping the fact that neither Mr. Conroy nor Mr.

1993 U.S. Dist. LEXIS 18005, *; 64 Empl. Prac. Dec. (CCH) P

Goldstein was in any way involved in the decisional process leading to the 1988 discharge.

Second, plaintiff asserts that Bonnie Holzer, who was chief of the planning and support branch of the IRS's Examination Division in Manhattan from approximately February 1987 to February 1988, made two racially discriminatory statements to him. The first allegedly occurred at a staff meeting on March 23, 1987. Plaintiff recalls Ms. Holzer asking Gussie Viola, a tax examiner, whether she wished to return to her[*38] former position as a batching clerk, which was a classification that had just received a pay increase. Plaintiff alleges that Ms. Holzer then told Ms. Viola, "You know you are behind the eight ball." n14 Plaintiff, who was seated in front of Ms. Viola, interpreted this statement to be a racial insult aimed at him. In plaintiff's words:

The 8 ball is an analogy to the black person, to an Afro-American, that is the use of 8 ball. It would have to be, because we were not in a billiard parlor; there was not a pool table.

Id. at 576.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -
- -

n14 In his deposition, plaintiff asserted that Ms. Viola said, "You are sitting behind the eight ball." Burrell Dep. 575 (emphasis added). However, in letters written two days after the incident to the EEO Officer, plaintiff quoted Ms. Viola as saying either "you know that you are behind the eight ball" or "you know you are behind the eight ball." 1st Burrell Aff., Ex. F1 (emphasis original)

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

Plaintiff alleges that Ms. Holzer made another racist statement to him one [*39]evening as he left work dressed in a tuxedo in order to attend a formal event. Seeing him so formally dressed, Ms. Holzer purportedly asked plaintiff whether he played in a band. Plaintiff construed this question to be racist:

Because right away it brought to mind, is that all Afro-Americans do when you see them in a formal outfit is that all they do is play in a band.

Id. at 577.

Ms. Holzer does not recall making either of these statements, Declaration of Bonnie Holzer, dated October 15, 1993 ("Holzer Decl."), PP 7, 9, though, for purposes of this motion, we will assume that she said them both. While we are not questioning the sincerity of plaintiff's sense of insult, we remain unconvinced that Ms. Holzer intended the "behind the eight ball" comment as a racial slur. The more obvious interpretation is that Ms. Holzer simply meant to imply that Ms. Viola, in electing to forego a pay raise, had made a choice that was unusual among her colleagues, many of whom apparently sought to return to their old jobs in order to make more money. See New Dictionary of American Slang 21 (Robert L. Chapman ed. 1986) (defining "behind the eight ball" to mean "in a losing or endangered[*40] position"). With respect to Ms. Holzer's question about whether plaintiff played in a band, we recognize that the phrasing of her inquiry could perhaps be construed as mildly insensitive and hurtful to Mr. Burrell. "Even an inadvertent racial slight unnoticed either by its white speaker or white bystander will reverberate in the memory of its black victim." *Harris v. International Paper Co., 765 F. Supp 1509, 1516 (D.Me. 1991).* However, given that these remarks were neither "relatively contemporaneous to the termination" nor "related to the employment decision in question," *Rush v. McDonald's Corp., 966 F.2d 1104, 1116 (7th Cir. 1992),* plaintiff again has not come close to demonstrating that defendant's nondiscriminatory explanation was mere pretext.

In addition to the incidents described above, plaintiff also claims that defendant discriminated against him by making a series of administrative errors, chief among them being the IRS's failure to credit him with his accrued annual leave pursuant to the Settlement Agreement. It is indeed unfortunate that the IRS took more than five years to provide plaintiff with the full[*41] payment promised under the Settlement Agreement, obviously causing him completely unnecessary distress. However, this administrative blunder does not constitute a violation cognizable under Title VII, because plaintiff has not alleged any facts to suggest that the IRS acted with a discriminatory motive in failing to credit him with the missing annual leave. See *International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n.15, 52 L. Ed. 2d 396, 97 S. Ct. 1843 (1977)* ("Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.").

