# EXHIBIT 9

SUSAN BICK, Plaintiff -against- THE CITY OF NEW YORK, DEPUTY INSPECTOR RICHARD LATUGA, DEPUTY INSPECTOR MAURICE BUCKLEY and LIEUTENANT THOMAS J. O'BRIEN, Defendants

95 Civ. 8781 (KMW)(MHD)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1998 U.S. Dist. LEXIS 5543

April 21, 1998, Decided
April 21, 1998, Filed

**DISPOSITION:** [*1] Defendant's motion for judgment as a matter of law denied. Its motion for a new trial on the basis of the asserted inadequacy of the evidence and the jury charge denied Plaintiff's application for attorney's fees and expenses granted as modified.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant employer filed a motion for judgment as a matter of law and a motion for a new trial in the court after a large jury verdict in favor of plaintiff employee.

**OVERVIEW:** The employer filed misconduct charges against the employee and claimed that the employee was relating another employee's harassment complaints. After all of the charges were dismissed, the employee filed suit against the employer. After the verdict, the employer sought a judgment as a matter of law and claimed that the verdicts were morally irreconcilable. The employer also filed a motion for a new trial on grounds that the verdict was against the weight of the evidence, that one sentence in the jury charge was fatally flawed, and that the award for emotional distress was excessive. The employee filed motion for an award of expenses and attorney fees under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e-5. The court held that (1) the employer was not entitled to a judgment as a matter of law because the employee's improper conduct was not a defense; (2) the employer was not entitled to a motion for a new trial based upon the evidence or jury instruction, but the employer was entitled to a new trial if the employee refused a remittitur in the damages award because the award was excessive; and (3) the employee was entitled to attorney fees and expenses.

**OUTCOME:** The motion for judgment as a matter of law was denied. The motion for a new trial was denied, unless the employee refused to accept a remittitur in the damages award. Subject to the acceptance of the remittitur, the employee's application for attorney fees and expenses was granted as modified.

**CORE TERMS:** sergeant, interview, misconduct, precinct, new trial, male, excessive, retaliation, gender, investigator, paralegal, First Amendment, gender discrimination, compensated, pain and suffering, mixed-motive, motivating, mental anguish, supervisor, lodestar, emotional distress, discriminatory, disciplinary, conversation, remittitur, reduction, witnessed, feeling, hourly rate, female

**LexisNexis(TM) Headnotes**

*Civil Procedure > Relief From Judgment > Motions for New Trial*

[HN1]If a party establishes an irremediable inconsistency in the verdicts, the appropriate relief is an order for a new trial under Fed. R. Civ. P. 59.

*Civil Procedure > Jury Trials > Jury Deliberations*

[HN2]Where assertedly inconsistent jury findings address separate legal claims consistency is not required.

*Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1964*

[HN3]Improper conduct by the employee is not a defense to liability unless the jury is satisfied that a discriminatory motive was not a but for cause of the defendant's adverse action.

*Civil Procedure > Relief From Judgment > Motions for New Trial*

[HN4]A motion for a new trial should be granted only if the court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice. Unlike a motion for judgment as a matter of law, in deciding a motion for a new trial, the court is not required to view the evidence in the light most favorable to the non-movant. However, the fact that the trial judge disagrees with the jury verdict is not a sufficient reason to order a new trial

*Constitutional Law > Civil Rights Enforcement > Civil Rights Generally*

[HN5]Gender stereotyping may provide proof that an employment decision was based on gender, but even if such stereotyping is established, plaintiff must show that it influenced employer decision-making

*Civil Procedure > Jury Trials > Jury Instructions*

[HN6]A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law. For an erroneous charge to be grounds for a new trial, the moving party must demonstrate that, even if the charge is viewed as a whole, it was prejudiced by the error.

*Civil Procedure > Jury Trials > Jury Instructions*

[HN7]To receive a mixed-motive instruction, plaintiff must show that the evidence is sufficient to allow a fact-finder to infer the presence of both permissible and discriminatory motives for the employer's adverse action. As a result, plaintiff's initial burden is heavier than the de minimis showing required to establish a prima facie case under a pretext analysis. To meet this initial burden and trigger a mixed-motive charge requires plaintiff to present either direct evidence of discrimination or circumstantial evidence directly tied to the alleged discriminatory animus.

*Criminal Law & Procedure > Evidence > Circumstantial & Direct Evidence*

[HN8]Although the test for circumstantial evidence directly tied to the alleged discriminatory animus has not been defined with geometric precision, it has been established that neither purely statistical evidence nor stray remarks by persons not involved in the decision-making process warrant a mixed-motive instruction. Evidence that may warrant such a charge includes statements or actions by decision makers that may be viewed as directly reflecting the alleged discriminatory attitude.

*Civil Procedure > Jury Trials > Jury Instructions*

[HN9]Whether a case is brought under a pretext or a mixed-motive theory, the ultimate issue is the same: whether plaintiff has proven that an impermissible criterion was in fact a motivating or substantial factor in the employment decision. The distinction between a pretext case and a mixed-motive case lies solely in the manner in which plaintiff meets that burden and whether the jury receives an instruction regarding defendant's affirmative defense.

*Civil Procedure > Relief From Judgment > Additurs & Remittiturs*

[HN10]Although juries have a great deal of discretion in awarding damages for pain and suffering, including emotional distress, a court may not sustain an award that it deems to be so excessive as to suggest that it was motivated by passion or prejudice rather than a reasoned assessment of the evidence of injury presented at trial. If a court finds that a verdict is excessive, however, it cannot simply reduce the award accordingly but may order a new trial on all the issues, or solely on the issue of damages. The court also has the option of remitting the award to the maximum amount that would not be excessive. Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.

*Civil Procedure > Relief From Judgment > Additurs & Remittiturs*

[HN11]The standard that the court applies to determine whether a compensatory damage award is excessive differs somewhat depending on whether plaintiff prevailed on a federal claim or on a state-law claim over which the federal court is exercising supplemental jurisdiction. When assessing an amount awarded for claims brought under federal law, the court must apply the federal standard, which asks whether the award is so excessive as to shock the conscience of the court. The court's assessment of a sum awarded for a state-law claim is governed by the law of the state.

*Civil Procedure > Relief From Judgment > Additurs & Remittiturs*

[HN12]A plaintiff may not recover compensatory damages in duplicate under both the Human Rights Law and Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e.

*Civil Procedure > Relief From Judgment > Additurs & Remittiturs*

[HN13]An award is excessive or inadequate if it deviates materially from what would be reasonable compensation. This so-called deviates materially standard for reviewing jury awards is less deferential to a jury verdict than the federal standard because it does not permit a reviewing court to sustain a damage award that is out of line with other awards for similar injuries, even if the amount the jury awarded was not shocking to the court's conscience. However, the standards are similar in that they both require the reviewing court to evaluate the magnitude of a jury award by comparing it to awards in analogous cases.

*Civil Procedure > Relief From Judgment > Additurs & Remittiturs*

[HN14]New York courts have held that mental injury may be proved by a complainant's own testimony, corroborated by reference to the circumstances of the alleged misconduct. To be compensated, plaintiff must also produce some evidence of the magnitude and duration of her emotional injury, although, in light of

Page 2

the strong anti-discrimination policy spelled out by the legislature of New York state, New York courts do not require plaintiff to produce the same quantum and quality of evidence to prove compensatory damages that she would have had to produce under an analogous provision.

*Civil Procedure > Costs & Attorney Fees > Reasonable Fee Amount*

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN15]The first step in determining an appropriate fee award involves the calculation of the so-called lodestar amount, which, in general terms, is the product of the number of hours reasonably expended by counsel on the litigation and a reasonably hourly rate. In calculating the lodestar figure, courts exclude any time that represents excessive, unnecessary, or duplicative work. The court must also exclude hours spent pressing unsuccessful claims unless plaintiff demonstrates that those claims were inextricably intertwined with her successful claims, in that they involve a common core of facts or are based on related legal theories.

