EXHIBIT 2

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER, JR.,                .    Case No. 3:03-CV-00149
                                    .    (WIG)
            Plaintiff,              .
                                    .    Bridgeport, Connecticut
      v.                            .    January 25, 2005
                                    .
HARTFORD FINANCIAL SERVICES .
                                    .
GROUP, INC., ET AL.,                .
                                    .
            Defendants.             .
 .   .   .   .   .   .   .   .   .   .   .   .

CONTINUED TRIAL
BEFORE THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Law Offices
                            By: RACHEL M. BAIRD, ESQ.
                            Stonegate Professional Bldg
                            379 Prospect Street
                            Torrington, CT 06790-5239

For the Defendant:          Jackson Lewis
                            By:  MARGARET STRANGE, ESQ.
                                 JAMES F. SHEA, ESQ.
                            55 Farmington Avenue
                            Suite 1200
                            Hartford, CT 06105

Court Monitor:              MS. SANDRA J. BALDWIN
                            MS. MARIA CORRIETTE

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1    A.    Right.  Right.

2    Q.    Did you tell Mr. Wardell about that?

3    A.    I don't remember if I told him about it, but like

4    I said, I wasn't convicted.  He asked me -- At the end

5    he asked me if I had any criminal convictions, and I

6    said no.

7    Q.    All right.  And true -- I'm sorry.  Strike that.

8          You learned later that your records indicated you

9    had criminal convictions, but you did not.

10         Is that accurate?

11   A.    Can you say that again?

12   Q.    Sure.  Did you later learn that your records

13   mistakenly indicated that you had criminal convictions?

14   A.    Well, I learned that, but then I learned from The

15   Hartford's own records that they received, was it 12

16   days after I was terminated, if that, that it wasn't.

17   Q.    Okay.

18   A.    And that was when I was pleading for

19   reinstatement, and The Hartford still claimed that I

20   was a criminal, but I learned by their records that

21   what I said was true, that I did not have, and still do

22   not have any criminal conviction.

23   Q.    Sir, is it your claim that you're pleading for

24   reinstatement with The Hartford?

25   A.    Yes, I wanted my job back, and I offered to -- am

1    I talking too much?

2            THE COURT:  That was a yes or no answer --

3            THE WITNESS:  Oh, yes.

4            THE COURT:  Okay.  Next question.

5    BY MS. STRANGE:

6    Q.    Okay.  And were you pleading for reinstatement in

7    -- with The Hartford after February of 2002?

8    A.    Yeah, I was asking for my job back then, too.

9    Yes.

10   Q.    When you met with Mr. Wardell, he -- you provided

11   with -- him with the information that you had accessed

12   Marianne Rhodes' voice mail, right, at work?

13   A.    Yes.  When he asked me, I told him.

14   Q.    Okay.  And that you had changed her pass code?

15   A.    Yes.

16   Q.    Okay.  And he also had that e-mail message that we

17   looked at yesterday, right, that e-mail that said --

18   A.    No.

19   Q.    -- you are a jealous dude?

20   A.    I don't remember being asked about that e-mail.

21   Q.    All right.  Do you know whether he had that e-

22   mail?

23   A.    No.

24   Q.    Okay.

25   A.    I don't believe he did.  I mean, if he did, he

1    THE COURT: The other thing is, I thought I

2   had told you not to ask him about the question about,

3   did he brandish a gun. However, by the time we got

4   finished with the segment of cross-examination we had,

5   he managed to open the door to, you know, God knows

6   what because he wouldn't answer yes or no to a

7   question, and went on about The Hartford getting

8   documents 12 days later, which, you know, raises the

9   question of what other information, police reports,

10   things like that The Hartford got.

11    MS. STRANGE: I misunderstood then.  I

12   thought you had said I couldn't ask him about being

13   arrested, but you said if I asked him about brandishing

14   a gun, he'd probably say no.

