Page 4

    I hope that this letter has cleared up any confusion or misunderstandings that you may have about this matter. If you feel that it is necessary to discuss it further, please do not hesitate to contact me.

Sincerely,

Ian M. Vejtzer

P42

# Law Office of Rachel M. Baird

Stonegate Professional Building
379 Prospect Street
Torrington CT 06790-5239

Phone: 860.626.9991
Facsimile: 860.626.9992
Toll free: 866.279.6402

Rachel M. Baird, Attorney

May 7, 2002

Ian Veitzer, Associate Counsel
The Hartford
Hartford Plaza
Hartford CT 06115

Re: **Former Employee Ferron Shorter, Jr., The Hartford Case #198305**

Dear Mr. Veitzer:

I am in receipt of your letter dated March 11, 2002, regarding my client, Ferron Shorter, Jr. Your efforts to "clear[] up any confusion or misunderstandings" on my part about Mr. Shorter's termination are, I am sure, intended well, and, therefore, I write this letter with a similar purpose, i.e., to "clear up any confusion or misunderstandings" on the part of The Hartford about this matter.

First, I understand that your review of the matter has revealed "neither any evidence of nor any basis for an allegation that Mr. Shorter's race or gender had anything to do with the investigation or his termination." To the contrary, one of The Hartford's own employees believes differently. This employee, MaryAnn Rhodes, has stated that Mr. Shorter probably would not have been discharged if he were white. Ms. Rhodes also has indicated that she could not believe that Mr. Shorter was fired; that she never expected Mr. Shorter to be fired; and that if he was fired she should have been fired also.

Second, admittedly, I am at disadvantage regarding The Hartford's investigative procedures. My understanding from our phone conversation preceding your March 11, 2002, letter was that you would make Ms. Rhodes' statement available to me. The instant letter, among other things, serves as a formal request for that statement. However, as long as The Hartford refuses to release its policy and procedures manual and other investigative material to me, I understand why you may believe that I "am laboring under some misunderstandings," specifically, I have less information about the process than you to review.

However, even given this disadvantage, at least three procedures, that I am aware of, used in the process of discharging Mr. Shorter, support Mr. Shorter's allegation that he was treated differently based upon his race:

Page 1 of 1

P55

Re: Ferron Shorter, Jr.   May 7, 2002

- The Hartford transported Ms. Rhodes to the Vernon Police Department to apply for a restraining order. According to Ms. Rhodes, neither Ms. Rhodes nor the police officer had any idea why The Hartford had brought Ms. Rhodes to the police station. Clearly, The Hartford has not done anything similar in the past or its representatives would have known that restraining orders are not obtained at the police department. Subsequently, Ms. Rhodes refused, despite the urging of The Hartford, to file the appropriate paperwork for a restraining order with the court. The entire process of transporting Ms. Rhodes to the police department to obtain a restraining order, had Ms. Rhodes and the police department cooperated, would have supported The Hartford's theory that Ms. Rhodes was a "victim."

- The Hartford claims that its investigator, Richard Wardell, omitted certain information from Mr. Shorter's statement, specifically certain statements about ownership of a gun. Mr. Shorter wrote in his statement that he does not own a gun. The Hartford's claim that Mr. Shorter made statements demonstrating gun ownership that were left out of the statement is an attempt to support The Hartford's theory that Mr. Shorter is a violent man. Neither the failed trip to the police station with Ms. Rhodes nor the actual written statement support this theory.[1]

- Finally, even according to Ms. Rhodes, the policy manual does not list using another employee's voice mail password as a violation; however giving another employee one's voice mail password is listed as a violation. Ms. Rhodes, who has a prior e-mail violation reprimand during her mere three-year work history at The Hartford, provided Mr. Shorter her voice mail password in violation of the written policy.[2] Mr. Shorter, a twelve-year employee of The Hartford with one prior discussion report from 1992 concerning his personal use of the phone, was discharged for using a password voluntarily given to him by another employee, a violation not prohibited by the written policy.

In addition, while Mr. Shorter was an employee at The Hartford he complained on at least two occasions to security that Ms. Rhodes was harassing him and disturbing him at his desk. Mr. Shorter's colleagues on numerous occasions asked Mr. Shorter why Ms. Rhodes would repeatedly approach him at his desk. The harassment did not end with Mr. Shorter's termination. In fact, apparently, The Hartford is contacting Mr. Shorter even though it is well aware that Mr. Shorter has counsel. Specifically, on Tuesday, April 9, 2002, an individual identifying himself as Bob Bagley from The Hartford contacted Mr. Shorter, accused Mr. Shorter of placing "hang-up" phone calls to Ms. Rhodes, and then threatened Mr. Shorter with arrest if he did not stop. Mr. Bagley also asked if Mr.

