DEFENDANT'S
EXHIBIT
1 CONT'D
ALL-STATE LEGAL

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER, JR.,            .    Case No. 3:03-CV-00149
                               .    (WIG)
              Plaintiff,        .
                               .    Bridgeport, Connecticut
     v.                        .    January 24, 2005
                               .
HARTFORD FINANCIAL SERVICES .
                               .
GROUP, INC., ET AL.,            .
                               .
              Defendants.       .
.   .   .   .   .   .   .   .   .   .   .

TRIAL
BEFORE THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:             Law Offices
                               By: RACHEL M. BAIRD, ESQ.
                               Stonegate Professional Bldg
                               379 Prospect Street
                               Torrington, CT 06790-5239

For the Defendant:             Jackson Lewis
                               By:  MARGARET STRANGE, ESQ.
                                    JAMES F. SHEA, ESQ.
                               55 Farmington Avenue
                               Suite 1200
                               Hartford, CT 06105

Court Monitor:                 MS. SANDRA J. BALDWIN
                               MS. MARIA CORRIETTE

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1  A.   -- and I -- that, I didn't know why and I was
2  wondering why he was asking me my social security
3  number.
4      First of all, I know the company had it; and
5  second of all, I just wondering.  I was concerned why
6  he was asking it, but I gave it to him anyway.  You
7  know, I said -- He already told me I had to cooperate
8  so I just gave him whatever he asked for.
9  Q.   What areas did he address first, after he got that
10  information from you, your personal history?
11  A.   He started talking about -- He asked me if I knew
12  Mary Anne.
13  Q.   And by "Mary Anne," was he referring to Ms.
14  Rhodes?
15  A.   Mary Anne Rhodes, right.
16  Q.   And what did you tell him about your relationship
17  with her?
18  A.   I told him, yeah.  I -- Word for word, I said -- I
19  think I said that we had a fling, --
20  Q.   Uh-huh.
21  A.   -- and, you know, I said, "And it didn't go well
22  toward the end," but it --
23  Q.   Did he ask you questions individually, where you
24  answered, or did you just make a statement to him after
25  he would ask a question?

1    A.    I thought he did, and if he didn't know at the

2    beginning, he knew at -- I reminded him.  I reminded

3    him of it.

4    Q.    And how did you remind him of that?

5    A.    Well, I told him that she was harassing me at my

6    desk and I mentioned to him that I had just told

7    security that Saturday, and even in the conversation I

8    think I mentioned to him that she hasn't bothered me

9    since.

10   Q.    Did you make any statement to Mr. Wardell during

11   the course of that interview, about a gun?

12   A.    No.  He asked me.

13   Q.    What did he ask you?

14   A.    He asked me if I owed one, if I ever, you know,

15   showed her one and seems to me he said "Pointed one.{"

16   I don't remember if he said "pointed one," but I told

17   him, "No," and then he said something -- he had to ask

18   me something else.  He got a little more into detail

19   and I said, "Yeah," I said, "we can all buy one,"

20   because he kept going on about a gun.  I said, "But I

21   don't have one."  I said, "I don't own one," and I

22   think that's it.

23        I don't -- I mean, he asked me about -- we talked

24   about my eye but it had nothing -- somewhere, but he

25   didn't put it in here.  I think he might have said

1    Q.   How would you characterize the difference in the
2    statement, between what you said and how it's in the
3    written statement?
4    A.   Well, I don't even think it was two consecutive
5    questions in that nature, and if it was, it was not the
6    way he wrote it here.
7        In other words, I wasn't saying that she does not
8    have a reason to be afraid of me because I have any
9    criminal convictions.  There was nothing like that.
10   They were two separate questions that he was asking me.
11   Q.   Did you provide any information to Mr. Wardell
12   during this interview that said you had information
13   about Ms. Rhodes' harassment towards you?
14   A.   Well, I told him that I had just complained to --
15   sent a complaint to security.
16   Q.   Did you tell him anything else?
17   A.   Well, I told him that he can even my -- the people
18   I work with, that they knew about it, that they
19   questioned me about it and that they, you know, they
20   witnessed it for the weeks, you know, for that whole
21   2002 up to that time that I was there.
22   Q.   Did you offer to provide him any evidence of her
23   harassment?
24   A.   I told him I had voice mail messages -- Well, I
25   told him there were may things that she would say to me

1    but a couple of voice messages that I still had -- that

2    I still saved and had and can -- and wanted to show to

3    him, or provide to him.

4    Q.   And where would those voice mail messages have

5    been?

6    A.   They were at work on my work voice mail, and then

7    I had a couple on my cell phone also, but they were on

8    my work voice mail.

9    Q.   Did you participate at all in drafting the actual

10   statement?

11   A.   No.

12   Q.   What happened after the discussion with Mr.

13   Wardell concluded?

14   A.   He just asked me to sign the statement and last I

15   did, I just -- you know, I signed it and figured I was

16   going back to work and then after I signed it I -- he

17   had a notary there to notarize it and then he asked me

18   to take a walk with him down the hall.

19   Q.   Where did the notary come from?  Was that notary

20   present during the --

21   A.   No, actually, he had me -- he told me he wanted me

22   to sign it and then -- He said he wanted me to sign it

23   and then we could wrap this up, and I -- he asked me to

24   wait for a moment and he went and got the guy.  I mean,

25   he was on the same floor.  He was gone for maybe like a

1   not mistaken.

