

DEFENDANT'S
EXHIBIT

**2**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER, JR.,           .    Case No. 3:03-CV-00149
                               .    (WIG)
          Plaintiff,           .
                               .    Bridgeport, Connecticut
     v.                        .    January 25, 2005
                               .
HARTFORD FINANCIAL SERVICES .
                               .
GROUP, INC., ET AL.,           .
                               .
          Defendants.          .
 .   .   .   .   .   .   .   .   .   .   .   .   .

CONTINUED TRIAL
BEFORE THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Law Offices
                            By: RACHEL M. BAIRD, ESQ.
                            Stonegate Professional Bldg
                            379 Prospect Street
                            Torrington, CT 06790-5239

For the Defendant:          Jackson Lewis
                            By:  MARGARET STRANGE, ESQ.
                                 JAMES F. SHEA, ESQ.
                            55 Farmington Avenue
                            Suite 1200
                            Hartford, CT 06105

Court Monitor:              MS. SANDRA J. BALDWIN
                            MS. MARIA CORRIETTE

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1   Q.   All right.  Now, you accessed her voice mail at

2   work on what date, December 29th?

3   A.   It was either December 29th or that morning,

4   December 30th. ENDFIELD

5   Q.   Okay.  And that's because she was showing some

6   type of suspect behavior.

7       Is that accurate?

8   A.   Well, that's what I said.  I believe in --

9   Actually towards the 28th, she became persistent, and

10   we even talked about me moving back -- well, she talked

11   about me moving back in, and that was not -- I was

12   refusing.  I mean, that wasn't even a question to me,

13   and that was when she began saying -- I was on vacation

14   at the time, and she began saying things about, you

15   know, what's going to happen when I'm at work, and it

16   had already kind of started, and it's just things like

17   that, and saying that I was wrong for not wanting to,

18   you know, give the relationship another shot.

19   Q.   Okay.  So you accessed her voice mail around

20   December 29th at work, correct?

21   A.   Either 29th or 30th, yeah.

22   Q.   Right.  And that's because you suspected

23   something, correct?

24   A.   No.  Like I said, again, she was threatening her

25   actions again at work when I got back to work.  Like I

1    said, I was on vacation at the time, and main reason

2    was because I was accused of not giving her a fair

3    chance. In other words, I was wrong for accusing her

4    of lying.

5    Q.   Okay. So you accessed her voice mail and found

6    out that she had gone to lunch with an old boyfriend,

7    correct?

8    A.   Right.

9    Q.   All right. And that made you mad, didn't it?

10    A.   No, that was my further excuse or reason for us to

11    not have any more contact.

12    Q.   Okay. And this message that we listened to

13    yesterday that you left for the old boyfriend, --

14    A.   Right.

15    Q.   -- that wasn't a mad message?

16    A.   No, that was the time -- That happened that

17    evening, the evening after she called me that whole

18    day, and was telling me that she was afraid because

19    when she met him for lunch, she told him how much she

20    loved me.

21    Q.   All right. Now, let me back up. Is December 29th

22    a significant date for you personally?

23    A.   Yeah, that's my daughter's birthday.

24    Q.   Okay. And do you recall calling Marianne Rhodes

25    after you picked up the message from Scott and

1  screaming at her that she had a nerve to go out with

2  another man on your daughter's birthday?

3  A.  No, I did not.

4  Q.  Okay.  And did you call Marianne after you got the

5  message from Scott?

6  A.  I believe I did.

7  Q.  All right.  You called her a couple of times,

8  didn't you?

9  A.  No, I called her to tell her that this should be

10  the finale as far as her ever coming to my desk and

11  harassing me at work when I got back from vacation.

12  Q.  Okay.  Now, you left a message for Scott that we

13  heard yesterday, correct?

14  A.  Yes.

15  Q.  All right.  And was that December 30th that you

16  left that message?

17  A.  Yes, it was.

18  Q.  All right.  So was December --

19  A.  No, it was December 31st.

20  Q.  Okay.  So December 31st.  Just so I'm clear, was

21  December 30th a Sunday, if you recall?

22  A.  December 30th was that Sunday morning when I first

23  heard the message, and then that was when I called her

24  and said, you know, it should be a finale.  I shouldn't

25  have to be harassed at work any more, and she called me

1    throughout that day.  And some of those other messages
2    were from that day, and that was the day she said that
3    because she had told him how much she loved me at
4    lunch, that she was afraid to stay home, and that I
5    needed to come to her apartment to be with her that day
6    and throughout that night.
7    Q.    All right.  Now, let me back up.  You said some of
8    those other messages were that day.  Let me just
9    clarify.
10        When you say, "Some of those other message," are
11    you talking about the messages we heard yesterday from
12    Marianne Rhodes to you?
13    A.    Yeah.
14    Q.    Okay.  And I believe you testified you saved those
15    messages, correct?
16    A.    I mean, I didn't erase all of the messages, but
17    yes, I had those --
18    Q.    All right.  And --
19    A.    -- on my cell phone.
20    Q.    -- some of those had been left on your voice mail
21    at work, correct?
22    A.    Yes.
23    Q.    All right.  And do you know what dates the
24    messages were left on your voice mail at work, which
25    messages?

1   A.   The six -- December 6th and December 13th of 2001.

2   Q.   Okay.  Now, those messages, December 6th and

3   December 13th, were left on your voice mail at work

4   while you were dating Mary -- while you were living

5   with Marianne Rhodes, correct?

