DEFENDANT'S
EXHIBIT

3

ALL-STATE LEGAL

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER, JR.,                .      Case No. 3:03-CV-00149
                                    .      (WIG)
              Plaintiff,            .
                                    .      Bridgeport, Connecticut
     v.                             .      January 26, 2005
                                    .
HARTFORD FINANCIAL SERVICES .
                                    .
GROUP, INC., ET AL.,                .
                                    .
              Defendants.           .
 .   .   .   .   .   .   .   .   .   .   .   .

CONTINUED TRIAL
BEFORE THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:            Law Offices
                              By: RACHEL M. BAIRD, ESQ.
                              Stonegate Professional Bldg
                              379 Prospect Street
                              Torrington, CT 06790-5239

For the Defendant:            Jackson Lewis
                              By: MARGARET STRANGE, ESQ.
                                  JAMES F. SHEA, ESQ.
                              55 Farmington Avenue
                              Suite 1200
                              Hartford, CT 06105

Court Monitor:                MS. SANDRA J. BALDWIN
                              MS. MARIA CORRIETTE

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

BOWLES REPORTING SERVICE
P O BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1    A.    No.

2    Q.    Did anyone at The Hartford ever discuss with you

3    anything about going to Mr. Shorter's desk?

4    A.    No.

5    Q.    Did anyone at The Hartford ever discuss with you

6    any complaint that had been made regarding your

7    harassment of Mr. Shorter?

8    A.    No.

9          MS. BAIRD:  No further questions.

10         MS. STRANGE:  Before I start, may we

11   approach?

12         THE COURT:  Yes.

13     (At side-bar:)

14         (Inaudible) ask her a question about her

15   relationship with Mr. Shorter.  I'm not sure that

16   (inaudible).

17         MS. BAIRD:  I didn't open it up.

18         MS. STRANGE:  I know, so I have to recall her

19   as our witness.  She's here.

20         MS. BAIRD:  I don't think it's relevant.

21         THE COURT:  What did you want to -- Well, he

22   testified at length that his relationship --

23         MS. STRANGE:  Yes, that's my problem.  I

24   wasn't going to go into it, but he testified at length.

25         THE COURT:   The whole history of the

1  Q.   And what happened the next day?

2  A.   On New Year's Day?

3  Q.   Right.

4  A.   I left him that voice mail message.

5  Q.   Okay, and then did you go to your brother's house

6  at some point?

7  A.   That was New Year's Eve day.

8  Q.   Okay.  All right.  Now, do you recall your

9  statement to The Hartford, and I'm actually going to --

10         MS. STRANGE:   I have copies for the jury.

11    (Pause.)

12  BY MS. STRANGE:

13  Q.   Do you have your statement in front of you?

14  A.   Yes.

15  Q.   Let's focus on one issue.

16    In your statement, you asked -- you say that Mr.

17  Shorter threatened your brother?

18  A.   Yes.

19  Q.   Okay.  Wasn't -- I'll give everybody a moment to

20  look at it.

21    (Pause.)

22  Q.   Okay.  When did Mr. Shorter threaten your brother?

23  A.   That was a few days after New Year's.  I don't

24  remember.  The first week of January, he had called and

25  said that -- he asked for my brother's address and said

1    Florida?

2    A.    I told him I was going to South Carolina to visit

3    my sister.

4    Q.    And was that true?

5    A.    No.

6    Q.    Now, when did you last speak to Mr. Shorter during

7    the week of January 18th?

8    A.    When I got into Florida.

9    Q.    Okay, and when you got into Florida, tell me what

10   happened?

11   A.    When I arrived in Florida, I called to check my

12   voice mail to see if Brian had left me any messages,

13   and that's when I found out that I couldn't -- the

14   password was not working.

15        And I checked my personal cell phone, too, and

16   that also was not working.

17   Q.    Were you concerned about this?

18   A.    Yes.

19   Q.    Why?

20   A.    Because I was there under the assumption that I

21   would be able to do work if he needed me.

22   Q.    So what did you do once you realized -- After you

23   called Brian?

24   A.    I called Ferron and asked him -- to tell me -- to

25   change the password back or to tell me what the

1    password was.

2    Q.    And did he?

3    A.    No, he didn't.

4    Q.    How many times did you speak with Ferron Shorter

5    that Friday evening?

