DEFENDANT'S
EXHIBIT
ALL-STATE LEGAL®
4

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FERRON SHORTER, JR., | . | Case No. 3:03-CV-00149 |
| | . | (WIG) |
| Plaintiff, | . | |
| | . | Bridgeport, Connecticut |
| v. | . | January 27, 2005 |
| | . | |
| HARTFORD FINANCIAL SERVICES | . | |
| | . | |
| GROUP, INC., ET AL., | . | |
| | . | |
| Defendants. | . | |

. . . . . . . . . . . . . .

CONTINUED TRIAL
BEFORE THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Law Offices
                            By: RACHEL M. BAIRD, ESQ.
                            Stonegate Professional Bldg
                            379 Prospect Street
                            Torrington, CT 06790-5239

For the Defendant:          Jackson Lewis
                            By:  MARGARET STRANGE, ESQ.
                                 JAMES F. SHEA, ESQ.
                            55 Farmington Avenue
                            Suite 1200
                            Hartford, CT 06105

Court Monitor:              MS. SANDRA J. BALDWIN
                            MS. MARIA CORRIETTE

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

---

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY. CONNECTICUT 06335
(860) 464-1083

1  department of special investigations, which is part of

2  internal audit at The Hartford Insurance Company.

3  Q.    Now, in January of 2002, were you asked to

4  participate in an investigation regarding Mr. Shorter?

5  A.    Yes, I was.

6  Q.    Okay, and what were you -- what was your role in

7  that investigation?

8  A.    I was asked to interview Mr. Ferron Shorter and

9  obtain a statement.

10  Q.    Who asked you to do that?

11  A.    My supervisor, John Jacewicz.

12  Q.    And when you were asked to interview Mr. Shorter

13  and obtain a statement, what was your understanding as

14  to what you were interviewing him about?

15  A.    I was advised and I was asked that the possibility

16  existed that Mr. Shorter had accessed another

17  employee's Hartford voice mail and prevented this

18  employee from receiving business-type calls and in

19  order -- when he accessed it, he was able to change

20  that employee's password, preventing her to accessing

21  it and also possibly deleting those messages.

22  Q.    Now, did you take some preliminary steps prior to

23  interviewing Mr. Shorter in regards to this situation?

24  A.    Yes.

25  Q.    And what did you do?

1   A.   I was shown a statement from Mary Anne Rhodes that

2   Lisa Anderson had taken.  I read that and I asked to

3   speak to Ms. Rhodes.  I also requested access to The

4   Hartford e-mails of Ferron Shorter and from information

5   that I saw in the statement of Mary Anne Rhodes, I made

6   a request of John Leone, who's a supervisor in our

7   background unit, to run a records check of Mr. Shorter.

8   Q.   Now, sir, I'm going to ask you to look at what's

9   been previously marked Exhibit 533 and just tell me if

10  you recognize this document?

11  A.   Yes, I do.

12  Q.   And what is that document?

13  A.   That is, to my knowledge, the statement, a copy of

14  the statement, that I read that I was told Lisa

15  Anderson took of Mary Anne Rhodes when I read it back

16  on January 23rd of '04.

17  Q.   Now, you said you did -- you requested access to

18  e-mails.  What e-mails did you request access to?

19  A.   At the time I remember I believe it was Ferron

20  Shorter's e-mail.

21  Q.   And why did you do that?

22  A.   Well, in accessing Ferron Shorter's e-mails, I was

23  looking to see corroborating information that is

24  possibly on e-mails that might corroborate information

25  in Mary Anne Rhodes' statement.  By going into Mr.

1    Shorter's e-mail, I would see anything incoming from

2    Mary Anne Rhodes and anything sent out to Mary Anne

3    Rhodes.  So, going into one actually accessed both.

4    Q.   And what did you see when you looked at the e-

5    mails?

