UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FERRON SHORTER JR., | : | |
| | : | |
| Plaintiff, | : | CASE NO.: 3:03-cv-149(WIG) |
| | : | |
| v. | : | |
| | : | |
| HARTFORD FINANCIAL SERVICES GROUP, INC., | : | |
| | : | |
| Defendant. | : | SEPTEMBER 16, 2005 |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
MOTION FOR JUDGMENT AS A MATTER OF LAW**

Plaintiff Ferron Shorter Jr., by and through his undersigned counsel, opposes Defendant Hartford Financial Services Group, Inc. (hereinafter, the "Company" or "The Hartford")'s Motion for Judgment as a Matter of Law.

I.  **SUMMARY REMARKS**

To the extent and in the manner Plaintiff committed any violation of the Company's Electronics Communications Policy (ECP), the same policy dictates that responsibility for the violation, while it may adhere to Plaintiff, bounds, without loss of import, to MaryAnne Rhodes.[1]

Sharon Courey, an employee of Defendant Hartford Financial Services Group, Inc., supported this "simple" argument at trial on direct examination by Plaintiff:

> "Q. So in terms of Ms. Rhodes and her providing her password to another individual, what was her responsibility with regard to the use of that password?
>
> A. Her responsibility for the use of the password, you mean as far as keeping it confidential? She had to keep that password, she was – Per the policy, employees are expected to keep their passwords to themselves and not to share them.

---

[1] The Hartford terms Plaintiff's argument "simple – and simplistic." (Def.'s Mem. in Supp. of Mot. for J. as a Matter of Law (hereinafter, "Def.'s Mem.") at 6). Plaintiff notes however that the characterization of Plaintiff's argument offered by Defendant, specifically that it is Plaintiff's contention that "both [Plaintiff] and Ms. Rhodes violated the ECP and thus should have received the same punishment" (Def.'s Mem. at 6) may miss some nuance that Plaintiff attempted to convey at trial.  See n. 6, infra.

>Q. And if they do share them, are they accountable for any actions taken using that password?
>
>A. Yes.

(January 25, 2005, Trial Tr. at 220-221) (doc. #129)[2]

The Defendant rewrites the ECP to its present cause when it represents that the "rules" exist to prevent "actual and tangible injury to another employee trying to perform company business." (Def.'s Mem. in Supp. of Mot. for J. as a Matter of Law (hereinafter, "Def.'s Mem.") at 1) The ECP is broader and exists by its own statement of purpose to prohibit "[p]ersonal use that interferes with company business." (ECP, Trial Ex. 527)[3] At trial, the Defendant argued, in its motion for directed verdict:

>My understanding of the summary judgment ruling is there was a question about whether Mary Anne Rhodes and Mr. Shorter were similarly situated. Well, his testimony addresses that. He admits they're not similarly situated because he says that – you know, when she gave him her pass code, she did not hinder his ability to perform his job.

(January 26, 2005, Trial Tr. at 103) (doc. #130)

Ms. Rhodes hindered her own ability to do her job. She hindered her supervisor's ability to do his job when he could not leave messages for her as he intended to do during the weekend

---

[2] See also direct testimony of Ms. Rhodes by Plaintiff concerning Exhibit 534, "Warning of Improper E-mail/Internet Use" issued to Ms. Rhodes on January 25, 2005:
Q. Ms. Rhodes, specifically on Exhibit 534, the attachment, the second page, if you'd look at the third bullet from the top, --
A. Uh-huh.
Q. – did anyone ever specifically discuss that provision of the electronic communications policy with you?
A. Yes, they did.
Q. Okay, and who discussed that with you?
A. Sharon Courey.
Q. And what is that provision?
A. 'Passwords must never be shared or revealed to anyone else besides the authorized user.'
Q. Is that all that's in that provision?
A. "To do so, exposes the authorized user to responsibility for actions that the other party takes with the password.'
(January 26, 2005, Trial Tr. at 30-31)  (doc. #130)
[3] Defendant's Memorandum provides no citation to company policy to support this proposition that the "rules" are limited to preventing one employee from causing actual and tangible injury to another employee trying to perform company business.

in question. Ms. Rhodes hindered her job and her supervisor's job when she lied, by omission, to her supervisor and did not reveal that her voice mail was compromised.

