1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER, JR.,              .      Case No. 3:03-CV-00149
                                  .      (WIG)
              Plaintiff,          .
                                  .      Bridgeport, Connecticut
      v.                          .      January 24, 2005
                                  .
HARTFORD FINANCIAL SERVICES .
                                  .
GROUP, INC., ET AL.,              .
                                  .
              Defendants.         .
  .   .   .   .   .   .   .   .   .   .   .   .

                         TRIAL
      BEFORE THE HONORABLE WILLIAM I. GARFINKEL
            UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:            Law Offices
                             By: RACHEL M. BAIRD, ESQ.
                             Stonegate Professional Bldg
                             379 Prospect Street
                             Torrington, CT 06790-5239

For the Defendant:           Jackson Lewis
                             By:  MARGARET STRANGE, ESQ.
                                  JAMES F. SHEA, ESQ.
                             55 Farmington Avenue
                             Suite 1200
                             Hartford, CT 06105

Court Monitor:               MS. SANDRA J. BALDWIN
                             MS. MARIA CORRIETTE


Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1    her house and I just told her, "Look, there are a lot
2    of" -- I'm very germ particular, and I just said, you
3    know, that "If you doing anything with any other guys,
4    that's gonna raise the risk for diseases and everything
5    else" and I just said, you know, "If that's the case,
6    you know, you go your way, I go mine," and that's when
7    the -- you know, she started being persistent and --
8    Q.   What time frame are we talking about now?
9    A.   This is still around September of 2001.
10   Q.   Okay.
11   A.   And at that time, that was the first time --
12   Again, when the phone -- when some other guy called, it
13   was inconsistent with what she was telling me all
14   along, and that was the time when -- the first time she
15   decided, I did not ask, and she e-mailed me the
16   password to her voice mail at work --
17   Q.   And --
18   A.   -- which was --
19   Q.   Do you recall what the password was?
20   A.   Yes, it was her date of birth, "092173."
21   Q.   Okay, and when was that e-mail transmitted, as
22   best you know?
23   A.   Either late September or early, and no later than
24   mid October.
25   Q.   And were you aware of what the purpose of

1   receiving that pass code was?

2   A.    Yeah, she wanted me to check her voice mail.   In

3   other words, her way of proving, saying, you know, "No

4   other guys" -- you know, "I don't talk to any of the

5   guys.   No other guys even have my number, and the ones

6   that did, they don't call me anymore, you can check my

7   messages anytime, and if you ever find one, you know,

8   tell me."

9   Q.    Did you, in fact, use the password in late

10  September when you received it?

11  A.    I don't recall using it at that time.   No.

12  Q.    And what happened --

13  A.    Not -- Might have.   I don't recall.

14  Q.    -- with the relationship after that?

15  A.    We stayed in touch and, you know, we tried to work

16  it out and I was going over there still, pretty much

17  regularly, and it was kind of -- it was causing

18  problems, I mean, as far as uncomfortability, back

19  where I was staying with Cheryl, and the end of October

20  Mary Anne, you know, she became a lot more strong -- a

21  lot more stronger as far as suggesting and recommending

22  me to move into her place, and to be to the exact day,

23  as far as I can remember, it was November 11th, I think

24  it was Veteran's Day when I moved into her apartment.

25  Q.    And when you say you "moved in," did you -- what

1    did you move in with?

2    A.    I brought all of my clothes and basically just the

3    things that -- like I said, my clothes.  Mainly my

4    clothes and everything that was mine.

5    Q.    And that apartment was located in Vernon?

6    A.    Yes, it was.

7    Q.    How many weeks did you live there?

8    A.    Five.  Five weeks.

9    Q.    And during those five weeks, describe what the

10   living atmosphere was in the apartment.

11   A.    I wasn't -- I was very uncomfortable.  She -- We

12   just -- I mean, even in conversations, you know, I was

13   still friends with Cheryl so I would talk to her and

14   she just became very controlling or attempting to

15   control what I do and, you know, whenever we would

16   disagree she began telling me things about how she can

17   -- First threat she gave me was when she can poke my

18   eye out when I was sleeping because I'm --

19   Q.    Why did she say that?

20   A.    Well, she knows I'm blind in one eye and, you

21   know, she -- I mean, just by being a friend and talking

22   to her.  She knows how, as far as me as a person, how

23   cautious I am of my eye, losing, you know, going blind.

24   So she would say things of that nature.

25        She told me that her parents did not like her

1    do with guns or bullets was when, you know, I told her
2    about my eye injury, and that was it.
3    Q.   At some point that week that we've been
4    discussing, January 14 through the 18th, --
5    A.   Yeah.
6    Q.   -- did you again receive Ms. Rhodes' password?
7    A.   Yes.  She called me on the -- that Thursday night
8    she called me and, you know, again asking me -- well,
9    telling me that it's not gonna stop at work, even
10   though she was going away that weekend and -- to her
11   sister's, she told me to her sister's in South
12   Carolina, but I wasn't gonna stop, and that I'm not
13   giving her a fair chance.  I mean, it was the same old
14   thing again.
15        So that night, January 17th, she tried to give me
16   her voice mail code again and Cheryl was there so I
17   hung up.
18   Q.   Where were you when she tried to give you -- her
19   password to you?
20   A.   I was home at Cheryl's house, --
21   Q.   Uh-huh.
22   A.   -- which was home to me at that time, and I told
23   her I would call her back and she said, "Why?", and she
24   said, "Why?  What's Cheryl telling you to do now?", and
25   so I just -- I hung up and of course I didn't call her

