```
                UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT

FERRON SHORTER, JR.,            :

     Plaintiff,                 :

        vs.                     :    No. 3:03cv0149(WIG)

HARTFORD FINANCIAL SERVICES     :
GROUP, INC.,
                                :
     Defendant.
-------------------------------X
```

### RULING ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

Following the entry of judgment in favor of plaintiff, Ferron Shorter, Jr., on his claims of race and gender discrimination and negligent infliction of emotional distress, defendant, The Hartford Financial Services Group, Inc., has renewed its motion for judgment as a matter of law **[Doc. # 161]**, pursuant to Rule 50(b), Fed. R. Civ. P.  For the reasons set forth below, defendant's motion will be granted in part and denied in part.

### Standard

Judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving party]." Merrill Lynch Interfunding, Inc. v. Argenti, 155 F.3d 113, 120 (2d Cir. 1998) (quoting rule 50(a)(1), Fed. R. Civ. P.).  "Stated differently, judgment as a matter of law must be granted when, under governing law, there can be but one reasonable conclusion as to the verdict."  9 James

Wm. Moore et al., Moore's Federal Practice § 50.60[1] (3d ed. 2005); see also Caruso v. Forslund, 47 F.3d 27, 32 (2d Cir. 1995). Where the movant challenges the sufficiency of the evidence, the Court must view all of the evidence in the light most favorable to the non-movant, and grant that party every reasonable inference that the jury might have drawn in his favor. Samuels v. Air Transp. Local 504, 992 F.2d 12, 14 (2d Cir. 1993). Moreover, "[i]n ruling on a motion for judgment as a matter of law, the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury." Williams v. County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999).

After a jury has deliberated and reached a verdict, the movant's burden in securing relief under Rule 50(b), Fed. R. Civ. P., is particularly heavy. Cross v. New York City Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005). It is not sufficient for the moving party to convince the court that it should have prevailed at trial. The district court may set aside the verdict only where

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that

>     reasonable and fair minded [persons] could
>     not arrive at a verdict against [it].

Cruz v. Local Union No. 3 Int'l Bhd. Elec. Workers, 34 F.3d 1148, 1154 (2d Cir. 1994) (internal citations and quotation marks omitted) (alterations in original).

## Discussion

### I. Plaintiff's Claims of Race and Gender Discrimination

Characterizing its conduct as "lawful differentiation" as opposed to "unlawful discrimination," defendant contends that it is entitled to judgment as a matter of law on plaintiff's claims of race and gender discrimination.[1]  (Def.'s Mem. at 1.) Defendant argues that it demonstrated at trial -- and plaintiff conceded -- that there was a legitimate, non-discriminatory reason for his termination, *i.e.*, his violation of the company's electronic communications policy and code of conduct.  Thus, defendant argues, plaintiff was required to show that this reason was pretextual and that defendant intentionally discriminated against him based on his race or gender.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

Defendant asserts that plaintiff attempted to carry that burden by comparing his punishment of discharge to the lesser punishment, a written warning, given to Mary Anne Rhodes, a white

---

[1] Plaintiff brought these claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1981 (racial discrimination), and Connecticut's Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60, et seq.

3

female, who also violated the company's electronic communications policy.  Defendant argues that, because Ms. Rhodes' infraction was not as serious as that of plaintiff, they were not "similarly situated"[2] and, thus, this comparative evidence cannot support an inference of discrimination.  (Def.'s Mem. at 5.)  Defendant maintains that it lawfully "differentiated" between plaintiff and Ms. Rhodes "by calibrating the discipline to the level of each person's culpability."  (Id. at 6 & 9.)  Moreover, defendant argues, plaintiff failed to provide any evidence that his race or sex played a role in his termination and, thus, his discrimination claims must fail as a matter of law.  (Id. at 14.)

Defendant's arguments, however, overlook several crucial pieces of evidence from which the jury reasonably could have concluded that plaintiff and Mary Anne Rhodes were similarly

---

[2] Once a defendant offers a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to prove that the defendant intentionally discriminated against him in its employment decision. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000).  A plaintiff may attempt to prove that the defendant's proffered reason for its employment decision was not the real reason but was a pretext for discrimination by showing that the defendant treated "similarly situated" employees of a different race or gender more favorably than the plaintiff. Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000).  To be "similarly situated," the individual(s) with whom the plaintiff compares himself "must be similarly situated in all material respects." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997).  The plaintiff must establish "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical," and their acts must be "of comparable seriousness." Graham, 230 F.3d at 40.

situated and that plaintiff's race and gender were motivating factors in the company's decision to terminate him.