2. Retaliatory Discharge

1993 U.S. Dist. LEXIS 18005, *; 64 Empl. Prac. Dec. (CCH) P

In his memorandum of law filed November 10, 1993, plaintiff cites *Johnson v. Palma, 931 F.2d 203 (2d Cir. 1991)*, in support of a claim of retaliatory discharge under Title VII. Plaintiff apparently alleges that he was dismissed in 1988 in retaliation for the complaints that he had filed with the EEOC since 1982. Perhaps also relevant to his retaliatory discharge claim, plaintiff alleges in his "Addendum to Affirmation in Opposition to Motion" that the IRS violated *29 C.F.R. § 1613.261* (1993) by terminating [*42] him while he had a complaint pending before the EEOC. n15

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n15 This provision reads as follows:

It is unlawful to restrain, interfere, coerce or discriminate against complainants, their representatives, witnesses, Directors of Equal Employment Opportunity, Equal Employment Opportunity Officers, Investigators, Counselors and other agency officials with responsibility for processing discrimination complaints because of involvement with a discrimination charge during any stage in the presentation and processing of a complaint, including the counseling stage under § 1613.213, or because an individual filed a charge of discrimination, testified, assisted or participated in any manner with an investigation, proceeding or hearing or because of any opposition to an unlawful employment practice under this part.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Title VII prohibits employers from dismissing workers in retaliation for their opposition to discriminatory employment practices. Section 704 of Title VII, *42 U.S.C. § 2000e-3*[*43] (a), provides as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The order and allocation of burdens of proof in retaliatory discharge claims follow the same general disparate treatment analysis as described in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, and *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)* See *Sumner v. United States Postal Serv., 899 F.2d 203, 208 (2d Cir. 1990)* Therefore, plaintiff must first demonstrate, by a preponderance of the evidence, the existence of a prima facie case of discrimination. To present a prima facie case, plaintiff must show four elements, namely "that he engaged in protected participation or opposition under Title VII, that the employer was aware of this activity, [*44] that the employer took adverse action against the plaintiff, and that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." *Sumner, 899 F.2d at 208-09* Accord *Cosgrove v. Sears, Roebuck & Co., No. 92-7197, 1993 U.S. App. LEXIS 30041*, at *15 (2d Cir. Nov. 19, 1993).

To establish that an activity was protected under Title VII, plaintiff need not prove the merit of the underlying discrimination claim, but only that he had a good faith, reasonable belief that a cognizable violation existed. See *Sumner, 899 F.2d at 209; Cosgrove, 1993 U.S. App. LEXIS 30041*, at *15-16; *Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1569 (2d Cir. 1989)*, *Manoharan v. Columbia Univ. College of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988)* Plaintiff can demonstrate a causal connection "indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory[*45] treatment or through evidence of disparate treatment of employees who engaged in similar conduct, or directly through evidence of retaliatory animus." *Sumner, 899 F.2d at 209*

Plaintiff has satisfied the first three elements of the prima facie test by showing that: (1) he filed an EEOC complaint against the IRS in 1982, which he tried to have reopened in 1988 based on his belief that the IRS had failed to comply with the Settlement Agreement; (2) the IRS was apprised of the complaint and the efforts to reopen the action; and (3) he was dismissed on August 25, 1988. But with respect to the crucial fourth element, we conclude that plaintiff has not alleged facts from which a reasonable jury could infer a causal link between the protected activity and the dismissal. We appreciate that "for purposes of establishing a prima facie case, Title VII of the 1964 Civil Rights Act is violated when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." *Cosgrove, 1993 U.S. App. LEXIS 30041*, at

*14 However, even accepting the factual allegations submitted by the plaintiff[*46] as true, there is no basis to conclude that discriminatory motives played any part in the adverse employment actions taken against Mr. Burrell. Therefore, we conclude that plaintiff has not satisfied his initial burden of proving a prima facie case of retaliatory discharge n16

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n16 In much the same vein, we note that defendant did not violate *29 C F R § 1613 261 (1993)* by terminating Mr. Burrell while he had a complaint pending before the EEOC. This provision, inter alia, prohibits an employer from discharging workers because they file discrimination charges. The provision does not bar an employer from firing a worker when the dismissal is for reasons wholly separate from the pending discrimination complaint. Nor does the regulation guarantee an employee continued tenure simply because of the filing or pendency of a complaint.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