*Civil Procedure > Costs & Attorney Fees > Reasonable Fee Amount*

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN16]A prevailing party is entitled to hourly rates that fall within the prevailing range of rates in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. In making the comparison to prevailing marketplace rates, courts must take into account the size of the law firm. Thus, if the movant is represented by a small or medium-sized firm, the appropriate rates are those typically charged by such firms, whereas a movant may obtain a higher hourly rate if represented by a large law firm, since such firms typically charge more per hour to cover a higher overhead. For purposes of determining the appropriate hourly rate, the prevailing community is the district in which the court sits.

*Civil Procedure > Costs & Attorney Fees > Reasonable Fee Amount*

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN17]The fee applicant bears the burden of producing evidence demonstrating that the requested rates are in line with those prevailing in the community. In the absence of such evidence, the court may take judicial notice of the rates prevailing within the community for comparable legal services.

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN18]To be compensated, attorneys for the prevailing party must provide the court with time records, made at the time the work was performed, that, at the minimum, specify for each attorney the date, the hours expended, and the nature of the work done. A reduction in the amount awarded for fees is appropriate where adequate contemporaneous records have not been kept.

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN19]When determining whether time records are sufficiently detailed, the court need not examine each entry individually, but rather must ask whether, assessed as a whole, the time records perform the function of accurately indicating how much time was spent on what general tasks.

*Civil Procedure > Costs & Attorney Fees > Reasonable Fee Amount*

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN20]An attorney may only be compensated for hours that were reasonably expended and therefore, in determining the lodestar figure, the court must exclude excessive, redundant or otherwise unnecessary hours.

*Civil Procedure > Costs & Attorney Fees > Reasonable Fee Amount*

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN21]As a general rule, fees may not be recovered for distinct unsuccessful claims.

*Civil Procedure > Costs & Attorney Fees > Reasonable Fee Amount*

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN22]Even where plaintiff's unsuccessful and successful claims are interrelated, if a plaintiff achieves only partial or limited success 'the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount.

*Civil Procedure > Costs & Attorney Fees > Reasonable Fee Amount*

[HN23]Although the lodestar may be adjusted based on several permissible factors, including the results

obtained, the risks involved and the delay in payment, there is a strong presumption that the lodestar figure represents a reasonable fee.

*Civil Procedure > Costs & Attorney Fees > Attorney Fees*

[HN24]When awarding attorney's fees, a court should also award the prevailing party reasonable out-of-pocket expenses incurred by the attorney and which are normally charged fee-paying clients.

**COUNSEL:** For SUSAN BICK, plaintiff: Peter J. Blessinger, CERRONE AND GEOGHAN, NEW YORK, NY.

For THE POLICE DEPT. OF THE CITY OF NEW YORK, RICHARD LATUGA, defendants: Robert S. Nobel, Paul A. Crotty, Corporation Counsel of the City of NY, New York, NY.

For THE CITY OF NEW YORK, MAURICE BUCKLEY, THOMAS J. O'BRIEN, Lieutenant, defendants: Robert S. Nobel, Corporation Counsel of the City of NY, New York, NY.

**JUDGES:** MICHAEL H. DOLINGER, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** MICHAEL H. DOLINGER

**OPINION: MEMORANDUM AND ORDER**

MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE:

Plaintiff Susan Bick, a sergeant in the New York City Police Department, commenced this action on October 16, 1995 against the City of New York and three senior police supervisors. Invoking Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-5), the Civil Rights Act of 1871 (42 U.S.C. § 1983), and the New York State Human Rights Law (N.Y. Exec. L. § [*2] 296), she asserted principally claims of gender discrimination and retaliation. She also pressed common-law claims of libel and intentional infliction of emotional distress.

Plaintiff's claims stemmed from the filing and prosecution of five misconduct charges against her by the Police Department. The charges were based in part on the allegation that plaintiff had not reported, either to the Department's Office of Equal Employment opportunity ("OEEO") or to her supervisors, a series of complaints by a female police officer in her precinct to the effect that a male sergeant was harassing her. The Department also charged plaintiff with obstructing the investigation into the harassment complaint and unlawfully disclosing the existence of the investigation.

After an extensive hearing and an appeal by Sergeant Bick, all of the departmental charges against her were dismissed. In the wake of that exoneration, Sergeant Bick sued the Department and three OEEO supervisors, asserting principally that the Department had pressed these charges against her because she is a female. Plaintiff also asserted that the Department had filed these charges, at least in part, in retaliation for her unwillingness, [*3] during the investigation, to conform her testimony to that of the female complainant. Plaintiff's claims of libel and intentional infliction of emotional harm stemmed from the creation and circulation within the Department of an assertedly false and malicious OEEO report about her. n1

--------------- Footnotes ---------------

n1 Plaintiff also asserted that the defamatory memorandum had been prepared and circulated to her precinct in retaliation for her perceived non-cooperation with OEEO.

------------ End Footnotes--------

As a result of various pre-verdict stipulations and court rulings, the Court submitted to the jury only two sets of claims, both pertaining to the filing of charges against her. The first was plaintiff's gender discrimination claims under federal and state law against the City, as her employer, and against one of the three individual defendants, Inspector Maurice Buckley. n2 The second was plaintiff's retaliation claim, as asserted against two of the individual defendants -- Inspector Buckley and Lt. Thomas J. O'Brien -- although the claim had been relabelled as one [*4] arising under the First Amendment, rather than Title VII, since plaintiff alleged that defendants had retaliated against her for having exercised her First Amendment right to speak truthfully.

--------------- Footnotes ---------------

n2 The gender-discrimination claim was dismissed during the trial as against the other two individual defendants.

------------ End Footnotes--------

Having received a mixed-motive charge, the jury returned a verdict in favor of plaintiff on her discrimination claim against the City and awarded her compensatory damages in the sum of $ 750,000 for pain and suffering and $ 450 for her out-of-pocket expenses. The jury found against plaintiff on her retaliation claim and also declined to hold Inspector Buckley liable on the gender discrimination claim.

The City now seeks judgment as a matter of law, based principally on its assertion that the verdicts were "morally irreconcilable" and "offensive to notions of fair play and decency." (Defts' Memo of Law at 31). Alternatively, defendant moves for a new trial on the grounds that the verdict is against the weight [*5] of the evidence and that one sentence in the jury charge was fatally flawed. Finally, the City argues that even if the jury's liability determination is not subject to challenge, the court should order a new trial unless the plaintiff agrees to a substantial reduction in the award for pain and suffering.

Plaintiff also seeks relief. Specifically, she has moved for an award of attorney's fees under Title VII in the amount of $ 169,987.50. She also seeks an award of expenses in the sum of $ 6,358.58.

For the reasons that follow, defendant's motion for judgment as a matter of law is denied. Its motion for a new trial on the basis of the asserted inadequacy of the evidence and the jury charge is also denied. Because we conclude, however, that the damage award was excessive, a new trial on damages will be ordered unless the plaintiff accepts a remittitur of the award for pain and suffering to $ 100,000.00. Subject to plaintiff's acceptance of a remittitur, her application for attorney's fees and expenses is granted as modified.

## BACKGROUND

I begin with a somewhat extended review of the events leading up to present lawsuit.

Sergeant Bick joined the New York City Police Department [*6] in 1980 in an administrative capacity and became a police officer in 1986. In the Spring of 1993 she was promoted to the rank of sergeant and assigned to the 19th Precinct (Tr. at 42-44). n3 On May 29, 1993 plaintiff was assigned to patrol a demonstration in front of the Yugoslavian Mission. During that patrol plaintiff approached a police officer named Tracy Bowden, who was assigned to the same patrol. (Id. at 49, 861). Sergeant Bick and Officer Bowden had a brief conversation during which Officer Bowden mentioned that she believed that her commanding officer, a Sergeant Steven Daly, was not treating her fairly because he frequently changed her assignment from car patrol to foot patrol and that in general he did not like women. (Id. at 50, 863).