15    THE COURT: Right, and I said, and that would

16   not -- That's why I don't want to get into it because -

17   -

18    MS. STRANGE: Oh.

19    THE COURT: Yeah, there's no --

20    MS. STRANGE: But I do think he -- I mean, I

21   think he opened the door a lot on --

22    THE COURT: Well, yeah.

23    MS. STRANGE: -- those issues.

24    THE COURT: Yeah.  I mean, it certainly --

25   You know, it's -- yeah, because the answer to a simple

1    yes or no question at the time, did The Hartford, you

2    know, have records that indicate that, perhaps

3    mistakenly, you had been convicted, then he volunteered

4    that 12 days later when he was trying to get his job

5    back, they had some documents.  I'm not sure

6    specifically what documents he's referring to, that

7    showed, you know, the record was a mistake.

8         And, of course, those aren't the only other

9    documents The Hartford got after he was let go.

10        MS. STRANGE:  Well, this is my -- and I

11   raised it again on this arrest record because the

12   arrest warrant in 1996 was a very similar circumstance

13   to what he did to -- what he allegedly did to Marianne

14   Rhodes.  He was accused of repeatedly telephoning this

15   woman at work.  He went to the daycare to get the child

16   that was a -- it described to me the exact, same type

17   of jealous conduct.

18        And if he's saying, "I've been trying to be

19   reinstated," Mr. Wardell had this arrest warrant.  The

20   Hartford had this information, and they would testify.

21   This information was extremely troubling to them when

22   they got it.  They got it long after the fact, --

23        THE COURT:  Right.

24        MS. STRANGE:  -- but it shows the exact, same

25   conduct, the exact, same accusations of conduct.

1      And I again would ask if we can ask him about

2   this situation because he's saying -- or at least get

3   this arrest record in through Mr. Wardell, because he's

4   saying he wanted to be reinstated, and this goes to why

5   The Hartford would not have reinstated him, at least

6   partially.

7           THE COURT:  Well, let me ask you.  What

8   documents was Mr. Shorter -- were Mr. Shorter -- I'm

9   not sure what the answer was.  There's some documents

10  he mentioned that they got about 12 days later.

11          MS. STRANGE:  Right.  What are those?

12          THE COURT:  Yeah, what documents was he

13  referring to?

14          MS. BAIRD:  Those are already in evidence as

15  Defendants' Exhibit 505, Bates Numbers 906, 907, and

16  908.

17          THE COURT:  Nine --

18          MS. BAIRD:  So those are exhibits that the

19  defendant has put into evidence.

20          THE COURT:  Well, 906 --

21          MS. STRANGE:  Came out.

22          THE COURT:  Nine-oh-six came out.  That's the

23  --

24          MS. STRANGE:  Right.

25          THE COURT:  -- affidavit.

1            MS. BAIRD:  Oh, okay.  Nine-oh-seven and

2    nine-oh-eight then.  They're the information sheets.

3            If I could approach and look at the actual

4    exhibit.

5            THE COURT:  Sure, you could.

6            MS. BAIRD:  I don't have it in front of me.

7            MS. STRANGE:  I thought they all came out.

8            MR. VEITZER:  Nine-oh-eight stayed in.

9            MS. STRANGE:  Oh, 908 stayed in.  So is that

10   908 maybe?

11           THE COURT:  Yeah, 904, 905, 906, 907, 909 are

12   out; 908 --

13           MS. BAIRD:  Okay.

14           THE COURT:  -- is in.

15           MS. BAIRD:  Is there a microphone here?  Can

16   I talk here, or should I go over here?

17           THE COURT:  You should probably go over

18   there, yeah.

19           MS. BAIRD:  It's 901, 902, 903, and 908 are

20   the substitute informations that were filed regarding

21   the 1996 arrest, and the defense put them into evidence

22   through document 505.

23           THE COURT:  Okay.  And --

24           MS. STRANGE:  We haven't put them into

25   evidence.

1          THE COURT:  No, but those -- Were those
2     documents that you -- Those aren't documents you
3     mentioned that you were challenging, because I wrote
4     down everything that you challenged, and I basically
5     ruled in your favor on just about every document you
6     were challenging.
7          I don't think you mentioned 908.  So 908,
8     you're right, is in.
9          MS. BAIRD:  Right.
10          MS. STRANGE:  And that's why we're going to
11     try again to reintroduce the state police report.
12          MS. BAIRD:  The problem I have with the state
13     police report, Your Honor, is this.
14          Mr. Wardell purportedly is a 20-year veteran
15     of the state police.  He would seemingly be familiar
16     with court procedures and arrest procedures.
17          He received documents on or about February
18     4th of 2002 showing, showing anybody with any knowledge
19     of the court system or criminal law that there, in
20     fact, was no conviction for threatening.
21          THE COURT:  Right.
22          MS. BAIRD:  And to allow, because of his I
23     don't know what it was, why he didn't recognize what he
24     saw when he received it, to allow the underlying arrest
25     warrant that resulted in no criminal conviction, to be

1    placed before this jury just because Mr. Wardell

2    seemingly doesn't know how to read criminal records, I

3    believe is it's prejudicial.