---

[1] Mr. Shorter does have a 1996 conviction for threatening, however Mr. Shorter appeared in court once, without counsel, paid a $75.00 fine and believed the case was reduced to an infraction or dropped.

[2] The March 11, 2002, letter from you seems to excuse Ms. Rhodes violation on the fact that Ms. Rhodes and Mr. Shorter "were romantically involved and were living together." In fact, on the first occasion when Ms. Rhodes gave Mr. Shorter her password in October 2001, they were not living together. Furthermore, on the second occasion when Ms. Rhodes gave Mr. Shorter her password on January 18, 2002, they were no longer living together and were no longer "romantically involved."

Re: Ferron Shorter, Jr.                                              May 7, 2002

Shorter had been interviewed by someone in Dick Seelander's unit or office. Coincidentally, perhaps, Ms. Rhodes had contacted Mr. Shorter on April 8, 2002, to inform Mr. Shorter that she was pregnant and invited him to listen to her office voice mail to hear a tape of her doctor informing her of the pregnancy. Mr. Shorter declined and asked Ms. Rhodes not to contact him. Between March 1, 2002, and April 22, 2002, Ms. Rhodes contacted Mr. Shorter, including from her cell phone number and work number, on numerous occasions. The instant letter serves as a formal request to The Hartford, including its employees and representatives, that any future contact with Mr. Shorter be made through my office.

My understanding from your letter is that it is The Hartford's position that Ms. Rhodes is a victim and any attempt by Mr. Shorter to contest the fairness or underlying motive of his discharge is "blaming the victim." Ms. Rhodes certainly does not consider herself to be a victim, when she is being truthful. Of course, Ms. Rhodes has also advised Mr. Shorter since his discharge that Mr. Shorter should lie to potential employers about his reason for being unemployed. One lie that Ms. Rhodes has advised Mr. Shorter to use is that he has been out of a job for months due to a sickness in the family. Another lie that Ms. Rhodes believes would be appropriate for Mr. Shorter to tell a potential employer to get what Mr. Shorter wants is that he left The Hartford for more opportunities. In your letter, you spend a great deal of time conveying your surprise toward my impression that Mr. Shorter's candor with the company may have accounted for something. Apparently, the company was much more impressed with the candor of Ms. Rhodes, who clearly advocates lying to an employer to obtain desirable ends.

                                                    Sincerely,

                                                    Rachel M. Baird, Attorney

c:   Ramani Ayer, Chairman and CEO
     The Hartford Financial Services Group, Inc
     Hartford Plaza
     Hartford CT 06115

     Ferron Shorter, Jr.

Page 3 of 3

P57



Ian Veitzer
Counsel

June 14, 2002

Rachel M. Baird, Esq.
Stonegate Professional Building
379 Prospect Street
Torrington, CT  06790-5239

    Re:    <u>Ferron Shorter</u>

Dear Ms. Baird,

    I am writing in response to your May 7, 2002, letter.

    Although I do not think that there is any point to rehashing the facts of this matter, I would like to respond to some of the allegations contained in your letter.

    First, there is no evidence whatsoever that your client's employment was terminated because of his race or gender. Nor do you provide any such evidence. Instead, you attempt to refute the absence of any evidence of an improper motive by asserting that MaryAnn Rhodes allegedly believes that your client probably would not have been discharged if he were white. Setting aside the fact that Ms. Rhodes denies holding such a belief, and the fact that since she did not participate in the termination decision, she would have no way of knowing whether your client's race was a factor, and the fact that, as far as I am aware, Ms. Rhodes has never participated in a termination or discipline decision for any Hartford employee, and thus has no way of knowing how others in similar circumstances would be treated, and the fact that you do not even allege that Ms. Rhodes believes that your client's gender was a factor in the decision, I find it curious that you would place such reliance on an alleged statement from a woman who you repeatedly assert lacks any credibility. In short, it appears that the only evidence that you can produce to support your claim is an allegation of an uninformed speculative belief of a woman you tell us we should not believe. Needless to say, we do not find such "evidence" very convincing.

    Second, you attempt to justify your inability to produce any real evidence of improper conduct on our part by suggesting, in essence, that we have camouflaged our allegedly discriminatory conduct by taking actions to create a false picture of the situation. Among other things, you imply that we have falsely represented your client's statements about his ownership of a gun to support a "theory" that your client is a violent man and that that we escorted Ms. Rhodes to the police station not because we had had reason to believe that it was appropriate to do so but rather in an effort to support our "theory" that Ms. Rhodes was a victim. This attempt, however, is completely devoid of any basis in fact. It is, in fact, ridiculous.