2   Q.   And when you got in the elevator, what floor did

3   the elevator go to, or where did it go to?

4   A.   It had to go down to what's called "A Level"

5   (inaudible) one.  So from 15 to 1.  It had to go down

6   14 flights.

7   Q.   Did you go back to your desk at all?

8   A.   No.  I asked them if I can go back to my desk and

9   retrieve my belongings and they said "No," and they had

10  me -- security had brought me to his office and I was

11  instructed to sit at the security office while Jennifer

12  Haber went and got my things from my desk, and she was

13  gone for like over a half hour.

14  Q.   While Ms. Haber was gone, where were you?

15  A.   Well, when he was walking me -- when you got off

16  the elevator, we had to walk a couple of turns to his

17  security office and that's when people that knew me,

18  you know, they saw that I was being walked and I later

19  found that it looked like I was being taken to jail

20  but, I mean, the security guard was escorting me and I

21  just put my head down when -- you know, as people that

22  I knew saw me.

23  Q.   In your twelve years at The Hartford, have you

24  ever seen any other employee escorted out by a security

25  guard?

1   A.   No.

2   Q.   And again, when the security guard escorted you

3   out, what route did you take?

4   A.   From the elevator we came -- from the tower

5   building, and we had to go through the hallway, which

6   was sort of a tunnel connector, to go -- to get from

7   the tower building back to the bottom of the north

8   plaza building and that's where the security guard

9   office is, at the bottom of that building.  Almost

10  between the bottom of the north plaza building and

11  right as you first enter the hallway, which is the

12  tunnel that connects the two.  It's a hallway.  It's

13  not a tunnel, but to the end (inaudible) that connects

14  the two buildings.

15  Q.   Did you spend any time in the security guard's

16  office or shack or whatever?

17  A.   Yeah.  I was there for over a half hour because

18  Jennifer was retrieving my -- well, retrieving most of

19  my things.

20  Q.   And what things did you get?

21  A.   Well, after she was up there, she just came down

22  with my, you know, my -- I have a gym bag that I bring

23  to work, all my things, my gym clothes and stuff, and I

24  store my bag, my keys and my coat and that was it, and

25  said they were going to ship the rest of the stuff, and

1    it came -- That was a Wednesday.  I believe it came

2    either that -- I think it came that next Tuesday

3    through Airborne Express, I think it was, one of those

4    express.

5    Q.    How -- What bulk of stuff was sent to your --

6    A.    Just my books.

7    Q.    Uh-huh.

8    A.    My books and --

9    Q.    Like what kind of books?

10   A.    Well, programming books, like my manuals to COBAL

11   and Visual Basic and just computer program books, and

12   my notebook and there was one thing missing and that's

13   what I was hoping for, which was the manual, the

14   corporate code, electronic communication manual.

15   Q.    Uh-huh.

16   A.    It is a little hand -- the employee handout

17   booklet and that wasn't there.

18   Q.    Why were you hoping to receive that also?

19   A.    Because that was what -- After a while, after I

20   was there, I -- Wardell had mentioned the -- they had

21   questioned me about the access to the voice mail, the

22   password, and he had showed me that booklet when he was

23   interrogating me.  I don't know if I mention that but

24   he was showing me that booklet and that was a booklet

25   where it shows that sharing a password is a violation,

1        Cheryl just said, "Just go over and talk to her.

2    Just, you know, try to finalize it," so I went over --

3    Q.   When was that suggestion made?

4    A.   Could have been like five -- somewhere around 5 or

5    6:00 o'clock that -- maybe 6 or 7:00 o'clock that

6    afternoon.

7    Q.   On what afternoon?

8    A.   December 31st.

9    Q.   And what was the suggestion that Cheryl Harris

10   made.

11           MS. STRANGE:  I'm gonna object --

12           THE COURT:  Yeah.

13           MS. STRANGE:  -- at this point.

14           THE COURT:  On --

15           MS. STRANGE:  Just hearsay grounds and

16   relevance, Your Honor.

17           THE COURT:  Yeah, we've already established

18   that he did something after getting a suggestion from

19   Cheryl so okay, why don't we just go on from there?

20   BY MS. BAIRD:

21   Q.   What did you then do?

22   A.   Well, I went over later on afterwards and just

23   told her I'll come talk to her and finalize everything

24   and when I got over there she was dressed very risque

25   and was trying to, you know, start something physical

1    and I didn't stay there too long, and again, actually,
2    one time I -- when I first tried to leave she
3    threatened to stand in front of the door again and so I
4    told her that -- Well, I didn't even tell her.  I
5    started going out towards the back door and then, you
6    know, I finally made -- tried to make peace with her
7    and I ended up leaving the -- probably like 10:30 or so
8    I left.  I got out of there.
9    Q.   Was that before or after this last phone message
10   that she left?
11   A.   Before.  I mean, she was -- like I said, she
12   agreed to -- at that moment she agreed to just -- to
13   let everything ride and leave it alone and so it was
14   like about an hour and a half before that message.
15        (An audio tape is played.)
16   BY MS. BAIRD:
17   Q.   And what was the date and times for that phone
18   call?
19   A.   That was on January 17th, 2002.
20        That was when she had first wanted to -- wanted me
21   to hear her new voice mail pass code -- password.
22   That's when I hung up and she thought I was gonna call
23   her back but I didn't call her back that night.
24   Q.   And the next time when, in fact, you saw her was
25   where?