6   A.   When I was trying to move out.

7   Q.   Okay.  And I believe, sir -- Let me ask you this.

8   Those are the messages that you contend were the

9   harassing messages that she left on your voice mail at

10  work, correct?

11  A.   Well, she was harassing me, and like I said, those

12  were the only two that I had on tape at the time.

13  There were -- I believe there were more, but again, I

14  asked The Hartford for all of my messages, and I never

15  received any, and those were the ones that I was able

16  to get on before this whole thing with the

17  investigation and my termination took place.

18  Q.   So just so I'm clear, those are what you -- The

19  messages we heard yesterday, the first two are what you

20  contend to be harassing messages, correct?

21  A.   It was some of them, yes.

22  Q.   Okay.  And were those -- Those were the obscene

23  messages that you told Mr. Wardell about, right?

24  A.   Like I said, they were some of them, yes.

25  Q.   All right.  Now, you say they were some of them.

1    Do you recall any other voice mails, other than the
2    ones that we heard yesterday, that Ms. Rhodes left on
3    your voice mail at work?  Are there any other voice
4    mails that you contend are harassing?
5    A.    At work?
6    Q.    Correct.
7    A.    There were other ones, but like I said, I couldn't
8    get any more, and I asked -- I mentioned in my
9    statement to Wardell and then after I had asked The
10   Hartford for more -- for all of my voice mail messages,
11   and they refused.  They said that they can -- it's
12   their property, and they can do what they wanted to do
13   with them.
14   Q.    Okay.  Now, let me just be clear.  You said to
15   Wardell that Marianne Rhodes has left you obscene
16   messages at work, correct?
17   A.    Yes, well -- and threatening, too, yeah.
18   Q.    Okay.  And the first three messages we heard
19   yesterday were the messages that you contend are --
20   were the ones she left at work, correct?
21   A.    They were the first two on that tape, and those
22   were the only two that I was able to get, --
23   Q.    Okay.
24   A.    -- but yeah.
25   Q.    All right.  And you don't -- Your testimony now is

1  you don't recall any other voice mails that Ms. Rhodes

2  left on your voice mail at work?

3  A.  No, I know they were --

4  Q.  Or you do recall now?

5  A.  I know there were other ones, but I couldn't get

6  to them, and The Hartford refused to --

7  Q.  And again, --

8  A.  -- turn them over.

9  Q.  So you recall your deposition where you testified

10 under oath, correct?

11 A.  Yes.

12      MS. STRANGE:  Okay.  And I'm gonna -- Your

13 Honor, may I show him this deposition?

14      THE COURT:  Yes.

15 BY MS. STRANGE:

16 Q.  I'm gonna ask you again to look at line 16 where I

17 ask him, "Do you recall any other voice mail that Ms.

18 Rhodes left on your voice mail at work, any other voice

19 mails that you contend are harassing?".

20      MS. BAIRD:  Your Honor, may I have the page

21 number?

22      THE COURT:  Oh, --

23      MS. STRANGE:  Oh, I'm sorry.  Absolutely.

24      It is page number 24, volume 2.

25      THE COURT:  All right.  Do you have a

1    question for -- I'm sorry.

2              MS. STRANGE:   Okay.

3              THE COURT:   Do you have a question for Mr.

4    Shorter, or you just want him to look at that?

5    BY MS. STRANGE:

6    Q.   I just -- okay.

7         Mr. Shorter, looking at that testimony, did you

8    testify in your deposition that you didn't -- that

9    there were no other voice mails at work that you were

10   aware of?

11   A.   Yes, and at this point I believe you were asking

12   me the ones that I had, and said, "Do you recall any

13   other voice mails that Ms. Rhodes left on your voice

14   mail at work, any other voice mails that you contend

15   are harassing?", and I said, "None that I can remember

16   off the top of my head.", and I didn't have any more at

17   that time, but I knew there were other ones that I

18   could not get, that The Hartford refused to turn over.

19   Q.   All right.  But all of the voice mails that you

20   produced were while you were living with her, right?

21   A.   It was the week that I was trying to move out, and

22   the last one was December 13th, which was a Thursday,

23   and I moved out that -- she went to the football that

24   Sunday, and that's when I moved out.

25   Q.   Okay.  Now, let me just take that back, please.

41

1  access to Marianne Rhodes' voice mail on Friday,

2  January 18th, 2002.

3  A.    Okay.

4  Q.    If you look under "message activity" here, it

5  shows the deleted -- a list of deleted messages.  Are

6  those the messages that you testified yesterday you

7  deleted?

8  A.    Yes.

9  Q.    All right.  And you notice there's four messages

10  there?

11  A.    Yes.

12  Q.    All right.  So you deleted four messages from

13  yourself to Marianne.

14        That's what those were, right?

15  A.    Right.

16  Q.    And where were those stored on her voice mail?

17  A.    Either "unopened" or "old."   I -- Mostly like

18  "unopened" I think.

19  Q.    All right.  And did you go through her other

20  unopened messages to get to these?

21  A.    I mean, I don't know -- remember what messages I

22  went through.  All I know is I got to mine.

23  Q.    All right.  And you also got to a message from

24  somebody named "Rich," correct?

25  A.    Somewhere, yeah.

1  skip over to get to your messages?

2  A.  I don't recall.  I mean, there were other messages

3  on there, but I don't -- All I know is, I didn't tamper

4  with them, the ones --

5  Q.  All right.  There were other messages on her phone

6  system?