6    A.    Numerous.  I think three or four times maybe.  I

7    ended up turning off the phone.

8    Q.    And did you speak with him again on Saturday?

9    A.    Yes, I did.

10    Q.    All right.  Did you call him or did he call you?

11    A.    He called me.

12    Q.    When was that?

13    A.    Some time in the morning, 8:00 o'clock, 9:00

14    o'clock.

15    Q.    All right, and what did -- What did he say to you?

16    A.    He told me that he was going to go to security and

17    report me and say that I was bothering him at his desk.

18    He was going to tell them that he wanted me to stop

19    coming over to his desk.

20    Q.    And did you ask him for your pass code back at

21    that time?

22    A.    Yes, I did.

23    Q.    Did he give it back to you?

24    A.    No.

25    Q.    And what was -- Were you -- What was your response

1  of him not giving you the pass code back?

2  A.  I told him that, after he told me he was going to

3  go to security, I said, "Well, I'll go to security

4  myself," and something about "You're not going to have

5  a desk when you come back on Tuesday because you'll get

6  fired if you don't change my password back."

7  Q.  Now, did you -- Did you talk to Mr. Shorter on

8  Sunday?

9  A.  Yes, I did.

10  Q.  All right, and how many times did you talk to him

11  on Sunday?

12  A.  A couple times, two or three maybe.

13  Q.  Let me back up.  On Saturday, when's the last --

14  How many contacts did you have with him on Saturday?

15  A.  I believe one long conversation and, again, I

16  turned the phone off.

17  Q.  Okay.  What time did you turn the phone off?

18  A.  Nine or ten o'clock in the morning.

19  Q.  And why did you do that?

20  A.  The phone was ringing nonstop and we were headed

21  -- we were going out for the day.

22  Q.  Where did you go?

23  A.  We went to Busch Gardens.

24  Q.  And did you -- When did you turn the phone back on

25  again?

1    A.    I turned it on sometime that evening.  The

2    Patriots were playing that night, and I called my

3    sister.  She's a Patriots fan, so I had called her

4    during that game and then I believe I turned it off

5    again.

6    Q.    Okay, and then on Sunday, did you have your phone

7    on?

8    A.    I turned it on in the morning.

9    Q.    Okay, and did you talk to Mr. Shorter?

10    A.    Yes, I did.

11    Q.    All right.  Did you call him or did he call you?

12    A.    He called me.

13    Q.    All right.  And again, did you ask him on Sunday

14    for your pass code back?

15    A.    Yes, I did.

16    Q.    All right, and did he give it to you?

17    A.    No, he did not.

18    Q.    Did you ask him to change the pass code back to

19    the original one?

20    A.    Yes.

21    Q.    Did he do that?

22    A.    No.

23    Q.    Now, did you also speak with Mr. Shorter when you

24    returned to work on Monday?

25    A.    He called me, yes.

1    Q.    All right, and what did he say?

2    A.    He said, "I hope you're happy about lying."

3    Q.    All right, and at that point in time, were you

4    afraid of Mr. Shorter?

5    A.    Yes.

6    Q.    Why?

7    A.    Because when I -- The conversation I had with him

8    during the weekend, when I said that he would be fired,

9    he had made a remark about if he had gotten fired, he

10    would come after me because he would have nothing to

11    lose.

12    Q.    Now, when you went in to work on Monday morning --

13    Strike that.

14        This is your statement, Exhibit 33, right, 533?

15    A.    Yes.

16    Q.    Okay, and who is Lisa Anderson?

17    A.    She is -- She works for the equal opportunity

18    development department.

19    Q.    Okay, and did you provide the information in this

20    statement to Lisa Anderson?

21    A.    Yes, I did.

22    Q.    Okay.  All right, and did you -- did you sign this

23    statement?

24    A.    Yes, I did.

25    Q.    All right, and I won't make you go through all of

1          THE COURT:  Yes.

2      (Pause.)

3   BY MS. STRANGE:

4   Q.   I just have one follow-up area I just need to set

5   up.

6       Can you see that from here -- from there?

7   A.   Not all of it.

8   Q.   No.

9          MR. SHEA:  You want me to hold it up?

10         MS. STRANGE:  Yeah, you can hold it up.  Do

11  you want to hold it up?  Okay.