6    A.   I saw e-mails from -- I saw non-Hartford business

7    e-mails related to both Mary Anne Rhodes and other non-

8    Hartford business.

9    Q.   What was the nature of the e-mails that you saw?

10   A.   Of the one that I recall specifically, was Mary

11   Anne Rhodes, was one that I believe was dated on the

12   18th of January, which would have been, if I remember

13   right, right before Mary Anne Rhodes had traveled that

14   particular weekend, and it was an e-mail from Ferron

15   Shorter to Mary Anne Rhodes and I just remember

16   indicating the language Ferron was using was that,

17   remember he's a jealous, I say, person, but he didn't

18   use that word.

19   Q.   Now, did you look at any other e-mails?

20   A.   Yes.

21   Q.   Okay, and what other e-mails did you look at?

22   A.   I looked at what I thought was non-Hartford

23   business related e-mails.

24   Q.   And what were the nature of those e-mails?

25   A.   Those e-mails had to do with, at the time that I

1    remembered, other females.  In fact, I remember

2    approximately there were approximately five other

3    females of conversations that were not Hartford

4    business related in a weeks time period leading up to

5    that particular weekend.  I was looking at those e-

6    mails.

7    Q.    Now, did you eventually print out those e-mails?

8    A.    Some of them I did, yes.

9    Q.    And what e-mails did you print out?

10   A.    I printed out the e-mails pertaining to

11   approximately those five females and as to non-Hartford

12   business.

13   Q.    And what did you do with those e-mails?

14   A.    I made them part of an exhibit and made that part

15   of my case investigation.

16   Q.    Now, did you do anything else before you met with

17   -- Strike that.

18        Did you meet with Mr. Shorter?

19   A.    Yes.

20   Q.    All right.  Before meeting with Mr. Shorter, did

21   you speak with anyone else about the situation?

22   A.    Yes.

23   Q.    Who did you speak with?

24   A.    I spoke to Mary Anne Rhodes.

25   Q.    Okay, and when did you speak with Mary Anne

1   Rhodes?

2   A.   I spoke to Mary Anne Rhodes the morning of the

3   twenty-third of '02, the morning before I interviewed

4   Ferron Shorter.

5   A.   And what was your purpose in speaking with Mary

6   Anne Rhodes?

7   A.   Because a statement wasn't taken from me, I wanted

8   to ask Mary Anne Rhodes and the statement I had, did

9   she, in fact, is it a truthful statement that she gave.

10  Q.   And who took the statement from Mary Anne Rhodes?

11  A.   Lisa Anderson.

12  Q.   And Lisa Anderson didn't work in your department,

13  correct?

14  A.   Correct.

15  Q.   Now -- And how did Mary Anne Rhodes respond when

16  you met her?

17  A.   Yes.   She said she did and she was truthful.

18  Q.   Did you ask her anything else in that meeting?

19  A.   Yes, I did.

20  Q.   What did you ask her?

21  A.   I asked her if she was in fear of her safety.

22  Q.   And how did she respond?

23  A.   She said she was.

24  Q.   Did you do anything else before meeting with Mr.

25  Shorter?

1   Mary Anne -- with Lisa Anderson, Lisa Anderson played

2   us a voice mail, a message from her voice mail

3   evidently that was sent to her of a two tape-typed

4   conversations that was on this -- on her voice mail.

5   She played that voice mail to us.

6   Q.   What -- Whose voices were on -- Strike that.

7        What was the nature of the two tapes that you

8   listened to?

9   A.   Well, I was told by Lisa Anderson that the voice

10  mail messages that we were listening to was Ferron

11  Shorter leaving a message to a male friend of Mary Anne

12  Rhodes' by the name of Scott, and then it was another

13  message of Ferron Shorter talking to Mary Anne Rhodes

14  with Mary Anne Rhodes responding to Ferron Shorter.

15  Q.   Did you -- You said you requested a criminal

16  records check; is that accurate?

17  A.   Yes.

18  Q.   All right, what -- who did you request that from?

19  A.   John Leone.

20  Q.   All right, and did you receive something in

21  response to that request?

22  A.   Yes.

23  Q.   What did you receive?

24  A.   What I received was a print out from the company

25  that John Leone made a request from as to an actual

1    results of a criminal check.

2    Q.    Did you include that in your investigative file?

3    A.    Yes, I did.

4    Q.    All right.  Now, let me just ask you when you

5    conduct investigations, do you generally keep a file?