The ECP, as written, proscribed Ms. Rhodes, as well as Plaintiff, from personal use of her voice mail system and pass code that interfered with Company business. When Ms. Rhodes relinquished unilateral control of her Company voicemail to the whim of her personal desires for connection to Plaintiff,[4] she created a direct correlation between the degree of Plaintiff's liability for interfering with Company business and her own liability.[5] At oral argument on Defendant's

---

[4] See Def.'s Mem. at 8 ("Here, Ms. Rhodes shared her password with Shorter, who at the time was her live-in boyfriend. She did so, not to impede Company business, but to reassure Shorter that she was faithful to him." (Tr. I at 105-106, 139) First, when Ms. Rhodes shared her password with Plaintiff on January 18, 2005, they were not living together as Cheryl Harris testified that Plaintiff had moved back in with her in December of 2001 and Ms. Rhodes agreed that Plaintiff had moved out of her apartment while she was attending a Jets game in New York in December of 2001 (the Jets would not have been playing in January). Second, Ms. Rhodes' purpose in providing her password could not have been more personal and therefore in violation of the ECP. Third, it is unclear why Plaintiff's use of the password for his personal purposes would be in violation but Ms. Rhodes' personal use would not. The Defendant seems to make a qualitative judgment that Ms. Rhodes' personal reason was better than Plaintiff's when it may be agreed that both may have been equally ill-advised. Finally, Defendant uses the term "password" interchangeably with pass code which Plaintiff adopts as well in accordance with The Hartford's interchangeable use of these terms in its policies.

[5] Ms. Rhodes admitted at trial that she provided her voicemail pass code to Plaintiff, that she did not tell her supervisor that she had done so, that she was unable to access her voicemail because she had provided her voicemail pass code to Plaintiff, and that she did not apprise her supervisor or anyone at The Hartford of the situation until the three days later. In the course of direct examination by Plaintiff, the following exchange occurred:
Q. During the course of the weekend of January 18th through January 20th, did you make an agreement with your supervisor, Mr. Vadney, regarding leaving Connecticut?
A. Yes.
Q. What was that agreement?
A. I could leave for the weekend as long as I was able to call into work and see if he needed me to do any work, and I would --- he would fax whatever he needed me to do wherever he was.
Q. Did you provide Mr. Shorter your password prior to going away that weekend of January 18th through January 20th?
A. Yes.
Q. At what point did you learn that Mr. Shorter had changed your password?
A. When I arrived in Florida, some time after 6:00.
Q. What day was that?
A. January 18th.
Q. Did you talk to Mr. Vadney on January 18th after you arrived in Florida?
A. Yes, I did.
Q. Did you tell him anything about the password?
A. I believe I told him I was having problems with both my cell phone voice mail and my work voice mail.
Q. Did you tell him what the problem was?
A. At that point, no.
Q. At what point did you tell him?
A. When I returned to work on Monday.
Q. Why did you tell him on Monday when you returned to work?

motion for a directed verdict, Plaintiff characterized this as a principal-agent relationship with Ms. Rhodes as the former and Plaintiff as the latter.[6]

## II. STANDARD OF LAW

"In reviewing the record to determine whether a motion for JMOL should be granted, 'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . . "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."' Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  JMOL is thus

---

A. I had told him that I couldn't access either one of my voice mails, and when I got in on Monday, he asked what was going on?
 A.[sic] What did you tell Mr. Shorter, if anything, about his changing your password?
A. I told him that I needed to be able to access my voice mail in case I needed to work.
(January 26, 2005, Trial Tr. at 27-29) (doc. #130)
[6] Plaintiff argued in opposition to Defendant's motion for directed verdict on January 26, 2005:
     "What The Hartford does is it creates an agent. It creates a principal agent relationship between the person who provides the password or log on ID and the person who uses it.
     I mean, I would cite that this is analogous to what our courts use in liability for acts of another in the criminal sense or its states that a person acting with the mental state required for commission of an offense who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender.
     Now, I asked Ms. Rhodes various questions about whether she informed Mr. Vadney of the situation so that it could at least be brought to his attention and rectified.
     She indicated that she had not during the course of that very important weekend that she was supposed to keep in touch with him, and that was the understanding that that was the only reason she would go because she made that representation.
     I mean, if she – If there was some reason, if there was something that was preventing her from telling Mr. Vadney that Mr. Shorter had changed the password and if there is anything you can do to reset it, that might constitute a defense.  It might constitute a mitigation to this, but again, you know, making an analogy to a defense under our criminal law in Connecticut, it says:
     'In any prosecution which the criminal liability of a defendant is based upon the conduct of another person, it shall be a defense that the defendant terminated his complicity prior to the commission of the offense under circumstances wholly depriving it of effectiveness in the commission of the offense and manifesting a complete involuntary renunciation of its criminal purpose.'
     Ms. Rhodes did no such thing.  She waited until that important weekend was over.  That was the weekend when her boss needed to get in touch with her.  She waited until she came in on Monday, and then, and only then, did she make any sort of report.
     The way The Hartford's policy stands, it's a principal agent liability for violation of the electronics communication policy and, therefore, whatever Mr. Shorter did, Ms. Rhodes did, and it's up to the jury to determine why they were treated differently."
 (Trial Tr. at 111-113) (doc. #130)