1    back, and she called me numerous times throughout the
2    night, but she left a message, probably left a couple
3    of messages, but she left one message and -- not too
4    long after I hung up.  I think I hung up around -- It
5    probably was around 15 minutes or so after I hung up
6    and she said, "You better hurry up f'ing call me back."
7    Q.   And did you call her back?
8    A.   No.
9    Q.   And how did you finally receive the password, if
10   you did?
11   A.   Well, that was Thursday, January 17th, and then
12   the 18th, that next day, I worked.  Of course, she
13   tried to call me in the morning.  I didn't pick up the
14   phone and she came over to my desk, and when she came
15   over, again, she would come over, stand there with her
16   arms folded, staring -- just staring at me, and I would
17   try to ignore her but I knew she wasn't gonna go away
18   and she'd stare at -- stand there with her arms folded,
19   tapping her feet, and my colleagues would see it and I
20   would get up and walk to the caf.
21        That was when she told me that, again, I was being
22   unfair and that, you know, I can't even give her the
23   time of day and things like that and I believe it was
24   that morning when she told me the password, and she
25   just said it to me, because the original password was

1   "092173" and she just said, "It's one digit higher,"

2   because she had changed it.  I don't know when she

3   changed it, but she had changed it from the previous

4   time, and it was from "092173" to "092273."

5   Q.   What was your understanding of what you were

6   supposed to do with that password when you received it

7   --

8   A.   Same --

9   Q.   -- on the eighteenth?

10  A.   -- thing again.  You know, if I have -- If I

11  really don't want to be with her or I choosing not to

12  be with her and I'm not giving her a fair chance, in

13  her words, that that would be one of the ways to prove

14  it.

15  Q.   What would be one of the ways to prove it?

16  A.   If -- You know, obviously if she had guy friends

17  they would call her or -- you know, on her machine and

18  -- as well as going to her house, because she wanted --

19  she had tried to give me another key to her house again

20  too, but I -- of course, I wasn't taking that, and she

21  just wanted to open up everything to show me that I was

22  wrong for not giving her and giving the relationship a

23  chance.

24  Q.   And on January 18th, what hours did you work that

25  day?

1    Q.    All right, and looking at the final statement,

2    sir, the one that you signed, --

3    A.    Right.

4    Q.    -- you knew when the -- when you gave your

5    statement that there was an internal investigation

6    being conducted by the department of special

7    investigations, correct?

8    A.    I just knew that Wardell was asking me questions.

9    Q.    Okay, and in your statement where you say you knew

10    there was an investigation going on; is that accurate?

11    A.    Yes.  I mean, I -- because I knew Wardell was

12    asking me questions, yes.

13    Q.    And then you knew, sir, that the investigation

14    concerned accessing another employee's voice mail,

15    correct?

16    A.    At that time I just knew that he was asking me

17    questions.  I wasn't sure of everything it pertained

18    to, but I was trying to piece it together as he was

19    asking me questions.

20    Q.    Okay.

21          Where it says:

22          "I am aware that an internal investigation is

23          being conducted by the department of special

24          investigations concerning accessing another

25          employee's voice mail."

1      Did you -- Is that accurate?

2    A.   Yes.

3    Q.   Okay.

4    A.   Uh-huh.

5    Q.   Now, sir, you did access another employee's voice

6    mail, didn't you?

7    A.   Yes.

8    Q.   All right, and, sir, you said you accessed it

9    approximately ten to fifteen times?

10   A.   Somewhere around that.  I mean, probably somewhere

11   around that.

12   Q.   All right, and that's what you say in your written

13   statement, ten to fifteen times?

14   A.   Right.

15   Q.   All right, and you testified here today that it

16   was about 20 times?

17   A.   About that, approximately, yes.

18   Q.   All right.

19       When you were looking at those phone records, sir,

20   it appeared that if you had more than one access in a

21   one-minute time frame, you counted that as one access;

22   is that correct?

23   A.   No.  The way that that worked is you log in --

24   It's like two accesses for each time, so, I mean, when

25   I accessed -- when I logged in once at 9:21 for

1   example, on page 1 -- Well, whoever logged in, it

2   wasn't me, I didn't have the password at this time, but

3   when she or whoever was control, on page 1, 1/18/02,

4   see at 9:21? That's one log-in but it's -- it gives

5   four, if you know what I mean.

6   Q.   Okay, and you know that now, sir? Have you -- Are

7   you familiar with these types of records?

8   A.   No, I just know that.

9   Q.   Okay.

10   A.   I mean, actually, I believe I saw a copy of mine

11   but I just -- I mean, I just know that.

12   Q.   Okay, and again, have you ever worked with these

13   types of phone records before?

14   A.   No.

15   Q.   All right.

16      Now, when you accessed Ms. Rhodes' password, you

17   changed it, correct?

18   A.   Correct.

19   Q.   All right, and you -- I think you admit in your

20   statement you changed it two times, correct?

21   A.   Yes.

22   Q.   All right, and you actually changed it four times;

23   is that correct?

24   A.   Three or -- Well, three, but yes, three different

25   times.

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER, JR.,          .     Case No. 3:03-CV-00149
                              .     (WIG)
              Plaintiff,      .
                              .     Bridgeport, Connecticut
      v.                      .     January 25, 2005
                              .
HARTFORD FINANCIAL SERVICES   .
                              .
GROUP, INC., ET AL.,          .
                              .
              Defendants.     .
 .   .   .   .   .   .   .   .   .   .   .

CONTINUED TRIAL
BEFORE THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Law Offices
                            By: RACHEL M. BAIRD, ESQ.
                            Stonegate Professional Bldg
                            379 Prospect Street
                            Torrington, CT 06790-5239

For the Defendant:          Jackson Lewis
                            By:  MARGARET STRANGE, ESQ.
                                 JAMES F. SHEA, ESQ.
                            55 Farmington Avenue
                            Suite 1200
                            Hartford, CT 06105

Court Monitor:              MS. SANDRA J. BALDWIN
                            MS. MARIA CORRIETTE

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1    I talking too much?