First, plaintiff introduced evidence through defendant's own witnesses and documents that it was company policy that any employee who shared his or her password with another person would be responsible for that person's actions using the password. Sharon Ann Courey, a Human Resources Generalist with The Hartford, testified that an employee sharing his or her password was accountable for any actions taken by a person using that password. (1/25/05 Tr. at 221.)[3]  Additionally, Ms. Rhodes

---

[3] Ms. Courey testified that the purpose of The Hartford's electronic communications policy was

> to secure The Hartford overall. . . . [E]mployees are not supposed to give out their password to anyone, and that includes phone mail, especially e-mail because we do deal with very secure financial information, and we want to keep that financial integrity.  So that is one of our policies.  You just – You don't give out your password.

(1/25/05 Tr. at 220-21.)  She quoted from the electronic communications policy (Ex. 527), which provided:

> "Use your log-on I.D. for purposes only as authorized by your management.  As the registered owner of the log-on I.D., you are accountable for all actions initiated under it."

(Id. at 221.)  She further testified:

> Q.  So in terms of Ms. Rhodes and her providing her password to another individual, what was her responsibility with regard to the use of that password?
>
> A. . . . Per the policy, employees are expected to keep their passwords to themselves, and not to share them.

herself acknowledged that defendant's electronic communications policy, which Ms. Courey had discussed with her, specifically provided that "[p]asswords must never be shared or revealed to anyone else besides the authorized user. . . . To do so, exposes the authorized user to responsibility for actions that the other party takes with the password."  (1/26/05 Tr. at 31; Ex. # 534.)

Although defendant maintains that it did, in fact, hold Ms. Rhodes responsible for sharing her password by issuing to her a written warning,[4] the jury could have reasonably concluded, based on defendant's own written policy and the testimony of its employees, that Ms. Rhodes should have been held fully accountable for the actions taken by plaintiff and, thus, the two were "similarly situated" for comparison purposes.

Second, plaintiff's case was not limited to a comparison of

---

>    Q.  And if they do share them, are they accountable for any actions taken using that password?
>
>    A.  Yes.

(Id.).

[4]  As plaintiff's counsel pointed out in her closing argument, the "warning" that was issued to Ms. Rhodes did not even address her giving plaintiff her voice mail password.  The subject line reads "WARNING OF IMPROPER EMAIL/INTERNET USE."  (Ex. # 534.)  Additionally, in terms of punishment, it merely stated:

>    If other incidents of this type occur in the future, further disciplinary action, up to and including termination may occur.

(Id.) (emphasis added).

6

the disparity in punishments that he and Ms. Rhodes received. Plaintiff also produced substantial evidence that the infractions of company policy were selectively and discriminatorily investigated.  One set of rules applied to defendant's investigation of Mr. Shorter, a black male; another set of rules applied to its investigation of Ms. Rhodes, a white female, both of whom had violated the company's electronic communications policy and both of whom had charged the other with harassment.

The first page of the investigative notes of Lisa Anderson, Consultant with The Hartford's Equal Opportunity Development Department and a key player in the investigation and decision-making process, refer to plaintiff as "S,B,M," [single, black, male], and to Ms. Rhodes as "S,W,F," [single, white, female]. (Ex. # 540.)  Ms. Anderson testified repeatedly that she had pulled this information from the human resources information system in preparation for her meeting with David Jimenez, Vice President of Employee Relations, because the first thing he was going to ask was the demographics of the individuals involved. (1/26/2005 Tr. at 150-52.)[5]

---

[5] Lisa Anderson testified on direct examination:

Q. All right, and what was your purpose in meeting with David Jimenez?

A. I had spent significant time on Monday evening after Mary Anne left, and on Tuesday, all day, corroborating what I could about her statement, and it was time to talk to Ferron Shorter, and . . . I would

7

not have done that unless I talked to my boss first to state, okay, this is – these – this is what we have in terms of the investigation. . . . We viewed this as a serious offense . . . .