3. Constructive Discharge

Plaintiff advances a claim of constructive discharge based on the general theory that defendant's conduct became so intolerable that he was forced to abandon[*47] his employment in 1988. Plaintiff attributes his abandonment to mental distress caused by his discovery of defendant's breach of the Settlement Agreement Burrell Dep. 564-66; 2d Burrell Aff. P 12. Apparently at one point, Mr. Burrell erroneously feared that he had forfeited his missing annual leave by not accepting the money before a stipulated expiration date. Burrell Dep. 565. Plaintiff also gives as a reason for his abandonment the allegedly racial slur made by one of the union officials in August 1987. In plaintiff's view, the slur created a work environment that "was not conducive to a recovering alcoholic who is a person with a handicapping condition of alcoholism." Id. at 569-70

A constructive discharge in violation of Title VII occurs when an employer, instead of directly firing an employee, intentionally makes his or her working conditions "so intolerable that the employee is forced

into an involuntary resignation " *Pena v Brattleboro. Retreat, 702 F 2d 322, 325 (2d Cir 1983)* (quoting *Young v. Southwestern Sav and Loan Ass'n, 509 F 2d 140, 144 (5th Cir 1975))* Accord *Lopez v S.B. Thomas, Inc , 831 F 2d 1184, 1188 (2d Cir 1987);* [*48]*Martin v. Citibank, 762 F 2d 212, 221 (2d Cir 1985)* The employer must have deliberately made the working conditions "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign " *Pena, 702 F 2d at 325* (quoting *Alicea Rosado v Garcia Santiago, 562 F 2d 114, 119 (1st Cir 1977))* Accord *Stetson v Nynex Serv Co , 995 F 2d 355, 361 (2d Cir 1993)*

Plaintiff's working conditions certainly did not become so unbearable as to constitute grounds for treating his self-described abandonment as a constructive discharge. Surely, it was reasonable for plaintiff to become frustrated, perhaps even exasperated, by defendant's continued inability to solve a simple administrative error; however, defendant's bureaucratic mistake did not render the working conditions so unpleasant or difficult as to have compelled a reasonable person to quit. Similarly, a stray racist remark by a union official -- who was neither a supervisor nor a co-worker -- is simply not a sufficient ground for a reasonable jury to find that Mr. Burrell[*49] was subject to a constructive discharge

4. Sexual Harassment

While he does not specifically identify sexual harassment as a cause of his abandonment, plaintiff does assert that he was "surrounded by women and was being taunted every day with sexually harassing situations." 1st Burrell Aff P 11. However, plaintiff does not provide any description of the taunts; nor does he identify the specific individuals responsible for the sexual harassment.

A claim of sexual harassment based upon a hostile work environment requires the victim to show that he or she had to endure sexually offensive behavior that was sufficiently severe, pervasive, or abusive as to alter the conditions of employment See *Teresa Harris v. Forklift Systems, Inc , 126 L Ed 2d 295, 1993 U S LEXIS 7155, 114 S Ct 367 (1993)* ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.") (quoting *Meritor Sav Bank v Vinson, 477 US 57, 65, 67, 91 L Ed 2d 49, 106 S Ct 2399 (1986))* (internal citations omitted)) [*50] Because Mr. Burrell has not offered any specificity as to the scope or extent of the alleged offensive behavior, we must find that he has not established a prima facie case of sexual harassment.

C. Rehabilitation Act Claim

Plaintiff contends that the fact that he engaged in a series of outbursts in 1981 was not a valid ground for his first dismissal because his repeated misbehavior was caused by alcoholism, which constitutes a disability under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Plaintiff claims that his drinking problem had the following effect on his conduct within the office in 1981: "My alcoholism was related to my termination because as an outgrowth of being an alcoholic, it caused my behavior to be non-acceptable and that caused the reasons that they stated." Burrell Dep. 289. Plaintiff further argues that his requests for leave in 1988, prior to his termination for being absent without authorization, were denied solely because he was an alcoholic. Id. at 923-24. He also asserts that he was suffering from "an alcohol relapse" at the time of his second termination. 2d Burrell Aff. P 11.

The Rehabilitation Act of[*51] 1973, which was substantially amended in 1992, Pub. L. 102-569, 106 Stat. 4346, represented the first comprehensive attempt by Congress to respond to the employment difficulties of disabled persons. n17 Section 504 of the Rehabilitation Act provides, in relevant part:

No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . .