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n3 Citations to "Tr." refer to the trial transcript.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

On July 2, 1993, Officer Bowden informed Sergeant Bick that during an after-hours social gathering of police officers at a bar called "Spanky's", Sergeant Daly had, on two separate occasions, approached her [*7] and reached his hand into the middle of her sundress and, while pulling the cloth upwards, stated that Officer Bowden was showing "too much cleavage." (Id. at 55, 868). When Sergeant Bick suggested that Bowden should report Sergeant Daly's conduct to the OEEO, Bowden responded that she had no interest in filing such a complaint. (Id. at 56, 878, 883).

After being informed by other officers that Daly had used gender-based slurs on several occasions when referring to Officer Bowden (id. at 59), and aware of the "Spanky's" incident, Sergeant Bick sought advice from several higher ranking police officials regarding how to handle what she perceived to be a problem. These supervisors included Lieutenant Pena, a lieutenant in charge of several precincts, including the nineteenth (id. at 56), and Captain Flaherty, the Captain for the nineteenth precinct. (Id. at 47).

On July 9, 1993, Sergeant Bick was asked to speak with the commander of the 19th Precinct, Inspector Buccino, about rumors he had heard regarding Sergeant Daly and Officer Bowden (Id. at 61-63). Following their conversation, and in Bick's presence, Buccino made an initial call to OEEO to find out how [*8] to proceed with a harassment complaint. (Id. 653) Because plaintiff knew more about Bowden's complaints, Buccino instructed her to make a follow-up call to OEEO to provide that office with greater detail. (Id. at 61-63). Bick called OEEO, spoke to a Sergeant June Martucci and relayed to her the gist of Officer Bowden's comments regarding Daly, including the Spanky's incident, the slurs and the complaint that Daly never allowed Bowden to remain on car patrol. (Id. at 66). Consistent with OEEO procedures, Martucci took this report as an anonymous complaint, but suggested to Bick that she persuade Officer Bowden to contact OEEO directly. (Id. at 344).

On July 17, 1993 while Officer Bowden was on assignment investigating a report of a dead body in an apartment, Daly entered the apartment and ordered Bowden to accompany him alone to the roof of the building. (Id. at 834). Once on the roof, Daly

confronted Bowden regarding his suspicion that she had complained to the OEEO about him. Bowden denied having done so but confirmed her unhappiness with his treatment of her, and he then responded by warning her that one push was all that it would take to toss her off the roof. [*9] (Id. at 834).

Several days after this incident, Bowden finally telephoned Sgt. Martucci at OEEO to file a formal complaint. (Id. at 353). Following an in-person interview with Officer Bowden by Sergeant Martucci, OEEO began an official investigation (Id. at 361).

Early in the OEEO investigation, Martucci interrogated Sergeant Bick. (Id. at 421). Because Martucci believed that plaintiff may have been trying to protect Sergeant Daly by providing "evasive" and even "untruthful" responses to the questioning at that first interview (id. at 425-26), Bick was required to return for a second interview approximately seven months later.

During both interviews Bick was asked, among other things, to verify Officer Bowden's claim that she had called Bick directly after the roof incident from the dead person's apartment to tell Bick that Sergeant Daly had threatened her. Bick maintained that she remembered receiving a call from Bowden earlier that day, but that she believed it concerned a routine investigative matter, not Daly. (Pl's Ex. 7A at 21-24, Pl's Ex. 22A at 60). Bick stated that once Bowden had returned to the station house, she had told Bick that Daly had confronted [*10] her, but Bick insisted that Bowden had not mentioned on that occasion that Daly had threatened her life. (Id.) She also recalled, however, that either in that discussion or in subsequent conversation, Bowden had expressed a fear that Daly would harm her. (Pl's Ex. 7A at 25).

On July 29, 1994 the Department filed five separate disciplinary charges against Sergeant Bick. Each of the first three charges alleged that Sergeant Bick had failed to report an allegation by Officer Bowden of serious misconduct by Sergeant Daly. The charges identified these disclosures as having been made to Sergeant Bick in May, June and July 1993, respectively. Although not detailed, the first of these charges apparently concerned the May 1993 conversation with Officer Bowden about her perception of Daly's attitude towards women, the second concerned the incident at Spanky's, and the third related to the roof incident. The fourth charge against Bick was that she had disclosed the existence of the OEEO investigation to a subordinate police officer named Paul D'Addarrio. The fifth charge alleged that Sergeant Bick had impeded the OEEO inquiry by intentionally giving false or evasive answers during her investigative [*11] interviews (Pl.'s Ex. 27). Although this last charge was also unspecific, it apparently was directed principally at Sergeant Bick's denial that Officer Bowden had told her of Daly's threat in a telephone conversation immediately after it had occurred.

Sergeant Bick went through a formal departmental hearing, which was also devoted to hearing a variety of charges against Sergeant Daly. (Tr. 212, 260, 599). Eventually Daly was terminated from the Department for his misconduct. (Id. at 260). As for Sergeant Bick, she was convicted on one of the five charges -- alleging that she had lied to the investigators -- but pursued an appeal to the Commissioner, who dismissed the remaining charge. (Id. at 615-16).

Following Bick's exoneration, she commenced this lawsuit, asserting principally that the departmental charges had been filed against her because she is a female. She also asserted that defendants had sought to retaliate against her for her unwillingness, during the investigation, to conform her testimony to that of the complainant, Officer Bowden.

ANALYSIS

As noted, defendant presses various challenges to the jury's verdicts insofar as they found the City liable for gender [*12] discrimination and awarded substantial damages to the plaintiff as a consequence. Plaintiff in turn seeks an award of fees and expenses.

We first address that portion of defendant's motion that challenges the jury's liability verdict as "irreconcilable" with the jury's rejection of the retaliation claim. For reasons to be noted, we conclude that defendant mischaracterizes its application as seeking judgment as a matter of law and that the motion is, in any event, meritless.

We next address three grounds on which defendant seeks a new trial. As will be noted, the City's attacks on the sufficiency of the evidence and the correctness of the jury charge are groundless. We nonetheless concur with defendant's contention that the damage award for pain and suffering is excessive, and that a new trial on damages should therefore be ordered unless plaintiff accepts a remittitur.

As for plaintiff's fee and expense motion, subject to plaintiff's decision with respect to the remittitur, we reject all but a handful of defendant's challenges to the fee requests. We also will grant plaintiff's expense application in part.

I. Defendant's Motion for Judgment as a Matter of Law

Defendant's purported [*13] Rule 50 motion is premised on its contention that the jury's rejection of plaintiff's First Amendment retaliation claim is fatal to her gender discrimination claim. In substance, defendant argues that the verdict on the retaliation

Page 6

claim amounts to a finding that plaintiff lied to the OEEO during its investigation of Officer Bowden's complaint about Sergeant Daly. If so, defendant suggests, then plaintiff cannot be allowed to recover on her claim that the disciplinary charges were motivated, at least in part, by her gender. To understand and evaluate this claim, however it is construed, we require a bit of context.

At trial we submitted two sets of plaintiff's claims to the jury. The first embodied her contention that the Department had filed the disciplinary charges against her in whole or in part because of her gender. In substance; she contended that if she had been a male, the defendants would not have taken the complained-of action against her.

The jurors were therefore asked to determine, in the first two special verdicts submitted to them, whether plaintiff had proven that "gender was a motivating factor in the decision to file charges against [her]" and, if so, whether [*14] defendants had established "that the same charges would have been filed against plaintiff even if she had been a male." The jurors answered the first question in the affirmative and the second in the negative.

The court also submitted to the jury the plaintiff's First Amendment claim. In support of this claim she alleged that the departmental charges had been filed against her, in whole or in part, to retaliate against her for her insistence on providing truthful responses to the OEEO investigators' questions, because those answers contradicted in certain respects the account provide by Officer Bowden. Since plaintiff has a First Amendment right to testify truthfully, she was asserting a claim of First Amendment retaliation.