4           THE COURT:   Uh-huh.

5           MS. BAIRD:   I mean, certainly explaining to

6    the jury why The Hartford mistakenly thought Mr.

7    Shorter had a criminal conviction is one thing.

8    Letting the jury see what underlied the arrest that led

9    to no criminal conviction is very removed from trying

10   to allow them to understand why they made a mistake.

11          THE COURT:   Well, the thing is, to anybody

12   with experience in the criminal justice system knows

13   that perhaps because someone's record or for other

14   reasons, a lot of criminal conduct does not result in

15   convictions.

16          Just as he perhaps should have understood or

17   maybe looked into whether something was vacated or, you

18   know, to indicate a record was mistaken, once he saw

19   that affidavit, he might've still had sufficient

20   concerns, even though the conviction was vacated.

21          Things can be -- I mean, convictions can be

22   vacated for all sorts of technical reasons, and to --

23   And my concern is giving an incomplete picture.  I

24   don't want to get into this at all.  I wish, you know,

25   Mr. Shorter hadn't gone on to indicate the 12 days

1    later they got documents that indicated that the
2    conviction was vacated.
3         But, you know, if you, you know, want to get
4    into that and argue that, you know, he should've been
5    reinstated once they realized that, well then, you
6    can't get -- give the jury an incomplete picture.  They
7    have to see, you know, all the information that was
8    received.
9         MS. STRANGE:  I think that's my problem with
10   him testifying that he wanted to be reinstated.  It's
11   not a claim in his complaint.  It's not part of this
12   case, --
13        THE COURT:  Right.
14        MS. STRANGE:  -- and I thought we had kind of
15   agreed on that.  Now that he --
16        THE COURT:  Right.
17        MS. STRANGE:  -- said, "I wanted to be
18   reinstated," and I clarified he wanted to be reinstated
19   after February, we had that arrest information in
20   February, and I think Wardell will testify that that
21   arrest -- If you look at the scenario, that arrest
22   scene with the mother of his child is very troubling.
23   It's a very similar circumstance, and Wardell will say,
24   "I was a state police officer for 25 years.  I saw a
25   problem here."

1        THE COURT:  Well, let me ask what happened

2    here.  Looking at this document that's Bates stamped,

3    or should be Bates stamped 908, --

4        MS. STRANGE:  Right.  That's the document,

5    and if I could just address that because Attorney

6    Baird, who's been telling me from the start of this

7    case that that is just a clear picture to anybody that

8    this thing was vacated, and --

9        THE COURT:  Well, it's a conditional

10   discharge, which is -- Is it a vacating of the

11   conditional discharge, or is it --

12       MS. STRANGE:  That's -- I showed it to Mr.

13   Wardell.  He has no idea what it is.  I don't know what

14   it is.

15       MS. BAIRD:  If I could approach and see the

16   actual exhibit again?

17       THE COURT:  Yes.  You know, even -- I have to

18   tell you, even I don't know what it is because it

19   doesn't appear if he has a conviction after that, that

20   he would've gotten on March 12th, a conditional

21   discharge.

22       MS. BAIRD:  Okay.  If I could address the

23   Court.

24       THE COURT:  Yeah, sure you could.

25       MS. BAIRD:  There was an original warrant

1    that issued charging Mr. Shorter with threatening and

2    violation of 53-62.  That's the warrant that's not

3    contained in 505 any more.

4                THE COURT:  Right.

5                MS. BAIRD:  Mr. Shorter came to court on

6    March 12th, 1996, which is indicated by Bates number

7    902.

8                THE COURT:  Nine-oh-two.  Just give me a

9    second.  Okay?

10               And 9-0 --

11               MS. BAIRD:  It appears that he went to

12   geographical area 14 in Hartford, and I believe it

13   would've been Judge Scheinblum, right?