Hartford Plaza
Hartford, CT  06115
Telephone 860 547 4573
Facsimile 860 723-4313
ian.veitzer@thehartford.com

P52

Page 2

As we previously discussed, your client's statement about an "illegal gun" was not included in his written statement at his request. Nevertheless, there were several witnesses who heard what he said and will be more than happy to testify about what they heard.

Similarly, contrary to your suggestion, it is standard procedure for our security department to escort employees to the police station to file a report when they believe that there is a risk of violence. This is done for two reasons. First, we cannot and do not provide protection outside of work. We thus think that it is important to have the police informed in case they need to deal with the situation. Second, filing a complaint with the police is a necessary step in obtaining a restraining order from the Court. I am quite comfortable that as former police officers, our internal security personnel are well aware of the proper procedure for obtaining a restraining order in these types of situations. I also am quite comfortable that they acted appropriately under the circumstances.

In the present case, as it turned out, Ms. Rhodes decided not to file a complaint with the police.[1] Nevertheless, we feel that we had a legitimate basis for fearing that violence was possible. First, Ms. Rhodes told us that she was in fear for her safety. Among other things, she told us that your client had previously assaulted her and had shown her a gun.

We did not, however, rely only on her statement. We also had obtained information about your client's previous conviction for Threatening. For your reference, I have enclosed a copy of the Application for an Arrest Warrant in that matter. As you will see, the victim in that incident also was a woman with whom your client had been romantically involved. As you know, despite denying any criminal convictions when our investigators interviewed him, your client pled guilty to this charge.

We also had a copy of a telephone message that your client left on a friend of Ms. Rhodes's answering machine. For your reference, I have enclosed a copy of the tape. The recipient was the "Scott" referenced in your client's January 23, 2002, statement. The female voice on the tape is Ms. Rhodes. The male voice is your client. I believe that the tape speaks for itself, and amply demonstrates why we felt it was necessary to take Ms. Rhodes's expressed concerns about her safety seriously.

In short, based on their years of experience and the evidence before them, our internal investigators had a legitimate belief that there was a potential for violence in this situation. Their actions in response were appropriate and proper, and were the same as they have done before and will do again in similar circumstances. Your suggestion that there was a disingenuous motive behind their actions simply is wrong.

Third, you reference a telephone call made to your client by Bob Begley, and suggest that your client was being harassed. What really occurred is quite different than what you suggest. Ms. Rhodes came to our internal security office and reported that she had been receiving a large number of hang up calls at work. This was confirmed by the other members of her unit. She told us that she believed that your client was responsible for the calls. As a result, Mr. Begley called your client and told him about the complaint. He also told your client that he did not know if your client was responsible for the calls and was not accusing him of making them. He told your client, however, that if he was responsible for the

---

[1] I understand, however, that she also did not stay at her apartment for a week after this incident. I further understand that her sister previously had called the police to complain about harassment from your client.

P53

Page 3

calls, they should stop immediately and that if they continued, the matter would be referred to the police. Coincidentally, perhaps, there were no further hang up calls after Mr. Begley's conversation with your client.

Please be assured that we have no desire to have any further contact with your client. We cannot, of course, prevent an employee from making a personal telephone call outside of work. As per your request, however, any new complaints about your client that we receive will be referred to you.

By the same token, I would request that all further communications with The Hartford about this matter be addressed only to me.

Fourth, your letter incorrectly states that your client was discharged for using a password voluntarily given to him by another employee. Your client did not simply use Ms. Rhodes password. He also deleted messages and changed her password so that she could not access her voice mail. In his jealous zeal to "catch her in a lie," he impeded her ability to perform her job. In our view, his conduct warranted the termination of his employment. We are entitled to make that decision. Although you might not agree with the result, there is nothing that even remotely suggests that it was based on anything other than your client's conduct.

Finally, I do not know why you were under the impression that I would be sending you a copy of Ms. Rhodes statement. What I told you was that I would be happy to send you a copy of your client's statement. It appears that you already have one. If not, please let me know and I will send one to you. As I noted in my March 7, 2002, letter, however, it is our policy not to release copies of other employee's statements, and I will not be doing so here.

If you have any questions or if you would like to discuss this matter further, please feel free to contact me.

Sincerely,

Ian M. Veitzer

Enclosures

P54