1    A.   January 18th, that next morning at work.

2

3    Q.   Mr. Shorter, when you were terminated from The

4    Hartford, what was your salary?

5    A.   $44,500 approximately.

6    Q.   And what was your -- describe the -- describe your

7    emotions following your termination.

8    A.   I was just down, depressed.  I even -- I'm not a

9    drinker but I was kind of -- I was just doing things

10   that I don't do, like I said, just drinking a lot and

11   not sleeping and --

12   Q.   Who did you first contact after you learned you

13   were fired?

14   A.   My dad.

15   Q.   And where does he -- Where did he live at the

16   time?

17   A.   He was in Georgia and I just called him.

18   Q.   And were you -- What were you feeling at that time

19   when you called him?

20   A.   I was down.  He later teased me, said I sound like

21   I was about to cry but I just down.

22   Q.   Did you, in fact, cry at some points after you

23   were fired?

24   A.   Yeah.  Yes.

25   Q.   Did you tell anyone else that you were terminated

1    immediately following?

2    A.    Yes.    After I called my dad I called Cheryl and

3    she was at the store and I just told her that -- you

4    know, I just asked her how long is it gonna be before

5    she got home because I needed to talk to her.

6    Q.    And did you meet her at home?

7    A.    Uh-huh.    Yes, I did.

8    Q.    Describe some of the feelings and steps you took

9    to deal with the termination.

10   A.    Well, after I was terminated, besides just feeling

11   just down and -- I just was trying to -- trying to pick

12   myself back up and I only just felt like real hopeless,

13   like everything is lifted out from under me and just

14   couldn't figure out -- well, I had figured why but, you

15   know, I just started praying a lot and I called --

16   after that called an attorney that I know, a friend of

17   mine, called him up, and he doesn't deal with that kind

18   of, you know, what I described to him, and the main

19   thing I wanted to do was just try to get my job back,

20   to try to clear this up and, you know, exactly find out

21   what was wrong and just to clear everything up and get

22   my job back --

23   Q.    At some point did you --

24   A.    -- as soon as possible.

25   Q.    -- begin to look for employment?

A.   Yes.

A few months down the road because immediately I went and met an attorney and he started writing --

Q.   Well, just answer the question, please.

A.   Yes.

Q.   At some point did you feel you were able to look for employment?

A.   Yes.

Q.   And when did you feel like you were able to do that?

A.   For employment back with The Hartford or back elsewhere?

Q.   Anywhere?  Elsewhere?

A.   Elsewhere, it was probably towards May, April -- April and May of 2002.

Q.   And between January and May what feelings did you have that may have impacted your ability to attempt to even find work?

A.   I just wasn't -- just depressed.  Like I said, I couldn't -- I had no ability to think or anything like that.  I mean, I didn't feel well.  Like I said, I wasn't sleeping.  I definitely wasn't eating.  I mean, I did sleep when my body was tired but, I mean, I wasn't eating at all and, you know, it was just -- just feeling upset all the time and I kept -- when I cried

1   I'm not -- I just don't like for people to see me cry

2   so, you know, I'd be holding it in and then trying to

3   go certain places where I could just, you know, let out

4   whatever I was feeling, you know, by myself.  Kind of

5   felt, just kind of like strange.

6   Q.   And starting in May of 2002, what did you do in

7   terms of looking for employment?

8   A.   I went -- started buying Sunday papers.  I went on

9   the internet.  I think it was ct.jobsearch and

10  monster.com and careerbuilders.com, and I just went

11  scanning, looking for jobs, and I started -- did my --

12  I had to redo my resume because all my resume was on my

13  computer at work, you know, my most recent resume, and

14  obviously I couldn't get to that and they didn't bring

15  that to me, so I had to redo my resume and I did that

16  and set up a, you know, a skeletal cover letter and I

17  started just applying for jobs, sending them out.

18  Q.   Did you just look in Connecticut?

19  A.   At that time, yes.

20  Q.   And at some point did you find the need to take

21  other measures?

22  A.   Yes.  After -- I did it for over a year, and I met

23  people, people called me back, and I just couldn't -- I

24  mean, I was never offered a job.

25       I got responses back that people were impressed,

1    but the main reason was, especially for IT, there

2    weren't as many positions for IT, and I knew this at

3    The Hartford, but at that time all the IT positions

4    were like going out of the country, all the

5    opportunities were like going to like other countries,

6    and the opportunities were dwindling as far

7    -- for IT, and especially for me. I was really a

8    beginner.

9        So I started applying for other positions, like

10    rating and underwriting assistant jobs, and I got a

11    good number of calls back, but when I was telling my --

12    when they would read my resume with my salary, they

13    said that I made too much money for those jobs, and I

14    told them I'd take a pay cut but they -- Actually, one

15    recruiter -- Actually, after I got to Georgia and I

16    started trying for a job, one recruiter told me why,

17    and I -- it made sense. He said that even if I took a

18    pay cut to try to take $28,000, that the companies

19    would still hesitate to hire me because they would

20    think, when they saw that I was making 40 -- like near

21    45,000, that I would try to -- that I would just stay

22    there long enough, and then leave if I found a job

23    making the money I was making at The Hartford.

24        I told them that I wouldn't do that, that I'd sign

25    a contract if I could, but I just wasn't having any

1    success unfortunately.