7  A.  I think so.  I believe so.

8  Q.  And were they work related messages?

9  A.  I don't recall.  All I know --

10  Q.  All right.

11  A.  -- is I didn't touch them.

12  Q.  Well, once you changed her password, she had no

13  access to those messages, right?

14  A.  Right, until I tried to call her and give it back

15  and show her the message.  Right.

16  Q.  Okay.  So you, as of 4:59 p.m. on Friday --

17  A.  Right.

18  Q.  -- locked her access to her voice messages at

19  work?

20  A.  And the reason I did it was so that she wouldn't

21  erase the message from Rich, because I felt that that

22  was my only chance to have her agree to leave me alone

23  at work and stop harassing me starting that next week

24  when I went back to work.

25  Q.  Okay.  And then you've changed her password again

1   A.    No, I didn't think about it, but I'm just saying,

2   because I remember being -- I think I was being accused

3   of destroying the messages, and I didn't destroy

4   anything.

5   Q.    No, you deleted them, right?

6   A.    Yes.  I didn't destroy them.

7   Q.    All right.  Other than your testimony here today,

8   nobody knows what those four messages are that you

9   deleted, right?

10  A.    They were my messages.

11  Q.    Right.  You're the only one who knows that,

12  though, right, because you deleted them?

13  A.    No, she knew it.

14  Q.    Okay.

15  A.    She knew I was deleting it.

16  Q.    All right.  So you deleted the messages.  Now,

17  you've changed her password at 4:59 p.m., and then

18  again at 5:18 p.m.?

19  A.    Yes.

20  Q.    All right.  And was that a calm, rational move on

21  your part?

22  A.    No, the first time I changed it, I moved it.

23  Like, I changed one digit, and then I --

24  Q.    Then you thought she might figure that out.  So

25  you decided maybe we should change it again?

1    Q.   All right.  Okay.  Let's look at the next day, the

2    January 20th.  I'm sorry, January 19th.

3    A.   Nineteenth.

4    Q.   All right.  You first accessed her voice mail at

5    5:18 in the morning, right?

6    A.   Right.

7    Q.   Okay.  And then you accessed it again at 8:05 and

8    8:07, correct?  I'm sorry, 8:05 and 9:10, correct?

9    A.   Right.

10   Q.   All right.  And you were at work at 8:05 and 9:10

11   working on that project you were supposed to be working

12   on, right?

13   A.   Well, I was on the release team, but like I said,

14   I believe that 8:05 one was -- it had to be after

15   because she called me at work that morning harassing

16   me, too.

17   Q.   Right.  She called you at work -- Let me back up.

18   She called you Friday night and said, "Can you please

19   give me my pass code back?", right?

20   A.   No, she -- no.  No.

21   Q.   Well, she did call you Friday night, right?

22   A.   She -- The first time we talked, she called me

23   Friday, and --

24   Q.   Right.

25   A.   -- she asked me -- we brought up her password, and

1   I said, "Yeah," said, "I'm going to connect you to the

2   message right now. And just listen to this message,

3   and of course, then we can take care of everything."

4   Q.   Right. And you told her, "Don't worry. There's

5   no messages from your boss. Don't worry about that,"

6   right?

7   A.   No, we didn't talk -- I don't remember -- We

8   didn't talk about her boss.

9   Q.   All right.

10  A.   Because, I mean, her boss had her cell phone

11  number so that -- I mean, that wasn't the --

12  Q.   And how do you know her boss had her cell phone

13  number?

14  A.   I mean, she has a cell phone. We talked about

15  that, I mean.

16  Q.   Well, you know she had to call her boss Friday

17  night, right, and tell him that she didn't have access

18  to her voice mails, right?

19  A.   No.

20  Q.   All right. You don't know that as you sit here

21  today that she called --

22  A.   Well, I found out later in paperwork, but again,

23  I've forgotten my password before, and all we have to

24  do is call and get it reset.

25  Q.   All right. And you don't -- Did you -- Were you

1  Q.   Okay.  And so she called you that Saturday

2  morning, right?

3  A.   Yes.

4  Q.   Right, and she wanted her pass code back, right?

5  A.   No, it wasn't about her password.  It wasn't about

6  that -- I never denied her, her password.

7  Q.   Okay.  You never gave it to her, did you?

8  A.   Well, again, I was trying to connect her, and then

9  I was going to give her the password.

10  Q.   All right.  Did you give anybody in management of

11  The Hartford her password in case they needed to get

12  into her voice mail over the weekend?

13  A.   No, I didn't speak to anyone in management.  Like

14  I said, they can -- they could have it reset.  I mean,

15  that was not the issue.

16  Q.   All right.  So now you changed her password.  What

17  made you change her password again at 9:19 a.m.?

18  A.   Because --

19  Q.   Were you afraid she might figure out the one you

20  were using?

21  A.   No, no.  Actually I changed it to her niece's

22  birthday because she wouldn't -- we couldn't stay on

23  the phone long enough, and if I remember correctly, she

24  -- Like I said, she called me that morning, and then

25  she called me again when I left work.  And I said,

1    Q.    Well, could they have been work related messages?

2    A.    From me?

3    Q.    Could they have been not from you?

4    A.    No, they were my messages.  That I know.

5    Q.    You're certain of that?

6    A.    Yeah.

7    Q.    All right.  And when you met with Mr. Wardell, you

8    knew he was investigating your use of the -- your

9    accessing another employee's voice mail at work, right?

10   A.    He asked me about it, yeah.

11   Q.    All right.  And you knew then -- He knew you

12   deleted messages, right?