12         THE COURT:  Thank you.

13         MS. STRANGE:  You can just go around.

14         THE COURT:  You can stand up.  Actually, if

15  you want to see, you can stand up, sure.  Take a look.

16      (Pause.)

17         MS. STRANGE:  While you're getting that set

18  up, I'll ask another question.

19  BY MS. STRANGE:

20  Q.   Ms. Rhodes, did you stay in your apartment the

21  night of January 24th, 2002?

22  A.   No, I did not.

23  Q.   All right.  Did you stay in your apartment after

24  that for a time period?

25  A.   Not for a week or two.

1  Q.   Why was that?

2  A.   Because I was afraid of Ferron.  He still had the

3  key to my apartment.

4  Q.   Okay, and I'm going to show you some documents to

5  refresh your recollection about you phone records for

6  the weekend of January 18th.

7  A.   Uh-huh.

8  Q.   I'm going to ask you to look at these and then --

9  Why don't you just take a look at these and just a few

10 questions.

11      Looking at this chart, I want you to just look at

12 your phone records and tell me if any of the calls, any

13 of the calls from Mr. Shorter match any of the times on

14 this chart for January 18th?

15          MR. BAIRD:  I need to object.  I don't know

16 what that document is.

17          THE COURT:  It's the phone records.  You want

18 to take -- Has Ms. Baird seen those records yet?

19          MS. STRANGE:  No.  They were never requested.

20 We just found them, in fact.  I'm going to give her --

21          THE COURT:  Sure.

22          MS. STRANGE:  I'm just refreshing her

23 recollection.  I don't have a problem giving her a copy

24 of this.

25          THE COURT:  Yes.  Are you intending to

1  A.   He would have nothing to lose, is what he said.

2  Q.   Okay.  And did you tell that to the Vernon police

3  officer when you talked to him on Wednesday, January

4  23rd, 2002?

5  A.   I don't remember exactly what we told him.

6  Q.   When you say what we told him, was there someone

7  else with you?

8  A.   Yes, there was.

9  Q.   And who was that?

10  A.   I don't remember his name.  It was somebody from

11  the special investigative unit.

12  Q.   Do you know why you were at the Vernon Police

13  Department?

14  A.   I was -- They wanted me to go and find out about

15  getting a restraining order.

16  Q.   Did you ask to go to the Vernon Police Department?

17  A.   No.

18  Q.   How long do you say that Mr. Shorter was at your

19  apartment in Vernon on New Year's Eve?

20  A.   A few hours.

21  Q.   What time did he arrive approximately?

22  A.   Somewhere between 7:00 and 8:00.

23  Q.   And what time did he leave?

24  A.   Just before midnight.

25  Q.   When -- When you testified that Mr. Shorter called

1  A.   Yes.

2  Q.   In fact, after Mr. Shorter was terminated, isn't

3  it true that Lisa Anderson asked you to go out to lunch

4  with her anytime?

5  A.   If I needed to talk, yes.

6  Q.   Did you ever have lunch with Lisa Anderson?

7  A.   No.

8         MS. BAIRD:  If I could have a moment, Your

9  Honor.

10        THE COURT:  Yes.

11 BY MS. BAIRD:

12 Q.   Did there come a time when you stopped being

13 afraid of Mr. Shorter?

14        MS. STRANGE:  Objection, Your Honor.

15        THE COURT:  Sustained.

16        MS. BAIRD:  No further questions.

17        THE COURT:  Thank you.  Anything further?

18        MS. STRANGE:  Just two brief questions, Your

19 Honor.

20        THE COURT:  Thank you.

21              RECROSS EXAMINATION

22 BY MS. STRANGE:

23 Q.   When you went to Lisa Anderson, were you afraid of

24 Mr. Shorter?

25 A.   Yes.

1    the weekend, that she asked for the password back,

2    asked him to fix it, that he didn't.

3        That she told him that she was going to report him

4    to security and that when she did that, that he

5    threatened her, that he said that if she did report

6    him, that he would lose his job, and if he lost his

7    job, he would have nothing to live for and he would

8    come after her.