6    A.    Yes.

7    Q.    Okay, and where do you keep your investigative

8    files?

9    A.    It will be at my desk area and then eventually

10   there are locked cabinets attached to our cubicles,

11   part of our unit.

12   Q.    What type of information do you include in the

13   file?

14   A.    Pertinent information that -- Information that we

15   believe is pertinent to the investigation.

16   Q.    Now, prior to meeting with Mr. Shorter, had you

17   ever -- had you done other investigations for The

18   Hartford?

19   A.    Yes.

20   Q.    And in conducting your investigations, do you

21   generally request written statements?

22   A.    Yes.

23   Q.    Okay, and do you request that those written

24   statements be signed under oath?

25   A.    Yes.

1    Q.    Why do you do that?

2    A.    It's a procedure that is instituted in our office,

3    our unit, that we're requested to do.  So, a procedure.

4    Q.    Is that -- Do you know if that's the same

5    procedure for the EOD investigations?

6    A.    I don't know that.

7    Q.    Do you also ask when you conduct interviews, do

8    you ask for social security numbers?

9    A.    No.

10   Q.    Okay.

11   A.    I take that back, if I may.

12   Q.    Sure.

13   A.    I do ask to verify information.  In doing an

14   employee investigation, I usually preformat that format

15   form and I have access to The Hartford system, it's

16   called PeopleSoft, in which we get all their personal

17   information.

18        So, I type in their name, their date of birth,

19   their social security number.  So, the question, of

20   course was strange that you asked me was, did I ask --

21   I guess I already had it, but I would have asked Mr.

22   Shorter, is this the correct social.  So, they answer

23   is yes.  I'm sorry.

24   Q.    Now, when did you meet with Mr. Shorter?

25   A.    Shortly after noontime, the best I can recall, on

1    the morning -- on the date of the 23rd, '02, of

2    January.

3    Q.   And where did you meet with him?

4    A.   I met with him in, we have a conference table in

5    our cubicle area on the 15th floor of the Tower

6    Building at The Hartford Insurance Company off Asylum

7    Street in Hartford, Connecticut.

8    Q.   How did it come about that Mr. Shorter -- Strike

9    that.

10       Did you ask Mr. Shorter to come to this meeting?

11   A.   Yes.

12   Q.   And when did you ask him?

13   A.   Shortly before then, I -- Shortly before that.

14   Q.   And where was he when you asked?

15   A.   He was at his desk area.

16   Q.   And describe -- did you approach him at his desk

17   area?

18   A.   Yes.

19   Q.   Describe for me what you said.

20   A.   To the best I can recall, I walked up to him, told

21   him I -- introduced myself to -- who I was.  I

22   explained to him that I had some questions to ask of

23   him and I would explain what I needed to talk to him if

24   we could come back to my location, my floor, in which I

25   would be able to ask him those questions.

1   Q.   And then did you go back to your location?

2   A.   Yes.

3   Q.   And describe for me, do you have a closed office

4   at The Hartford?

5   A.   There are doors that could close.  It's a separate

6   wing on the 15th floor.  It's just a room off to the

7   side.  There are other sections like that throughout

8   the company, but it's just -- there's two doors and it

9   opens up into cubicles where investigators that work

10  for the company sit.

11  Q.   And did you meet with Mr. Shorter in a cubicle?

12  A.   I met him at a conference room table, which is

13  nothing more a larger cubicle, but there's a conference

14  room-type table there.

15  Q.   Now, describe for me what Mr. Shorter's demeanor

16  was in this meeting.