4

'proper only if 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'" Fiacco v. City of Rensselaer, 783 F.2d 319, 329 (2d Cir. 1986) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970)), cert. denied, 480 U.S. 922 (1987). And in making this determination, the court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. at 151." Mickle v. Morin, 297 F.3d 114, 120 (2d Cir. 2002).

### III. ARGUMENT

The Hartford argues that Plaintiff sought to satisfy his burden at trial with "comparative evidence." (JMOL at 2)   The comparative evidence was not limited to each of Plaintiff's and Ms. Rhodes' ECP violations, however.  The comparative evidence addressed The Hartford's method of investigating Plaintiff's and Ms. Rhodes' conduct, the difference in the method of investigation, and the reasons for the differences.[7]  The company chose not to discipline Ms.

---

[7] Plaintiff testified, and the evidence supported, that the Defendant, in the course of its investigation, did a criminal background check regarding Plaintiff, demanded that he provide a written statement under oath, demanded that he agree to not speak to anyone regarding the statement, and informed Plaintiff that his employment was contingent on these demands as well as on the truthfulness of his statement.  As Ms. Rhodes' testimony demonstrated she was not subject to any of these conditions and terms of employment and was not questioned about any area that might have supported Plaintiff's reports of harassment and similar ECP violations on the part of Ms Rhodes. In the course of direct examination by Plaintiff, the following exchange occurred:
Q. Ms. Rhodes, is that your voice on those messages that were left?
A. Yes, it is.
Q. And who did you leave those messages for?
A. Ferron Shorter.
Q. Do you recall if any of those messages were left on his voice mail messaging system at The Hartford?
A. Some of them were.
Q. Subsequent to January 21st, 2002, did anyone at The Hartford ever discuss the messages that we just heard that were left on Mr. Shorter's voice mail at The Hartford with you?
A. Not that I can remember.
Q. Did you send personal e-mails to Mr. Shorter while you were employed at The Hartford"
A. yes, I did.
Q. And following January 21st, 2002, did anyone at The Hartford ever discuss with you those personal e-mails that you had sent to Mr. Shorter?
A. No.
Q. Prior to January 25th of 2002, had you received any warnings, whether verbal or written, regarding your use or violation of the electronics communications policy?

Rhodes to the extent that Plaintiff was disciplined even though Plaintiff could not have committed any violation of the ECP but for the actions of Ms. Rhodes. Plaintiff argued that the Company's decision to terminate his employment and issue a warning to Ms. Rhodes was based on his race and gender. Defendant countered that Plaintiff's violation of the ECP was more egregious than Ms. Rhodes' violation and added to its justification for Plaintiff's termination his

---

A. I received a verbal warning in March of 2001 for forwarding the attachment."
"Q. On January 21st, 2002, were you working that day?
A. Yes, I was.
Q. Did you have an opportunity to talk to a Hartford employee by the name of Lisa Anderson?
A. Yes, I did.
Q. When you spoke to Ms. Anderson, did you make a written statement to her? Did you make a written statement?
A. Yes.
Q. Was that statement made under oath?
A. No, no that I remember>
Q. Was there any notary present that required you to swear to the truth of that statement?
A. No.
Q. Did Ms. Anderson ask you for your social security number?
A. Not that I remember.
Q. Did Ms. Anderson tell you that your continued employment was contingent on your truthfulness in that statement?
A. Not that I remember.
Q: Did Ms. Anderson tell you not to discuss the case with anyone?
A. Yes.
Q. Was that contained in your statement?
A. Do you mean was it written in the statement?
Q. Right
A. I don't remember; I don't think so.
Q. I'm going to provide you what's already been admitted as Defendant's Exhibit 533. Do you recognize that?
Q. Yes, I do.
A. What is that?
A. This is the statement I made to Lisa Anderson.
Q. And is it contained anywhere in that statement Ms. Anderson's instruction to you not to discuss that statement with anyone?
A. No it's not.
Q. Did Ms. Anderson ask you if you had any criminal convictions?
A. I don't remember.
(p.27) Q. Did anyone at The Hartford discuss that e-mail at Defendant's Exhibit 512 with you at any time?
A. No, they didn't.
Q. Did anyone ever ask you if you were threatened by that e-mail?
A. No, they didn't.
Q. What, in fact, did that e-mail mean to you?
A. He was telling me to have a safe trip, and I don't know. It was like a joke because I had just left him before he sent it.
Q. Did anyone at The Hartford ever ask you if you had kept the attachment to that e-mail?
A. No, they didn't.
Q. Did anyone at The Hartford ever ask you for it period?
A. No.
(January 26, 2005, Trial Tr. at 21-23) (doc. #130)