2         THE COURT:  That was a yes or no answer --

3         THE WITNESS:  Oh, yes.

4         THE COURT:  Okay.  Next question.

5    BY MS. STRANGE:

6    Q.  Okay.  And were you pleading for reinstatement in

7    -- with The Hartford after February of 2002?

8    A.  Yeah, I was asking for my job back then, too.

9    Yes.

10   Q.  When you met with Mr. Wardell, he -- you provided

11   with -- him with the information that you had accessed

12   Marianne Rhodes' voice mail, right, at work?

13   A.  Yes.  When he asked me, I told him.

14   Q.  Okay.  And that you had changed her pass code?

15   A.  Yes.

16   Q.  Okay.  And he also had that e-mail message that we

17   looked at yesterday, right, that e-mail that said --

18   A.  No.

19   Q.  -- you are a jealous dude?

20   A.  I don't remember being asked about that e-mail.

21   Q.  All right.  Do you know whether he had that e-

22   mail?

23   A.  No.

24   Q.  Okay.

25   A.  I don't believe he did.  I mean, if he did, he

1    didn't ask me about it because I would've explained.

2    Q.    Okay.

3    A.    I was never questioned about it.

4    Q.    All right.  And Mr. Wardell also had that -- a

5    report about a conviction, right?

6    A.    Well, that showed that to me after I was

7    terminated, and I told them that it was wrong.  And

8    like I said, they verified that it was wrong 12 days

9    later.

10    Q.    Okay.  Sir, accessing Marianne Rhodes' voice mail,

11    --

12    A.    Uh-huh.

13    Q.    -- changing her pass code 10 to 15 times, --

14    A.    I --

15    Q.    -- or accessing it 10 to 15 times, changing her

16    pass code twice, and deleting messages, is that the

17    information that you provided to Mr. Wardell?

18    A.    I don't -- First of all, I don't -- we don't -- we

19    did not talk about the deleting messages, but if we

20    did, like I said, I would've told him exactly what I

21    said here today, that they were my messages, and that

22    it was reflecting on her harassing me.

23           That's all it was, and I didn't access her --

24    After that weekend, I did not access her voice mail for

25    myself.  I already knew what was on it.  When the

1    A.   No, I think I did that that one time.

2    Q.   Oh, you just accessed her cell phone once?

3    A.   I'm not -- Yeah, but like I said, I don't

4    remember.  And I might've heard that one before I heard

5    the other one.

6         Like I said, I was just wanted to know -- I wanted

7    to listen to a message that I can show to her that, and

8    hopefully she would leave me alone and stop harassing

9    me from that point.

10   Q.   Well, you already had a message on her phone voice

11   mail that you're going to show her at work, right?

12   A.   Right.

13   Q.   So you were now accessing her cell phone to see

14   maybe if you could find another message to show her?

15   A.   Like I said, I wasn't sure if I had heard that

16   message before.  I don't know.  I don't remember.

17   Q.   All right.  And it's your testimony that you were

18   not angry at all when you're making any of these calls?

19   A.   I had no reason to be angry.  I was trying to

20   connect her, correct.

21   Q.   All right.  Okay.  Now, sir, I just want to be

22   clear.  When The Hartford -- Your employment with The

23   Hartford was terminated, right?

24   A.   Yes.

25   Q.   Okay.  And when your employment was terminated,

1  you knew that you had given the statement to Mr.

2  Wardell, right?

3  A.    Correct.

4  Q.    Right.  And you knew you admitted accessing the

5  voice mail?

6  A.    Correct.

7  Q.    All right.  And you knew that you had admitted

8  changing the pass code, right?

9  A.    Correct.

10  Q.    All right. And you knew -- Now, Marianne Rhodes

11  never told you that you could change her password, did

12  she?

13  A.    I mean, she never said that I couldn't.  When she

14  gave me the password, she said "Whatever you" -- "If

15  you were to find something, do whatever you had to do."

16  Q.    She never told you, you could change her pass

17  code, did she?

18  A.    No, she never said to do it, but like I say, she

19  never said, you know, not to do anything.

20  Q.    Okay.  And The Hartford also had information that

21  you showed you had convictions, right?

22  A.    From what I know at that time, there was a report

23  that I told them was wrong.

24  Q.    Okay.  But they had that report when they talked

25  to you?

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER, JR.,

            Plaintiff,

      v.

HARTFORD FINANCIAL SERVICES

GROUP, INC., ET AL.,

            Defendants.

Case No. 3:03-CV-00149
(WIG)

Bridgeport, Connecticut
January 26, 2005

CONTINUED TRIAL
BEFORE THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:

Law Offices
By: RACHEL M. BAIRD, ESQ.
Stonegate Professional Bldg
379 Prospect Street
Torrington, CT 06790-5239

For the Defendant:

Jackson Lewis
By: MARGARET STRANGE, ESQ.
     JAMES F. SHEA, ESQ.
55 Farmington Avenue
Suite 1200
Hartford, CT 06105

Court Monitor:

MS. SANDRA J. BALDWIN
MS. MARIA CORRIETTE

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

---

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1    Q.   Did anyone ever ask you when it was that you found
2    out when Mr. Shorter changed your password?
3    A.   I believe so.
4    Q.   Who?
5    A.   Lisa Anderson.
6    Q.   What did you tell her?
7    A.   When I got into Florida, I tried to access my
8    voice mail and I couldn't get into it.
9    Q.   And did she ask you if you knew why you couldn't
10   get into it?
11   A.   Yes.
12   Q.   And what did you tell her?
13   A.   I told her that I believe Ferron had changed the
14   password.
15   Q.   Did Ms. Anderson ask you why you didn't tell Mr.
16   Vadney on Friday evening when you learned what was the
17   problem?
18   A.   I don't remember.
19   Q.   Did anyone ever ask you why you didn't convey to
20   Mr. Vadney the nature of the problem?
21   A.   I don't remember.
22        (Pause.)
23   Q.   Did anyone at The Hartford ever discuss with you
24   any allegations that you had gone improperly to Mr.
25   Shorter's desk?