. . . .

Q. Okay, and did [Mr. Jimenez] have certain expectations when you called him?

A. Absolutely.

Q. And what were his expectations?

A. I knew that if I were to bring this matter to David Jimenez' attention, that it would have to be in good order. I would have to be able to sit down and go through the complaint in a succinct fashion. <u>But I also knew that the first thing he was going to ask me was what are the demographics of the individuals involved</u>. So to prepare for my meeting with David Jimenez on Tuesday, I went to our human resources system, which I have full access to, and I pulled Ferron Shorter's demographics from our human resources system as well as Mary Anne's.

Q. Okay, and what did those demographics show?

A. That he was a single, black male, developer who worked in the – I forget the name of the department that he worked in and that he had been with the company probably about twelve years at the time. So I told you, you know, the race, gender, marital status, and that the job title I believe is supervisor.

Q. And what did Mary Anne Rhodes' demographic show you?

A. That she was a single, white female. I don't remember – I don't remember their ages, that she was – she worked in the finance division and I believe I wrote down the name of her supervisor as well. And that would be standard procedure if I was going to go in and have a meeting with David Jimenez. <u>It was going to be the first thing he was going to ask me.</u>

8

Defendant attempted to explain these notations as standard demographic information.  "[A]ny competent Human Resources professional is mindful of key demographic information in making an important employment decision."  (Def.'s Reply Mem. at 9 n.6.) But, plaintiff's counsel argued to the jury, and the jury could have concluded, that there was no <u>legitimate</u> reason for the race

---

(1/26/2005 Tr. at 150-52 (emphasis added).)  And, on cross-examination concerning her hand-written notes, she reconfirmed,

> Q.  And that information, demographic information that you collected that's on that exhibit [540].  When did you collect it?
>
> A.  I probably collected the demographics on Mary Anne and Ferron on Monday night. . . . As I said before, I attempted to start looking into this as soon as I possibly could with the resources that I had.  One of them is the human relations system that contains that information. . . . I knew I'd be dealing with Mr. Jimenez and that <u>this is what he was going to want to see.</u>

(<u>Id.</u> at 196-97 (emphasis added).)

Ms. Anderson then testified that she had first made a notation as to the demographics shortly after she spoke with Mary Anne Rhodes on Monday.  (<u>Id.</u> at 198, referencing Ex. 545.)

> Q.  So is this a practice that you had in your possession before speaking to Mr. Jimenez or your immediate boss to obtain what you call the demographics to present to them in any case?
>
> A.  Yes, it is.
>
> Q.  Do you know why that's important?
>
> A.  It's important to me because <u>it's the first thing my boss is going to ask for.</u>

(<u>Id.</u> (emphasis added).)

9

and gender of the parties to have played a role in defendant's investigation. Instead, the jury could have reasonably concluded that this "key demographic information" did indeed play a role in defendant's investigation and decision-making process - a discriminatory role.

Throughout the trial, plaintiff presented evidence concerning the disparity in defendant's investigation of plaintiff, a twelve-year employee of the company, as compared to its investigation of Ms. Rhodes, a three-year employee with a prior record of a violation of the company's electronic communications policy. There was substantial evidence that defendant vigorously investigated Ms. Rhodes' claims against plaintiff, but did not even look into plaintiff's charges that he had been subjected to harassment in the workplace by Ms. Rhodes,[6] even though plaintiff's claims were corroborated by another employee.[7] The jury also eventually learned that it was

---

[6] Plaintiff testified at length concerning Ms. Rhodes' harassing conduct at work, which was commented on by his co-workers. (See, e.g., 1/24/05 Tr. at 114-17, 122, 127, 133-34, 136-37, 141, 148-50.)

[7] Maurice Kuck, who worked with plaintiff, testified that he observed the harassment by Ms. Rhodes and that he reported this to Jennifer Haber in Human Resources, who told him to go to corporate security. Mr. Kuck then spoke with Mr. Wardell, the same person who conducted the investigation of plaintiff, and provided him with a written statement, but no further investigation of these charges of workplace harassment by Ms. Rhodes was ever made. (1/25/05 Tr. at 181-91; Ex. # 505, Bates ## 736-737.)

10

plaintiff who finally obtained a restraining order against Ms. Rhodes. (1/26/05 Tr. at 19.)