29 U.S.C. § 794(a) (1993 supp.). To establish a claim under Section 504 in a case involving a termination, a plaintiff must ultimately prove four elements: (1) that he or she held a position in a program or activity receiving financial assistance from the federal government; (2) that he or she is an "individual with a disability," as defined in 29 U.S.C. § 706(8)(B); (3) that he or she is "otherwise qualified" for the position; and (4) that the decision to dismiss him or her was "solely by reason[*52] of" the disability. See Cushing v. Moore, 970 F.2d 1103, 1107 (2d Cir. 1992), Doe v. New York Univ., 666 F.2d 761, 774-75 (2d Cir. 1981).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -
- -

n17  See generally Judith W. Wegner, The Antidiscrimination Model Reconsidered: Ensuring Equal Opportunity Without Respect to Handicap, Under Section 504 of the Rehabilitation Act of 1973, 69 Cornell L. Rev. 401 (1984), Note, Employment Discrimination Against the Handicapped and Section 504 of the Rehabilitation Act: An Essay on Legal Evasiveness, 97 Harv. L. Rev. 997 (1984)

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

The Second Circuit has devised two different methods of analysis for allocation of burdens and presentation of proof depending on whether or not the employer acknowledges reliance on a worker's disability in making an employment decision. See Doe, 666 F.2d at 776-77. If an employer disclaims reliance on the disability, then the same general analysis used[*53] in Title VII suits, which was devised by the Supreme Court in McDonnell Douglas Corp v. Green, 411 U.S. 792, 802-05, 36 L.Ed. 2d 668, 93 S.Ct. 1817 (1973), and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 67 L. Ed. 2d 207, 101 S.Ct. 1089 (1981), is applicable. See Teahan v. Metro-North Commuter Railroad Co., 951 F.2d 511, 514 (2d Cir. 1991), cert. denied, 121 L. Ed. 2d 24, 113 S.Ct. 54 (1992), Doe, 666 F.2d at 776. If, on the other hand, the employer admits having based its decision to terminate the worker on his or her disability, or a consequence of the disability, then the "pivotal issue is not whether the handicap was considered but whether under all of the circumstances it provides a reasonable basis for finding the plaintiff not to be qualified or not as well qualified as other applicants." Doe, 666 F.2d at 776. In such a case, plaintiff can establish a prima facie case by showing (1) that he or she is an "individual with a disability," as defined in 29 U.S.C. § 706(8)(C), and (2) that, although otherwise qualified, [*54] he or she was fired because of the disability. See id. Once plaintiff has proven his prima facie case, the burden shifts to the "institution or employer to rebut the inference that the handicap was improperly taken into account by going forward with evidence that the handicap is relevant to qualifications for the position . . . ." Id. Plaintiff then must bear the ultimate burden of demonstrating, by a preponderance of the evidence, that he or she is qualified regardless of the disability. See id.

The initial question for us to consider is whether Mr. Burrell's bout with alcoholism in 1981 qualified him as an "individual with a disability" entitled to the protection of the Rehabilitation Act. Alcoholism is generally recognized as a disability under the Rehabilitation Act. See Teahan, 951 F.2d at 517, Fuller v. Frank, 916 F.2d

*558, 561 (9th Cir. 1990); Crewe v. United States Office of Personnel Management, 834 F.2d 140, 141 (8th Cir. 1987).* However, an "individual with a disability" does not include "any individual who is an alcoholic whose current use of alcohol prevents such[*55] individual from performing the duties of the job in question . . ." *29 U.S.C. § 706(8)(C)(v)* (1993 supp.) (emphasis added). See also *Golson-El v. Runyon, 812 F. Supp. 558, 560 (E.D.Pa. 1993)* (citing *29 U.S.C. § 706(8)(C)(v)*). Obviously, Congress did not want the Rehabilitation Act to become "a haven to protect substance abusers who have not in the past sought -- nor do they seek in the present -- help." *Teahan, 951 F.2d at 518.*

In this case, plaintiff now admits that he was abusing alcohol through the time of his discharge, though he stresses that he did not recognize himself as an alcoholic in 1981 because he did not appreciate the symptoms of the disease. Plaintiff estimates that after about five or six months at the IRS, he began to drink during the workday. Burrell Dep. 196-97. His intake of alcohol steadily increased until he reached a point where he was drinking in the morning before work, drinking at the morning break, and drinking at lunch. Id. at 193-94, 196. Looking back at this period of time with "a sober eye," Mr. Burrell now realizes [*56] that he had "an excuse of denial" that preventing him from contemporaneously acknowledging his alcoholism. Id. at 192-93. Whether or not Mr. Burrell recognized his alcohol problem in 1981, however, the admitted facts are that he continued to drink from May or June right through to his termination and that his behavior became increasingly erratic and disruptive over this period. Therefore, we find that Mr. Burrell does not qualify as an "individual with a disability," as the term is defined in *29 U.S.C. § 706(8)(C)*, since his then "current use of alcohol prevented" him "from performing the duties of the job . . ." *29 U.S.C. § 706(8)(C)(v)*.