To assess the retaliation claim, the court submitted three special verdicts to the jury. The first asked whether plaintiff had established that her statements "to the OEEO investigators during her investigatory interviews had been truthful". If it so found, the jury was then asked to determine whether plaintiff had established that her "refusal to alter her truthful account in the course of the OEEO investigation was a motivating factor in the decision to file [*15] charges against her" and, if so, whether defendants had established "that the filing of the same charges against plaintiff would have been authorized in the absence of any intent by defendants to retaliate against her for exercising her First Amendment right to truthfully testify." The jury answered "no" to the first of these queries and therefore did not address the remaining two.

As noted, defendant characterizes its analysis on this aspect of its motion as seeking judgment as a matter of law. This cannot be correct.

Defendant's attack on the jury's verdict concerning gender discrimination is based on the asserted inconsistency between these findings and the verdict on the second claim. Relief under Rule 50, however, turns solely on whether "there is [a] legally sufficient evidentiary basis for a reasonable jury to find for" the prevailing party on the challenged claim. See Fed. R. Civ. P. 50(a). Even if two special verdicts are inconsistent with one another, that inconsistency is not tantamount to a lack of sufficient evidence and thus does not come within the scope of this rule.

The inapplicability of Rule 50 to this circumstance is underscored by the requirement that [*16] the movant must have raised, prior to the verdict, the precise ground that it seeks to press after the trial. See, e.g., Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, 286 (2d Cir. 1998)(quoting inter alia McCardle v. Haddad, 131 F.3d 43, 51 (2d Cir. 1997)). Obviously, this is not possible if the post-trial motion concerns a claimed inconsistency in the verdicts. n4

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n4 One might respond to this point by noting that an anticipatory objection could be made that the jury verdict form, as worded, would permit a jury to return inconsistent verdicts. As a procedural matter, we are not aware of any caselaw that requires such a pre-verdict objection as a basis for later complaining that the jury verdicts are inconsistent. In any event, this observation would not assist defendant here since its counsel never offered such an objection to the verdict form, although both parties were given the opportunity to review the form and to object to it. (Tr. 1066).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[HN1]If a party establishes an irremediable [*17] inconsistency in the verdicts, the appropriate relief is an order for a new trial under Rule 59. See, e.g., Lavoie v. Pacific Press & Shear Co., a Div. of Canron Corp., 975 F.2d 48, 53 (2d Cir. 1992); Brooks v. Brattleboro Memorial Hosp., 958 F.2d 525, 529 (2d Cir. 1992). Application of this rule to the present case, however, equally demonstrates the futility of defendant's argument.

First, defendant's factual premise -- that the jury determined that plaintiff had lied to OEEO -- is unproven. Plaintiff bore the burden of proof on this issue. (Tr. 1042). Thus, the verdict may represent only the jury's conclusion that plaintiff had not shown that it was more likely than not that she had been entirely truthful with OEEO. In short, the jurors may simply have decided that the evidence on the question was in equipoise.

Second, even if the jurors concluded that plaintiff had lied in some respect to the OEEO investigators, that finding is not factually or legally inconsistent with their finding that plaintiff's gender was a motivating factor in the decision to press charges against her and that, had she been a male, the Department would not have filed such charges under the same circumstances. [*18] Indeed, defendant appears to concede that the verdicts are not legally inconsistent (see Deft's Memo at 31 (suggesting that the verdicts were "morally irreconcilable")), a concession that is hardly surprising under the circumstances. See generally Vichare v. AMBAC Inc., 106 F.3d 457, 464 (2d Cir. 1996) (court must adopt a reading of the case, if there is one, that resolves any seeming inconsistency)(citing, inter alia Brooks, 958 F.2d at 529; Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 891 (2d Cir. 1988)).

As we note in more detail below, the premise of a mixed-motive analysis is that, despite the existence of a permissible basis for taking an adverse employment action, the employer was motivated, at least in part, by an impermissible reason. See, e.g., Price Waterhouse v. Hopkins, 490 U.S. 228, 245-47, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989); Luciano v. Olsten Corp., 110 F.3d 210, 218 (2d Cir. 1997). Thus, even if the jurors concluded that the Department had a legitimate basis for pursuing charges against plaintiff, that finding is neither factually nor legally inconsistent with the further conclusion that, as a matter of fact, the Department [*19] would not have sought to discipline plaintiff for her perceived dishonesty if she had been a male. n5

------------Footnotes----------

n5 We do not understand defendant to argue, in this aspect of its post-trial motion, that there was insufficient evidence, as a matter of law, to sustain the discrimination verdict. Indeed, their analysis under Rule 50 is pinned exclusively to the purported legal significance of the jury's verdict for defendants on the First Amendment retaliation claim.

In any event, such an argument would be entirely baseless. As we discuss in detail when addressing defendant's motion for a new trial, there was substantial evidence of disparate treatment in the Department's handling of the investigation. This included (1) comments by the lead investigator suggesting animus towards the plaintiff based on her failure to conform to the investigator's gender stereotype, (2) indications that the investigator repeatedly misstated the tenor of statements made by plaintiff and others during the OEEO interviews, all to the detriment of the plaintiff, and (3) evidence of very different treatment by OEEO of comparable misconduct by a male sergeant who witnessed one of the key encounters between Officer Bowden and Sergeant Daly, as well as of arguably equivalent dishonesty by several male police officers during the same investigation. (See pp. 21-40, infra).

------------End Footnotes--------

[*20]

Third, even if we concluded that the two verdicts were inconsistent, that would not compel any relief. As has been observed, [HN2]where assertedly inconsistent jury findings address separate legal claims, as here, consistency is not required. See, e.g., Lavoie, 975 F.2d at 53-54 (citing United States Football League v. National Football League, 644 F. Supp. 1040, 1045-46 (S.D.N.Y. 1986), aff'd, 842 F.2d 1335 (2d Cir. 1988)).

Defendant's argument, although garbed in some of the terminology of verdict inconsistency, seems to spring from a somewhat different source. Defendant appears to suggest that we should deem the plaintiff to have been guilty of dishonesty in dealing with the OEEO investigators, and that we should then take the further step of holding, as a matter of "policy", that by virtue of such misconduct she is disentitled to recover from the Department even if she was charged in circumstances in which a male sergeant guilty of the same misconduct would not have been charged. The apparent point of defendant's argument is to create some form of deterrent to such dishonesty by Police Department employees.

Not surprisingly, defendant cites no legal authority for such [*21] a judicially-defined limitation on the otherwise unambiguous reach of a statute. n6 Moreover, apart from the absence of any support for such a step either in the language of the pertinent

statutes or in their legislative histories or in any caselaw authority to which our attention may have been drawn, we note that defendant's theory is undercut by a recent Supreme Court decision on a somewhat analogous argument, and is in any event refuted by the substantial body of caselaw recognizing potential liability under Title VII even if the employer relied in part on a proper motive for taking adverse action against the employee.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n6 Since plaintiff sued under both Title VII and the New York Executive Law, we would presumably have to perform the invited judicial surgery on both the federal and the state statutes. Given our limited role in construing state law under our supplemental jurisdiction, see, e.g., Baker v. Coughlin, 77 F.3d 12, 15 (2d Cir. 1996), defendant's invitation in this respect is even more breathtaking than it may seem at first blush.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*22]

In recent years, defendants in Title VII and other employment-rights litigation have repeatedly argued that if a plaintiff complaining of discriminatory termination was discovered, in the course of the litigation, to have been guilty of misconduct sufficient to have justified termination -- for example, having made misrepresentations to the employer about job qualifications -- the plaintiff should, as a matter of policy, be barred from any recovery. See, e.g., Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 40 (2d Cir. 1994); Moodie v. Federal Reserve Bank of New York, 831 F. Supp. 333, 335 (S.D.N.Y. 1993). In substance, this type of argument pressed a form of "unclean hands" analysis, albeit in the context of a statutory scheme that made no allowance for such an exception to liability.