14               THE COURT:  Yes, Judge Scheinblum.

15               MS. BAIRD:  Yeah, Judge Scheinblum.  On March

16   12th, 1996, a prosecutor looked at the case,

17   substituted it down to a lesser offense of disorderly

18   conduct indicated by the D.C., --

19               THE COURT:  Uh-huh.

20               MS. BAIRD:  -- and disorderly conduct is in

21   violation of 53-182.

22               THE COURT:  Right.

23               MS. BAIRD:  Mr. Shorter pleaded guilty.

24   That's indicated about half way down the page where it

25   says "G".

1    He got 90 days execution suspended, two years
2  conditional discharge.
3    THE COURT:  Oh, he did get conditional
4  discharge.
5    MS. BAIRD:  He did.
6    THE COURT:  Yeah.
7    MS. BAIRD:  And then he went to probation,
8  probably, or saw somebody in the courthouse, and they
9  filled out Bates number 908.
10    THE COURT:  On the 12th?
11    MS. BAIRD:  On the 12th.
12    THE COURT:  And --
13    MS. BAIRD:  I can go on.
14    THE COURT:  Okay.  But the state police
15  record, does that refer to 182 or --
16    MS. BAIRD:  Well, we're not done yet with
17  this.
18    THE COURT:  Okay.
19    MS. BAIRD:  And then Scheinblum, I think he -
20  - My understanding is he saw Mr. Shorter in the hallway
21  and said, "There's something wrong with what happened
22  here today.  Why don't you come back tomorrow, and
23  we'll fix it."
24    THE COURT:  That was a -- That's wonderful
25  that he had that ex parte communication with Mr.

1   Shorter.  Okay.

2            MS. BAIRD:  Well, I don't know if it was ex

3   parte.

4            THE COURT:  All right.

5            MS. BAIRD:  It may have been on the record.

6            THE COURT:  But nevertheless, he did, and Mr.

7   Shorter comes back the next day.

8            MS. BAIRD:  Mr. Shorter came back the next

9   day, March 12th -- March 13th, 1996, and that's

10  indicated by Bates number 901.

11           THE COURT:  Uh-huh.

12           MS. BAIRD:  And on that day the plea was

13  vacated that he had given the previous day, and you can

14  see that by Bates number 908, in the upper, right-hand

15  corner, it says, "vacated, 3/13/96", on Bates number

16  908 in the upper, right-hand corner.

17           THE COURT:  Okay.  Yes, it does.

18           MS. BAIRD:  It says "vacated".

19           THE COURT:  Right.

20           MS. BAIRD:  And then Mr. Shorter, according

21  to Bates number 901, pleaded guilty to creating a

22  public disturbance, violation of 53a-181a.

23           THE COURT:  This is 901?

24           MS. BAIRD:  Yes.  Which is not a criminal

25  offense; it's an infraction.

1    THE COURT:   That's 50 -- And that's 53 what?

2        MS. BAIRD:   One-eighty-one "A".

3    THE COURT:   One-eighty-one "A," as opposed to

4    182?

5        MS. BAIRD:   Yes.

6        THE COURT:   Right.

7        MS. BAIRD:   Pleaded guilty to creating a

8    public disturbance, which is infraction, not a criminal

9    offense.

10       THE COURT:   Right.

11       MS. BAIRD:   Paid a $75 fine, and it was over.

12       THE COURT:   Uh-huh.

13       MS. BAIRD:   Somehow the New Britain Police

14   Department put down in their records that he had

15   pleaded that day to threatening, 53-62.

16       THE COURT:   And that's how it ended up in the

17   state police records also?

18       MS. BAIRD:   Exactly.   But it's obvious from

19   these three pieces of paper that that's what happened.

20       MS. STRANGE:   But if I can respond.   That's

21   my frustration.

22       THE COURT:   Right.

23       MS. STRANGE:   Honestly, I'd never gotten that

24   whole story 'til today.   It's never been obvious to us,

25   and I understand it's part of the plaintiff's position

1    that we clearly knew in January that his -- that

2    everything was vacated, and he wasn't a criminal, and

3    therefore we should've reinstated him, and I -- my

4    frustration is that -- And I don't think it is obvious.