2    Q.    Do you -- What do you know, if anything, about

3    your pension status or retirement status when you were

4    terminated from The Hartford?

5    A.    As far as retirement eligibility?

6    Q.    Yes.

7    A.    There -- I was nearly halfway to retirement.  They

8    have a thing called "Rule of 70" and "Rule of 80," and

9    what it is, is when your age plus your years of service

10   at The Hartford add up to 70, you can retire, but you

11   don't have the benefits, but if it adds up to 80, then

12   you can retire from The Hartford with the benefits, and

13   I would have been eligible at age 51 because I started

14   when I was 22 and that would have been 29 years plus,

15   what, 29 years plus 51, yeah, which adds up to 80.

16        So I was 17 years away from retirement eligibility

17   with benefits.

18   Q.    And approximately how many months have you been --

19   has it been since your termination from The Hartford?

20   A.    As of today?

21   Q.    Yes.

22   A.    It was thirty-six -- three years to the day,

23   yesterday, 36 months.

24   Q.    How often did you receive paychecks while you were

25   there?

1    A.    While I've been unemployed?

2    Q.    No, why you were at The Hartford?

3    A.    Bi-monthly, two times a month.

4    Q.    And so --

5    A.    Bimonthly.

6    Q.    So if you had gone three years and you received

7    paychecks twice a month, how many paychecks have you

8    missed since your termination?

9    A.    Twenty-four times three is 72.  Seventy-two

10   altogether.

11   Q.    And how much did you receive in payment every two

12   weeks?

13   A.    It was $1,862 and some change.  It was $1,862

14   every half month.

15   Q.    What kind of benefits did you receive why you were

16   at The Hartford?

17   A.    I had great medical benefits and great dental plan

18   but I can't remember.  I'm not quite sure of the

19   details offhand.

20   Q.    Do you know what carrier they were through?

21   A.    Delta Dental and Connecticare for medical.

22   Q.    Since your discharge have you carried any health

23   insurance or dental insurance?

24   A.    No.

25   Q.    Did you have any sort of investment or savings

1    plan through The Hartford because of your employment

2    there?

3    A.    Yes.   In the -- It was -- I think it was $5,000 in

4    when I left -- when I was terminated.

5    Q.    Are you familiar with how that program worked?

6    A.    Not too much in the detail, but actually I was --

7    I needed to look into it.   That was my plan for that

8    year when I left.   I should have had a lot more than I

9    did, from what I was told.

10   Q.    Do you know how the 5,000 got in there to begin

11   with?

12   A.    Actually, like I said, I didn't even -- never even

13   found that out.

14   Q.    And what happened to that 5,000?

15   A.    They returned it to me when -- April -- It was

16   approximately two-plus months after I was terminated,

17   nearly three months after.

18   Q.    And did you request for it to be returned?

19   A.    No.

20   Q.    Have you had any physical symptoms related to your

21   feelings about being discharged?

22   A.    Just, I mean, besides fatigue and in my mind, like

23   I said, I was just depressed and everyone around me

24   just, you know, they noticed something.   Obviously they

25   noticed something wasn't right and they knew what it

1   was, but I couldn't afford to go to any kind of a
2   therapist or anything.  I didn't have any insurance and
3   like I said, I was just doing a lot of just consuming
4   alcohol and stuff like that and --
5   Q.   How long did that last?
6   A.   A good three months.
7   Q.   And what events caused that to stop, if it did
8   stop, the consumption of alcohol?
9   A.   Actually, it was probably the first two months,
10  and then it -- I kind of just started getting better.
11  I mean, I just, you know, I just know my personal
12  belief.  I just went on my personal beliefs and I, you
13  know, I just know that God always brings, you know,
14  brings anyone or brings me or anyone out of bad
15  situations sometime, somehow.  You know, I just have to
16  just pray and I just started praying and I just started
17  looking -- you know, I mean just of got back, like,
18  "Okay, you got knocked down but," you know.
19       My father was on me with that too, you know, like,
20  "Okay, you're down but, you know, you're not gonna sit
21  around and roll around," and he told me that from
22  Georgia because I talk to my sister a lot and she knew
23  what was going on, and I guess she had told my parents,
24  and which I told her not to because she kept calling me
25  and checking up on me a lot, but yeah, I mean, I just,

1    my prayers, and like I said, and my dad kind of -- not

2    even kind of, he reminded me, you know, that that's

3    what life's about, you know.  You don't let one thing

4    keep you down.  I mean, honestly, I just started

5    praying and feeling better, just knowing that there's

6    gonna be some light at the end of the tunnel somehow,

7    sometime, so I started feeling better and that was it.

8             MS. BAIRD:  Your Honor, there are a number of

9    exhibits that I've referenced in the testimony today

10   and as you had suggested, there are copies for the

11   jurors but they're not separated, and I would ask that

12   I have the opportunity to separate them out tonight and

13   put them into binders for the jurors --

14            THE COURT:  Sure.

15            MS. BAIRD:  -- and have it organized by

16   tomorrow morning.

17            THE COURT:  Okay.  Okay.

18            MS. BAIRD:  Thank you.

19            THE COURT:  Any further questions for Mr.

20   Shorter?

21            MS. BAIRD:  No.  No.

22            THE COURT:  Okay.

23            Let's take about ten minutes and begin cross.

24   We'll end a few -- about five to five.

25            Does anyone need to take a break or -- Is

1    everyone okay?