13   A.    We -- I don't remember us talking about deleting

14   messages.  I didn't really remember hearing about that

15   until after when I was trying to be reinstated.

16   Q.    All right.  And you never bothered to tell Mr.

17   Wardell, did you, that all of the messages that you

18   deleted are supposedly from you?

19   A.    If he asked, I would've told him.

20   Q.    All right.  But the first time you said that was

21   really here yesterday, right?

22   A.    About what?

23   Q.    The fact that all -- that the seven messages you

24   deleted, you now claim were all your messages?

25   A.    I know they were my messages.

1    Q.  All right.  And the first time you've ever said

2    that in terms of to The Hartford was here yesterday,

3    right?

4    A.  I believe so.  I mean, if I was asked that another

5    time, I'm sure I would've told them that.

6    Q.  Okay.  Now, you claim you went to a security guard

7    over the weekend, right?

8    A.  Yes.

9    Q.  All right.  And I just want to be clear.  You did

10   that after you accessed Marianne Rhodes' voice mail,

11   right?

12   A.  I did it that afternoon, Saturday.

13   Q.  That afternoon, you -- I think you went to The

14   Hartford for about eight minutes that afternoon?

15   A.  No, we went, excuse me, we went back.  Cheryl came

16   with me, --

17   Q.  Okay.

18   A.  -- and we went that afternoon, and --

19   Q.  And you were on the premises for about eight

20   minutes that afternoon?

21   A.  No, we went -- First we pulled into the security

22   guard.

23   Q.  Uh-huh.

24   A.  And he's the one at the -- in the driveway at the

25   booth when you first pull in, and I told him about it.

1   He asked me her name and number, and I gave him her

2   name, number and extension.  And when I came inside,

3   that's when I say Wayne Jackson, who is a -- He's the

4   supervisor.

5   Q.   And he's a supervisor of the security force,

6   right?

7   A.   Right, right.

8   Q.   Okay.  And you knew that the security officers

9   were not Hartford employees?

10  A.   I mean, it was security of the building that we

11  worked in.

12  Q.   Right.  You knew that they didn't work for The

13  Hartford, though, right?

14  A.   Well, I knew they were connected security, so.

15  And so again, he was a supervisor, and I saw him there.

16  And I told him about the harassing visits, and when I

17  was talking to him, there was another security guard in

18  back of the wall where you check in.  And he told him

19  to write it down.  I mean, he can hear as we were

20  talking, but he -- you know, Wayne told him to write it

21  down.  And like I said, that was about a good 10, 15

22  minutes, if not longer.

23       And then after that was when I checked in.  I

24  signed in.  Because Cheryl was with me, I brought her

25  upstairs.  She wanted to see my desk and my work

1  station.

2      So we signed -- I signed in, and then she got --

3  she received a visitor's pass, and we went upstairs

4  onto the sixth floor.  I showed her my work station,

5  and we were up there for, like, about eight minutes, I

6  guess, eight -- anywhere from five to ten minutes,

7  let's just say.

8  Q.  All right.  Just so I'm clear, the security guard

9  you spoke to, he worked for a security company,

10  correct?

11  A.  I don't know who he worked for.  I just know he

12  was the security guard at The Hartford.  I mean, he was

13  our security.

14  Q.  Okay.  And again, so you recall being -- giving

15  your deposition in this case?

16  A.  Yeah.

17  Q.  Do you recall being asked -- so that security

18  guard you spoke to you, did he also -- did he work for

19  the security company?

20  A.  I believe -- Well, if he did, he did, but like I

21  said, a security company was working for The Hartford

22  from what I knew -- I was going to say, from what we

23  knew from what -- of any employee I spoke to knew, they

24  were our security guard.

25  Q.  All right.  So but neither of the security guards

1   that you spoke with were employees of The Hartford,

2   correct?

3   A.   Not directly.   They're employees of the security

4   company or employed from the -- by The Hartford.

5   Q.   Okay.

6   A.   So, I mean --

7   Q.   And when you were talking to them, sir, you knew

8   that they worked for the security company, not for The

9   Hartford.

10  A.   Well, I knew they were from a security company.   I

11  knew the security company worked for The Hartford.

12  Q.   Okay.   Now, when you went to meet with the

13  security guard, you didn't tell the security guard that

14  you had accessed Marianne Rhodes' voice mail, changed

15  her pass code, did you?

16  A.   No, I didn't even get into the part about her, you

17  know, giving me the password and disbursing, however

18  you want to put it, in that part, no.   I mean, I

19  could've.

20  Q.   All right.   And you didn't tell them that, you

21  know, "This is her new pass code in case somebody at

22  the company needs to reach her."

23       You didn't say that, did you?

24  A.   No.

25  Q.   Okay.   And you didn't tell the security guard that

1    A.   No, I mean, like I said, I had no idea that my

2    back was against the wall for my career.  He just said

3    to answer the questions truthfully, and he was asking

4    questions.

5    Q.   All right.  But he gave you a chance to answer

6    those questions, right?

7    A.   Well, I mean, I answered the questions, but again,

8    if I'd have known the entire situation, I would've --

9    And I did tell him why.  When we got to the password, I

10   told him why I changed it.  And, you know, he just gave

11   -- All he wanted to hear was just the one sentence

12   answer.  I said, yeah, to show she was lying.  He

13   didn't ask me to go into any further detail or

14   obviously I would've, and I mean, this was the first

15   chance I had, basically here.

16   Q.   All right.  He gave you a chance to explain your

17   answers, didn't he?