9        I asked her if she took this threat seriously and

10   she said she did, and I asked why. She told me that

11   they had -- that he was very jealous --

12              MS. BAIRD:  Objection, Your Honor.  It --

13              THE COURT:  Overruled.

14              MS. BAIRD:  Okay.

15   A.   She told me that she had a voice mail tape of him

16   berating her on the phone.  She told me that he had

17   bruised her arm in the past and kicked her.  He told --

18   She told me that he had threatened her brother in the

19   past.  She told me that her sister-in-law had called

20   the police on them, the Vernon police, when she

21   overheard them on the phone having an argument, she

22   said that they weren't having the argument at her

23   apartment so that even though when the police came,

24   they weren't there.

25       So those were the reasons why she told me that she

1    was afraid of him.

2    BY MS. STRANGE:

3    Q.   I'm going to show you, although you did well

4    without them, I'm going to show you a document, Exhibit

5    547.

6        I just ask you if these are the notes that you

7    took?

8    A.   Yes.

9    Q.   All right.

10            MS. STRANGE:   I'm going to ask that those be

11   admitted.   I'm going to hand and pass them out to the

12   jury.

13            THE COURT:   Okay.

14   BY MS. STRANGE:

15   Q.   All right.  Now, did -- did you ask Ms. Rhodes any

16   questions?

17   A.   I did ask her some questions along the way, mainly

18   in an attempt to clarify the chronology of what she was

19   telling me.

20       So when she started talking to me, she was

21   throwing a lot of information at me and I was taking my

22   notes as quickly as I could, probably not getting the

23   chronology right.

24       Early on in her complaint to me, I realized that

25   it was a very serious complaint that she was making and

1    A.    She told me that when she confronted Ferron
2    Shorter and said, "I am going to report you for
3    changing my password and blocking my access," that he
4    said to her, "If you do that, I will lose my job, and
5    if I lose my job, I will have nothing to live for and I
6    will come after you," and I was concerned about that.
7    Q.    All right.    At that point, did -- had you made any
8    decisions about whether or not Mr. Shorter was going to
9    lose his job?
10   A.    No, absolutely not.
11   Q.    All right.    What did you do next in regard to Ms.
12   Rhodes' complaint?    What did you do when she left your
13   office?
14   A.    After she left my office, I started working on her
15   complaint that day.    I took it as a very serious
16   matter, and I started looking into it right away.
17        I actually called security to report the complaint
18   that she had made and to get some guidance on whether
19   or not we could find out if Ferron Shorter had been in
20   the building multiple times on Saturday, as she
21   reported to me.
22   Q.    Okay.    Let me just stop you there.
23        What specifically did she tell you about Mr.
24   Shorter coming into the building?
25   A.    She told me that he was there for his usual work

1    Q.   All right.  Now, where -- Where did you meet with

2    David Jimenez?

3    A.   In his office, and also to prepare for the

4    meeting, I forwarded the voice mail message that was on

5    my voice mail account, and just what the preliminary

6    message said, this is for our meeting at 4:00 o'clock.

7    Q.   All right, and I should have asked you.

8         The voice mail message that you forwarded, that

9    was the one that -- the Scott voice mail messages?

10   A.   Yes.

11   Q.   All right.  I'm not going to play them again, but

12   what was your response to those messages?

13   A.   My reaction to the messages was that, you know,

14   Ferron was obviously very angry on the phone and, you

15   know, Mary Anne, one of her complaints to me was that

16   she was -- had been threatened and gave me reason to

17   take it seriously.

18   Q.   Now, did Mary Anne tell you about conversations

19   she had with Ferron over the weekend?

20   A.   She told me that -- about the conversation on

21   Saturday morning where she said, "I'm going to report

22   you," and that's when he said that, "If you report me,

23   I will have nothing to live for, and I will come after

24   you.  I'll lose my job.  I won't have anything to live

25   for.  I will come after you."  She told me about that

1   Q.   Did -- Did anything about that conduct concern

2   you?

3   A.   Absolutely.

4   Q.   And what was that?

5   A.   It gave me a sense that this guy was controlling.

6   It was intimidating type of behavior.   It's like,

7   "Well, here, I can access your voice mails, but you

8   can't."

9        There was just a real element of control about

10  that that the overall picture was just -- it was -- the

11  overall picture concerned me.

12  Q.   All right.   Now, when did you -- How long did you

13  meet with Mr. Jimenez?

14  A.   I believe it was less than a half an hour,

15  probably about twenty-five minutes.