17  A.   Cooperative.

18  Q.   And did you ask him questions?

19  A.   Yes.

20  Q.   All right.  What types -- What did you ask him?

21  A.   Initially, when he did come to the floor, I

22  explained to him that my investigation had to do with

23  misconduct concerning a -- he being possibly accessing

24  another employee's Hartford voice mail, and that by

25  accessing it, changing of the password, deleting of

1   messages, affecting that employee from not being able
2   to receive messages.
3   Q.    And did -- how did Mr. Shorter respond to you?
4   A.    Mr. Shorter said, yes, I did and I'd like to
5   explain to you why.
6   Q.    And what did he tell you?
7   A.    As best I can recall without referring to my
8   statement here, if I had it here, he admitted that he
9   did access Mary Anne Rhodes' voice mail.  He accessed
10  it because she had given him her password and he
11  accessed it because he wanted to see messages to see if
12  she was with other gentleman and he was going to prove
13  to her that if there were messages there, he's going to
14  prove to her that she was lying to him.
15       So, he admitted to me that when he accessed her
16  voice mail, he saw that there were messages, he saved
17  those -- saved some of those messages and wanted to
18  play them back to her so he could prove to her that she
19  was lying and in order to prevent her from erasing
20  those messages, he was going to change the -- her
21  Hartford password to get those messages.
22  Q.    Did you ask him whether he deleted any messages?
23  A.    Yes.
24  Q.    And how did he respond?
25  A.    He responded best I remember, no.

1    answer your questions?

2    A.    Oh, yes.  In fact, some -- Yes.

3    Q.    All right.  Did you ask Mr. Shorter whether he had

4    a gun?

5    A.    Yes.

6    Q.    Why did you do that?

7    A.    Because in Mary Anne Rhodes' statement to Lisa

8    Anderson, Mary Anne Rhodes said that Ferron had showed

9    her a gun and, because she mentions the word, "that he

10   showed her a gun."

11   Q.    And how did he respond when you asked him that?

12   A.    His spontaneous comment was, not legally, and then

13   he said, well, I have access to a gun.

14   Q.    And in his final statement, did he say he had

15   access again?

16   A.    Well, when he gave me that, I was typing it up in

17   a statement.  He said, don't put that in a statement,

18   take it out.  So, I took that out as I was typing, out

19   of the statement.

20   Q.    And did you ask Mr. Shorter if he had any

21   convictions?

22   A.    Yes.

23   Q.    All right, and how did he respond?

24   A.    He said I have no convictions.

25   Q.    And why did you ask him that?

1    A.   Because in Mary Anne Rhodes' statement, she also

2    goes on when she said to me she was fear of her safety,

3    and when I read in her statement where he mentions gun,

4    he also mentions -- she also mentions that he says, she

5    bruised him.

6        She also said in her statement that, what I can

7    recall, is that he -- there was an incident with her,

8    there were family members and there was a threat and

9    police responded.  So, the fact that police responded,

10   the fact that she says she was bruised, the fact that

11   the word gun was used.

12   Q.   All right, and she -- did she that she bruised

13   him?

14   A.   No, no.  She was bruised by him.

15   Q.   Now, did -- in your statement with Mr. Shorter,

16   did he say anything about any messages that he received

17   from Mary Anne Rhodes?

18   A.   Yes, he did.

19   Q.   And what did he say?

20   A.   What I can recall, he says, he had messages from

21   Mary Anne Rhodes where she used obscene language, if I

22   remember right.

23   Q.   Okay, and did you do anything in response to that?

24   A.   No.

25   Q.   Did Mr. Shorter ever send you copies of those

1    because he accessed a voice mail, changed that password

2    and then prevented from getting into it. So, I guess

3    the answer would still be possibly no.

4    Q.   After you viewed Mary Anne Rhodes' statement, my

5    understanding from your direct testimony, is you had

6    one question to ask her; is that correct?

7    A.   Yes, that's what I can recall that I was -- had

8    one question that I wanted to. I asked her if her

9    statement was true and I wanted to be assured of her

10   personal safety.

11   Q.   Now -- And is it your testimony that she did tell

12   you that she was fearful?

13   A.   Yes.

14   Q.   Now, you've already testified that the reason you

15   didn't take a statement from Mary Anne under oath is

16   because you already had a statement that Lisa Anderson

17   had taken; is that correct?

18   A.   Yes.

19   Q.   Now, this one question you had, whether she was

20   fearful for her safety, was the answer to that question

21   pretty important to you?

22   A.   Yes.

23   Q.   Did you think it was important to have it

24   notarized or taken under oath to insure the accuracy of

25   it?