alleged threat of workplace violence and criminal history. Plaintiff set facts before the jury creating genuine issues concerning the cause for a belief that Plaintiff presented a threat of workplace violence. Plaintiff set facts before the jury creating genuine issues concerning the Company's method of investigating Plaintiff's actions by inquiring into his criminal history, taking his statement under oath, and making his continued employment contingent on truthfulness, when it took none of these actions regarding Ms. Rhodes. In addition, Plaintiff focused on notations in the notes of Lisa Anderson, a contributing decision-maker in both disciplines meted out to Plaintiff and Ms. Rhodes. Plaintiff argued that these notations referencing Plaintiff as a "S,B,M" and Ms. Rhodes as a "S,W,F" were direct evidence of discriminatory intent, or, at the least, provided a reasonable inference of discriminatory intent. (Trial Exs. 540, 545) While, in response, The Hartford presented testimony purporting to explain the reasons for the notations, a jury could not be called unreasonable for finding that such evidence, considered by itself or in combination with the other evidence, provided at least a "shred" of direct or inferential evidence of discriminatory motive. (Def.s' Mem. At 2) ("Shorter claims in this lawsuit that he was terminated because of his race and gender, but he did not and could not adduce even a shred of evidence to support either claim.")

    A.    The Hartford's Clear-Cut Rules of Comparative Evidence[8]

In its Memorandum at section I.B., the Defendant' cites five (5) cases in support of its argument that Plaintiff did not meet his burden of demonstrating that Ms. Rhodes was similarly situated to Plaintiff. (Def.'s Mem. at 5) The cases are either inapposite or diminish Defendant's claim that Plaintiff, in the instant case, has not met his burden:

---

[8] See Def.s' Mem. at 5 ("But employment discrimination law has developed rules for analyzing claims, like this one, resting on comparative evidence. The rules are clear-cut: An employer's treatment of a comparator cannot give rise to an inference of discrimination unless the comparator is 'similarly situated' with the plaintiff 'in all material respects.") (citations omitted)

7

- Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96 (2d Cir. 1999)  In Norville, plaintiff, a black female employed as a nurse, alleged that the defendant employer accommodated two white female nurses with disabilities "but refused to extend Norville the same consideration."  In finding that Norville had failed to demonstrate that the white female nurses were similarly situated to her, the court stated:  "The trial record contains no evidence regarding the specific degree to which either of these nurses was disabled, the type of work they did prior to becoming disabled, or the ways in which they were limited in performing their jobs."  Id.  Furthermore, Norville failed to provide sufficient evidence of the employer's accommodation for the white nurses' disabilities.  Id.  These insufficiencies in the trial evidence precluded Norville from demonstrating that the employer treated the shire nurses more favorably because there was no evidence from which a reasonable jury could find that Norville was similarly situated to the white nurses or in fact that each white nurse was even similarly situated to the other.

- Wyvill v. United Cos. Life Ins. Co., 212 F.3d 296, 302 (5th Cir.)  In Wyvill, the Fifth Circuit Court of Appeals found it unfortunate that the trial court had allowed the record to be "saturated with anecdotal evidence."  "Plaintiffs strongest age-related evidence was 'anecdotal testimony from former United Companies employees that United Companies had a 'pattern and practice' of discriminating against older workers. This evidence included witnesses' subjective beliefs that they and others had been terminated on account of age. United Companies argues that these anecdotal accounts of discrimination should have been excluded as incompetent to support a claim of pattern or practice discrimination. We agree."

- Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344 (6th Cir.)  In Ercegovich, the

8

Sixth Circuit Court of Appeals reversed the trial court's grant of summary judgment to the employer finding that the trial court had "misconstrued this circuit's precedent in applying an exceedingly narrow reading of the Mitchell [v. Toledo Hosp., 964 F.2d 577 (6th Cir. 1992)] decision." Id at 352. Although the trial court had dismissed Ercegovich's claim of age discrimination for failure to "identify a similarly-situated employee outside the protected class receiving more favorable treatment[,]" the Sixth Circuit wrote: "We explained in Mitchell that when the plaintiff lacks direct evidence of discrimination, 'the plaintiff must show that the "comparables" are similarly-situated in all respects,' absent other circumstantial or statistical evidence supporting an inference of discrimination." Id.

- Graham v. Long Island R.R., 230 F.3d 34 (2d Cir. 2000) In Graham, the court reversed a trial court's grant of summary judgment: "Because we think there are some material questions of fact as to whether there was equal treatment in this case, we reverse and remand." Id at 36. The court characterized the Sixth Circuit's decision in Ercegovich as indication that the "Sixth Circuit itself has backed away from a rigid interpretation of Mitchell." Id at 40. In essence then, and referencing Norville, the Second Circuit defined similarly situated as a varied and not "clear-cut." (Def.'s Mem at 5) "What constitutes "all material respects" therefore varies somewhat from case to case and, as we recognized in Norville, must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." Id.

- Hargett v. Nat'l Westminster Bank, 78 F.3d 836 (2d Cir. 1996) In Hargett, the plaintiff appealed from the following instruction to the jury: "It is for you to decide if the other

9

individuals were similarly situated to the plaintiff. You may consider the positions held and the conduct in question in determining if the individuals were similarly situated. If you believe by a preponderance of the evidence that plaintiff has proven that other similarly situated employees did commit similar acts and were not terminated, then you may find defendants' reason pretextual."[9] Id at 839.

The Hartford relies on a showing that "[n]ot all violations of the ECP (or any policy) are alike." (Def.'s Mem. at 6) Since no policy at The Hartford, including the ECP, provides for a hierarchy of egregiousness for ECP violations, the matter appears discretionary. Plaintiff argued at trial that this discretion which led to more serious discipline for Plaintiff than for Ms. Rhodes was unlawfully motivated by the race and genders of Ms. Rhodes and Plaintiff. Lisa Anderson, the decision-maker, whom Plaintiff alleged has discriminatory motive, supported the termination for Plaintiff and warning for Ms. Rhodes.[10]

---

[9] At trial, The Hartford, following instructions to the jury stated: "We just renew our objections yesterday, and to the extent we submitted any written instructions which were not accepted, we take exception." (January 28, 2005, Trial Tr. at 116) (doc. #132) The Hartford did not take exception to any instruction which referenced or did not reference the jury's consideration of "similarly situated." In its Request to Charge No. 15, entitled "Proving a *Prima Facie* Case of Race/Sex Discrimination," The Hartford did not include any special instruction or reference to the standard for deciding whether Plaintiff and Ms. Rhodes were "similarly situated." (doc. #104-3 at 23-24) Therefore, The Hartford should be foreclosed from claiming an insufficiency in Plaintiff's case that Defendant either (1) did not deem sufficiently at issue to be placed before the jury or (2) omitted from its requests to charge based on its trial strategy, or other reasons, at the time.

[10] In cross-examination by Plaintiff of Lisa Anderson, an employee of The Hartford, the following exchange occurred:
Q. "I'd like to show you Defendant's Exhibit 527, the electronic communication policy.
Is it true that it has examples of violations on the second page?
A. Yes, it does.
Q. And one of those violations is not disbursing or disbursing the password; is that correct?
A. That's correct.
Q. And the next one. The next violation immediately under that is using a password, even if you receive it from someone who is an authorized user; is that correct?
A. Yes.
Q. Is there any way – Is there any way to tell from that policy which is the more serious offense?
A. No.
Q. Is there anything at The Hartford in the policy that talks about what is the more serious offense?
A. Not that I'm aware of.
Q. That's a decision that you arrived at; is that correct?
A. I – Yes. I determined that the act of sharing the password was less of an offense than changing the password, blocking someone's access to their messages.