1   A.   I believe when he moved in.

2   Q.   Now, you said for your cell phone.

3        Did you give him your pass code for work as well?

4   A.   I told him I used it for everything.

5   Q.   And why did you give him the pass code?

6   A.   Because he wanted to be able to hear if I was

7   getting messages from other men.

8   Q.   Now, did you ever change your pass code?

9   A.   I tried to change it once.  He had called me and

10  told me he was about to delete the messages, and I

11  tried to get in there and change it because he could,

12  but he had already -- he had already deleted the

13  messages, and had changed it by one number, and I ended

14  up changing it back.

15  Q.   And when was that?

16  A.   It was the end of December.

17  Q.   Now when you were -- When you were dating Mr.

18  Shorter, did you see each other at work?

19  A.   Yes.

20  Q.   Okay, and where was your desk located?

21  A.   I was on the towers, sixteenth floor.

22  Q.   Where was Mr. Shorter's desk?

23  A.   North Plaza.

24  Q.   How close were -- Were those two separate

25  buildings?

1  Q.  All right, and what did he say?

2  A.  He said, "I hope you're happy about lying."

3  Q.  All right, and at that point in time, were you

4  afraid of Mr. Shorter?

5  A.  Yes.

6  Q.  Why?

7  A.  Because when I -- The conversation I had with him

8  during the weekend, when I said that he would be fired,

9  he had made a remark about if he had gotten fired, he

10  would come after me because he would have nothing to

11  lose.

12  Q.  Now, when you went in to work on Monday morning --

13  Strike that.

14      This is your statement, Exhibit 33, right, 533?

15  A.  Yes.

16  Q.  Okay, and who is Lisa Anderson?

17  A.  She is -- She works for the equal opportunity

18  development department.

19  Q.  Okay, and did you provide the information in this

20  statement to Lisa Anderson?

21  A.  Yes, I did.

22  Q.  Okay.  All right, and did you -- did you sign this

23  statement?

24  A.  Yes, I did.

25  Q.  All right, and I won't make you go through all of

1   it.

2       Is the information in this -- in this statement

3   accurate?

4   A.   Yes.

5   Q.   Okay.  Now, did -- did Lisa Anderson offer you any

6   assistance after you gave her this statement?

7   A.   Meaning?

8   Q.   Did she -- When you left the building that night,

9   did anybody go with you?

10  A.   Not the night of the statement.  Ferron wasn't

11  working that day.

12  Q.   Okay.  I'm sorry.  The following day, did anybody

13  go with you?

14  A.   Two days later.  This is after I found out that he

15  was terminated.  I had an escort out to the car.

16  Q.   Okay, and did you also -- did you also go to a

17  meeting with Sharon Courey at some point?

18  A.   Yes, I did.

19  Q.   Okay.  When was that?

20  A.   I believe the 25th, January 25th.

21  Q.   And what happened at that meeting?

22  A.   She went through the -- Gave me the written

23  warning for violating the electronic policy.

24          MS. STRANGE:  Your Honor, may I have one

25  moment, please.

1          THE COURT:  Yes.

2          MS. STRANGE:  I'm sorry; and 530 as well.

3          THE COURT:  Okay.

4    BY MS. STRANGE:

5    Q.  All right.  Now, do you know Mary Anne Rhodes?

6    A.  Yes, I do.

7    Q.  Okay, and have you -- Who is Mary Anne Rhodes.

8    A.  Mary Anne Rhodes first came to see me.  The first

9    time I ever saw her was when she came into my office on

10   January 21st to make a complaint about Ferron Shorter.

11   Q.  Okay.  Had you ever met her before?

12   A.  No, I had not.

13   Q.  All right, and how did this meeting come about,

14   when she came to your office?

15   A.  My recollection is that someone called and asked

16   to have an appointment with me to make some kind of a

17   complaint on the morning of the 21st, and I had some

18   time in the afternoon.

19   Q.  Okay, and that meeting occurred in your office?

20   A.  Yes, it did.

21   Q.  Okay, and how long was the meeting?

22   A.  It was a couple of hours.

23   Q.  All right.  And describe for me, if you will, what

24   happened at that meeting?

25   A.  Mary Anne came into my office.  She sat down.  She

1   was -- She was visibly upset.  She was pale, she was

2   shaky.  She was very soft spoken.  She didn't make eye

3   contact with me.  She was very quiet, almost inaudible.

4        And she told me that -- When she started talking,

5   she threw a lot of stuff at me.  I was taking notes the

6   whole time she was talking, but she would start her

7   sentences and then stop and then go on to another

8   thought.  So she told me a lot of different

9   information.

10       She started off by telling me that she had

11  traveled to Florida over the weekend, that her voice

12  mail password worked before she got on the phone, that

13  it did not work -- excuse me -- before she got on the

14  plane, that it did not work after she got off the

15  plane, that she had spoken to Ferron Shorter who was

16  someone that she had lived with previously, who she had

17  given her password to.  She said she knew it was wrong,

18  but she had given it to him because he was jealous,

19  that he had admitted that he changed it, that he

20  started playing back her work messages for her from her

21  voice mail.

22       It didn't make any sense to me how he could do

23  this because he was explaining what he could do with

24  three-way calling.  I was taking notes.  Essentially,

25  she told me that they had exchanged phone calls over

1   the weekend, that she asked for the password back,

2   asked him to fix it, that he didn't.

3       That she told him that she was going to report him

4   to security and that when she did that, that he

5   threatened her, that he said that if she did report

6   him, that he would lose his job, and if he lost his

7   job, he would have nothing to live for and he would

8   come after her.