Plaintiff testified that defendant, in the course of its investigation, did a criminal background check on plaintiff, inquired as to whether he owned a gun, demanded that he provide his written statement under oath, told him that he could not speak to anyone about his statement, informed him that his employment was contingent on these demands, as well as the truthfulness of his statement.  (1/24/05 Tr. at 198, 200, 204, 205, 206.)  Plaintiff described his two and one-half hour interview with Investigator Wardell as an "interrogation," after which he was immediately fired.  (Id. at 198, 208, 210.)  In contrast, Ms. Rhodes testified that no one at The Hartford ever discussed with her obscene voice mail messages she had left on plaintiff's voice mail at work or the personal e-mails she sent him at work; she was not required to swear under oath to the truth of her written statement; no one ever told her that her continued employment was contingent on her truthfulness in her written statement, nor was she instructed not to discuss her statement with anyone; no one inquired if she had any criminal convictions; and defendant made no investigation whatsoever of plaintiff's complaints that she had been sexually harassing him at work or leaving obscene voice mail messages for him at work.  (1/26/05 Tr. at 21-23; see also Testimony of Richard Wardell,

11

1/27/2005 Tr. at 71.)  Defendant's investigator reviewed and copied all of plaintiff's e-mails, including e-mails with other women outside of work who were not involved with this matter. However, he did not check or copy Ms. Rhodes' e-mails. (1/27/2005 Tr. at 21, 32, 58-60.)

The jury could have reasonably inferred that this aggressive investigation of Ms. Rhodes' complaints about plaintiff was precipitated by a rush to judgment by Lisa Anderson in Human Relations based upon her gender-based and racial stereotyping of Ms. Rhodes as the innocent white, female victim, and plaintiff as the black, male aggressor.  See generally Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 125 n.16 (2d Cir. 2004) (involving sexual stereotyping).  Indeed, in an effort to authenticate Ms. Rhodes' story that she feared plaintiff, Ms. Anderson's investigation went far beyond the workplace and delved into personal matters unrelated to work.  For example, one of the first things mentioned in Ms. Anderson's report concerned a three-week-old tape-recorded message left by plaintiff for "Scott," a former boyfriend of Ms. Rhodes, on Scott's home message machine.  (1/26/05 Tr. at 69.)  Although Scott was not employed by defendant and had nothing to do with plaintiff's violation of the electronic communications policy, a substantial portion of Ms. Anderson's investigative notes are devoted to this three-week-old personal and out-of-work message left by plaintiff

for Scott.  (Ex. ## 543, 545, 546.)

Another Hartford employee went so far as to take Ms. Rhodes to the Vernon police station to file a complaint about plaintiff. (1/26/05 Tr. at 71.)  Yet, Christopher Hammock, from the Vernon Police Department, testified that he talked with Ms. Rhodes and found no threat of violence in her case.  (1/26/2006 Tr. at 210-11; Ex. # 13.)  The police report states, "The employer suggested she report that he may have alluded to getting back at her for making a complaint although no specific threat was made to her." (Ex. # 13.)  Ms. Anderson went so far as to invite Ms. Rhodes to call her at any time and "even to have lunch in a week or so." (Ex. # 542.)  Plaintiff, on the other hand, was immediately terminated as soon as he admitted to having changed Ms. Rhodes' password.  Clearly, The Hartford's investigations of the two "subjects," Ms. Rhodes and plaintiff, was handled in significantly different manners.

Third, although defendant drew a distinction between the relative seriousness of plaintiff's and Ms. Rhodes' violations of its electronic communications policy, the policy statement itself drew no such distinction.  The policy simply listed examples of violations.  (1/26/95 Tr. at 215-16.)  Plaintiff violated the policy by using Ms. Rhodes' password to access her voice mail at work.  Ms. Rhodes violated the policy by providing her password to plaintiff.  Plaintiff, a twelve-year employee of the company,

13

and a black male, was terminated; Ms. Rhodes, a three-year employee of the company, a white female with a history of a prior violation, was given only a written warning.