Furthermore, even if Mr. Burrell were assumed to be a disabled person for purposes of the Rehabilitation Act, his claim would still have no merit. n18 While he could then satisfy his initial burden of proving a prima facie case, defendant would easily rebut the inference of discrimination by demonstrating that Mr. Burrell's disability caused repeated outbursts that were highly disruptive to his co-workers. "If the consequences of the handicap are such that the employee [*57] is not qualified for the position, then a firing because of that handicap is not discriminatory, even though the firing is 'solely by reason of' the handicap." *Teahan, 951 F.2d at 516.* Mr. Burrell certainly has not shown that he was qualified despite his disability; on the contrary, he has admitted that his alcoholism made him a very contentious, erratic employee. Accordingly, accepting the accuracy of the facts as described by Mr. Burrell, we find

no basis for his claim that his 1981 discharge violated the Rehabilitation Act. n19

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n18 Given this assumption, we would follow the analysis appropriate for cases where an employer fired a worker because of his or her disability or a consequence thereof. See *Teahan, 951 F.2d at 516* (finding that an alcoholic employee who has excessive unexcused absences from work was fired because of his disability even though his employer claimed reliance on absenteeism as the ground for termination).

n19 In addition, we reject plaintiff's argument, based largely on several decisions by the Merit Systems Protection Board, that the IRS failed to make reasonable accommodations or to provide rehabilitative assistance for his disability. Pl.'s Mem. of Law at 1. Although plaintiff flatly denied to his supervisor that he had a drinking problem, he was offered the opportunity to take advantage of free alcohol counseling. In fact, defendant relieved plaintiff of his work responsibilities so that he could attend the counseling sessions during business hours. In light of the fact that plaintiff refused to acknowledge in 1981 that he had any alcohol problem at all, defendant deserves credit rather than criticism for helping plaintiff to receive some counseling. Indeed, plaintiff's whole argument about reasonable accommodation seems somewhat insincere given his apparent concession that, in retrospect, he would not expect defendant to have been able to discern that he had a drinking problem in 1981. Burrell Dep. 260.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*58]

Plaintiff also does not qualify as an "individual with a disability" for purposes of his second termination, since he concedes that he was "in a state of alcohol relapse," 2d Burrell Aff. P 11, that impaired his ability to function properly on the job. 1st Burrell Aff. P 12, Ex. L1. In other words, his current use of alcohol prevented him

1993 U.S. Dist. LEXIS 18005, *; 64 Empl. Prac. Dec. (CCH) P

from performing the duties of his job. Furthermore, even assuming that Mr. Burrell is correct that he was fired solely by reason of his disability, it is clear that he no longer could be considered "otherwise qualified" since he had stopped reporting for work. That is to say, defendant can rebut any inference of discrimination on the basis that Mr. Burrell was absent without authorization for a five month period. The Rehabilitation Act "does not protect absenteeism or employees who take excessive leave and are unable to perform the prerequisites of their jobs." *Stevens v. Stubbs, 576 F. Supp. 1409, 1415 (N.D. Ga. 1983).* In short, there is no merit to plaintiff's claim that his second termination violated the Rehabilitation Act.

CONCLUSION

We hold that there is no genuine issue as to any material fact and that [*59]the facts assumed in plaintiff's favor fail as a matter of law to support a finding that defendant violated the relevant provisions of either Title VII or the Rehabilitation Act. Although this complaint calls into question defendant's intent and motivation, summary judgment is nonetheless appropriate because plaintiff has failed to allege facts from which a reasonable jury could infer a prima facie case of discrimination. Therefore, for the reasons stated above, defendant's motion for summary judgment is granted.

IT IS SO ORDERED.

DATED: New York, New York
December 21, 1993

NAOMI REICE BUCHWALD

UNITED STATES MAGISTRATE JUDGE