Confronted with this issue two terms ago, the Supreme Court squarely rejected the theory. See McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995). In doing so, the Court emphasized that the overriding policy of Title VII and of comparable statutes is to deter discriminatory employment practices, as well as to compensate individual victims, and [*23] it concluded that "it would not accord with this scheme if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the Act." 115 S. Ct. at 884. n7 See also Vichare, 106 F.3d at 468. Applying recognized Title VII standards, the Court observed that the plaintiff's misconduct in that case had not been known until after she was fired, and "the employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason." McKennon, 115 S. Ct. at 885.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n7 The Court did hold that proof of such misconduct could affect the amount of any assessment of back and front pay. Id. at 886.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

In substance, then, the Court rejected the same type of non-statutory, policy-based reasons for limiting liability based upon arguable equitable concerns about plaintiff misconduct. Moreover, although the Court in McKennon noted that the employer in that case [*24] had acted from a single, impermissible motive, its reference to the line of cases recognizing so-called mixed-motive analysis, id., underscores the point that defendant's theory here is also belied by that body of authority. See also Padilla v. Metro-North Commuter R.R., 92 F.3d 117, 122-23 (2d Cir. 1996), cert. denied, 520 U.S. 1274, 138 L. Ed. 2d 211, 117 S. Ct. 2453 (1997).

The decisions that have upheld dual-motive liability -- originating with the Supreme Court's analysis in Mt. Healthy City School Dist. Bd. of Edu. v. Doyle, 429 U.S. 274, 287, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977) -- are premised on the assumption that an employer may undertake adverse action against an employee for permissible reasons, including employee misconduct, and yet will be held liable for such action in some circumstances. Specifically, if the employee can demonstrate that an impermissible motive also played a significant role in the decision -- in legal terms, the improper consideration was "a motivating factor" -- liability will attach unless the employer can show that he would have undertaken the same action even absent the improper motive. See, e.g., Fields v. New York State OMRDD, 115 F.3d [*25] 116, 122 (2d Cir. 1997); de la Cruz v. N.Y. State Human Resources Admin. Dep't of Social Services, 82 F.3d 16, 23 (2d Cir. 1996). See also McKennon, 115 S. Ct. at 885 (citing Price Waterhouse, 490 U.S. at 252 ("proving that the same decision would have been justified . . . is

not the same as proving that the same decision would have been made.")).

In short, it is well settled that [HN3]improper conduct by the employee is not a defense to liability unless the jury is satisfied that a discriminatory motive was not a "but for" cause of the defendant's adverse action. Accordingly, there is no basis for imposing a rule that would make proof of employee misconduct, by itself, an absolute defense under either Title VII or New York State law.

**II. Defendant's Application for a New Trial**

Defendant seeks a new trial on the grounds that the verdict was against the weight of the evidence, that the jury's finding was based on an erroneous jury instruction, and, finally, that the jury's damage award for emotional distress was excessive.

Each of these grounds will be addressed in turn. For reasons to be noted, we reject the arguments premised on asserted evidentiary insufficiency [*26] and error in the jury charge. We nonetheless conclude that the damage award was indeed beyond justification, and therefore order a new trial on damages unless plaintiff accepts a reduction of that award.

A. Sufficiency of the Evidence

[HN4]A motion for a new trial should be granted only if the court is convinced that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Lightfoot v. Union Carbide Corp., 110 F.3d 898, 911 (2d Cir. 1997)(quoting Hygh v. Jacobs, 961 F.2d 359, 365 (2d Cir. 1992)). See also Sorlucco v. New York City Police Dep't., 971 F.2d 864, 871 (2d Cir. 1992). Unlike a motion for judgment as a matter of law, in deciding a motion for a new trial, the court is not required to view the evidence in the light most favorable to the non-movant. See Song v. Ives Laboratories, 957 F.2d 1041, 1047 (2d Cir. 1992); Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir. 1978). However, the fact that the trial judge disagrees with the jury verdict is not a sufficient reason to order a new trial. Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir. 1983). See Saloomey v. Jeppesen & Co., 707 F.2d 671, 679 (2d [*27] Cir. 1983).

In this case defendant contends that the jury's finding of gender discrimination in the decision to file departmental charges against plaintiff is contrary to the great weight of the evidence, and that it would be a miscarriage of justice to allow the verdict to stand. This assertion is baseless.

Plaintiff presented sufficient evidence to support a finding that gender was a motivating factor in the decision to bring disciplinary charges against her and that charges would not have been filed but for plaintiff's gender. From the trial testimony of the OEEO investigators, a reasonable juror could justifiably infer that because Sergeant Bick was a woman, the Department decisionmakers expected her to be more sensitive to a complaint of sexual harassment and therefore held her to a higher standard of reporting. Gender bias could also be inferred from the evidence that the lead OEEO investigator, who had expressed arguably gender-based animosity toward plaintiff, when preparing her interview summaries misrepresented a number of key statements by Sergeant Bick and at least one other officer during their interviews with the investigator and that these mischaracterizations were [*28] consistently adverse to Bick and were relied upon in determining whether to file charges against her.

Additionally, the evidence indicated that several male members of the Department were probably guilty of misconduct that was at least the equivalent of the charges against Bick, and that the OEEO investigators recognized the likelihood of such misconduct by the male officers but chose not to seek charges against them. Moreover, although the OEEO officials offered some explanations at trial for the apparently differing treatment of Bick and the male officers, those explanations were permissibly rejected by the triers of fact as pretextual.

1. Evidence of Gender Stereotyping by OEEO Officials

Sergeant Martucci testified that she was the key decision-maker in OEEO in determining whether charges would be filed against Sergeant Bick. (Tr. at 514). Her testimony regarding her reaction to Sergeant Bick's response to questioning could fairly be interpreted as evidencing animus towards Bick based on plaintiff's failure to conform to Martucci's view of appropriate feminine responses to male boorishness. n8

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n8 The fact that Martucci, like Bick, is a female is of course not a basis for rejecting a claim of gender discrimination. See generally Oncale v. Sundowner Offshore Services Inc., 523 U.S. 75, 140 L. Ed. 2d 201, 118 S. Ct. 998, 1001-002 (1998); Wrightson v. Pizza Hut of America, Inc., 99 F.3d 138, 142 (4th Cir. 1996); Quick v. Donaldson Co. Inc., 90 F.3d 1372, 1378 (8th Cir. 1996); Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 148 (2d Cir. 1993)(Van Graafeiland, J. concurring), cert. denied, 510 U.S. 1164, 127 L. Ed. 2d 539, 114 S. Ct. 1189 (1994).

Page 10

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*29]

During the Daly investigation, Bick acknowledged to the OEEO investigators that Sergeant Daly had on occasion called her a "skirt," although Bick claimed that Daly's use of this term had not bothered her because she and Daly had had a bantering relationship in which they kidded one another. (Pl's Ex. 7A at 11). Sergeant Martucci testified that Bick's response "bothered me as a woman, as an investigator and as a sergeant." (Tr. at 475). Inspector Richard LaTuga, an OEEO supervisor who participated in the first interview with Bick, also testified that the fact that Sergeant Bick was not offended by Daly having called her a "skirt" indicated to him that she would not be "sensitive" to Bowden's complaints of harassment. (Id. at 748).

Sergeant Martucci further testified that "I basically took a stronger stand with her [Bick]", evidently because Bick had not been bothered by the use of the term "skirt" and because she had indicated some discomfort in reporting a complaint on behalf of an unwilling complainant against a fellow sergeant with whom she had been friendly. (Id. at 476).