5        And if that's going to be a theory of the

6    case, we've got to be able to get in that we have a

7    state police record here that says differently.  We

8    have an arrest warrant that describes situations very

9    similar to the situation at hand, and I think Mr.

10   Shorter has opened the door to that by saying we knew,

11   because it's not obvious.

12       MS. BAIRD:  Well, actually, that's not an

13   argument -- That's an argument I'm making here, but I

14   don't plan to make it to the jury that that's obvious.

15       THE COURT:  Right.  Yeah, because you --

16       MS. BAIRD:  And I thought I had made this

17   argument when we had the teleconference --

18       THE COURT:  Right.

19       MS. BAIRD:  -- last week.  I had really gone

20   into this, I thought.

21       THE COURT:  Yeah, and I wanted to stay out of

22   the whole thing about reinstatement because it really

23   isn't part of the case, and it opens the door to all

24   the information that came in after the termination, and

25   the communications between counsel, and --

1        MS. STRANGE: Right. I mean, that's my
2    problem with his testimony here today when he said The
3    Hartford received information 12 days later that was
4    clear. This is that information, that little
5    handwritten "vacated." It --
6        MS. BAIRD: Well -- oh.
7        MS. STRANGE: We've got to be able to address
8    that.
9        MS. BAIRD: Well, Your Honor, we certainly
10   haven't amended the complaint to add reinstatement. I
11   mean, reinstatement is one of the forms of relief.
12       THE COURT: One of the forms of relief,
13   right.
14       MS. BAIRD: You don't have to make a claim,
15   and we're certainly not making that claim that they
16   should have, you know --
17       THE COURT: Right. I think the jury might
18   need to be instructed that there's no claim in the case
19   for -- relating to any refusal to reinstate, and I
20   think, though, we need to clarify, and it can be done -
21   - I'm looking for a way to do it without actually
22   loading up the record with this -- with a very
23   prejudicial arrest warrant application, the reliability
24   of which there's some reason to question in light of
25   what happened in the criminal process.

1       But just, though, as The Hartford received

2   information that perhaps clarified what actually

3   happened in superior court, they also received

4   information that included the -- that arrest warrant

5   application.  Is that your -- Is that what actually --

6       MS. STRANGE:  Right.  There's an arrest

7   warrant application.  There's also a Hartford Courant

8   article that they received --

9       THE COURT:  Well --

10      MS. STRANGE:  -- on an arrest, a separate

11  incident.

12      THE COURT:  Another incident?

13      MS. STRANGE:  Yeah, I believe.  Where is

14  that?  Do you know?

15      MR. VEITZER:  Number one and two.

16      MS. STRANGE:  Oh, the beginning?

17      MR. VEITZER:  No --

18      MS. BAIRD:  That case was nollied, and, I

19  mean, they shouldn't have received -- That's why they

20  probably received no other information about that,

21  because that was properly nollied, and after 13 months,

22  dismissed, you know, by operation of law and --

23      MS. STRANGE:  It's number -- Bates number

24  753, it's Ferron Shorter.  This is from an old article

25  that they -- When they were doing their investigation,

1    they were investigating Ferron Shorter, "September '92
2    breach of peace as charged.  Case involved a complaint
3    by female students on Memorial Boulevard that a man
4    tried to force them into his car."
5          The problem, Your Honor, and you know, I
6    understand your concern in instructing the jury that
7    this claim isn't about reinstatement, but Mr. Shorter
8    just testified that it is, and that's --
9          THE COURT:  No, no.  No, he didn't testify --
10         MS. STRANGE:  Well, he testified that we
11   didn't reinstate when he was seeking it, and they've
12   heard that.  So I don't know if the jury can really set
13   back and say it's not about reinstatement.  I mean, he
14   -- when the plaintiff believes it is.
15         THE COURT:  Well, I think they can.  The
16   question is how to just present the evidence as clearly
17   as possible to the jury without, you know, trying,
18   actually inviting them weigh the merits of any
19   underlying charge against Mr. Shorter.
20         And Mr. Wardell's going to testify as to, you
21   know, what information he had, correct?
22         MS. STRANGE:  Well, that's going to be the
23   question.  He -- Right, if the information he had was
24   the article, the --
25         THE COURT:  No, the information that he had

1    at the time of termination.