2            Okay, let's take about ten minutes.  Let's

3    use the time that we have and then --

4            MS. STRANGE:  Okay.

5            THE COURT:  Thanks.

6            MS. STRANGE:  May I approach the jurors with

7    copies of exhibits?

8            THE COURT:  Yes.  These are things that have

9    already been discussed --

10            MS. STRANGE:  Yes.

11            THE COURT:  -- and are coming in as full

12    exhibits?

13            MS. STRANGE:  Yes.

14            THE COURT:  Okay.

15            (Inaudible), do you need a break?

16            UNIDENTIFIED SPEAKER:  No.

17            THE COURT:  Okay.

18            MS. STRANGE:  And may I have 532?

19            THE COURT:  Okay, I'll be right back in a

20    moment.

21            MS. STRANGE:  You may have it in front of

22    you.

23            Do you have your statement in front of you?

24            THE WITNESS:  Yes, I do.

25            THE COURT:  Okay.  You can use that.  You can

1   approach too, if you need it.

2           MS. STRANGE:  Okay.

3

4                       CROSS EXAMINATION

5   BY MS. STRANGE:

6   Q.   Mr. Shorter, I just want to -- wanted you to take

7   a look at that statement that's marked as 532.

8        Now, that is not the first copy of that statement

9   you saw, correct?

10  A.   Correct.

11  Q.   Okay.

12       So you had a -- you made a -- there's a prior

13  statement, correct?  There's a prior draft of that

14  statement, correct?

15  A.   I mean, this is the one I -- this is a copy of the

16  one I signed three years ago.

17  Q.   Okay.

18       Do you recall a prior draft that you made

19  handwritten changes on?

20  A.   I think there might have been, yeah.  I think

21  there was.  Like a scratch -- Like a rough draft?

22  Q.   Correct.

23  A.   Uh-huh.

24           MS. STRANGE:  May I have Exhibit Number 504,

25  please?

239

1              May I give the jury copies of 504?

2              THE COURT:  Yes.

3         (Pause.)

4              MS. STRANGE:  May I approach Mr. Shorter with

5    the --

6              THE COURT:  Yes, please.

7              MS. STRANGE:  Okay.

8    BY MS. STRANGE:

9    Q.   Mr. Shorter, --

10   A.   Thanks.

11   Q.   -- give you that document that's been marked as

12   504.

13        Do -- Is that a draft of the statement that have

14   -- you have in front of you, of 532?

15   A.   Yes.

16   Q.   All right, and it's your -- does your handwriting

17   appear on that draft?

18   A.   Yes.

19   Q.   All right, and are those your handwritten changes

20   on the draft?

21   A.   Yes.

22   Q.   All right.

23        Now, looking at the -- So you were given a draft

24   and an opportunity to make changes, correct?

25   A.   Uh-huh.  Yes.

1  Q.  All right, and looking at the final statement,
2  sir, the one that you signed, --
3  A.  Right.
4  Q.  -- you knew when the -- when you gave your
5  statement that there was an internal investigation
6  being conducted by the department of special
7  investigations, correct?
8  A.  I just knew that Wardell was asking me questions.
9  Q.  Okay, and in your statement where you say you knew
10  there was an investigation going on; is that accurate?
11  A.  Yes.  I mean, I -- because I knew Wardell was
12  asking me questions, yes.
13  Q.  And then you knew, sir, that the investigation
14  concerned accessing another employee's voice mail,
15  correct?
16  A.  At that time I just knew that he was asking me
17  questions.  I wasn't sure of everything it pertained
18  to, but I was trying to piece it together as he was
19  asking me questions.
20  Q.  Okay.
21     Where it says:
22     "I am aware that an internal investigation is
23     being conducted by the department of special
24     investigations concerning accessing another
25     employee's voice mail."

241

1      Did you -- Is that accurate?

2    A.   Yes.

3    Q.   Okay.

4    A.   Uh-huh.

5    Q.   Now, sir, you did access another employee's voice

6    mail, didn't you?

7    A.   Yes.

8    Q.   All right, and, sir, you said you accessed it

9    approximately ten to fifteen times?

10   A.   Somewhere around that.  I mean, probably somewhere

11   around that.

12   Q    All right, and that's what you say in your written

13   statement, ten to fifteen times?

14   A.   Right.

15   Q.   All right, and you testified here today that it

16   was about 20 times?

17   A.   About that, approximately, yes.

18   Q.   All right.

19       When you were looking at those phone records, sir,

20   it appeared that if you had more than one access in a

21   one-minute time frame, you counted that as one access;

22   is that correct?

23   A.   No.  The way that that worked is you log in --

24   It's like two accesses for each time, so, I mean, when

25   I accessed -- when I logged in once at 9:21 for

1  example, on page 1 -- Well, whoever logged in, it

2  wasn't me, I didn't have the password at this time, but

3  when she or whoever was control, on page 1, 1/18/02,

4  see at 9:21?  That's one log-in but it's -- it gives

5  four, if you know what I mean.

6  Q.  Okay, and you know that now, sir?  Have you -- Are

7  you familiar with these types of records?

8  A.  No, I just know that.

9  Q.  Okay.

10 A.  I mean, actually, I believe I saw a copy of mine

11 but I just -- I mean, I just know that.

12 Q.  Okay, and again, have you ever worked with these

13 types of phone records before?

14 A.  No.

15 Q.  All right.

16    Now, when you accessed Ms. Rhodes' password, you

17 changed it, correct?