18   A.   Again, I explained -- I answered the question, and

19   I said it proves she was lying because she was

20   harassing me and this and that.  And I mean, he put in

21   what he put in.

22   Q.   But did he give you a chance to answer -- explain

23   your answers to him?

24   A.   Yes, I explained.  I mean, I explained what he

25   asked basically.

1  Q.  And you have in two and a half hours plenty of
2  time to share any information you wanted to share with
3  him, right?
4  A.  Right.
5  Q.  All right.  He told you that you had accessed, or
6  he asked you whether you had accessed her voice mail,
7  right?
8  A.  Yes.
9  Q.  All right.  And you agreed to that?
10  A.  Right.
11  Q.  All right.  And then you said you accessed it 10
12  to 15 times, right?
13  A.  Again, that was -- I mean, obviously that turned
14  out to be inaccurate by The Hartford's own records,
15  because it wasn't from work.
16  Q.  Okay.  All right.  Now, he also asked you about a
17  gun, right?
18  A.  Yes.
19  Q.  All right.  And did you tell him you had access to
20  a gun?
21  A.  No, we talked, and again, when we were talking, he
22  gave me real -- at one time he was being very friendly
23  like he was my friend.  So I said, "Yeah, we all have
24  access."  I mean, I forgot exactly what led to that,
25  but when he asked me the question, I said no.

1    Q.    Okay.  And I believe yesterday I showed you some
2    changes that you made to the statement, right?
3    A.    Correct.
4    Q.    Just want to go over those changes.  It's Exhibit
5    504.
6         All right.  So Mr. Wardell was typing this
7    statement as he was meeting with you, right?
8    A.    Right.
9    Q.    Okay.  And your first handwritten change, it says,
10   "During this whole fling, I caught her in many lies
11   instead of all these big and small lies."
12        Do you see that on the first page?
13   A.    Yes.
14   Q.    All right.  And that's your handwriting, right?
15   A.    Right.
16   Q.    All right.  So you wanted to make clear that it
17   was many lies?
18   A.    Right.
19   Q.    Okay.  And then you have a couple of other small
20   changes.
21        Is that your handwriting on the first page?
22   A.    Right.  Yes.
23   Q.    Okay.  And now, sir, let me just get it clear.
24   When you accessed these voice mails and you deleted
25   voice mails, were these all -- Have you testified to

1    A.    Right.

2    Q.    -- I'm just asking, that's separate from getting

3    the message from Liz.

4    A.    Yes.

5    Q.    That wasn't on her company --

6    A.    Yes, but I did not  -- I mean, as the record

7    showed, I did not access it 10, 15 times from my desk

8    phone.

9    Q.    Okay.

10   A.    So like I said --

11   Q.    Now, going down to the bottom here, you said --

12   you add the statement, "By the corporate conduct law,

13   Marianne violated by sharing her I.D. password.  I did

14   not violate it."

15         Do you see that?

16   A.    Yes.

17   Q.    Okay.  And you added that change, right?

18   A.    Right.

19   Q.    And that change appears in the final draft, right?

20   A.    Right.

21   Q.    All right.  So Mr. Wardell gave you an opportunity

22   to give whatever changes you wanted here, right?

23   A.    Right.  And that change --

24   Q.    And you took that opportunity, didn't you?

25   A.    Yes.

1    Q.   Okay.  And you never said to Mr. Wardell, "Wait, I
2    want to write down here that none of the messages I
3    deleted were from anybody at work."?
4    A.   We weren't discussing deleted messages.
5    Q.   Okay.
6    A.   I mean, I don't even -- It's not anywhere
7    mistakable, but we weren't -- we didn't discuss deleted
8    messages.  We didn't -- He never asked me about that e-
9    mail that we spoke about.
10        The voice mail message, I mean, that was out of
11   work, but he never asked me about that because I
12   would've -- I mean, I would've been glad to explain it.
13   Then I would've had to go into detail like I've been
14   trying to do here
15   Q.   Okay.  And now you reviewed this statement
16   carefully before you signed it, right?
17   A.   Yes, I looked it over.
18   Q.   Okay.  And you told Mr. Wardell that you had no
19   convictions, correct?
20   A.   Right.
21   Q.   All right.  And, sir, would you agree that the
22   records that Mr. Wardell had at the time indicated that
23   you did have a criminal conviction?
24   A.   No.  Well, actually, first he asked me if I've
25   been arrested, and I told him yeah.  I said, "You know,

1    A.    Right.  Right.

2    Q.    Did you tell Mr. Wardell about that?

3    A.    I don't remember if I told him about it, but like

4    I said, I wasn't convicted.  He asked me -- At the end

5    he asked me if I had any criminal convictions, and I

6    said no.

7    Q.    All right.  And true -- I'm sorry.  Strike that.

8          You learned later that your records indicated you

9    had criminal convictions, but you did not.

10         Is that accurate?

11   A.    Can you say that again?

12   Q.    Sure.  Did you later learn that your records

13   mistakenly indicated that you had criminal convictions?

14   A.    Well, I learned that, but then I learned from The

15   Hartford's own records that they received, was it 12

16   days after I was terminated, if that, that it wasn't.

17   Q.    Okay.

18   A.    And that was when I was pleading for

19   reinstatement, and The Hartford still claimed that I

20   was a criminal, but I learned by their records that

21   what I said was true, that I did not have, and still do

22   not have any criminal conviction.

23   Q.    Sir, is it your claim that you're pleading for

24   reinstatement with The Hartford?