16  Q.   All right, and what did -- What did you provide

17  Mr. -- What did you tell Mr. Jimenez?

18  A.   I provided him with the results of everything that

19  I had found over the previous twenty-four hours that I

20  had been working on this, the itinerary, the voice --

21  the voice mail log, the voice mail message.

22       I had told him about my conversations with

23  Jennifer Ames, that we looked at this as a very serious

24  matter, that we thought the behavior was a terminable

25  offense and that if he -- if Ferron admitted to the

1    behavior, that his employment should be terminated, and
2    he agreed with that.
3    Q.   When you say terminable offense, what do you mean?
4    A.   When you look at the conduct, you separate the
5    conduct from the person and you look at what happened.
6    Is that -- Does that behavior rise to the level that
7    that person's employment should be terminated, and in
8    my estimation, the answer is yes.
9    Q.   And why?
10   A.   He interfered with her ability to get her job
11   done.  He -- He -- He -- He had the password, yeah, she
12   wasn't supposed to give it to him.  He was -- He didn't
13   have authorization to change it.  He didn't have
14   authorization to block her messages.  He didn't have
15   authorization to delete any of those messages, but on
16   top of that, I had to consider the threat as well, was
17   that credible.  In my estimation, yes, it was given the
18   way she told me the threat came up.
19        She says, "I'm going to report you," and he
20   responds by saying, "I'm -- I won't have anything to
21   live for, I'll come after you," and then turns around
22   and tries to turn the tables and goes to The Hartford
23   to report what he calls a complaint.
24   Q.   Now, did David Jimenez agree with your conclusion?
25   A.   Yes, he did.

1   Q.   Okay.  Did David Jimenez make any other

2   recommendations?

3   A.   Yes, he did.  He took the potential violence in

4   the work place threat very seriously and he told me

5   that I would not be the person to interview Ferron

6   Shorter.

7   Q.   And who was going to interview Ferron Shorter?

8   A.   That he was going to request that our department

9   of special investigations interview Ferron.

10  Q.   Okay.  Now, did you -- Were you -- Did you --

11  Strike that.

12      Did David Jimenez say anything else?

13  A.   He said that he --

14          MS. BAIRD:  Objection, Your Honor.  It's

15  hearsay.  I believe Mr. Jimenez will be here to

16  testify.

17          THE COURT:  Well, actually, it's not coming

18  in for the truth or false -- of what Mr. Jimenez said

19  to Ms. Anderson, but rather for what he said to Ms.

20  Anderson and any role it played in her decision making.

21          So I'll overrule the objection for that

22  reason.

23  A.   Just to -- Mr. Jimenez said that he took the

24  violence, the perceived threat, the potential threat

25  very seriously, that he agreed with the conclusion that

1    voice in that conversation?

2    A.    It was normal conversation.

3    Q.    All right.  And what about Mr. Shorter's voice?

4    A.    It was normal conversation.

5    Q.    All right.  Did Mr. Shorter appear to you to be

6    comfortable talking to Mr. Wardell?

7    A.    Very.

8    Q.    Okay.  Did he readily provide information?

9    A.    Yes.  Yes, he did.

10   Q.    Now, did you hear Mr. Shorter talk about phone --

11   anything about phone messages that he received from

12   Mary Anne Rhodes?

13   A.    He made a reference to the fact that she had sent

14   him obscene phone calls.

15   Q.    Okay, and did you -- did you do anything in

16   reference to that?

17   A.    No, I did not.

18   Q.    And why not?

19   A.    I was looking at the situation in its totality.  I

20   didn't -- I did not make a determination he was making

21   a complaint.

22        Today is -- This is Wednesday when he's being

23   interviewed.  He didn't come forward on Tuesday.  He

24   didn't come forward on Monday to follow up on the

25   complaint he made to security on Saturday, to provide

1      When you met with Mr. Wardell, did you have an

2   understanding about Mr. Shorter's conviction record?

3   A.   I understood that there were two complaints.

4   There were two charges against Mr. Shorter, and at one

5   -- at least one --

6            MS. BAIRD:  Objection.  I believe she was

7   instructed to just answer shortly.

8            THE COURT:  Yes.  Okay.  So we'll cut the

9   answer off right now.

10           MS. STRANGE:  Right.  That's fine.

11  BY MS. STRANGE:

12  Q.   And when -- when you listened to Mr. Wardell speak

13  to Mr. Shorter, did he ask him about convictions?