1    another person.  You understand that, don't you?

2            MS. STRANGE:  Objection, Your Honor.

3            THE COURT:  Sustained.  I think, you know,

4    yes, it's more with regard to specificity, if you want

5    to take another shot at it.

6    BY MS. BAIRD:

7    Q.   Because you understood in this case between Ferron

8    Shorter and Mary Anne Rhodes that it was important to

9    pin down Ms. Rhodes' motivations for saying she felt

10   threatened and fearful?

11   A.   No.

12   Q.   You didn't feel that was important?

13   A.   I felt, not that it wasn't important the way your

14   question is, is that I was asked as to, did he, in

15   fact, use Hartford resources, change her password,

16   prevent her from accessing her voice mail to receive

17   Hartford business and deleting those messages.  That's

18   what I was asked to do.

19        Yes, I did feel it's important, but that's what I

20   was asked to address as to the changing of The Hartford

21   voice mail of another employee, preventing them from

22   doing Hartford business.

23   Q.   And you testified on direct there was a certain e-

24   mail from January 18th, 2002, from Mr. Shorter to Ms.

25   Rhodes that you viewed?

1    A.    Yes.

2    Q.    And you classified that e-mail in what way?   How

3    did you --

4    A.    Non-Hartford business.

5    Q.    Okay.   Did you classify it as a threatening e-

6    mail?

7    A.    At the time -- If I can look at that e-mail.

8    There was a sentence in there that --

9    Q.    It's Defendants' Exhibit 512.

10   A.    Thank you.   May I read this --

11   Q.    You may.

12   A.    -- out loud?

13   Q.    You may.

14   A.    Thank you.   It's from Ferron Shorter to Mary Anne

15   Rhodes:

16          "Have a safe trip.  Please don't call me anymore

17          because you did too much sneaky shit and I'm a

18          real jealous-type dude.  Just check out the

19          attachment and take it easy.  Remember this," used

20          an offensive word, "won't forget about you right

21          away."

22          I don't know how to take that last sentence.

23   Q.    Well, that word's offensive to you because you

24   don't use, correct?

25   A.    No, I'm not saying that.   I'm not saying that.

1    Q.    Uh-huh.

2    A.    I'm saying the word, "Remember, won't forget about

3    you right away."  I don't know how to take that.

4    Q.    Well, did you ask Ms. Rhodes how she took it?

5    A.    Not at the time, no.

6    Q.    Because, after all, Ms. Rhodes was formerly in a

7    relationship with Mr. Shorter.

8    A.    I did ask Ms. Rhodes, was there a concern for her

9    safety.

10   Q.    Uh-huh.

11   A.    And she said yes.

12   Q.    But did you ask her about that particular e-mail?

13   A.    No, not that I recall.

14   Q.    You just assumed that it was threatening towards

15   her.

16   A.    I asked -- I didn't know how to take that e-mail

17   other than, when he says jealous, he's a real jealous -

18   - I'm a real jealous type a dude -- In his statement he

19   told me, I'm not a jealous, I just wanted to prove she

20   was lying.  That's what he continually said, to prove

21   that she was lying in his statement.  If you'd like me

22   to read from, I'm glad to do that.

23          So, this was a lie to me and a contradiction of

24   what he had in his statement.

25   Q.    Would it surprise you to know that in a

1   reports.  I mean, maybe we could add something to the
2   stipulation that --
3              THE COURT:  No, it just --
4              MS. STRANGE:  -- The Hartford confirmed --
5              THE COURT:  I don't think so.  I kind of like
6   it the way it is with the -- It's simple, it's --
7   that's just, you know, 'cause they got two reports in
8   January, they got additional information in February.
9   Let's just leave it the way with the last sentence
10  being, "Mr. Shorter did not have any criminal
11  convictions."  It's true.  I just like to keep it
12  simple and true.
13             As Henry Kissinger used to say, it has the
14  added advantage of being true, and I'm -- I think it's
15  short, too, which is good.  It's just -- and then we
16  move on, you know, 'cause it's not really not one of
17  the overridingly critical issues in the case.
18             Okay.  Can I have that, though, so that I
19  won't -- Well, actually, why don't you just read it to
20  me.
21             MS. STRANGE:  Any notes about the Judge on
22  there you don't want us to see?
23             THE COURT:  Why don't you just read it to me?
24  That's okay.  Yes.
25             MR. SHEA:  "The parties have stipulated that