10

The plain language of the ECP, however, which attaches responsibility to an authorized pass code user for the acts of an unauthorized user of the pass code diminishes Plaintiff's burden. Evidence that the decision by Ms. Anderson, while discretionary, was affected by discriminatory motive adds to the jury's consideration. The Hartford's decisions and the entire investigation of Ms. Rhodes complaint and the non-investigation of Plaintiff's complaint support a finding of discriminatory motive but, more simply stated, by The Hartford's own policy and through the testimony of its employee, Ms. Courey, to the extent that Plaintiff was culpable so was Ms. Rhodes. Of course, Plaintiff argued at trial that Ms. Rhodes was more culpable because she lied to her supervisor in withholding information related directly to the security of the Company and lied to the Company in other ways by portraying herself as fearful and Plaintiff as a threat for the purpose of mitigating her own culpability, a method that clearly achieved her ends in keeping her employment despite her conduct.

    B.    Additional Case Law Cited By Defendants

        1. Albury v. J.P. Morgan Chase, No. 03 Civ. 2007 (HBP), 2005 WL 746440 (S.D.N.Y. Mar. 31, 2005) (Def.'s Mem. at Ex. 7)

In Albury, plaintiff was terminated for accessing confidential employee account information. She claimed that she was subject to disparate treatment compared to a black, male

---

(Pause)
Q. And isn't is true what led you to come to that conclusion was all the other information that you believed you had obtained about what a threat Mr. Shorter was in the work place to Mary Anne and that you believed he had a prior conviction?
A. I had made the determination that the behavior was a terminable offense before I knew anything about the conviction.
It was – A lot of what helped me make my decision was what he did with those messages once he got them. He blocks the access. She can't get it. He calls her up. He plays them back in a very – in an intimidating fashion. It was very controlling type of behavior. It was totally inappropriate use of the company's system.
Q. But when you say that a totality – you act as if you actually heard him playing those messages back to Ms. Rhodes, but you didn't hear him do that, did you?
A. No.
Q. You're going by what she told you?
A. Yes.
(January 26, 2005, Trial Tr. at 215-216) (doc. #130)

11

who was terminated upon complaints of sexual harassment and compared to three co-workers who had asked plaintiff to access their confidential account information in violation of employer policy. The court held that the facts of the black, male's termination were not comparable to the facts related to the plaintiff's termination. The court then held that a material difference existed between the seriousness of plaintiff's offense and her three co-workers.

The Hartford cites this case as "on all fours" with the instant case. (Def.'s Mem. at 10) In Albury, the three co-workers "merely asked plaintiff to access their own confidential information; they did not access account information themselves." Id at 10. Albury is distinguishable from the instant case. First, the three co-workers did not provide Albury the means to gather their confidential information. Ms. Rhodes not only allowed Plaintiff access to her restricted Company information that Plaintiff would not otherwise have had access to, but she provided the means for Plaintiff's access. For Albury to be "on all fours" with the instant case, each co-worker would have had to have had a password or pass code to access their confidential information, each co-worker would have had to provide that password or pass code to Albury, and Albury's employer would have had to have had a policy stating that any employee who provides his or her password or pass code to another employee to access his or her confidential information is responsible for the actions of the employee who accesses the confidential information. The judge in Albury did not address such a set of facts because the case did not present them.

  C.  Defendant's Explanation of the Verdict

In its memorandum, "The Hartford sees two possible explanations for the verdict." (Def.'s Mem. at 14) Possibilities do not meet the standard for setting aside a jury verdict. Fiacco v. City of Rensselaer, 783 F.2d 319, 329 (2d Cir. 1986) ("JMOL is thus 'proper only if

'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached.'")

### 1.     *Defendant's Possibility No. 1*

Defendant argues that the jury may have been affected by a perception that Plaintiff received a "raw deal on the criminal conviction issue." (Def.s' Mem. at 16)  However, the possibility also existed that the jury, knowing at least that Plaintiff had been arrested for some reason even if he did not have a criminal record, could have held that against him under the perception that if someone is arrested he or she must have committed some wrong.