9       I asked her if she took this threat seriously and

10  she said she did, and I asked why.  She told me that

11  they had -- that he was very jealous --

12          MS. BAIRD:  Objection, Your Honor.  It --

13          THE COURT:  Overruled.

14          MS. BAIRD:  Okay.

15  A.   She told me that she had a voice mail tape of him

16  berating her on the phone.  She told me that he had

17  bruised her arm in the past and kicked her.  He told --

18  She told me that he had threatened her brother in the

19  past.  She told me that her sister-in-law had called

20  the police on them, the Vernon police, when she

21  overheard them on the phone having an argument, she

22  said that they weren't having the argument at her

23  apartment so that even though when the police came,

24  they weren't there.

25      So those were the reasons why she told me that she

1    was afraid of him.

2    BY MS. STRANGE:

3    Q.   I'm going to show you, although you did well

4    without them, I'm going to show you a document, Exhibit

5    547.

6        I just ask you if these are the notes that you

7    took?

8    A.   Yes.

9    Q.   All right.

10        MS. STRANGE:   I'm going to ask that those be

11   admitted.   I'm going to hand and pass them out to the

12   jury.

13        THE COURT:   Okay.

14   BY MS. STRANGE:

15   Q.   All right.  Now, did -- did you ask Ms. Rhodes any

16   questions?

17   A.   I did ask her some questions along the way, mainly

18   in an attempt to clarify the chronology of what she was

19   telling me.

20        So when she started talking to me, she was

21   throwing a lot of information at me and I was taking my

22   notes as quickly as I could, probably not getting the

23   chronology right.

24        Early on in her complaint to me, I realized that

25   it was a very serious complaint that she was making and

1  it would be my usual practice when someone makes a
2  serious complaint for me to take a statement.
3      So early on when I was listening to her, I
4  determined that I was going to need to take a
5  statement, which was why I was taking the copious notes
6  that I was, so that I -- so that the statement would be
7  in her words.
8  Q.   All right, and you said take a statement from her.
9      What do you mean by that?
10 A.   When someone makes a serious complaint against
11 another employee, it's a matter that needs to be looked
12 into, and it's very important that the employee make a
13 formal statement so that we know exactly what behaviors
14 need to be investigated, and also that the employee
15 sign their name that this is a truthful statement.
16 Q.   Do you have -- In your practice, do you have
17 employees sign their statements under oath?
18 A.   No.
19 Q.   Why not?
20 A.   I wouldn't even know how to do that.  I'm sorry.
21 Q.   That's all right.  Do you take employees' social
22 security numbers?
23 A.   I don't do that, no.
24 Q.   Okay, and at The Hartford, is there a -- are you
25 familiar or were you familiar with that department of

1   special investigations?

2   A.   Yes.

3   Q.   What is the department of special investigations?

4   A.   The department of special investigations is

5   another division, part of the internal audit department

6   at The Hartford, and they are primarily responsible for

7   investigating fraud and other perhaps -- perhaps

8   violence, other wrongdoing in The Hartford that falls

9   outside of a human resources perspective.  So it's a

10  different division under -- it's not part of human

11  resources.

12  Q.   All right, and do you know whether this -- your

13  role -- in human resources, you follow the same

14  practices for taking statements as the department of

15  special investigations?

16  A.   No, we don't.

17  Q.   Do you know what the differences are?

18  A.   At the time when I was in the opportunity

19  development area, we did not notarize the statements.

20  We did not include the social security numbers.  I

21  would always include the address so that the person

22  would identify who they were, and I believe theirs are

23  under oath with a witness; whereas I'll meet with an

24  employee and have the employee sign in front of me.  So

25  I will witness the statement, but I believe the

1   department of special investigations has two witnesses.

2   Q.   Okay.

3   A.   So I think that's the difference.

4   Q.   Now, did you prepare a statement for Mary Anne

5   Rhodes?

6   A.   Yes, I did.

7   Q.   Okay, and when did you prepare that statement?

8   A.   While she was speaking to me on the afternoon of

9   Monday the 21st.

10  Q.   So were you typing up that statement while she was

11  speaking with you?

12  A.   I listened for a while and got it clear in my mind

13  what the chronology of events was and, at some point, I

14  started typing, but I did more listening for probably

15  about the first half hour so I could sort through what

16  she was telling me.

17  Q.   I'm going to show you what's been marked as

18  Exhibit 533.

19      Is that the statement you prepared for Mary Anne

20  Rhodes?

21  A.   Yes, it is.

22  Q.   All right, and did she review it?

23  A.   Yes, she did.

24  Q.   All right.  Did she make any changes to it?

25  A.   Yes, she did.  She was -- I was seated at my desk

1   Anne Rhodes was going to report him for changing her

2   voice mail password.

3   Q.   But Ms. Anderson, isn't it true that Ms. Rhodes

4   didn't complain about anything to you until she showed

5   up at work on Monday and faced the possibility of

6   having another violation of electronic code policy?

7   A.   She reported her complaint to me on Monday, yes.

8   Q.   Yes, and did you ask her why she didn't report it

9   to Mr. Vadney on Friday night, January 18th, 2002, when

10   she found out about it?

11   A.   She told me that she told Mr. Vadney that there

12   was something wrong with her telephone password and

13   that she thought someone had interfered with her

14   ability to access her messages.

15   Q.   So is it your testimony here today that Ms. Rhodes

16   indicated to you that she had no idea on Friday night

17   who had done this to her voice mail?

18   A.   No.   She told me that she knew that it was Ferron.

19   She told me that she did not tell Mr. Vadney on Friday

20   that it was Ferron.

21   Q.   Do you think that that would be an important thing

22   for Ms. Rhodes to report to Mr. Vadney that somebody

23   had control over her voice mail system and she couldn't

24   access it?

25   A.   It would be important to report it.

1    what date you wrote those notes?

2    A.    I wrote this and I can say this with certainty.

3    In preparation for my meeting with David Jimenez, and

4    the reason I say that with certainty is because what

5    you see is an outline where I wrote the word statement,

6    itinerary voice mail logs.  It was a sticky note that I

7    had put on the cover of this document.