Fourth, while defendant repeatedly argues that plaintiff's violation was the more serious because it impeded company business, the jury could have concluded that Ms. Rhodes' violation was equally egregious.  The jury could have concluded that Ms. Rhodes also interfered with company business in that by giving plaintiff, an unauthorized user, her password, she had compromised the security of the office voice mail system and had done so at a time when her boss had expressly conditioned her taking time off on her being able to check her voice mail for work-related messages that he might need to leave for her. (1/27/2005 Tr. at 27-30.)

Fifth, the jury could have considered the disparity in defendant's treatment of plaintiff's and Ms. Rhodes' explanations for their conduct as evidence of discrimination.  Plaintiff testified that he accessed Ms. Rhodes' voice mail for purely personal reasons, to prove to her that their relationship would not work because she was seeing other men.  He also testified that the only messages he deleted were ones that he himself had left for her.  (1/24/2005 Tr. at 106, 143, 173.)  Ms. Rhodes likewise testified that her motivation for giving plaintiff her password was purely personal, to prove to plaintiff that she was

not getting phone calls from other men.  (1/26/2005 Tr. at 41.)
Defendant readily accepted Ms. Rhodes' explanation as to why she
gave plaintiff her password - to quell his jealousy - but ignored
his justification for what he had done - to quell his
relationship with her.

Based on the foregoing, when the evidence is viewed in the
light most favorable to plaintiff with all reasonable inferences
drawn in plaintiff's favor, the Court cannot conclude that there
was "no legally sufficient evidentiary basis for a reasonable
jury to find" that plaintiff's gender and race were motivating
factors in defendant's employment decisions, Merrill Lynch
Interfunding, 155 F.3d at 120, or that there was such a "complete
absence of evidence supporting the jury's verdict that the jury's
findings could only have been the result of sheer surmise and
conjecture."  Cruz, 34 F.3d at 1154.  Accordingly, the Court
denies defendant's motion for judgment as a matter of law on
plaintiff's claims of race and gender discrimination.

## II.  Negligent Infliction of Emotional Distress

Defendant next argues that the jury's verdict in favor of
plaintiff on his claim of negligent infliction of emotional
distress must be set aside because there was no evidence that
defendant engaged in unreasonable conduct in the termination
process.  See Perodeau v. City of Hartford, 259 Conn. 729, 747
(2002).  Plaintiff has not responded to this argument in her

opposition brief.  See Pl.'s Mem. at 17.

Following the Connecticut Supreme Court's decision in Perodeau,[8] the law is well-settled in Connecticut that, in an employment setting, the tort of negligent infliction of emotional distress is limited to conduct occurring during the termination process.  259 Conn. at 754.  The dispositive issue is whether the defendant's conduct during the termination process was sufficiently wrongful that the "defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm."  Parsons v. United

---

[8] In Perodeau, the Connecticut Supreme Court held that, for policy reasons, an individual employee "may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment."  259 Conn. at 744.  The rationale was that subjecting employers to lawsuits for negligent infliction of emotional distress would have a "pervasive chilling effect" that would "outweigh[] the safety interest of employees in being protected from negligent infliction of emotional distress."  Id. at 758.  "[I]n light of the inherently competitive and stressful nature of the workplace and the difficulties surrounding proof of emotional distress, extending the tort of negligent infliction of emotional distress to ongoing employment relationships would open the door to spurious claims."  Id.

Therefore, this Court has repeatedly recognized, that "after Perodeau, only conduct occurring in the process of termination can be a basis for recovery for negligent infliction of emotional distress in the employment context."  Brunson v. Bayer Corp., 237 F. Supp. 2d 192, 208 (D. Conn. 2002); see also Antonopoulos v. Zitnay, 360 F. Supp. 2d 420, 429 (D. Conn. 2005) ("Recovery for negligent infliction of emotional distress is limited to the termination process itself, not conduct preceding that discharge. . . .").

16

Techs. Corp., 243 Conn. 66, 88 (1997); see also Morris v. Hartford Courant Co., 200 Conn. 676, 683 (1986); Montinieri v. Southern New England Tel. Co., 175 Conn. 337, 345 (1978); Olson v. Bristol-Burlington Health Dist., 87 Conn. App. 1, 6 (2005), pet. for cert. granted, 273 Conn. 914 (Mar. 11, 2005).

There is no question in this case that plaintiff was terminated. The sole issue raised by defendant's motion is whether there is any evidence in the record to support the jury's finding that plaintiff was subjected to conduct occurring during the "termination process" that was sufficiently egregious to sustain a negligent infliction of emotional distress claim.