During Sergeant Bick's second investigatory interview, Lieutenant O'Brien asked her if she would [*30] be upset if another member of the service grabbed the front of her dress and pulled up on it. (Ex. 22A at 39). At trial Lieutenant O'Brien stated that the purpose of this question had been to determine Bick's "understanding" of Bowden's complaints regarding Daly. (Id.). Sergeant Bick's response to O'Brien's question was that it would probably not bother her personally, but that she understood that she might be different in this respect from other women. (Id.). Based on this comment, Sergeant Martucci testified that, as a woman, she was "shocked" and "disappointed" that Bick was not bothered by the idea of someone touching her dress. (Tr. 555). Sergeant Martucci also admitted at trial that at the close of the Daly investigation she remained shocked at Bick "as a woman." (Id. 559).

This testimony could fairly be understood by the jury as indicating that Sergeant Martucci, who was the self-described key decisionmaker and the author of the investigative summaries that were apparently crucial to the decision to recommend charges against plaintiff, was holding plaintiff to a different behavioral standard based upon her gender. Such [HN5]gender stereotyping "may provide proof that [*31] an employment decision . . . was based on gender." Galdieri-Ambrosini, 136 F.3d at 289 (citing, inter alia, Price Waterhouse, 490 U.S. at 250-51).

We recognize that even if such stereotyping is established, the plaintiff must show that it influenced employer decision-making. Id. (quoting Price Waterhouse, 490 U.S. at 251). Again, however, there was significant evidence in the record from which a trier of fact could conclude (1) that Martucci prepared summaries of interviews with key witnesses, including plaintiff, and in those summaries repeatedly misrepresented statements by the interviewees in a manner designed to suggest dishonesty or other culpability by plaintiff, (2) that the more senior OEEO officials relied on those summaries in deciding to recommend the filing of charges against plaintiff, (3) that a male sergeant who appeared to be at least equally culpable in (a) failing to report misconduct by Sergeant Daly and (b) making false statements to OEEO was not charged, even though Martucci recognized his misconduct, (4) that several male police officers also provided apparently false or misleading information to OEEO in the course of the same investigation and [*32] yet were not charged, and (5) that the explanations offered by OEEO witnesses for not charging any male personnel other than Daly were inconsistent with the independent evidence and with the criteria that were used to decide to charge plaintiff. I address each of these items in turn.

2. Examples of Misstatements In Interview Summaries

Sergeant Bick was interviewed twice by OEEO concerning the complaint of Officer Bowden against Sergeant Daly. In each instance Sergeant Martucci conducted the interview, together with a more senior OEEO officer, and then prepared a summary of the interview.

According to Sergeant Bick, she was called for the first interview, on July 26, 1993, on short notice and without having her memo book with her. As indicated by the transcript of the taped interview, Martucci and LaTuga asked her numerous questions concerning the details of events from as long ago as two months before. (Pl's Ex. 7A at 13, 18, 32, 34, 35) In response to several of these questions, Sergeant Bick expressed uncertainty as to precise dates or times when certain events had occurred and repeatedly offered to review her own records to clarify these uncertainties if Martucci thought [*33] the matter important. (Id.; Tr. at 114, 424).

In preparing a summary of the interview, however, Martucci inserted as a concluding observation that "throughout the questioning Sgt. Bick claimed that she is very forgetful and can't remember what happened yesterday." (Pl's Ex. 7 at 2). A review of the transcript

Page 11

of the interview reveals that plaintiff in fact stated, on a single occasion, "I don't remember what I did yesterday. I am just not good with dates and times. But, I have the information, I can get it to you." (Pl's Ex. 7A at 34) Thus, Martucci's comment can fairly be viewed, especially in context, as a misrepresentation of the tenor of the interview and of Bick's reportage. Moreover, this representation by Martucci was hardly inconsequential since it (a) indicated animus towards plaintiff and (b) foreshadowed the later requirement that Bick report for a second interview and Martucci's later recommendation that Bick be the subject of charges because she was not being candid in her interview responses. n9

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n9 Indeed, both Sergeant Martucci and Inspector LaTuga testified that they found Bick to be unduly forgetful (id. at 423, 741), principally because Bick had trouble identifying what had occurred on certain dates. (Id. at 424) Martucci and LaTuga in their testimony also acknowledged that they had found Bick's answers to be non-committal, evasive and even untruthful because Sergeant Bick had not offered them anything "new" regarding the case against Daly, and more specifically because she did not corroborate the claim that Bowden had called her directly after the roof incident to report that Sergeant Daly had threatened her life. (Tr. 495-96, 686-87, 742).

- - - - - - - - - - - - End Footnotes- - - - - - - -

[*34]

Bick was called back for a second interview on February 14, 1994, approximately seven to eight months after the key events underlying Officer Bowden's complaint about Daly had taken place. During that interview, conducted by Martucci and O'Brien, Bick indicated some uncertainty as to whether she had heard of the Spanky's incident from Bowden or from other officers. In response, Lt. O'Brien asked whether she would be upset "if another member of the service had grabbed your dress and pulled it up?" (Pl's Ex. 22 at 38-39). In answer to that question, Bick responded "honestly, probably not. But that's me." (Id. at 39).

Strangely, in Martucci's summary of the interview, she made the following statement:When questioned as to why she failed to report Bowden's allegation [about Daly having grabbed her in Spanky's bar] she stated she was not aware she had to and that she didn't consider a ranking officer touching complainant's dress/chest a big deal. Sergeant Bick continued by saying she wouldn't have reported it if it happened to her.(Pl's Ex. 22 at 22). This description can fairly be viewed as seriously misleading and in part false.

First, the question to which [*35] Sergeant Bick responded was not about the touching of Tracy Bowden's "chest", but rather about the hypothetical touching of Sergeant Bick's dress. Second, Bick never indicated that Daly's alleged grabbing of Bowden's chest or dress was a minor matter, but rather suggested that, if it had happened to her, she would simply have chosen not to report it or confront Daly, apparently because she would have felt somewhat intimidated (Pl's Ex. 22 at 48-49). Third, Bick's cited response was not, as indicated by Martucci, in answer to a question about why she had not reported the Spanky's incident, to which she had not even been a witness. Rather, Bick had indicated at the interview that she was unsure -- seven and one-half months after the event -- whether she had heard of the incident from Bowden or from other officers. Lt. O'Brien then asked whether she would have been offended if an officer had touched her dress and indicated, after hearing her answer, that he had asked the question because he was surprised that she did not have a clearer recollection of how she had learned of the event since it seemed to him to be so egregious. (Id. at 38-39).

Fourth, contrary to what Martucci's summary [*36] suggests, the investigators never even asked Bick why she had not reported the Spanky's incident, and thus she was never given the opportunity to offer an explanation. n10 Indeed, Martucci's reference to Bick saying that she had not known that she had to report it is again a misstatement. Martucci is plainly referring to a discussion later in the interview about rumors in the precinct that Daly had called Bowden "a skirt" or "a cunt". Bick conceded being aware of these rumors, and it was in answer to a question about her failure to report the use of such language that she said that she had not known at the time that she was required to report it. (Pl's Ex. 22A at 82-83).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n10 One potential explanation for why Bick failed to report the incident might have been the fact that senior officers, including a Police Sergeant Feeney, had witnessed the incident and would presumably report it if anything untoward had occurred. The trial record indicates that Feeney not only witnessed the incident

but intervened mildly to assist Bowden, and that Feeney's role was common knowledge in the precinct, having been reported by Bowden herself as well as by other officers. (Tr. 376, 378, 439, 867-73).

Interestingly, defendant offers, as one explanation for not charging any male officers for failing to report the Spanky's incident, the officers' understanding that Bowden had mentioned it to Bick. Given Feeney's equal rank and greater seniority in the precinct, we might expect that the Department would similarly excuse Bick for not having reported the incident on the assumption that Feeney would do so. Significantly, not only did the Department fail to excuse Bick on this basis, it failed as well to charge Feeney for (a) not reporting the incident even though he was an eyewitness and participant and (b) lying about the incident in his interview when he first professed not to have seen anything unusual and then vaguely conceded that something out of the ordinary might have occurred but claimed a memory loss. (Pl's Ex. 14). Both Martucci and LaTuga conceded on cross-examination that Feeney was obviously not being candid. (Tr. at 709).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*37]

We also take note of at least one other significant misrepresentation in Martucci's interview summaries. This involved an interview with another officer from the precinct and concerns an incident that appears to have been central to the decision to charge plaintiff.