2            MS. STRANGE:  Right.

3            THE COURT:  Right.

4            MS. STRANGE:  He will testify to that, but

5    Mr. Shorter just testified that The Hartford verified

6    that the conviction record was wrong 12 days later, and

7    that's -- I mean, then you have to get into what Mr.

8    Wardell did after the termination.  He went and got the

9    arrest warrant as background information.  He got the

10   state police.  So he looked.  I mean, he tried to find

11   out, or he continued to investigate.

12           MS. BAIRD:  But this case isn't about what

13   happened after January 23rd, 2002, --

14           THE COURT:  No.

15           MS. BAIRD:  -- and it just rests on why he

16   was terminated that day or what led up to the

17   termination that day, then it shouldn't make any

18   difference what Mr. Shorter said about 12 days later or

19   reinstatement.  That has no impact on the case.

20           For all the jury knows that there's no method

21   of reinstating somebody after they're terminated.  He

22   was terminated, and that's it.

23           THE COURT:  Uh-huh.

24           MS. STRANGE:  Well, but he's kind of told

25   half a story there when he says that we verified that

1    the conviction record was wrong 12 days later.

2         I mean, it certainly suggests that The

3    Hartford, you know, found that out in a clear document,

4    and that's not what happened.

5         MS. BAIRD:  Well, maybe -- I mean, The

6    Hartford can certainly say, "We didn't understand the

7    records.  We didn't know."

8         THE COURT:  I think what I'm going to do is

9    instruct the jury to disregard Mr. Shorter's testimony

10   about anything that transpired with respect to his

11   request after termination for reinstatement, and

12   explain to them that that also is not an issue in the

13   case.

14        And again, I think through Mr. Wardell's

15   testimony it's going to become clear that the

16   information that they had at hand at the time did show

17   that there was a conviction.

18        Now, I don't know -- Are you finished with

19   Mr. Shorter on this subject, or were you planning to

20   ask any more questions on --

21        MS. STRANGE:  I believe I was going to, in

22   wrapping up, just go through everything that Hartford

23   had, a conviction record, and ask, you know, this is

24   all the information they had when they terminated you?

25        THE COURT:  Right.

1          MS. STRANGE:  So the conviction --

2          THE COURT:  I'll let you do that.

3          MS. STRANGE:  Okay.

4          THE COURT:  I will certainly let you do that,

5     but at this point I really don't want to get into the

6     affidavit and also a long back and forth over how the

7     Connecticut criminal justice system works.  And -- But

8     I think I will instruct the jury to disregard the

9     testimony about any communications, any information

10    conveyed after the termination.

11         I do with Mr. Shorter had not volunteered

12    that.  I realize he was just trying -- And I can

13    understand.  He's just trying to explain the situation,

14    and he -- you know, he's not counsel.  But that is the

15    danger of letting responses that should be "yes" or

16    "no's," you know, go on.

17         MS. STRANGE:  Your Honor, I think in terms of

18    an instruction to the jury, though, it needs to be

19    specific to Mr. Shorter's testimony that The Hartford

20    knew --

21         THE COURT:  Yes.

22         MS. STRANGE:  -- that the conviction was

23    vacated.

24         THE COURT:  Right.  It will be.

25         MS. STRANGE:  Okay.

1          THE COURT:  Okay.  They have to disregard

2    that testimony.

3          MS. STRANGE:  Right.  Otherwise we need to be

4    able to get into it.

5          THE COURT:  Yeah.  Yeah.  But, you know,

6    there's -- And, of course, he has redirect yet to go,

7    and God knows what's going to be said during then.  You

8    may want to just take -- Well, let me let you take a

9    couple of minutes in light of what we discussed, you

10   know, before I bring back in the jury, and you can

11   conclude your cross, just to organize your thoughts and

12   map out where you want to go, give you a chance to

13   think a little bit about redirect because you'll be

14   doing redirect before lunch.

15         And do you -- you can take about five

16   minutes?

17         MS. STRANGE:  Perfect.

18         THE COURT:  I don't want to keep the jury out

19   too much longer.

20         Okay.  Thanks.

21         MS. STRANGE:  Thank you.

22      (Recess at 12:10 p.m.)

23         THE COURT:  Can we go ahead and bring in the

24   jury?