18 A.  Correct.

19 Q.  All right, and you -- I think you admit in your

20 statement you changed it two times, correct?

21 A.  Yes.

22 Q.  All right, and you actually changed it four times;

23 is that correct?

24 A.  Three or -- Well, three, but yes, three different

25 times.

1    Q.   All right, and you didn't give Ms. Rhodes her

2    password back, did you?

3    A.   No.  I didn't withhold it from her.  I was trying

4    to call her to let her hear the message

5    Q.   All right.

6         Well, you didn't give it back to her, did you?

7    A.   No, it had changed and I was trying to call her

8    and connect her to the voice mail.

9    Q.   Right, and you didn't -- You actually changed it

10   four times, correct?

11   A.   Three.  I think the last time that was the same

12   one.  Like I went in but it was the same one, her

13   niece's date of birth.

14   Q.   All right, and you didn't call anybody at The

15   Hartford to tell them, "Hey, I've changed another

16   employee's voice mail," did you?

17   A.   No, it was on the weekend, first of all, but no.

18   Q.   All right, and it was on the weekend.

19        Now, were you aware that -- You knew Mary Anne

20   Rhodes personally, correct?

21   A.   Yes.

22   Q.   All right, and you are aware that her job required

23   her to work weekends, particularly in January, correct?

24   A.   No.

25   Q.   All right.

1     Would you -- Were you aware that her supervisor
2   needed her to be available weekends in January?
3   A.   No.
4   Q.   All right, so you weren't aware that her --
5   A.   I wasn't --
6   Q.   -- accounting function required her to work in the
7   January time frame to be -- to have access to her voice
8   mails?
9   A.   I think in our conversation she might have
10   mentioned that that was -- that she was -- that
11   accountants were busy at that time, but she didn't say
12   she needed it that weekend.
13   Q.   Oh, okay.  So she --
14   A.   Okay.
15   Q.   And you talked to her that Friday, before she
16   left, right?
17   A.   Correct.
18   Q.   All right, and you sent her an e-mail saying you
19   were a real jealous type of dude that Friday?
20   A.   I told her that the reason -- I am a jealous guy
21   and that's why it wouldn't work out, because she had
22   too many other things going on.
23   Q.   Okay.  Well, let me just get --
24   A.   Okay.
25   Q.   -- a copy of that e-mail --

1    A.    Okay.

2    Q.    -- and ask.

3              MS. STRANGE:  Can I have a copy of Exhibit

4    512, please?

5              THE COURT:  Okay, and after we finish with

6    that e-mail, we'll break for the day.

7              MS. STRANGE:  Okay.

8              THE COURT:  Okay?

9              MS. STRANGE:  And may I approach --

10             THE COURT:  Sure.

11             MS. STRANGE:  -- the jury?  Here you go, sir.

12             THE WITNESS:  Thanks.

13   BY MS. STRANGE:

14   Q.    Sir, you have in front of you Exhibit 512?

15   A.    Yes.

16   Q.    Is that the e-mail that you sent on Friday

17   afternoon to Ms. Rhodes?

18   A.    Yes, Friday morning.  Uh-huh.

19   Q.    Friday morning.  Okay, and was this e-mail sent

20   before you learned she went away for the weekend with

21   another man, or after?

22   A.    This was before.

23   Q.    Okay.

24             MS. STRANGE:  Your Honor, we -- should I

25   offer these into evidence or based on our discussions

1    this morning, I know we --

2            THE COURT:  I think they are in as full

3    exhibits.

4            MS. STRANGE:  That's what I had thought.

5            THE COURT:  Yes.

6            MS. STRANGE:  I just wanted to make sure.

7            THE COURT:  Yeah.

8            MS. STRANGE:  Okay.  Thank you.

9            THE COURT:  All right.  We're gonna break at

10   this point and resume with the cross-examination of Mr.

11   Shorter tomorrow and then there will be -- or maybe --

12   there may be a witness taken out of turn?

13           MS. BAIRD:  I -- We don't know.  We weren't

14   able --

15           THE COURT:  You don't know yet?

16           MS. BAIRD:  -- to reach them, but we also are

17   going to bring binders for the exhibits tomorrow --

18           THE COURT:  Okay.

19           MS. BAIRD:  -- for people to put them in.

20           THE COURT:  And maybe you could work that out

21   with Ms. Baird, just to keep things as compact as

22   possible for the --

23           MS. STRANGE:  Right.

24           THE COURT:  -- folks over there, and -- but

25   we'll start tomorrow at 10:00 o'clock, the usual time.

1   You get here a little bit before then.

2           Counsel should get here about 9:30 to see if

3   there's any housekeeping we have to take care of before

4   that but just a reminder not to discuss the case and

5   we'll see you in the morning.

6           Drive careful.  God knows what it's like out

7   there.  I hope it wasn't like -- it's not like the

8   weekend.  I haven't had a chance to see what the

9   weather is like out there but -- been in rooms like

10  this all day.

11          So anyway, drive careful and we'll see you in

12  the morning and just, as I said, a reminder not to

13  discuss the case.

14          Oh, and the notepads they should leave in the

15  jury room and Carol will get them back to you in the

16  morning.

17          Thanks.

18      (Jury out at 4:55 p.m.)

19          THE COURT:  Okay.  You guys could be seated.

20          Anything we need to take up -- take care of

21  this evening?