25   A.    Yes, I wanted my job back, and I offered to -- am

1    I talking too much?

2            THE COURT:  That was a yes or no answer --

3            THE WITNESS:  Oh, yes.

4            THE COURT:  Okay.  Next question.

5    BY MS. STRANGE:

6    Q.   Okay.  And were you pleading for reinstatement in

7    -- with The Hartford after February of 2002?

8    A.   Yeah, I was asking for my job back then, too.

9    Yes.

10   Q.   When you met with Mr. Wardell, he -- you provided

11   with -- him with the information that you had accessed

12   Marianne Rhodes' voice mail, right, at work?

13   A.   Yes.  When he asked me, I told him.

14   Q.   Okay.  And that you had changed her pass code?

15   A.   Yes.

16   Q.   Okay.  And he also had that e-mail message that we

17   looked at yesterday, right, that e-mail that said --

18   A.   No.

19   Q.   -- you are a jealous dude?

20   A.   I don't remember being asked about that e-mail.

21   Q.   All right.  Do you know whether he had that e-

22   mail?

23   A.   No.

24   Q.   Okay.

25   A.   I don't believe he did.  I mean, if he did, he

1    didn't ask me about it because I would've explained.

2    Q.    Okay.

3    A.    I was never questioned about it.

4    Q.    All right.  And Mr. Wardell also had that -- a

5    report about a conviction, right?

6    A.    Well, that showed that to me after I was

7    terminated, and I told them that it was wrong.  And

8    like I said, they verified that it was wrong 12 days

9    later.

10   Q.    Okay.  Sir, accessing Marianne Rhodes' voice mail,

11   --

12   A.    Uh-huh.

13   Q.    -- changing her pass code 10 to 15 times, --

14   A.    I --

15   Q.    -- or accessing it 10 to 15 times, changing her

16   pass code twice, and deleting messages, is that the

17   information that you provided to Mr. Wardell?

18   A.    I don't -- First of all, I don't -- we don't -- we

19   did not talk about the deleting messages, but if we

20   did, like I said, I would've told him exactly what I

21   said here today, that they were my messages, and that

22   it was reflecting on her harassing me.

23        That's all it was, and I didn't access her --

24   After that weekend, I did not access her voice mail for

25   myself.  I already knew what was on it.  When the

1    A.   No, my departments had a different department code

2    than Marianne's.

3    Q.   Okay.

4    A.   And even with the password, you cannot get into

5    someone's voice mail just with the password.  You also

6    have to know their department's code.

7    Q.   Okay.

8    A.   It's a voice messaging system that you have to

9    call into, and she gave that to me as well, and that

10   was for her whole department.

11   Q.   All right.

12   A.   So again, I -- I mean, that's why I didn't -- Like

13   I said, if I would've told a security guard that, I

14   mean, that was -- that would look like I was

15   intentionally trying to screw her, and I did not want

16   her to get in any trouble.  I just wanted her to stop

17   harassing me at my desk.

18   Q.   Okay.  But let me just be clear.

19   A.   Uh-huh.

20   Q.   Do you think your conduct in deleting the voice

21   mail messages and changing the pass code was

22   appropriate?

23   A.   Well, for the reason that I did it, and again, I

24   did not know that my back was against the wall as far

25   as my career, or else I would've explained all of that.

1    Q.   Sir, that's -- That is really the essence of your
2    claim, right?  You're in essence mad that Marianne
3    received a warning, and you got --
4    A.   No, not --
5    Q.   -- terminated, right?
6    A.   No, no.  The point is, is that it was not a
7    terminable offense.  I mean, --
8    Q.   Well, you violated the electronic communications
9    policy.
10        You agree with that, right?
11   A.   Right, but again, and if we go back, what you were
12   asking me about the -- when I wrote in by the corporate
13   conduct law.  In the handbook that we received, that
14   wasn't in there.
15        No, I'm still not saying that was correct, but I'm
16   --
17   Q.   Right.  I mean, --
18   A.   -- just saying, that was not in there.  So, I
19   mean, it's not even a written rule of what I did.
20   Q.   All right.  But you understand, as you sit here
21   today, that you violated the company's policy when you
22   changed her password?
23   A.   Yeah, but like I said, but I had a reason, and the
24   reason was, like I said, I didn't want to -- It was to
25   protect her from her job, but yet at the same time,

1    protect me from the harassment which was disrupting my

2    work.

3    Q.   All right.  There was a reason you -- The reason

4    you accessed her pass code was because you wanted to

5    get -- because you were mad at her, right?

6    A.   I wasn't -- I -- If I was mad, I was mad about

7    being harassed at work.  I was not mad.

8         Like I said, I was involved with -- I mean, I had

9    female friends.  I was living with a woman.  What she

10   did had nothing to do with my -- with me being mad.

11              THE COURT:  Ms. Strange, we could take a

12   break now unless --

13              MS. STRANGE:  That's fine.

14              THE COURT:  Okay.  Good stopping point for a

15   break.

16              So just a reminder not to discuss the case,

17   and we'll come back at noon.  Thanks.

18        (Jury out.)

19        (Recess.)

20              THE COURT:  Okay.  Just a couple of things.

21              Please be seated.

22              Just generally speaking, I should mention one

23   thing, because there have been, oh, I don't know, the

24   last half hour or so of questions that could be

25   answered yes or no that weren't.  Generally speaking, I

1    interfere with your work, the telephone usage?