14  A.   Yes.

15  Q.   All right, and what did Mr. Shorter say?

16  A.   That he didn't have any arrests or convictions.

17  Q.   All right, and did that impact your -- Did that in

18  any way impact your view of the situation?

19  A.   Yes, because my understanding was that he did have

20  convictions.

21  Q.   Now, you -- you made a rec -- did you make a

22  recommendation that Mary Anne Rhodes receive a written

23  warning?

24  A.   Yes, I did.

25  Q.   All right.  When?

1    A.    Probably on Wednesday the 24th.

2    Q.    And why did -- Who did you make that

3    recommendation to?

4    A.    Her generalist, the generalist that supports her

5    area, Sharon Courey.

6    Q.    All right, and why did you make that

7    recommendation?

8    A.    Mary Anne's violation did not come close to

9    Ferron's.  Mary Anne was guilty of sharing her voice

10   mail password with a person with whom she had a live-in

11   relationship, and that's it.

12   Q.    I'm just going to show you a document that's been

13   marked as 534.

14   A.    Okay.

15   Q.    All right.  Have you seen that document before?

16   A.    Yes.

17   Q.    All right, and what is this document?

18   A.    This is the warning that Sharon Courey prepared

19   for Mary Anne Rhodes.

20   Q.    All right.  Looking at the second page of that

21   document, do you see a policy there?

22   A.    Yes.

23   Q.    All right.  What is that policy?

24   A.    This appears to be the policy related to a

25   person's log on ID for your computer.

1   Q.   And do you -- do you know why this policy was

2   attached to Mary Anne's --

3   A.   No.

4   Q.   All right.  Does this policy apply to the

5   company's voice mail?

6   A.   No.

7           MS. STRANGE:  I have no further questions.

8           THE COURT:  Okay.  Thank you.

9           And while we proceed with the cross -- Would

10  you like to take a break now?

11          MS. BAIRD:  Could I just have five minutes.

12          THE COURT:  Why don't we take -- It's about

13  the time.  Ten minutes.

14          MS. BAIRD:  Okay, thanks.

15          THE COURT:  So why don't we take a break for

16  fifteen minutes and then come back, okay.  We'll just

17  take it now.

18          Thanks.  Just a reminder not to discuss the

19  case.

20          Are you all a little warm?

21          UNIDENTIFIED SPEAKER:  Yes.

22          THE COURT:  Yes.  Could you maybe just --

23          UNIDENTIFIED SPEAKER:  Lower the --

24          THE COURT:  Yes, thanks.  You know, does it

25  feel hot?

223

INDEX

|  | | | | Further |
| --- | Direct | Cross | Redirect | Recross | Redirect |

WITNESSES FOR

THE PLAINTIFF:

| | Direct | Cross | Redirect | Recross | Further Redirect |
| --- | --- | --- | --- | --- | --- |
| Mary Anne Rhodes | 19 | 35 | 66 | 73 | 74 |
| Cheryl Ann Harris | 77 | 86 | -- | -- | -- |

WITNESSES FOR

THE DEFENDANT:

| | Direct | Cross | Redirect | Recross | Further Redirect |
| --- | --- | --- | --- | --- | --- |
| Lisa Anderson | 120 | 178 | 216 | -- | -- |

EXHIBITS:

| | | Offered | Admitted |
| --- | --- | --- | --- |
| D - 517 | Tape Recording | 47 | 47 |
| D - 549 | E-Mail | 88 | 95 |
| D - 528 | Policy re: Harassment | 128 | 130 |
| D - 529 | Policy re: Violence | 128 | 130 |
| D - 530 | | -- | 130 |
| D - 531 | Code of Conduct | 129 | 130 |
| D - 547 | Anderson Notes | 133 | 133 |
| D - 548 | Rhodes Flight Itinerary | 142 | 142 |
| D - 511 | Phone Records | 147 | 148 |
| D - 140 | Anderson Notes | 153 | 153 |
| D - 518 | Anderson Chronology | 159 | 159 |

224

INDEX (CONTINUED)

D - 527        Electronic Communications

               Policy                    162        --

D - 534        Warning to Ms. Rhodes     171        --

P - 9          Page 3 from Electronic

               and Voice Mail Policy      188        189

225

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.

_Stephen C. Bowles_                    February 17, 2005

STEPHEN C. BOWLES