1     at the time of Mr. Shorter's termination, The

2     Hartford had documentation which indicated

3     that Mr. Shorter had a criminal conviction

4     record. Those documents" --

5     THE COURT: I'm sorry. "Through no fault" --

6     MR. SHEA: "of Mr. Shorter or The Hartford,

7     were incorrect. Mr. Shorter did not have any

8     criminal convictions."

9     THE COURT: Right, 'cause they could be

10 incorrect and -- about which particular conviction he

11 had or something like that. It -- Just being incorrect

12 doesn't quite do it. I think that the last sentence

13 simply and clearly gets it right and we don't need

14 anymore than that. Okay.

15     Why don't we bring them in and then I'll take

16 care of this and we'll move on. Thanks.

17     Did anybody, by the way, the state,

18 department of public safety or any of the people

19 involved in keeping these records, did they ever

20 apologize to Mr. Shorter?

21     MS. BAIRD: I don't think so.

22     THE COURT: No, I don't think they tend to do

23 that.

24     UNIDENTIFIED SPEAKER: Actually, she told me

25 -- she charged me when she gave it to me and then she

1    checked and said, oh, no charge.

2         THE COURT:  Oh, it's good.  They didn't

3    charge you to retrieve that.  That's the least they

4    could do.  Since you do a lot of criminal work, that's

5    a good story for you to share with the people in that

6    field.  They actually waived the charge on that one.

7         (Jury in.)

8         THE COURT:  Welcome back.  The Court notes

9    all jurors are present and can't vouch for the quality

10   of the pizza you're about to receive, but -- yes, it's

11   not, you know, Bridgeport, not New Haven.  You have

12   better options there.

13        I do have -- Before we have the next witness,

14   would you -- who'll be called by The Hartford, I do

15   have just a brief stipulation of the parties to read to

16   explain something that may have been a little bit

17   confusing and it's come in, in a way that might be a

18   little bit choppy.

19        So, the parties to this case have stipulated

20   that at the time of Mr. Shorter's termination from The

21   Hartford, The Hartford had documentation which

22   indicated that Mr. Shorter had a criminal conviction

23   record.  Those documents, through no fault of Mr.

24   Shorter or The Hartford, were incorrect.  Mr. Shorter

25   did not have any criminal convictions, and let me turn

1  sense, the investigation that she had done.

2  Q.    Now, based on the information that Ms. Anderson

3  provided to you, did you advise her to do anything

4  further?

5  A.    Yes, I did.

6  Q.    What did you advise her?

7  A.    Well, after I heard the fact finding that she had

8  done and the statement that she received, it was clear

9  to me that this had less to do about harassment and

10  discrimination, which is really the core responsibility

11  of the EOD department, and had to do more about

12  misconduct, misuse of a corporate asset, the voice mail

13  system, and a potential breach of that policy, and that

14  there was also a potential threat of violence involved

15  here and for that matter, for that reason, I asked her

16  to work with the department of special investigations,

17  which is the department that more routinely handles

18  these kinds of subject matters.

19  Q.    And you said there was potential violence.  What

20  did you base that on?

21  A.    Well, Lisa Anderson reported to me and the

22  statement reflected that Ms. Rhodes felt threatened by

23  Mr. Shorter and stated that he had threatened her.

24  Q.    Now, did you also advise Lisa Anderson anything

25  else as to Mr. Shorter's employment?

1    A.   I told Lisa that I was very concerned about the

2    issue of violence and I wanted that to be considered

3    and reviewed and I was very concerned about the breach

4    of our electronic communications policy and that if, in

5    fact, the interview with Mr. Shorter corroborated the

6    fact that he had obtained a password that belonged to

7    another employee, used that password to access another

8    employee's voice mail, had, in fact, changed the

9    password and impeded the ability of that coworker to do

10   her Hartford work, that I view that as a terminable

11   offense.