At trial, Plaintiff only addressed the criminal record in the context of his claim that The Hartford's decision to request a criminal background check on Plaintiff and not Ms. Rhodes provided one inference of discrimination.[11]  If The Hartford had conducted a criminal

---

[11] Ms. Rhodes confirmed the disparity in the investigatory process she experienced and the process experienced by Plaintiff.  During direct examination of Ms. Rhodes by Plaintiff, the following exchange occurred:
Q. Ms. Rhodes, is that your voice on those messages that were left?
A. Yes, it is.
Q. And who did you leave those messages for?
A. Ferron Shorter.
Q. Do you recall if any of those messages were left on his voice mail messaging system at The Hartford?
A. Some of them were.
Q. Subsequent to January 21st, 2002, did anyone at The Hartford ever discuss the messages that we just heard that were left on Mr. Shorter's voice mail at The Hartford with you?
A. Not that I can remember.
Q. Did you send personal e-mails to Mr. Shorter while you were employed at The Hartford"
A. Yes, I did.
Q. And following January 21st, 2002, did anyone at The Hartford ever discuss with you those personal e-mails that you had sent to Mr. Shorter?
A. No.
Q. Prior to January 25th of 2002, had you received any warnings, whether verbal or written, regarding your use or violation of the electronics communications (p.22) policy?
A. I received a verbal warning in March of 2001 for forwarding the attachment."
"Q. On January 21st, 2002, were you working that day?
A. Yes, I was.
Q. Did you have an opportunity to talk to a Hartford employee by the name of Lisa Anderson?
A. Yes, I did.
Q. When you spoke to Ms. Anderson, did you make a written statement to her?  Did you make a written statement?
A. Yes.
Q. Was that statement made under oath?

background check on Ms. Rhodes then the issue could have been excluded entirely from the trial.

Finally, for The Hartford to argue now that it may have been prejudiced by this information before the jury when Plaintiff, as he was obligated to do, abided by the Court's order and did not present testimony of the numerous efforts he made following his termination to inform The Hartford that it was mistaken regarding his record, is frustrating to Plaintiff, who recalls the numerous, detailed, and rejected efforts made on his behalf to conduct a dialogue with The Hartford regarding its error. As regards that testimony, had it been allowed, there is little doubt that the jury would have believed Plaintiff received a "raw deal."

      2.      *Defendant's Possibility No. 2*

The Hartford argues that a "red herring" of internal cross-complaints between Plaintiff and Ms. Rhodes may provide a possible explanation for the jury verdict. (Def.'s Mem. at 17) ("Shorter may contend that he and Ms. Rhodes were similarly situated because each filed an

---

A. No, not that I remember.
Q. Was there any notary present that required you to swear to the truth of that statement?
A. No.
Q. Did Ms. Anderson ask you for your social security number?
A. Not that I remember.
Q. Did Ms. Anderson tell you that your continued employment was contingent on your truthfulness in that statement?
A. Not that I remember.
Q. Did Ms. Anderson tell you not to discuss the case with anyone?
A. Yes.
Q. Was that contained in your statement?
A. Do you mean was it written in the statement?
(January 26, 2005, Trial Tr. at 21-23) (doc. #130)
Q. Right
A. I don't remember; I don't think so.
Q. I'm going to provide you what's already been admitted as Defendant's Exhibit 533. Do you recognize that?
Q. Yes, I do.
A. What is that?
A. This is the statement I made to Lisa Anderson.
Q. And is it contained anywhere in that statement Ms. Anderson's instruction to you not to discuss that statement with anyone?
A. No it's not.
Q. Did Ms. Anderson ask you if you had any criminal convictions?
A. I don't remember.

internal complaint against the other.") Plaintiff has never made this claim in pleadings, on the record, or before the jury. Plaintiff did argue that The Hartford's method of investigating each of their claims provided inference of discrimination. If Defendant is arguing that the jury may have concluded that Plaintiff and Ms. Rhodes were similarly situated based on their internal cross-complaints, whether or not such an argument could have been made, there was certainly no basis in evidence or the jury instructions for the jury to enter into such a consideration. (See n. 9, supra.)

### IV.    MISCELLANEOUS

- At page one of its Memorandum, The Hartford states:

"Plaintiff Ferron Shorter (i) violated his employer's technology rules, and (ii) did so in a way that demonstrated exactly why the rules exist: He caused actual and tangible injury to another employee trying to perform company business."

Plaintiff now responds: Ms. Rhodes (i) violated her employer's technology rules, and (ii) did so in a way that demonstrated exactly why the rules exist: She caused actual and tangible injury to her own ability and the ability of her supervisor to conduct company business.

- At page one of its Memorandum, The Hartford states:

"Specifically, Shorter repeatedly used Maryanne [sic] Rhodes' password and department code to access her work voicemail system, listen to her messages, delete her messages, change her password,[12] and block her access to her voicemail."