8    Q.    Uh-huh.

9    A.    So that when I went in to talk to Mr. Jimenez,

10   that I would be prepared to go through who the people

11   were and what evidence did I collect that would support

12   what Mary Anne had told me.

13   Q.    And that information, demographic information that

14   you collected that's on that exhibit.

15        When did you collect it?

16   A.    I probably collected the demographics on Mary Anne

17   and Ferron on Monday night.  There's a -- As I said

18   before, I attempted to start looking into this as soon

19   as I possibly could with the resources that I had.  One

20   of them is the human resources system that contains

21   that information.

22        So I did what I could on Monday night.  I knew

23   that this matter was going to need to have a level of

24   management look at it.  I knew my boss was out for that

25   week.  I knew I'd be dealing with Mr. Jimenez and that

1    this is what he was going to want to see.

2    Q.   And when did you actually see Mr. Jimenez?

3    A.   Tuesday around 4:00 o'clock.

4    Q.   Did you make any other notes for Mr. Jimenez

5    regarding the demographics of Mr. Shorter and Ms.

6    Rhodes?

7    A.   No.

8    Q.   Did you make other -- any other notations

9    concerning the demographics of Mr. Shorter and Ms.

10   Rhodes for any other reason other than to present to

11   Mr. Jimenez?

12   A.   No, just to present to Mr. Jimenez.

13   Q.   And are those the notes in front of you on

14   Defendant's Exhibit 540 that are the notes that were

15   prepared for Mr. Jimenez?

16   A.   These are the notes that were prepared for Mr.

17   Jimenez.  There is another notation in my notes where I

18   wrote down the demographics.  It was shortly after.  I

19   talked to Mary Anne Rhodes on that Monday.  That is the

20   first time I wrote down the demographics.  I rewrote my

21   notes in preparation for my meeting with Mr. Jimenez.

22   Q.   Okay.  So you wrote down the demographics prior to

23   Monday evening is your testimony now?

24   A.   No.  On Monday evening was the first time I wrote

25   it down.  You will see notations on the demographics in

1    two places in my notes.

2    Q.    Well, let me show you Defendant's Exhibit 545.

3          Are those the notes?

4    A.    Yes.  Yep.

5    Q.    And when did you make those notes?

6    A.    I made these notes right after I talked to Mary

7    Anne.

8    Q.    Oh.  So when you say Monday night, --

9    A.    Monday night.

10   Q.    -- you're talking about 4:30 or 5:00 o'clock?

11   A.    Yes, or later.

12   Q.    So is this a practice that you had in your

13   possession before speaking to Mr. Jimenez or your

14   immediate boss to obtain what you call the demographics

15   to present to them in any case?

16   A.    Yes, it is.

17   Q.    Do you know why that's important?

18   A.    It's important to me because it's the first thing

19   my boss is going to ask for.

20   Q.    Even in a case where there's no allegation that

21   demographics had anything to do with it?

22   A.    I will pull the demographics of every person that

23   I talk to when I worked in EOD.

24   Q.    Now, do you know how The Hartford decides what

25   demographics to pull?

1     A.     No, I don't.

2     Q.     For instance, why is it more important to know

3     somebody's race than their religion?

4     A.     We don't have -- We don't have religion on the

5     system.

6     Q.     Okay, but you have race on the system?

7     A.     We have race on the system.

8     Q.     Why is race on the system and not religion?

9     A.     I don't know.

10    Q.     What is it about race that makes it important to

11    have it on the system?

12            MS. STRANGE:  Objection, Your Honor.  No

13    foundation here as to this witness deciding what goes

14    on the system or what system she's talking about.  I

15    let it go with one question.

16            THE COURT:  I think she said she doesn't know

17    why.  So I'll sustain the objection.

18            MS. BAIRD:  All right.

19            MS. STRANGE:  Thank you.

20    BY MS. STRANGE:

21    Q.     So I'll just end this line of questioning with

22    collecting the demographics is something you do because

23    it's expected?

24    A.     Yes, it is expected that I will put together a

25    comprehensive file on who the complainant is, who the

1    alleged harasser is, and I'll pull that information

2    from a human resources system that is precanned. It

3    isn't something that we created on our own. It's not a

4    home grown system, and that's the information that it

5    has on it.

6    Q.  So, for instance, based on your experience, if you

7    went in to Mr. Jimenez and didn't have that demographic

8    information, he'd say --

9    A.   I would look unprepared.

10   Q.   He'd say, "What race are these people?"  Is that

11   what he would say?

12   A.   He would say, "Who are these people?"

13   Q.   And by who are these people, he'd say, "What race

14   are these people?"

15   A.   I can't -- That would be speculating on my part

16   what he would say if I went in and was unprepared.

17   Q.   But it's not really speculation because in

18   preparation, you put down SBM and SWF?

19   A.   Yes.

20   Q.   So you're -- It's some speculation. You know what

21   he wants and you give it to him?

22   A.   Yes.

23   Q.   Okay, and what he wants is to know the race, the

24   gender --

25   A.   The age.

1  Q.   -- and the marital status of someone.

2  A.   The age.

3  Q.   Okay.

4  A.   The job.

5  Q.   The job, yes.

6  A.   You would absolutely want to go into the human

7  resources system and make sure that these are actually

8  employees that are -- that you're dealing with.

9  Q.   Well, would you agree that knowing somebody's job

10 at The Hartford is related to their work?

11 A.   Yes.

12 Q.   Knowing how long somebody has been at The Hartford

13 is related to their work?

14 A.   Yes.

15 Q.   Knowing their race at The Hartford as related to

16 their work?

17 A.   No.

18 Q.   Do you recall when an individual by the name of

19 Peter Kuck approached you?

20 A.   Peter Kuck never approached me.

21 Q.   Did you have any part in investigating or

22 following up with regard to any complaints that Mr.