Plaintiff testified that, on the day of his termination, he was sitting at his desk in an open work area. (1/24/2005 Tr. at 194.) Someone from security came to his desk, interrupted his work, and demanded that he follow him. Investigator Wardell interrogated him for two hours and one-half hours (Id. at 198, 208), with Ms. Anderson sitting on the other side of the partition listening in on the interrogation. (It is not clear whether plaintiff was aware of her presence or not.) Plaintiff was wrongfully accused of having a criminal conviction, he was asked about owning a gun, and he was accused of making threats of violence against Ms. Rhodes. (Id. at 199, 211.) He was told that his continued employment was conditioned upon his telling the truth, which it appears that he did. (Id. at 199.)

Nevertheless, he was immediately terminated without any opportunity to retrieve his personal belongings.  (Id. at 210, 215.)  He asked if he could speak with someone about his termination and was told "no."  (Id. at 215.)  A security guard then came in, grabbed his arm, and walked him in front of several people to the elevator.  (Id.) He was then escorted out of the building by security – something he had never seen happen to anyone before in his thirteen years of employment with defendant. (Id. at 218.)  He was not allowed to go back to his desk to obtain his personal belongings, and when he contacted defendant about reconsidering its decision and reinstating him, his requests were denied.  (Id. at 99.)

Clearly, the evidence presented at trial paints a picture of a very unpleasant and uncomfortable situation for plaintiff. That plaintiff was upset by his treatment by his employer of thirteen years is understandable.  Plaintiff called defendant repeatedly over the next few days and weeks seeking reinstatement but his requests were denied.

Nevertheless, given the substantive law of Connecticut, which is controlling in this case, the Court must agree with defendant that, even after all of the evidence is viewed in the light most favorable to plaintiff and all reasonable inferences are drawn in his favor, there is no legally sufficient basis to support the jury's finding of liability on the part of defendant

for negligent infliction of emotional distress.

This court has previously held that the fact that a plaintiff, following her discharge, was escorted out of the building without an opportunity to clean out her desk was insufficient to establish unreasonable conduct in the termination process. Davis v. Liberty Mut. Ins. Co., 218 F. Supp. 2d 256, 263-64 (D. Conn. 2002); see also Meola v. Eagle Snacks Corp., No. CV 960384760, 2000 WL 1342561, at *5-6 (Conn. Super. Ct. Sept. 6, 2000) (granting summary judgment on a plaintiff's negligent infliction of emotional distress claim where the plaintiff alleged that he was "given ten minutes to get his things and leave the office; was escorted from the premises by a security guard; when he asked for his check, [his supervisor] wrote him a check and threw it at him; the defendant refused to pay him a bonus or for vacation; and he had to leave behind a number of his personal belongings"). In Cavuoto v. Oxford Health Plans, Inc., No. 3:99cv446(EBB), 2000 WL 888263, at *8 (D. Conn. June 22, 2000), this court found that there was nothing unreasonable or socially intolerable in plaintiff's termination even though she was not allowed to retrieve her personal belongings on her own. And, in Parsons, 243 Conn. at 89, the Connecticut Supreme Court held that it is not patently unreasonable for an employer to remove a discharged employee from the premises under a security escort.

The evidence does not support the jury's finding that the defendant's conduct during the termination process was sufficiently wrongful that the "defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm."  Parsons, 243 Conn. at 88.  Therefore, the Court grants defendant's motion for judgment as a matter of law on plaintiff's claim of negligent infliction of emotional distress.

## Conclusion

As discussed above, the Court grants defendant's motion for judgment as a matter of law **[Doc. # 161]** as to plaintiff's claim of negligent infliction of emotional distress but denies it as to plaintiff's claims of race and gender discrimination.  This ruling, however, does not affect the judgment of $516,963.57, entered by the Court on July 15, 2005.  Any damages awarded by the jury on plaintiff's claim of negligent infliction of emotional distress were also recoverable on plaintiff's claims of race and gender discrimination.

SO ORDERED, this   6th   day of   December   2005, at Bridgeport, Connecticut.

>      /s/ *William I. Garfinkel*
> WILLIAM I. GARFINKEL,
> United States Magistrate Judge