As noted, Bowden reported to OEEO that, after having been threatened by Daly on the roof of a building, she had promptly telephoned Bick at the precinct and told her of the threat. Bick, on the other hand, denied having participated in such a phone call n11, although she indicated that Bowden had told her later that day, in a face-to-face conversation in front of the precinct, that she had had a confrontation with Daly and, either that day or soon thereafter, she had also told Bick that she was afraid for her physical safety. Bick's failure to corroborate Bowden's version of the telephone conversation and her failure to report Daly's threat -- assuming that she knew of it at the time -- apparently played a significant, if not crucial, role in the decision to charge Bick.

- - - - - - - - - - - - Footnotes - - - - - - - - - -

n11 Bick did report having received an earlier call from Bowden, which related to an official police matter and did not involve any reference to Daly. (Pl's Ex. 22A at 60).

- - - - - - - - - - - - End Footnotes- - - - - - - - - -

[*38]

In assessing the question of the phone call, Martucci obtained telephone records for the apartment from which Bowden had made the call (Pl's Ex. 23) and also had available to her the precinct log, which showed who was at the front desk at the time of the call. (Pl's Ex. 24). She also interviewed Officer Ricardo Sacarello, who had apparently picked up the phone call from Officer Bowden. (Pl's Ex. 13).

Perhaps significantly, the telephone records showed a call made to the precinct desk at approximately 7:40 p.m. from the deceased's apartment, but the toll records indicated that the call had lasted no more than one minute, possibly casting some doubt on the notion that Bowden had had the time to describe the incident with Daly to whomever she was talking with. (Tr. 415, 561). Perhaps also significantly, the precinct log showed that Sergeant Bick had signed off the desk about fifteen minutes before the call was made. (Pl's Ex. 24 at third unnumbered page).

Consistent with this evidence, Officer Sacarello reported during his interview with Martucci that he had taken the call from Officer Bowden, and that she had asked to speak to Sergeant Bick. When Martucci asked Sacarello whether Sergeant [*39] Bick had been there at the time, Sacarello initially said "I don't remember if she got to speak to the sergeant. I don't remember if the sergeant was sitting there." (Pl's Ex. 13 at 11). After Sacarello mentioned that he had had at least a brief conversation with Bowden when she called, apparently to ask whether she was feeling all right, because she had sounded "sad or something was bothering her", he reiterated that he did not recall "if the sergeant spoke to her." (Id. at 11-12). When further pressed on this question, he said: "Well then probably, if I answered the desk phone then the sergeant wasn't around and I answered -- I don't remember her talking to the sergeant." (Id. at 13).

Having elicited these answers, Sergeant Martucci prepared an interview summary that, in the one crucial respect relevant to Sergeant Bick's asserted culpability, bears little resemblance to what Sacarello had actually said. Thus she reported:

Page 13

On 7/17/93 P.O. Sacarello was assigned T/S duty [.] He stated he answered the desk phone and it was P.O. Bowden[.] She asked to speak to the desk sergeant. He stated that P.O. Bowden didn't sound like herself[.] She sounded sad[.] He asked [*40] her what was the matter but she didn't tell him what was wrong.

He did not overhear any part of the conversation between Sgt. Bick and P.O. Bowden.

(Id. -- Report at second page (emphasis added)). By this sleight-of-hand Martucci implied that Sacarello had confirmed in the interview that Bick had spoken to Bowden despite Bick's denial, whereas in fact Sacarello had not only denied recalling whether such a conversation had taken place, but had ended up strongly suggesting that it had not. This distortion becomes even more egregious when we recall that, according to the telephone records, the entire phone call lasted no more than sixty seconds, presumably including the time during which Sacarello quizzed Bowden about why she sounded "sad" and then looked around for Bick, who, according to both the log and Sacarello, was not at the desk.

This pattern of misstatements by Martucci, in combination with her expressed and apparently gender-based aversion to Bick, could fairly lead a trier of fact to infer that she was seeking to inculpate Bick and to encourage the filing of charges because Bick's responses to the investigatory questioning did not accord with her view of the proper [*41] response by a female in Bick's situation. Moreover, since her supervisors concededly relied on her summaries in determining that charges should be filed against Bick, (Tr. 690, 738, 760, 776, 786), there was ample evidence, solely from the cited testimony and documents, that discriminatory animus was a motivating factor in the adverse action of which plaintiff complains.

3. The Failure of Male Officers to Report Daly's Misconduct and to Respond Honestly to the OEEO's Inquiry

A further basis for inferring a gender-based animus is the evidence suggesting disparate treatment by the Department in its determination to file charges against Sergeant Bick and not against male officers who seemingly engaged in misconduct equivalent to that charged against plaintiff. The most telling comparison in this respect concerns the failure of the OEEO to request the filing of charges against Sgt. Feeney based on his not having reported the conduct of Sgt. Daly in repeatedly grabbing Officer Bowden at Spanky's -- an event that Feeney apparently witnessed at close quarters -- and his later statements to OEEO concerning this incident, which even Sgt. Martucci characterized as not forthcoming.

When [*42] Officer Bowden was interviewed concerning her complaint, she reported to the OEEO investigators that Sgt. Feeney, who was of the same rank and assigned to the same precinct as Bick (Tr. 74), was not only aware of the Spanky's incident, but had actually witnessed both instances in which Sergeant Daly had touched her chest. (Id. at 376-77, 381, 689, 778). Bowden stated that Feeney not only had been present during the incidents, but had been standing next to her at the time and had offered to protect her from any further harassment by Sergeant Daly. (Id. at 867-73).

Although Sergeant Feeney was subject to the same reporting requirements as Sergeant Bick (id. at 379, 780), he never reported this misconduct to anyone. (Id. at 378, 781). Moreover, when interviewed by OEEO, he initially denied that he had witnessed any of the alleged misconduct by Daly, and, under further questioning, conceded only that something untoward might have occurred but that he could not recall if that was the case. Despite the concession by both Martucci and LaTuga that Feeney was required to report the incident and that they believed that he was not being candid with them during the interview, [*43] disciplinary charges were never filed against him. (Id.).

In seeking to explain why no charges were brought against Feeney, defendants asserted that such charges were precluded because OEEO had been unable to corroborate that Feeney had seen Daly's acts of misconduct. (Id. at 379, 704, 795). The jury was fully justified in rejecting this explanation for a variety of reasons.

First, plaintiff established that the Police Department does not require corroboration of a complainant's allegation as a predicate to filing disciplinary charges. (Id. at 606). Indeed, the absence of any corroboration requirement was amply demonstrated by the fact that no one had witnessed Bowden's alleged disclosure to Bick on the telephone that Daly had threatened her, and yet that alleged discussion was the basis for the two most serious charges filed against Bick. (Id. at 710).

Second, even if some corroboration had been required, it is evident from the record that the Department had significant corroboration of Feeney's awareness of the Spanky's incident. Not only was OEEO able to confirm from various sources that Feeney had been at the bar when the incident occurred (id. at 376, 378), [*44] but Officer Sacarello provided still more specific corroboration by telling the OEEO investigators that he

Page 14

had seen Feeney, Daly and Bowden standing close together at the bar. (Id. at 439; Pl's Ex. 7, 27).