25         THE CLERK:  (Inaudible.)

1    impropriety in failing to reinstate Mr. Shorter after

2    he was terminated.  That's not part of this case, and

3    that subject is to be disregarded.

4            And for that reason, I instruct you to

5    disregard the testimony that Mr. Shorter offered

6    shortly before the break to the effect that The

7    Hartford had documents about 12 days after he was

8    terminated that should have informed them, or made

9    clear to them that he did not, in fact, have a record

10   of criminal convictions.  That testimony has to be

11   disregarded, and again, there is no claim in the case

12   concerning any failure to reinstate after termination.

13   Okay.

14           And let me come back to Ms. Strange, who is

15   still in cross-examination with Mr. Shorter.

16           MS. STRANGE:  Thank you.

17                CROSS-EXAMINATION (CONTINUED)

18   BY MS. STRANGE:

19   Q.   Now, Mr. Shorter, I just want to ask you a couple

20   of questions about your job search efforts.  You left

21   employment at The Hartford in January of 2002, correct?

22   A.   Correct.

23   Q.   Right.  I believe you testified you then were

24   involved in some drinking over that winter, and you

25   were not able to -- you didn't make much of an effort

1   to look for work; is that correct?

2   A.   First couple of months, I was, yeah, drinking,

3   depressed, embarrassed, everything.

4   Q.   Well, you said the first couple of months.

5        Did you make any efforts to look for employment

6   before October of 2002?

7   A.   Yes.

8   Q.   Okay.  And, sir, you produced some documents in

9   connection with this case regarding your efforts to

10  find employment.

11       Do you know if there's any documents regarding any

12  efforts to find employment before October of 2002?

13  A.   If I remember correctly, I thought I produced some

14  from that summer.  I thought I did because I was

15  looking.  In particular, I believe I had one from

16  Aetna, some time from when I applied there in the

17  summer.  It's probably, like, June or July of 2002.

18  Q.   Okay.  And I'll just show you to just refresh your

19  recollection.

20       This is the letter dated October 28th, 2002, that

21  you received from Aetna?

22  A.   Yes.

23  Q.   All right.  So -- And that was -- It's your

24  testimony that you looked for work with Aetna before

25  October of '02?

1    A.    Yes.

2    Q.    All right.  And did you -- That was the first real

3    attempt you made to find work, right?

4    A.    No, that was just a first response.  I had started

5    looking.  Like I said, it's probably either April or no

6    later than May, I think.  Definitely no later than June

7    I went on the -- Well, I started buying Sunday papers

8    and went on the internet.

9    Q.    Okay.  But you have no documents of any job search

10   efforts before October of 2002, correct?

11   A.    Like I said, this is the first official response

12   that I got as far as appreciation for me applying.

13   Q.    And then you collected unemployment compensation

14   during that time period, right?

15   A.    Yes.

16   Q.    Right.  You collected about $15,000 in

17   unemployment compensation?

18   A.    I'm not sure of the exact amount.

19   Q.    All right.  Let me just show you Defendants'

20   Exhibit 535.

21         Is that the unemployment comp you received?

22   A.    Yes.

23   Q.    All right.  So did you start looking for work

24   after you stopped receiving unemployment comp?

25   A.    Did I stop looking for --

1   Q.   Did you start after you -- your unemployment --
2   A.   Well, I was already looking when I stopped
3   receiving.
4   Q.   All right.  Are you currently working?
5   A.   Yes.
6   Q.   All right.  And how much are you earning?
7   A.   Off hand, I think about $8 -- $12 an hour relief.
8   Q.   Okay.  And how long -- Where are you working?
9   A.   The name of the company's called American
10   Distributions.
11   Q.   How long have you been working there?
12   A.   Since July of 2004.
13   Q.   Now, I want to go back over a couple of things
14   from this morning, and I want to ask you a couple more
15   questions about this final -- this statement that you
16   signed, --
17   A.   Okay.
18   Q.   -- Exhibit 532.
19       Mr. Shorter, you indicate on that statement on the
20   second page that you came to work on Saturday at The
21   Hartford, and I think -- and you said you "accessed
22   Marianne's voice mail about ten times from your desk
23   phone to see how much more she was lying to you."
24       Do you see that?
25   A.   Yes.

1    objection, I'll let you publish them to the jury,

2    though if --

3            MS. BAIRD:  Did Your Honor want me to respond

4    or?

5            THE COURT:  No.

6            MS. BAIRD:  Okay.  Your Honor, at this time

7    I'm going to move to have Plaintiff's Exhibits 23

8    through 29 entered in full.

9            THE COURT:  What are they?

10           MS. BAIRD:  They have to do with Mr.

11   Shorter's salary at The Hartford, his attempts to get a

12   job following his termination, financial documents such

13   as that, his retirement plan, et cetera.

14           THE COURT:  Okay.

15           MS. BAIRD:  Okay.

16           THE COURT:  That was touched on in cross

17   probably -- okay.  Better now than not.

18           MS. BAIRD:  Okay.

19           THE COURT:  Thank you.  That's 23 through --

20           MS. BAIRD:  Twenty-nine.

21           THE COURT:  Okay.

22       (Pause.)

23   BY MS. BAIRD:

24   Q.  Mr. Shorter, directing your attention to Exhibit

25   23.

1    A.    Yes.

2    Q.    What are those documents?

3    A.    These are the W-2 forms.

4    Q.    Okay.  And directing your attention -- And who do

5    they pertain to?

6    A.    My years working at The Hartford.

7    Q.    Directing your attention to Plaintiff's Exhibit

8    24.

9          Do you recognize that document, and if so, what is

10   it?

11   A.    I don't believe I have 24.  I see 25.

12         Okay.  Here it is, underneath.

13         This is from the, excuse me, from The Hartford

14   retirement unit.

15   Q.    And who does it pertain to?

16   A.    It pertains to me.  They were letting me know that

17   they were informed of my termination of employment.

18         MS. STRANGE:  Your Honor, I'm going to object

19   at this point.  She's getting in -- She's putting on a

20   damages case now.

21         I asked him about efforts to find employment,

22   but this didn't come in on direct or on cross, his

23   pension at The Hartford or what happened at The

24   Hartford.

25         THE COURT:  That's true.

1       MS. BAIRD:  Well, Your Honor, on direct it
2   did, and --
3       THE COURT:  Well, yeah.
4       MS. BAIRD:  And yesterday I had said that I
5   had more -- that I had documents pertaining to that,
6   but I didn't have copies of them for the jury, and I
7   was gonna wait 'til today.
8       THE COURT:  Okay.  Yeah, I didn't know that
9   you were gonna introduce them to -- but under those
10  circumstances then, you know, and there's no objection
11  to these documents being exhibits, let me let you go
12  ahead and without having to recall him or recall -- or
13  call someone from The Hartford to introduce these
14  documents.  Why don't you just go ahead and finish
15  introducing them.  Okay.
16  BY MS. BAIRD:
17  Q.   Okay.  And, Mr. Shorter, Exhibit 26.
18       Can you identify it, and what is it?
19  A.   This is from my investment savings plan from --
20  Q.   And who was that investment savings plan with?
21  A.   With The Hartford.
22  Q.   And 27, what is that document?
23  A.   My tax return --
24  Q.   From what year?
25  A.   -- from 2001.

1    Q.   And 28?  Plaintiff's Exhibit 28, can you identify

2    it?

3        Do you have it?

4    A.   I'm looking.  I don't see it, but.

5            MS. BAIRD:  If I could approach?

6            THE COURT:  Sure.

7            THE WITNESS:  Sure.  Oh.  Okay.

8            This is my last -- this is a pay stub from my

9    most recent job.

10   BY MS. BAIRD:

11   Q.   And what is that job?

12   A.   From American Distributions, I'm driving, making

13   deliveries, delivering magazines.

14   Q.   Okay.  And finally Exhibit 29, can you identify

15   those documents?

16   A.   Yes.

17   Q.   And what is it -- what are those?

18   A.   It's my resume and cover letters and responses

19   from the jobs that I've been trying to obtain.

20           MS. BAIRD:  No further questions, Your Honor.

21           THE COURT:  Okay.  Thank you.

22           You can reserve the decision whether you have

23   any recross until after lunch.  It's time for us to

24   take a break.  Okay?

25           MS. STRANGE:  Okay.  Thank you.

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.

*Stephen C. Bowles*                    February 17, 2005

STEPHEN C. BOWLES