22          MS. STRANGE:  No, I'm only concerned about

23  the timing tomorrow, if we can't get hold of Mary Anne

24  Rhodes.  I don't know if you want us to have Sharon

25  Courey come tomorrow --

1          MS. BAIRD:  Yes.

2          MS. STRANGE:  -- but I don't see that there's

3    enough for the whole day, do you?

4          THE COURT:  I mean, that happens, it's not

5    great but it's not the end of the world.

6          You know, I have a feeling Mr. Shorter is

7    gonna be on the stand for a while, I would think, and

8    that that has a -- you know, you, add in a break in the

9    morning and you -- you know, it takes us to (inaudible)

10    that way we go to about 12:00 o'clock, between direct

11    and -- I mean cross and redirect, and then do we have

12    anybody though, for after Mr. Shorter?

13          MS. BAIRD:  I could have Mr. Cook and the

14    Vernon police officer.  They're pretty much on call at

15    my disposal.

16          THE COURT:  Okay.

17          Is there anybody else other than that?

18          MS. BAIRD:  Sharon Courey but I -- she may

19    not be on as much as disposal as these other two

20    people.  I'm not sure, and Cheryl Harris.  She's down

21    for Wednesday.  She can probably come --

22          THE COURT:  What would the -- Would the

23    Vernon police officer -- If the invasion of privacy

24    claim isn't coming in, what's the Vernon police officer

25    going to be here for?

1          MS. STRANGE:  I don't know.

2          MS. BAIRD:  He's coming to show the disparity

3    in treatment between Mr. Shorter and Mary Anne Rhodes.

4    In other words, the report by the Vernon police

5    officer, when I spoke to him, he indicates that these

6    people came to the police station seeking a restraining

7    order when you don't go to police stations to get a

8    restraining order and that in the report that they told

9    him, it says, she -- they alluded to a possible

10   statement that may have been a complaint, which they're

11   talking about the e-mail, so it just -- it's

12   inconsistent that The Hartford was claiming that there

13   was some sort of threat in that e-mail, and I think

14   they're gonna use that a lot with the jury, this

15   threatening e-mail, and the police officer's gonna

16   testify that they didn't even say that there was any

17   threatening behavior, and he saw absolutely no reason

18   to file a criminal complaint or to do anything in the

19   criminal context, and certainly if you threaten

20   somebody by e-mail, that is a crime.

21          THE COURT:  I don't think he's gonna be

22   allowed to come in to give his expert opinion on

23   whether it's something they would treat as a crime or

24   not.

25          MS. BAIRD:  Well, I -- he's got --

1          THE COURT:  I mean, what -- unless, of
2    course, no one -- I mean, do you all -- I mean, is this
3    testimony that you folks were fine with?
4          MS. STRANGE:  No, I -- We had talked on
5    Friday.  I don't -- I'm not quite sure what they're
6    testifying to and we -- when we talked on Friday I
7    think Attorney Baird said she'd find out and let us
8    know but I'm still not clear of what they're testifying
9    to.
10          MS. BAIRD:  Well, it just -- it -- Oh, I'm
11    sorry.
12          It just shows the length that The Hartford
13    went to, to believe everything that Mary Anne Rhodes
14    said.  This was even before the statement was even
15    taken by Mr. Shorter.
16          THE COURT:  Oh, this is --
17          MS. BAIRD:  They went to the police station.
18          THE COURT:  Okay.  This is before the -- This
19    is actually in -- January 20th, or something like that?
20    Twenty --
21          MS. BAIRD:  It was January 23rd but in the
22    morning.
23          THE COURT:  Okay.  Yeah.  I'm inclined to let
24    it in for some -- how far and, you know, we'll have to
25    see, but you have to be careful with opinion testimony

1    from --

2              MS. BAIRD:  Okay.

3              THE COURT:  -- about, you know, what he

4    thought about all this and -- I mean, he's not coming

5    as an expert on this but if it's something that The

6    Hartford did in the course of reacting to Ms. Rhodes'

7    complaint and leads up to the termination of --

8              MS. BAIRD:  Absolutely.

9              THE COURT:  -- Mr. Shorter, I'm inclined to

10   let you go with it.

11             It's -- By the way, did anyone at The

12   Hartford ever listen to the voice mail of Mary Anne

13   that you played?

14             MS. BAIRD:  I believe that from the

15   deposition testimony, no.

16             THE COURT:  Okay, and those are the voice

17   mail messages that Mr. Shorter referred to in his

18   statement --

19             MS. BAIRD:  Yes.

20             THE COURT:  -- that he had saved?

21             MS. BAIRD:  Yes.

22             THE COURT:  Okay.  Okey-dokey.

23             Let's see, who's Ms. Courey or --

24             MS. STRANGE:  She's the human resources

25   person who gave Mary Anne Rhodes a written warning.

252

1        THE COURT:  Oh, okay, and Anderson's coming
2   in later in -- on Thursday probably?
3        MS. STRANGE:  We never -- I think Anderson
4   will be first, so that's whenever --
5        THE COURT:  She might even be Wednesday.
6        MS. STRANGE:  That's what I was thinking,
7   yeah.
8        THE COURT:  Yeah.
9        MS. STRANGE:  We have Anderson, Wardell --
10       THE COURT:  Yeah.
11       MS. STRANGE:  -- David Jimenez, then Jennifer
12  Ames.
13       THE COURT:  Okay.
14       Just so I'm clear on this, the criminal
15  conviction that The Hartford thought Mr. Shorter had
16  was the 53a --
17       MS. BAIRD:  181a.
18       THE COURT:  -- 181.
19       Do they know what the actual -- Is it your
20  position that he actually knew what the Connecticut
21  section number was?  Do they have the document that had
22  that section number on it?
23       MS. BAIRD:  They have the information sheet
24  with that section number on it but I believe they
25  didn't receive it until February 4th, after --

253

1          THE COURT:  Oh, okay.

2          MS. BAIRD:  -- the termination.

3          THE COURT:  Okay.

4          MS. BAIRD:  That's --

5          THE COURT:  Okay.

6          MS. BAIRD:  That's what their fact shows, at

7    least.

8          THE COURT:  Okay.

9          What did ya'll have?  What did The Hartford

10   have?

11         MS. STRANGE:  We have a report, and that's

12   why it gets confusing.  We have a report from CRA, it's

13   a criminal investigation background report, that shows

14   two convictions, one for breach of peace and one for

15   threatening.

16         THE COURT:  And Mr. Wardell was able to pull

17   that up in the course of his investigation?

18         MS. STRANGE:  Yes, he requested it from CRA

19   and we have John Leone, who's gonna testify that he

20   does the CRA requests, and it does -- that's what we

21   have.  It's a threatening and it says:

22              "Verdict: Found guilty.  Breach of the peace

23              Verdict: Found guilty.  Threatening."

24         THE COURT:  And that's -- And what document

25   number is that?

1       MS. STRANGE:  This is exhibit -- our Exhibit
2   508.
3       THE COURT:  508, and I guess your point will
4   be that Mr. Shorter tried to explain that he did not
5   lie about having criminal convictions and that they
6   didn't follow up to find out what the real story was?
7       MS. BAIRD:  Right, and if you -- It actually
8   doesn't show a conviction for breach of peace.  I think
9   it says, "SI," which means "substitute information,
10  creating a public disturbance, known as a CPD" in
11  violation of 53a-183a.
12      THE COURT:  That's 508?
13      MS. BAIRD:  Yeah.
14      In other words, when charges come to a
15  criminal courthouse, prosecutors always substitute them
16  down, usually, to get a plea, --
17      THE COURT:  Right.
18      MS. BAIRD:  -- and that's what happened in
19  that case.
20      THE COURT:  That's right.
21      MS. BAIRD:  So it wasn't a breach of peace,
22  it was a CPD.
23      THE COURT:  Okay.  That's 508?
24      MS. BAIRD:  Right.
25      THE COURT:  Oh, it's Confidential Research

1    Associates, okay.

2                    I mean, and -- all righty.

3                    And Mr. Wardell, though, got this from John

4    Leoni?

5                    MS. STRANGE:  Right.

6                    THE COURT:  On that morning or mid day, some

7    time like that or --

8                    MS. STRANGE:  Before -- Right.  Before he met

9    with Mr. Shorter.

10                    THE COURT:  Okay.

11                    Was he a Connecticut police officer, Mr.

12   Wardell himself, or he had been federal or what was he?

13                    MS. STRANGE:  He was actually Connecticut

14   State Police.  He was with the Norwich --

15                    THE COURT:  Oh, Connecticut State --

16                    MS. STRANGE:  -- the major crime squad --

17                    THE COURT:  Major crime squad.

18                    MS. STRANGE:  -- out of Norwich.

19                    THE COURT:  Okay, and these were two separate

20   events, the threatening and the breach of peace?

21                    MS. BAIRD:  Right.

22                    THE COURT:  The threatening doesn't have the

23   particular section involved, right?

24                    It doesn't on this one.

25                    MS. BAIRD:  It should be 5362 but I don't --

1              THE COURT:  It doesn't have it on there.

2              MS. STRANGE:  But not the section that shows

3    that it -- what she's saying.

4              THE COURT:  Right.

5              MS. STRANGE:  It shows that it wasn't --

6              MS. BAIRD:  That's correct.  That's correct.

7    It doesn't show that.

8              THE COURT:  But it would be probably 53 --

9              MS. BAIRD:  181a.  If you look at the

10   information sheets it has the substitute.  He --

11             THE COURT:  But the threatening -- the

12   threatening would probably be what, 53 --

13             MS. BAIRD:  a-62.

14             THE COURT:  53a-62.

15             MS. BAIRD:  Yeah.

16             THE COURT:  But -- Yeah.  Okay.

17        I was just curious.  All righty.  Yeah, I was

18   just trying -- Okay, and 508 is this -- is actually

19   document that they had contemporaneously and I guess

20   your point is that doesn't tell you that -- all that

21   much and that they should have followed up.

22             MS. BAIRD:  They -- Right.  I mean, that's

23   gonna be our argument, they should have followed up.  I

24   mean, the cover sheet from the CRR says, you know,

25   "There may be mistakes here," we don't -- "we can't be

265

INDEX

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESSES FOR THE PLAINTIFF: |  |  |  |  |  |
| Ferron Shorter | 96 | 238 | -- | -- | -- |
| WITNESSES FOR THE DEFENDANT: |  |  |  |  |  |
| None. |  |  |  |  |  |

|  | Offered | Admitted |
|---|---|---|
| EXHIBITS: |  |  |
| None. |  |  |

266

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.

_Stephen C. Bowles_                February 16, 2005

STEPHEN C. BOWLES