2    A.   At that time, correct.

3    Q.   All right.  So your only concern when you worked

4    at The Hartford is that you not engage in conduct that

5    interferes with your work, right?

6    A.   Oh, I mean, I would never want to interfere with

7    anyone's work.

8    Q.   Right.  And I think you testified yesterday your

9    work was very important to you?

10   A.   Yes.

11   Q.   Okay.  And when you engaged in this conduct, you

12   interfered with Marianne Rhodes' work, didn't you?

13   A.   No.  I mean, not intentionally.  I called her to

14   connect her to the voice mail.  I tried one last time,

15   and only because she had called me earlier, shortly

16   before that.  Like I said, it was after midnight, and I

17   tried one more time, and again, she hung up.  So I just

18   -- Like I said, there was no more.

19   Q.   When Marianne Rhodes gave you her pass code, she

20   wasn't interfering with your work, was she?

21   A.   By doing that, I mean, she was interfering by

22   harassing me at my desk at that time.

23   Q.   All right.  I'm not asking about harassing you at

24   your desk.

25        When Marianne Rhodes handed -- gave you her pass

138

1    code, she wasn't interfering with your work, was she?

2    A.   No, I mean, not at that time.

3    Q.   All right.  And just to clarify, you went to

4    security, but you didn't want her to get in trouble,

5    right?

6    A.   Correct.

7    Q.   All right.  You just wanted her to stop, in your

8    words, harassing you, right?

9    A.   Stop harassing me at my desk, correct.

10   Q.   All right.  You wanted her to stop coming to your

11   desk?

12   A.   Right.

13   Q.   That's all you wanted with your complaint to

14   security?

15   A.   Well, from what I remember, that's -- that was the

16   main thing, stop harassing me at my desk.

17   Q.   Okay.

18   A.   It was out of control.

19   Q.   All right.  And when you were -- when -- You

20   testified this morning that you listened to Liz's voice

21   mail on the cell phone?

22   A.   I believe so.

23   Q.   All right.  So in addition to accessing Marianne

24   Rhodes' voice mail all weekend long, time after time,

25   you were accessing her cell phone as well?

1    recross, and we'll take it from there.  Thanks.

2                    RECROSS-EXAMINATION

3    BY MS. STRANGE:

4    Q.   Mr. Shorter, do you have Exhibit 532 in front of

5    you, your statement that you were testifying to?

6    A.   Yes.

7    Q.   Okay.  Could you just read for me that last

8    paragraph right above your signature?

9    A.   "I have read the above statement and been afforded

10   the opportunity to make changes, deletions,

11   modifications, and/or additions I felt were necessary.

12   This is statement is true and accurate to the best of

13   my knowledge."

14   Q.   Okay.  And that statement is true and accurate,

15   right?

16   A.   Oh, yeah.

17   Q.   You didn't lie in this statement?

18   A.   No.

19   Q.   Okay.  Sir, just one, final question.

20        I just want to clarify, you talking about

21   contacting Marianne Rhodes over the weekend.  Every

22   time you contacted her voice mail, I believe you

23   testified that you contacted Marianne Rhodes as well.

24        Is that accurate?

25   Q.   Right.  I tried to call her cell phone.

1    A.    I don't recall her showing me any evidence, and as

2    a matter of fact, I've written that there wasn't a lot

3    that was I able to do for the woman.

4    Q.    And what do you mean there wasn't a lot you were

5    able to do?

6    A.    Well, as I initially said, when you code something

7    in a 6100, which implies a domestic, in this day and

8    time in Connecticut, I have certain responsibilities

9    and obligations I'm required to follow.  So my

10    questions were tailored specifically to find out if

11    there was a criminal violation, any fear or threat, or

12    even a harm to the complainant.

13        I found none to the degree that I did not even

14    contact the person who she names as a possible suspect

15    here, and my -- the extent of my involvement was to

16    document that we had a conversation, that I recall

17    giving her some informed advice as to who might be able

18    to help her better than I, and then this was forwarded

19    on solely for the purposes of educating the next few

20    shifts or having intelligence information for the next

21    couple of days if, in fact, the situation that's

22    described here would've changed any.

23    Q.    Was there any discussion with Ms. Rhodes about a

24    restraining order?

25    A.    I don't specifically recall, but in situations

1    like this, it's common to have those kind of

2    conversations.  I give them on a routine basis.

3        I was just talking to someone in the back of the

4    room this afternoon, the dynamics of this job in my 26

5    years have changed to the degree that this is the most

6    prevalent aspect of it lately.  So I have these

7    conversations a lot, is my point.

8    Q.   And is someone able to obtain a restraining order

9    at the Vernon Police Department if they so desire?

10            MS. STRANGE:  Objection, Your Honor.

11            THE COURT:  Sustained.

12   BY MS. BAIRD:

13   Q.   I believe you already answered this, but I'll ask

14   it.

15       Did you ever speak to any individual by the name

16   of Ferron Shorter regarding this report?

17   A.   No, ma'am.

18   Q.   And finally, what are these obligations that you

19   refer to in this time and age about domestic violence?

20   A.   The law in Connecticut is fairly rigid with my

21   responsibilities as determining whether there's been

22   any threat of violence, any actual violence, any

23   implied violence as far as it being a threat or an

24   eminent threat to the victim.  I found none in this

25   particular case.

1   Rhodes that was brought to your attention, that

2   required your attention?

3   A.    Well, you know, we looked at the statement in two

4   different ways.  We looked at it from a safety issue,

5   Marianne's safety, and we also looked at it from a

6   violation issue because there was a violation of our

7   phone mail.

8   Q.    And what was the violation of the phone mail that

9   you're referring to?

10  A.    Marianne supplied her password to Mr. Shorter.

11  Q.    I'm showing you a document that's been marked as

12  Defendants' Exhibit 533.

13        Do you recognize that?

14  A.    Yes.

15  Q.    What is that document?

16  A.    This is her -- This is Marianne's statement to

17  Lisa Anderson in EOD when she met with her on the 21st

18  of January.

19  Q.    Is that the statement that you reviewed?

20  A.    Yes, with Lisa.

21  Q.    And after reviewing that statement and discussing

22  with Lisa Anderson what action should be taken, what

23  action was, in fact, taken?

24  A.    Uh-huh.  Two courses of action were taken.  Number

25  one, in response to the safety issue, we spoke to

1    policies.  You just -- You don't give out your
2    password.
3    Q.   And if I could direct your attention to that
4    attachment where it's numbered two -- excuse me, where
5    it's numbered one.
6    A.   Yes.
7    Q.   What does that state?'
8         If you could read it and then describe what it
9    means.
10   A.   Sure.  "Use your log-on I.D. for purposes only as
11   authorized by your management.  As the registered owner
12   of the log-on I.D., you are accountable for all actions
13   initiated under it."
14   Q.   So in terms of Ms. Rhodes and her providing her
15   password to another individual, what was her
16   responsibility with regard to the use of that password?
17   A.   Her responsibility for the use of that password,
18   you mean as far as keeping it confidential?  She had to
19   keep that password, she was -- Per the policy,
20   employees are expected to keep their passwords to
21   themselves, and not to share them.
22   Q.   And if they do share them, are they accountable
23   for any actions taken using that password?
24   A.   Yes.
25              MS. BAIRD:  No further questions.

1    A.   With Lisa Anderson and her manager.  You know, we

2    sat down, and we just discussed what is the appropriate

3    next course of action, and we did discuss termination

4    as a potential course of action.

5    Q.   And you obviously didn't choose that action.

6         Why is that?

7    A.   Because with each of these instances, we look at

8    them on a case-by-case basis, and in this particular

9    case, we felt that written warning was the appropriate

10   course of action.

11   Q.   Do you have 534 up there?

12   A.   Yes, I do.

13   Q.   Could I have you take a look at the attachment for

14   a moment?

15   A.   Yeah.

16   Q.   When this document refers to log-in I.D., what is

17   that referring to?

18   A.   Log-in --

19   Q.   Do you understand my question?

20   A.   Yeah.  I'm just reading through.

21   Q.   Okay.

22   A.   Log-on I.D. usually refers to the person's work

23   station.  So it's their computer, their P.C. versus,

24   like, the phone.

25   Q.   Is there a log-on I.D. in The Hartford's voice

1    mail system?

2    A.    There's a password in our voice mail system.

3    Q.    Okay.  Ms. Courey, when you recommended a written

4    warning for Marianne Rhodes, did you know Mr. Shorter's

5    race?

6    A.    No, I didn't.

7             MR. VEITZER:  I have no further questions.

8             THE COURT:  Thank you.  Ms. Baird, any

9    further questions?

10            MS. BAIRD:  Yes, if I could just have a

11   moment.

12            THE COURT:  Sure.

13       (Pause.)

14                 REDIRECT EXAMINATION

15   BY MS. BAIRD:

16   Q.    If you could just look at Exhibit 534 again.

17   A.    Uh-huh.

18   Q.    That attachment, is there another page to that

19   attachment or more pages that you know of?

20   A.    Yes, there is more attachments, and I think what

21   we did in Marianne's particular case is, we put the

22   attachment that was relative to her specific case.  So

23   it was -- Instead of giving the whole document, we gave

24   her the piece that was relative to the log-on, or

25   excuse me, the password violation.

240

INDEX

|  |  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|---|
| **WITNESSES FOR** | | | | | | |
| **THE PLAINTIFF:** | | | | | | |
| Ferron Shorter | | 13 | 148 | 170 | -- | -- |
| Peter Kuck | | 173 | 194 | 201 | 202 | -- |
| Christopher | | | | | | |
| Hammock | | 204 | 212 | -- | -- | -- |
| Sharon Courey | | 214 | 222 | 227 | -- | -- |
| **WITNESSES FOR** | | | | | | |
| **THE DEFENDANT:** | | | | | | |
| None. | | | | | | |

| **EXHIBITS:** | | **Offered** | **Admitted** |
|---|---|---|---|
| D-520 | E-Mail | -- | 8 |
| D-521 | E-Mail | -- | 8 |
| D-522 | E-Mail | -- | 8 |
| D-519 | Discussion Report | 50 | 51 |
| D-511 | Unidentified | -- | 147 |
| P-15 | Unidentified | 159 | 159 |
| P-20 | Unidentified | 159 | 159 |
| P-21 | Unidentified | 159 | 159 |
| P-22 | Unidentified | 159 | 159 |
| P-23 | W-2 Forms | 159 | 159 |
| P-24 | Document from Retirement Unit | 159 | 159 |

241

INDEX (CONTINUED)

| P-25 | Unidentified | 159 | 159 |
| P-26 | Unidentified | 159 | 159 |
| P-27 | Unidentified | 159 | 159 |
| P-28 | Pay Stub | 159 | 159 |
| P-29 | Resume/Cover Letters | 159 | 159 |

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_Stephen C. Bowles_                    February 17, 2005

STEPHEN C. BOWLES