12   Q.   Now, did you have any other involvement in Mr.

13   Shorter's employment?

14   A.   Other than to receive a follow up report that the

15   investigation was completed, no.

16   Q.   And did you learn that Mr. Shorter was terminated?

17   A.   Yes.

18   Q.   Okay, and what was the basis for that termination?

19   A.   The basis for the termination primarily was his

20   breach of our policy that relates to this corporate

21   asset, our voice mail, his misuse of a password and his

22   impeding of workflow to Ms. Rhodes.

23        In addition, there was the concern that he posed a

24   threat of violence to Ms. Rhodes and/or perhaps the

25   workforce.

1   Q.   Now, did you advise Ms. Anderson to terminate Ms.

2   Rhodes' employment?

3   A.   No.

4   Q.   And why not?

5   A.   Well, I considered the conduct and/or misconduct

6   between Mr. Shorter and that of Ms. Rhodes to being

7   completely separate, on completely different plains.  I

8   mean, on the one hand, Mr. Shorter's conduct had a

9   direct effect on the flow of work on The Hartford's

10  ability to conduct business by way of its employee, Ms.

11  Rhodes.

12       Ms. Rhodes' sharing of a password is a problem and

13  certainly something that would render her subject to

14  discipline, but not a terminable offense, nothing that

15  would impede the ability of another employee to do

16  their work, nothing that would compromise another

17  individual's ability to do their job.

18  Q.   And at The Hartford, if an employee receives a

19  written warning, are there any consequences that go

20  along with that?

21  A.   Yes.  A written warning goes in your personnel

22  file.  It stays part of your personnel file.  If you

23  post for other positions at the company, that is in

24  your personnel file and it's subject to review by

25  another manager who might be interested in hiring or

1    with Lisa Anderson regarding Mr. Shorter's employment?

2    A.    On the twenty-third.

3    Q.    Okay, and what happened on the twenty-third?

4    A.    My understanding that Mr. Shorter was in the

5    special investigations unit providing a statement to

6    Mr. Wardell and that Ms. Anderson was present there at

7    that time.

8    Q.    And did Ms. Anderson contact you?

9    A.    She did.

10    Q.    How did she contact you?

11    A.    She called me on the phone.

12    Q.    And what did she tell you?

13    A.    She let me know that Mr. Shorter had not been

14    truthful in his statement at the time regarding

15    deleting messages.

16    Q.    At that time, did you make a determination as to

17    whether you thought Mr. Shorter's employment should be

18    terminated?

19    A.    Because she had mentioned that he had not only not

20    been truthful during his statement, but that he had

21    admitted accessing the voice mail and to changing the

22    password a few times, although the times that he

23    mentioned were not -- didn't corroborate with the

24    information that we had and we had determined at that

25    time that he would be terminated.

1    Q.   All right, and is that a determination that you

2    agreed with?

3    A.   Yes.

4    Q.   All right, and as the HR generalist for his area,

5    did you have input into that decision?

6    A.   Yes, we all consulted on it and agreed.

7    Q.   Okay, and did you recommend that his employment be

8    terminated?

9    A.   Yes.

10   Q.   All right.  Was that in that telephone

11   conversation with Lisa Anderson on the twenty-third?

12   A.   Yes.

13   Q.   At that point in time, had you ever met Mr.

14   Shorter?

15   A.   No.

16   Q.   Did you have any idea what color he was?

17   A.   No.

18   Q.   Now, what did you do next in regards to Mr.

19   Shorter?  Let me back up.

20        You said Mr. Shorter lied on his statement.  What

21   was your understanding as to what was inaccurate about

22   Mr. Shorter's statement?

23   A.   The frequency with which he accessed the voice

24   mail, the frequency with which he changed the password

25   and regarding deleting voice mail.

1    Q.   And what was your understanding as to what he said

2    regarding deleting voice mails?

3    A.   It was my understanding he said he didn't.

4    Q.   And what about the frequency of the access?  What

5    was your understanding?

6    A.   That he in his statement I believe he said he

7    accessed ten to 15 times, and according to our records,

8    it was closer to 40.

9    Q.   And what did he say about changing the pass code?

10   A.   That he had changed it perhaps twice.

11   Q.   And what did your records show?

12   A.   Five times.

13   Q.   Did -- What did you do next in terms of Mr.

14   Shorter's employment?

15   A.   I went to the department of special investigations

16   and reviewed his statement and I was the person who had

17   delivered the information to him that his employment

18   was being terminated.

19   Q.   And what specifically did you tell him?

20   A.   I told him that he was being terminated for

21   violations of a company policy, specifically the

22   electronic communications policy and our Hartford code

23   of conduct.

24   Q.   Did you tell him anything else?

25   A.   That we would, as a matter of practice, he

1    wouldn't be going back to his desk area; that we would

2    be able to get some immediate personal belongings for

3    him and then he would be, you know, leaving The

4    Hartford premises.

5    Q.    And then did you -- Why did you tell him he

6    couldn't go back to his desk area?

7    A.    It's not uncommon, particularly in an involuntary

8    termination situation and particularly with someone who

9    works in the information technology area because of the

10   access that they to, you know, to our systems and

11   things.

12        So, it's not uncommon that people don't go back to

13   their work, and also to protect any disruption to

14   coworkers around that area.

15   Q.    Now, when you had this conversation with Mr.

16   Shorter, had you looked at any documents?

17   A.    I'm sorry?

18   Q.    Prior to this conversation terminating Mr.

19   Shorter's employment, had you looked at any documents?

20   A.    Yes.

21   Q.    What documents did you look at?

22   A.    Phone records.

23   Q.    Did you look at any statement that he made?

24   A.    Yes.

25   Q.    Okay, and was that statement consistent with what

1        THE COURT:  That is true.  Mr. Cook already

2  testified to --

3        MS. STRANGE:  Correct.

4        THE COURT:  -- the conversation.  Okay.  Yes,

5  I'll sustain the objection.

6        MS. STRANGE:  Thank you.

7  BY MS. BAIRD:

8  Q.  Is it fair to say that after you read Mr.

9  Shorter's statement and you learned of what he had said

10  about Ms. Rhodes coming to his desk, you didn't take

11  any further action after that at any time, correct?

12  A.  What type of action?

13  Q.  Any kind of action.

14  A.  I'm not sure I understand.

15  Q.  Did you investigate the complaint?

16  A.  I didn't take it as a complaint.

17  Q.  Okay.  So, since you didn't take it as a

18  complaint, is it fair to say that you didn't take any

19  further action on it?

20  A.  Yes.

21  Q.  Do you know if Ms. Rhodes said she felt threatened

22  by the e-mail that you have in front of you?

23  A.  From my conversation with Ms. Anderson, I know

24  that she felt threatened.  I'm not certain if this is

25  the reason, the e-mail or for other statements Mr.

195

INDEX

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|
| WITNESSES FOR | | | | | |
| THE PLAINTIFF: | | | | | |
| Ferron Shorter | 148 | -- | -- | -- | -- |
| | | | | | |
| WITNESSES FOR | | | | | |
| THE DEFENDANT: | | | | | |
| Richard Wardell | 16 | 36 | 77 | 79 | -- |
| David Jimenez | 102 | 111 | -- | -- | -- |
| Jennifer Ames | 119 | 139 | 146 | 147 | -- |

| EXHIBITS: | | Offered | Admitted |
|---|---|---|---|
| D-501 | The Hartford's equal opportunity employment policy | 129 | 129 |
| D-502 | The Hartford's equal opportunity development department's role | 129 | 129 |
| D-505 | Mr. Wardell's request for for involvement | 35 | 35 |
| D-506 | Mr. Wardell's summary report | 35 | 35 |

196

INDEX (CONTINUED)

D-507    Mr. Wardell's investigative        35        35
         time line

D-508    Criminal record of                78        78
         Mr. Shorter

197

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.

_Stephen C Bowles_                February 17, 2005

STEPHEN C. BOWLES