Plaintiff now responds: Specifically, Ms. Rhodes took no action and continued to allow

---

[12] Although the Defendant argues in its footnote 4 to its memorandum that a policy attached to a written warning received by Ms. Rhodes on January 25, 2005, (Trial Ex. 534) did not apply to the Company's voicemail system but to the e-mail system, it is evident throughout the Defendant's brief that it refers to the voicemail system pass code that Plaintiff changed as a password when a password would apply to an e-mail system and not a voice mail. The viability of Defendant's claim that "as a factual matter, the record at trial was uncontroverted that the attached policy applied to the Company's *email* system, not to its *voicemail* system" is negated by not only the testimony of Sharon Courey and Ms. Rhodes, but by the Defendant's own interchangeable use of the terms in its memorandum. (Def.'s Mem at 10 n. 4)

15

Plaintiff to use her password and department code to access her work voicemail system, listen to her messages, delete her messages, change her password, and block her access to her voicemail.

- At page one of its Memorandum, The Hartford states:

"Shorter admitted this misconduct to defendant Hartford Financial Services Group, Inc. ("The Hartford" and "Company") during its investigation of the matter, and he repeated his admissions at trial."

Plaintiff responds: Ms. Rhodes did not admit her conduct to her supervisor even though she spoke to him after learning that Plaintiff had changed her pass code and The Hartford never addressed the fact with Ms. Rhodes that she had lied to her supervisor, by omission.

- At pages one and two of its Memorandum, The Hartford states:

"The Company decided to terminate Shorter for violating its Electronic Communications Policy ("ECP") and Code of Conduct, and because the Company believed that Shorter lied about his criminal history during the investigation.

Plaintiff responds: The Company did not terminate Ms. Rhodes for violating the ECP, did not check Ms. Rhodes' criminal history, did not demand that Ms. Rhodes swear under oath to the truth of her statement regarding Plaintiff and her own ECP violation, did not obtain voice mails or e-mails from Ms. Rhodes' work station, and did not discipline Ms. Rhodes for lying to her supervisor regarding her knowledge of the reason why she was unable to check her messages.

- At page three of its Memorandum, The Hartford states:

"Shorter broke into Ms. Rhodes' voicemail and interfered with her ability to access her work messages."

Plaintiff responds: Ms. Rhodes willingly provided Plaintiff her voicemail and was

16

unable to access her work messages because she was a willing participant in the ill-advised interaction with Plaintiff and declined to advise the proper parties at The Hartford who would have reset the pass code and allowed Ms. Rhodes and her supervisor to conduct business.

- At page four of its Memorandum, The Hartford states:

"He [Plaintiff] admittedly did not alert anyone at the Company that he had changed Ms. Rhodes' password, and he did not give the new passwords to Ms. Rhodes or anyone else at The Hartford."

Plaintiff responds:  Ms. Rhodes did not alert anyone at the Company that Plaintiff had changed Ms. Rhodes' password.

- At page five of its Memorandum, The Hartford states:

"His [Plaintiff's] sole proffered evidence of discrimination was that Ms. Rhodes' also violated the ECP (by sharing her password) and was given a lesser punishment (a written warning)."

Plaintiff responds:  Plaintiff presented other evidence of discrimination.  See transcript of Plaintiff's closing argument summarizing the evidence.

- At pages 19 and 20 of its Memorandum, The Hartford states:

"There is no evidence that The Hartford engaged in unreasonable conduct in the termination process."

Plaintiff responds:

## V. CONCLUSION

For the foregoing reasons and arguments of law, Plaintiff respectfully asks that the verdict stand.

17

                                        PLAINTIFF
                                        FERRON SHORTER JR.

BY:   /s/ Rachel M. Baird
        Rachel M. Baird
        (ct12131)
        Law Office of Rachel M. Baird
        379 Prospect Street
        Torrington CT 06790-5239
        Tel: (860) 626-9991
        Fax: (860) 626-9992
        E-mail: bairdlawoffice@aol.com

## **CERTIFICATION OF SERVICE**

I HEREBY CERTIFY THAT the foregoing <u>Plaintiff's Memorandum of Law in Opposition to Motion for Judgment as a Matter of Law</u> was mailed, first-class, postage-paid, on September 16, 2005, to:

Margaret J. Strange
Jackson Lewis LLP
90 State House Sq Fl 8
Hartford CT 06103

                                                          /s/ Rachel M. Baird
                                                          Rachel M. Baird