23 Kuck had lodged at The Hartford?

24          MS. STRANGE:   Objection, Your Honor.

25          THE COURT:   Well, that's a yes or no.  I'll

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FERRON SHORTER, JR.,                .    Case No. 3:03-CV-00149
                                    .    (WIG)
              Plaintiff,            .
                                    .    Bridgeport, Connecticut
       v.                           .    January 27, 2005
                                    .
HARTFORD FINANCIAL SERVICES .
                                    .
GROUP, INC., ET AL.,                .
                                    .
              Defendants.           .
  .   .   .   .   .   .   .   .   .   .   .   .   .

CONTINUED TRIAL
BEFORE THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Law Offices
                            By: RACHEL M. BAIRD, ESQ.
                            Stonegate Professional Bldg
                            379 Prospect Street
                            Torrington, CT 06790-5239


For the Defendant:          Jackson Lewis
                            By:  MARGARET STRANGE, ESQ.
                                 JAMES F. SHEA, ESQ.
                            55 Farmington Avenue
                            Suite 1200
                            Hartford, CT 06105

Court Monitor:              MS. SANDRA J. BALDWIN
                            MS. MARIA CORRIETTE




Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

```
 1                    DIRECT EXAMINATION

 2   BY MS. STRANGE:

 3   Q.   Good morning.

 4   A.   Good morning.

 5   Q.   Are you -- Where are you currently employed, Mr.

 6   Wardell?

 7   A.   At The Hartford Insurance Company in Hartford,

 8   Connecticut.

 9   Q.   And what position do you hold there?

10   A.   I'm an internal investigator for the company.

11   Q.   How long have you held that position?

12   A.   April 1, I will be there seven years.

13   Q.   So, you were an internal investigation -- internal

14   investigator on January of 2002?

15   A.   Yes, I was.

16   Q.   And, sir, can you just give us a brief background

17   before The Hartford as to your career?

18   A.   Yes.  I was -- I'm a retired law enforcement

19   officer for the department of public safety in

20   Connecticut, the state police, 21 plus years, retired

21   in March of '98, and before that, I had managerial and

22   working positions within the jewelry retail community

23   and graduated from Kings College in Pennsylvania 1971.

24   Q.   And in your years with the Connecticut state

25   police, do you have some investigative experience?
```

1    Rhodes?

2    A.    I spoke to Mary Anne Rhodes the morning of the

3    twenty-third of '02, the morning before I interviewed

4    Ferron Shorter.

5    A.    And what was your purpose in speaking with Mary

6    Anne Rhodes?

7    A.    Because a statement wasn't taken from me, I wanted

8    to ask Mary Anne Rhodes and the statement I had, did

9    she, in fact, is it a truthful statement that she gave.

10   Q.    And who took the statement from Mary Anne Rhodes?

11   A.    Lisa Anderson.

12   Q.    And Lisa Anderson didn't work in your department,

13   correct?

14   A.    Correct.

15   Q.    Now -- And how did Mary Anne Rhodes respond when

16   you met her?

17   A.    Yes.  She said she did and she was truthful.

18   Q.    Did you ask her anything else in that meeting?

19   A.    Yes, I did.

20   Q.    What did you ask her?

21   A.    I asked her if she was in fear of her safety.

22   Q.    And how did she respond?

23   A.    She said she was.

24   Q.    Did you do anything else before meeting with Mr.

25   Shorter?

1    results of a criminal check.

2    Q.   Did you include that in your investigative file?

3    A.   Yes, I did.

4    Q.   All right.  Now, let me just ask you when you

5    conduct investigations, do you generally keep a file?

6    A.   Yes.

7    Q.   Okay, and where do you keep your investigative

8    files?

9    A.   It will be at my desk area and then eventually

10   there are locked cabinets attached to our cubicles,

11   part of our unit.

12   Q.   What type of information do you include in the

13   file?

14   A.   Pertinent information that -- Information that we

15   believe is pertinent to the investigation.

16   Q.   Now, prior to meeting with Mr. Shorter, had you

17   ever -- had you done other investigations for The

18   Hartford?

19   A.   Yes.

20   Q.   And in conducting your investigations, do you

21   generally request written statements?

22   A.   Yes.

23   Q.   Okay, and do you request that those written

24   statements be signed under oath?

25   A.   Yes.

1   Q.   Why do you do that?

2   A.   It's a procedure that is instituted in our office,

3   our unit, that we're requested to do.  So, a procedure.

4   Q.   Is that -- Do you know if that's the same

5   procedure for the EOD investigations?

6   A.   I don't know that.

7   Q.   Do you also ask when you conduct interviews, do

8   you ask for social security numbers?

9   A.   No.

10  Q.   Okay.

11  A.   I take that back, if I may.

12  Q.   Sure.

13  A.   I do ask to verify information.  In doing an

14  employee investigation, I usually preformat that format

15  form and I have access to The Hartford system, it's

16  called PeopleSoft, in which we get all their personal

17  information.

18       So, I type in their name, their date of birth,

19  their social security number.  So, the question, of

20  course was strange that you asked me was, did I ask --

21  I guess I already had it, but I would have asked Mr.

22  Shorter, is this the correct social.  So, they answer

23  is yes.  I'm sorry.

24  Q.   Now, when did you meet with Mr. Shorter?

25  A.   Shortly after noontime, the best I can recall, on

1    the morning -- on the date of the 23rd, '02, of

2    January.

3    Q.    And where did you meet with him?

4    A.    I met with him in, we have a conference table in

5    our cubicle area on the 15th floor of the Tower

6    Building at The Hartford Insurance Company off Asylum

7    Street in Hartford, Connecticut.

8    Q.    How did it come about that Mr. Shorter -- Strike

9    that.

10         Did you ask Mr. Shorter to come to this meeting?

11   A.    Yes.

12   Q.    And when did you ask him?

13   A.    Shortly before then, I -- Shortly before that.

14   Q.    And where was he when you asked?

15   A.    He was at his desk area.

16   Q.    And describe -- did you approach him at his desk

17   area?

18   A.    Yes.

19   Q.    Describe for me what you said.

20   A.    To the best I can recall, I walked up to him, told

21   him I -- introduced myself to -- who I was.  I

22   explained to him that I had some questions to ask of

23   him and I would explain what I needed to talk to him if

24   we could come back to my location, my floor, in which I

25   would be able to ask him those questions.

1   Q.   And then did you go back to your location?

2   A.   Yes.

3   Q.   And describe for me, do you have a closed office

4   at The Hartford?

5   A.   There are doors that could close.  It's a separate

6   wing on the 15th floor.  It's just a room off to the

7   side.  There are other sections like that throughout

8   the company, but it's just -- there's two doors and it

9   opens up into cubicles where investigators that work

10  for the company sit.

11  Q.   And did you meet with Mr. Shorter in a cubicle?

12  A.   I met him at a conference room table, which is

13  nothing more a larger cubicle, but there's a conference

14  room-type table there.

15  Q.   Now, describe for me what Mr. Shorter's demeanor

16  was in this meeting.

17  A.   Cooperative.

18  Q.   And did you ask him questions?

19  A.   Yes.

20  Q.   All right.  What types -- What did you ask him?

21  A.   Initially, when he did come to the floor, I

22  explained to him that my investigation had to do with

23  misconduct concerning a -- he being possibly accessing

24  another employee's Hartford voice mail, and that by

25  accessing it, changing of the password, deleting of

1    messages, affecting that employee from not being able

2    to receive messages.

3    Q.    And did -- how did Mr. Shorter respond to you?

4    A.    Mr. Shorter said, yes, I did and I'd like to

5    explain to you why.

6    Q.    And what did he tell you?

7    A.    As best I can recall without referring to my

8    statement here, if I had it here, he admitted that he

9    did access Mary Anne Rhodes' voice mail.  He accessed

10   it because she had given him her password and he

11   accessed it because he wanted to see messages to see if

12   she was with other gentleman and he was going to prove

13   to her that if there were messages there, he's going to

14   prove to her that she was lying to him.

15        So, he admitted to me that when he accessed her

16   voice mail, he saw that there were messages, he saved

17   those -- saved some of those messages and wanted to

18   play them back to her so he could prove to her that she

19   was lying and in order to prevent her from erasing

20   those messages, he was going to change the -- her

21   Hartford password to get those messages.

22   Q.    Did you ask him whether he deleted any messages?

23   A.    Yes.

24   Q.    And how did he respond?

25   A.    He responded best I remember, no.

1   A.   No.

2   Q.   Did you think it was important to have it

3   notarized or taken under oath so that she understood

4   the import of the statement that she was making?

5   A.   No.

6   Q.   Did you think it was important to have it

7   notarized or taken under oath so that she understood

8   that her continued employment was contingent on her

9   truthfulness?

10  A.   No.

11  Q.   But, in fact, isn't every Hartford's employee

12  continued employment contingent on their truthfulness

13  to an investigator such as yourself?

14  A.   All I can tell you from the unit that I work in,

15  that when we conduct investigations and we interview

16  employees, that is the statement that we read to

17  employees, that's the sentence that we read to

18  employees.

19       So, I can't answer to you what The Hartford does,

20  what other entities of The Hartford does, but I believe

21  --

22  Q.   But, Mr. Wardell, you, yourself took a statement

23  from Ms. Rhodes that day, January 23rd, 2002; did you

24  not?

25  A.   From Ms. Rhodes?

1  Q.   What information do you request?

2  A.   Well, I expect investigators to collect certain

3  vital information that relates to the employees that

4  they are investigating or questioning and to have that

5  as part of their intake process and to do that,

6  frankly, universally.

7  Q.   Okay, and what information do you ask

8  investigators to provide to you?

9  A.   Well, I want to have basic information about the

10  employee's name, their job, their tenure with the

11  company, the position they hold, their demographic

12  information and their tier level in the company.

13  Q.   And when you say, "demographic information," what

14  are you referring to?

15  A.   Their race and gender.

16  Q.   And why do you want an employee's race and gender

17  when you're receiving this information?

18  A.   Well, the equal opportunity development department

19  has at its core, the responsibility to investigate

20  complaints of harassment and complaints of

21  discrimination, and in those kinds of matters, it's

22  vitally important that we know the demographics of the

23  employees that are involved in those kinds of a

24  investigations to see whether the conduct at issue, the

25  employment action taken by a manager or by a coworker

1    may have in any way been associated with the

2    demographics of the individuals. So, you have to have

3    that information up front.

4    Q.    Now, did you meet with Ms. Anderson regarding Mr.

5    Shorter?

6    A.    Yes, I did.

7    Q.    Okay, and when did that occur?

8    A.    Mid to late January of 2002.

9    Q.    When you had this meeting with Ms. Anderson, where

10    was the meeting?

11    A.    It was in my office.

12    Q.    When you had this meeting with Ms. Anderson, did

13    you know Mary Anne Rhodes?

14    A.    No, I did not.

15    Q.    And you didn't know Mr. Shorter?

16    A.    Correct.

17    Q.    Okay, and tell me what did Ms. Anderson tell you

18    in this meeting?

19    A.    Well, she told me that Ms. Rhodes had come to her

20    and made a complaint against Mr. Shorter. She said

21    that Ms. Rhodes reported being in a on-again/off-again

22    relationship with Mr. Shorter; that she feared Mr.

23    Shorter; that Mr. Shorter had obtained her voice mail

24    password, had used that password to access her work

25    voice mail, had deleted messages and had prevented Ms.