In addition, a number of officers from the precinct confirmed to OEEO that the day after the incident Officer Bowden had told them of the event and had specifically mentioned Feeney's role in witnessing Daly's behavior and in offering her some protection. As Lt. O'Brien observed in commenting generally on the way in which OEEO assessed the credibility of complainants, one key indicator of truthfulness was if a complainant had earlier told others the same story that she then reported to the OEEO. (Tr. 704-05). In this case Bowden precisely fit O'Brien's test for credibility, and in fact Sergeant Martucci testified that she had found Officer Bowden to be "very credible" and believed her when she reported that Feeney had witnessed the touching. (Id. at 378). n12

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n12 We note that Bowden testified at trial and reported the same version of the facts. (Tr. 867-77). From our perspective, we found her to be quite credible on this matter, and we infer that the jurors viewed her in a similar light.

- - - - - - - - - - - - End Footnotes- - - - - - - - -
- - - - - -

[*45]

Apart from the assertedly more favorable treatment of Sergeant Feeney, the jury heard evidence that a number of other male officers, including senior officials, had become aware of Officer Bowden's complaints about Sergeant Daly, but had not reported this information. n13 Sergeant Bick testified, without contradiction, that she had informed Lieutenant Pena, who was in her chain of command, that Bowden had complained about Daly's refusal to allow her to patrol in a car. (Id. 56). She also reported the problem to Captain Flaherty, as did Bowden at another time (id. at 58-59, 848), but Flaherty apparently did not report the matter to OEEO or anyone else.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n13 In addition to the evidence of disparate treatment with reference to Bick's alleged failure to report misconduct by Sgt. Daly and the difference in handling the evidence of misstatements to OEEO by Bick and Sgt. Feeney, there is evidence in the record that other officers provided misleading or false information to OEEO and yet were not charged. For example, during Officer Sacarello's interview with Sergeant Martucci, he admitted that he had told another police officer that he had seen Daly touch Bowden at Spanky's (Tr. at 440), but he claimed to Martucci that he had in fact not seen the touching incident. (Id. at 440) Sergeant Martucci conceded that she had found Sacarello's response "odd" and unsatisfactory. (Id. at 441). Despite Sacarello's contradictory testimony, he, like Sergeant Feeney, was not charged with impeding the sexual harassment investigation.

- - - - - - - - - - - - End Footnotes- - - - - - - - -
- - - - - -

[*46]

On a more junior level, Officers Sacarello, Busby, and Harrop -- all of whom were assigned to the same precinct -- also admitted to Sergeant Martucci that Officer Bowden had told them about the Spanky's incident. Although all three had failed to report it at the time, none of them was charged with misconduct. (Id. at 440-441).

The defendants claimed that these officers were not charged with failure to report because, unlike a sergeant, the line officer's only obligation is to report misconduct to his commanding officer or to a supervisory head. (Id. at 383, 447, 449, 454). Sergeant Martucci testified that these officers had not violated the reporting requirement even though they had failed to report Daly's misconduct to anyone (id. at 454), because they had believed that Sergeant Bick -- the sergeant to whom they would report -- was already aware of the incident. However, on cross-examination Sergeant Martucci acknowledged that not all of the officers who had admitted having heard about the Daly incident had actually told her that they had believed that Sergeant Bick was aware of it. (Id. at 444-45).

In contrast to these male members of the police force, Sergeant [*47] Bick, who had never witnessed first-hand any of Sergeant Daly's misconduct towards Bowden and who did, in fact, report the touching incident as well as the use of derogatory language to the OEEO, albeit at the request of Inspector Buccino, was charged with failing to report Sergeant Daly's serious misconduct. This pattern adds at least some support to the argument by plaintiff that she was held to a different standard because of her gender.

A further consideration supporting this conclusion is found in the testimony of Officer Bowden, consistent with her statement to OEEO, that Daly's harassment of

her -- both verbal and physical -- had begun as early as late 1992 or the beginning of 1993, months before Bick arrived at the 19th Precinct. (Tr. 45, 860) If the abuse to which Bowden referred was as pervasive as she suggested, one might reasonably infer that others in the precinct would have been aware of it long before Bick learned of it. Moreover, this inference becomes overwhelming if one credits Bowden's testimony that Daly not only repeatedly abused her verbally and apparently even pointed a weapon at her and others on occasion (Tr. 856-59), but did so in the immediate vicinity [*48] of the front desk of the precinct, which is always manned by an officer with the rank of sergeant or higher. (Tr. 857-59).

Apparently no one -- whether line officers or more senior precinct personnel -- ever reported any of this behavior to the OEEO or to anyone else prior to Bick's joining the precinct and talking to Bowden. From these circumstances one might equally infer that the Department was utilizing a double standard, not only tolerating such behavior by Daly and the failure of others in a male-dominated precinct to report the misconduct, but becoming more demanding only when a female supervisor acted in imitation of her male colleagues.

Finally, in assessing whether animus had motivated the decision to recommend charges against Bick, the jury could well have taken into account the nature of the charges pressed by OEEO against Bick. Thus, for example, the first failure-to-report charge concerned Bick's first conversation with Officer Bowden, in which Bowden mentioned only her unhappiness that Daly had frequently changed her post from motor to foot patrol. We suspect that such complaints about assignments are probably fairly common in the Department, even by female officers [*49] who have male supervisors, see, e.g., White-Ruiz v. City of New York, 983 F. Supp. 365, 1997 WL 442150, at *2 (S.D.N.Y. 1997), and we equally suspect that this is hardly a matter that requires a report when another supervisor hears such a complaint, much less that a failure to make such a report would ordinarily trigger Department charges. Indeed, even Inspector Buckley admitted that Sergeant Bick's failure to report this conversation was not the sort of serious misconduct that would normally merit a charge. (Id. at 792). Similarly, the charge that Bick improperly disclosed the investigation appears to have been so evanescent that the officer in charge of pursuing the disciplinary hearing against Bick apparently abandoned the charge by the time of the hearing. (Id. at 604)

We recognize that defendants offered some testimony to the effect that once the Department decides to charge an officer with misconduct, it may tend to overcharge. (Id. at 792-93). The jury was free to credit that general, if somewhat damning, explanation, but it was equally free to view what occurred as an institutional effort to "throw the book" at Sergeant Bick, in marked contrast to its diffidence in [*50] calling male officers and supervisors to account for specific misfeasance or nonfeasance. Such a conclusion could fairly supply at least some additional weight to plaintiff's contention that she was targeted for reasons unrelated to the merits or demerits of her conduct in dealing with Officer Bowden's expressed unhappiness with Sergeant Daly.

4. Conclusion Concerning the Sufficiency of the Evidence

In sum, having freely weighed the evidence, we find that it cannot be said that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Lightfoot, 110 F.3d at 911. There was ample evidence from which a reasonable juror could infer that Sergeant Bick had been held to a higher reporting standard than her male counterparts because she was expected, as a female, to be "more sensitive" to the issue of sexual harassment, and that had she not been a woman, the charges would not have been filed against her.

B. Jury Instructions

Defendants also contend that a new trial is warranted because the jury's verdict was the result of a seriously erroneous jury charge. (See Deft's Mem. at 20). [HN6]A jury instruction is erroneous if it "misleads [*51] the jury as to the correct legal standard or does not adequately inform the jury on the law." Anderson v. Branen, 17 F.3d 552, 556 (2d Cir. 1994) (citing Folger Adam Co. v. PMI Indust., Inc., 938 F.2d 1529, 1533-32, cert. denied, 502 U.S. 983, 116 L. Ed. 2d 612, 112 S. Ct. 587 (1991)). See Luciano, 110 F.3d at 218. For an erroneous charge to be grounds for a new trial, the moving party must demonstrate that, even if the charge is viewed as a whole, it was prejudiced by the error. See Renz v. Grey Advertising, 135 F.3d 217, 223 (2d Cir. 1997) (citing Hygh, 961 F.2d at 365).

Over the objection of the defendants, this case was submitted to the jury with a mixed-motive instruction. Defendant does not seek on its current motion to challenge the decision to give such a charge (see Deft's Mem. at 20 n.5), but rather focusses on two words found in one sentence of that instruction. For context, however, I briefly note the nature of and basis for providing a mixed-motive charge. n14

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -